PETITION FOR WRIT OF HABEAS CORPUS
UNDER 28 U.S.C. SECTION 2254

Prisoner's Name:          Jamil Abdullah Al-Amin

Prisoner's Number:        Register No. 99974-555

Place of Confinement:     USP CANAAN (Waymart, Pennsylvania)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| JAMIL ABDULLAH AL-AMIN, <br><br> Petitioner, <br><br> v. <br><br> DAVID EBBART, Warden, and HOMER BRYSON, Commissioner, Georgia Department of Corrections, <br><br> Respondents. | CIVIL ACTION NO. 1:12-CV-1688-AT-GGB <br><br> HABEAS CORPUS 28 U.S.C. § 2254 |

## THIRD AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

Miles J. Alexander (Ga. Bar 009000)       KILPATRICK TOWNSEND & STOCKTON LLP
A. Stephens Clay (Ga. Bar 129400)         1100 Peachtree Street, Suite 2800
C. Allen Garrett Jr. (Ga. Bar 286335)     Atlanta, Georgia 30309-4528
Ronald L. Raider (Ga. Bar 592192)         Telephone: (404) 815-6500
                                          Facsimile: (404) 815-6555

*Attorneys for Petitioner Jamil Abdullah Al-Amin*

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ..................................................................2

II.   SUMMARY OF MR. AL-AMIN'S HABEAS CLAIMS .............................3

    A.   Mr. Al-Amin's Fifth Amendment Claim ...............................3

    B.   Mr. Al-Amin's Confrontation Clause Claim ........................8

    C.   Mr. Al-Amin's Ineffective Assistance Claim .....................11

    D.   Mr. Al-Amin's Brady Claim and Request for Discovery .................13

    E.   The Relatedness of Mr. Al-Amin's Constitutional Claims.................16

III.   HISTORY OF PROCEEDINGS ..................................................16

IV.   FACTS RELEVANT TO MR. AL-AMIN'S HABEAS CLAIMS...............21

    A.   After Achieving Notoriety as H. Rap Brown in the 1960s, Mr. Al-Amin Converts to Islam and Becomes a Community Leader in Atlanta's West End Neighborhood...................................................22

    B.   In Mr. Al-Amin's Criminal Trial, the Trial Judge Rules The Traffic Stop Leading to the Issuance of the Warrant Violated the Fourth Amendment.......................................28

    C.   In the State Habeas Case, Mr. Al-Amin Testified He Did Not Shoot the Deputy Sheriffs and Explained Why He Went to White Hall, Alabama Immediately After the Shooting...................................................30

    D.   Deputy English, the Only Eyewitness Who Specifically Identified Mr. Al-Amin, Stated He Shot the Assailant (Mr. Al-Amin Was Not Injured) and that the Assailant had Grey Eyes (Mr. Al-Amin's Eyes are Brown)..............................31

    E.   Imhotep Shaka, the Only Eyewitness to the Actual Shootings Other than the Deputies, Testified he Was "Absolutely Positive" Mr. Al-Amin Was Not the Shooter...................................................36

    F.   Other Evidence Showing Mr. Al-Amin was Not the Shooter...................................................37

G.    Otis Jackson's Swears to Committing the Crimes in a Deposition Taken in the State Habeas Proceeding. ...........................43

H.    Deputy English's Eyewitness Identification of Mr. Al-Amin. .................................................................................47

I.    FBI Agent Campbell's Involvement in Mr. Al-Amin's Arrest. ...............................................................................49

J.    Mr. Al-Amin's Defense Lawyers File a Motion to Prohibit Prosecutorial Misconduct Specifically Discussing the Dangers of Improper Prosecutorial Argument...............................................................................53

K.    The Trial ...........................................................................54

L.    Conviction and Sentencing.................................................66

M.    Post-Trial and Appellate Briefing .....................................67

N.    The Georgia Supreme Court's Decision in the Direct Appeal...............................................................................71

O.    The State Habeas Proceedings .........................................75

P.    The State Habeas Court's Final Order ...............................78

V.    CLAIMS FOR RELIEF..............................................................80

CLAIM I    THE STATED VIOLATED MR. AL-AMIN'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS WHEN THE PROSECUTION ENGAGED IN A MOCK CROSS-EXAMINATION OF MR. AL-AMIN AFTER HE HAD INVOKED HIS CONSTITUTIONAL RIGHT NOT TO TESTIFY...................................................80

A.    The Rigorous Standards for Finding "Harmless Error".....................80

B.    The Repetitive Nature of the Prosecution's Violations of Mr. Al-Amin's Fifth Amendment Rights Should Have Been Considered...............................................................82

C.    The Georgia Supreme Court Unreasonably Concluded the Evidence of Mr. Al-Amin's Guilt was "Overwhelming." .................................................................84

D.    The Trial Court's Instruction Exacerbated, Rather than Cured, the Prosecution's Repeated Fifth Amendment Violations. ...........................................................................92

E.    The Mock Cross-Examination Had A Substantially and Injurious Effect on the Jury's Verdict. ..............................94

CLAIM II   THE STATE COURT VIOLATED MR. AL-AMIN'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS BY PRECLUDING HIM FROM CROSS-EXAMINING FBI AGENT CAMPBELL REGARDING THE 1995 SHOOTING OF GLENN THOMAS IN PHILADELPHIA. ..................................................98

CLAIM III  THE DEFENSE LAWYERS VIOLATED MR. AL-AMIN'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO INVESTIGATE THE CONFESSION OF OTIS JACKSON ADEQUATELY. ...............................106

A.    Mr. Jackson's Confession Tracks Key Trial Evidence. ....................107

B.    The Defense Lawyers Should Not Have Accepted the Assertion of the Prosecution Mr. Jackson Was Home at the Time of the Crime and Simply Abandoned Their Investigation of Mr. Jackson. ...........................................110

C.    The Defense Lawyers' Failure to Investigate Mr. Jackson's Confession Prejudiced Mr. Al-Amin's Defense. ...........................................................................113

CLAIM IV  MR. AL-AMIN'S BRADY CLAIM REGARDING EVIDENCE OF AN ONGOING FBI INVESTIGATION OF HIM AT THE TIME OF THE CRIMES. ..............................................116

A.    The FBI's Involvement in the Investigation and Prosecution of Mr. Al-Amin's Underlying Criminal Case. ...........................................................................118

B.    The FBI's Testimony In June 2001 That There Was No Ongoing Investigation of Mr. Al-Amin at the Time of the Crimes.................................................................................119

C.    FOIA Documents Showing the FBI's Ongoing Investigation of Mr. Al-Amin at the Time of the Crime..................121

D.    The U.S. Marshal Declaration Regarding "Other Individuals" Involved in the Crime..................................................122

E.    The State Habeas Court's Ruling Regarding the Brady Claim .............................................................................................123

VI.    PRAYER FOR RELIEF ............................................................126

# TABLE OF AUTHORITIES

## Cases

*Al-Amin v. Georgia*,
   543 U.S. 992, 125 S. Ct. 509 (2004)....................................................17

*Al-Amin v. Hugh Smith, et al.*,
   Decl. of Deputy U.S. Marshal Kenneth J. Staub, No. 6:05-cv-
   00025-JEG (S.D. Ga. filed June 26, 2012) ........................................122

*Al-Amin v. State*,
   278 Ga. 74, 597 S.E.2d 332 (2004)............................................... passim

*Allen v. State*,
   275 Ga. 64, 561 S.E.2d 397 (2002)....................................................57

*Alston v. Garrison*,
   720 F.2d 812 (4th Cir. 1983)..............................................................67

*Anderson v. Nelson*,
   390 U.S. 523, 88 S. Ct. 1133 (1968)............................................6, 81

*Arnold v. McNeil*,
   622 F. Supp. 2d 1294 (M.D. Fla. 2009)..........................................117

*Berger v. United States*,
   295 U.S. 78, 88 S. Ct. 629 (1935)...................................................116

*Bowen v. State*,
   252 Ga. App. 382, 556 S.E.2d 252 (2001).........................................68

*Brady v. Maryland*,
   373 U.S. 83, 83 S. Ct. 1194 (1963)............................................... passim

*Braithwaite v. State*,
   275 Ga. 884, 572 S.E.2d 612 (2002)............................................6, 90

*Brecht v. Abrahamson*,
   507 U.S. 619, 113 S. Ct. 1710 (1993)................................................94

*Brooklyn v. Janis*,
   384 U.S. 1, 86 S. Ct. 1245 (1968)......................................................10

*Brown v. Payton*,
    544 U.S. 133, 125 S. Ct. 1432 (2005)................................................................80

*Bruton v. United States*,
    391 U.S. 123, 88 S. Ct. 1620 (1968)................................................................92

*Burton v. United States*,
    391 U.S. 123, 88 S. Ct. 1620 (1968)................................................................54

*Chapman v. California*,
    386 U.S. 18, 87 S. Ct. 824 (1967)............................................................ passim

*Cruz v. New York*,
    481 U.S. 186, 107 S. Ct. 1714 (1987)................................................................54

*Davis v. Alaska*,
    415 U.S. 308, 94 S. Ct. 1105 (1974)........................................................ passim

*Davis v. Alaska*,
    418 U.S. 308, 94 S. Ct. 1105 (1974)................................................... 68, 69, 102

*Delaware v. Van Arsdall*,
    475 U.S. 673, 106 S. Ct. 1431 (1986)........................................................ 10, 99

*Dunn v. United States*,
    307 F.2d 883 (5th Cir. 1962)................................................................93

*Farmer v. Ratelle*,
    131 F.3d 146 (Table), 1997 WL 730314 (9th Cir. 1997) ........................ 106, 114

*Gamache v. California*,
    131 S. Ct. 591 (2010) ................................................................83

*Greer v. Miller*,
    483 U.S. 756, 107 S. Ct. 3102 (1987)................................................................92

*Griffin v. California*,
    380 U.S. 609, 85 S. Ct. 1229 (1965)............................................................ 73, 80

*Hays v. State of Alabama*,
    85 F.3d 1492 (11th Cir. 1996) ................................................................117

*Hill v. State*,
    250 Ga. 277, 295 S.E.2d 518 (1982)............................................................ 74, 82

*Hill v. Turpin*,
    135 F.3d 1411 (11th Cir. 1998) ................................................................ 82, 83

*Hopkinson v. Shillinger*,
  866 F.2d 1185 (10th Cir. 1989),
  *rev'd on other grounds*, 888 F.2d 1286 (10th Cir. 1989) ....................................67

*Huddleston v. United States*,
  485 U.S. 681, 106 S. Ct. 1496 (1988)...................................................... 103, 104

*Jackson v. State*,
  282 Ga. 494, 651 S.E.2d 702 (2007)............................................................ 91, 92

*Jones v. Wood*,
  114 F.3d 1002 (9th Cir. 1997) ...................................................... 107, 113, 114

*Kyles v. Whitley*,
  514 U.S. 419,115 S. Ct. 1555 (1995),
  *aff'd for reasons stated by district court*,
  595 F.3d 1324 (11th Cir. 2010) ............................................................. 118, 125

*Mangum v. State*,
  274 Ga. 573, 555 S.E.2d 451 (2001)..................................................................68

*Miller-El v. Cockrell*,
  537 U.S. 322, 123 S. Ct. 1029 (2003)................................................................85

*Mitchell v. United States*,
  526 U.S. 314, 119 S. Ct. 1307 (1999)...............................................................84

*O'Lone v. Estate of Shabazz*,
  482 U.S. 342 (1987)..........................................................................................27

*O'Neal v. McAninch*,
  513 U.S. 432, 115 S. Ct. 992 (1995)........................................................... 81, 94

*Olden v. Kentucky*,
  488 U.S. 227, 109 S. Ct. 480 (1988)........................................................... 10, 99

*Pinson v. U.S. Dep't of Justice*,
  No. 1:12-cv-01872-RC (D.D.C.) .....................................................................125

*Reese v. State*,
  252 Ga. App. 650, 556 S.E.2d 150 (2001).......................................... 70, 72, 101

*Riner v. Owens*,
  764 F.2d 1253 (7th Cir. 1985) ..........................................................................67

*Sanders v. Ratelle*,
  21 F.3d 1446 (9th Cir. 1994)..................................................................... 106, 114

*Secretary, Fla. Dep't of Corrs. v. Baker*,
  406 Fed. Appx. 416 (11th Cir. 2010).................................................................100

*Smith v. Illinois*,
  390 U.S. 129, 88 S. Ct. 748 (1968).....................................................................99

*Smith v. Wainwright*,
  799 F.2d 1442 (11th Cir. 1986) .............................................................. 107, 113

*State v. Al-Amin*,
  No. 00SC03563, Order on Def.'s Request for Access to a Sealed
  File of the Prosecution's Personal Notes (Ga. Super. Ct., Fulton
  Cty. Oct. 22, 2014).......................................................... 110, 118, 119

*State v. Ball*,
  675 N.W.2d 192 (S.D. 2004) ...............................................................................83

*Strickland v. Washington*,
  466 U.S. 668, 104 S. Ct. 2052 (1984)........................................... 12, 13, 106, 113

*Strickler v. Greene*,
  527 U.S. 263, 119 S. Ct. 1936 (1999)........................................................ 116, 125

*United States v. Al-Amin*,
  Case No. 2:01-cr-00152-MHT-CSC-1 (M.D. Ala. Dec. 6, 2002).......................50

*United States v. Antone*,
  603 F.2d 566 (5th Cir. 1979).................................................................... 117, 118

*United States v. Bagley*,
  473 U.S. 667, 105 S. Ct. 3375 (1985)................................................................116

*United States v. Cohen*,
  888 F.2d 770 (11th Cir. 1989) .................................................................. passim

*United States v. Gray*,
  878 F.2d 702 (3d Cir. 1989).............................................................................106

*United States v. Jorn*,
  400 U.S. 470, 91 S. Ct. 547 (1971).....................................................................53

*United States v. Meneses-Davila*,
  580 F.2d 888 (5th Cir. 1978)...............................................................................84

*United States v. Risha*,
    445 F.3d 298 (3d Cir. 2006).............................................................................118

*United States v. Spagnoulo*,
    960 F.2d 990 (11th Cir. 1992) ............................................................ 117, 125

*United States v. Stone*,
    9 F.3d 934 (11th Cir. 1993).............................................................................92

*Watkins v. Sowders*,
    449 U.S. 341, 100 S. Ct. 654 (1980)................................................................48

## Statutes

Fed. R. Evid. 404(b).................................................................................................68

## Other Authorities

18 U.S.C. § 2101 (1996) ..........................................................................................24

18 U.S.C. § 2102 (1996) ..........................................................................................24

28 U.S.C. § 2241(d) .................................................................................................20

28 U.S.C. § 2242(d)(2).............................................................................................20

28 U.S.C. § 2254 ............................................................................................... 1, 126

O.C.G.A. § 24-4-404................................................................................................72

O.C.G.A. § 24-9-84..................................................................................................71

O.C.G.A. § 9-14-40..................................................................................................18

O.C.G.A. § 9-14-48(d)...........................................................................................123

## Rules

3A J. Wigmore, *Evidence* § 940, at 775 (Chadbourne rev. 1970)................... 72, 98

Clive Lawrence & Gil Scott, *'Rap' Arrest: Blacks Hurting for
    Leadership,* CHRISTIAN SCIENCE MONITOR, OCT. 18, 1971 .................................25

David Firestone, *2 Deputies Are Shot While Seeking Arrest Of Ex-
    Black Panther*, N.Y. TIMES, Mar. 17, 2000 .......................................................35

Doug Payne, *2 Fulton Deputies Shot in 'Ambush'*, ATL. J. CONST.,
   Mar. 17, 2000 ...................................................................................35

Ekwueme Michael Thelwell*, H. Rap Brown/Jamil Al-Amin: A
   Profoundly American Story*, THE NATION, Mar. 18, 2002....................................22

Gail Bensinger & Maurine McLaughlin, *Report Says Rap Brown
   Didn't Cause Md. Riot*, WASH. POST, Mar. 5, 1968 ...........................................24

http://www.innocenceproject.org/free-innocent/improve-the-law/fact-
   sheets/eyewitness-identification-reform. ..........................................................48

http://www.thenation.com/article/h-rap-brownjamil-al-amin-
   profoundly-american-story#...........................................................................22

Jim Mann, *No Sign of Rap Brown on Bel Air Trial Eve*, WASH. POST,
   Mar. 16, 1970 ...................................................................................25

John Kifner, *Court Voids 5 Convictions in 1968 Convention Case*,
   N.Y. TIMES, Nov. 22, 1972 .....................................................................24

Lyda Longa, *Officers Vow to Find Former Black Panther*, ATL. J.
   CONST., Mar. 18, 2000 ........................................................................36

*Muslim Groups Demand Probe into Arrest of H. Rap Brown,* WASH.
   POST, Aug. 29, 1995............................................................................28

SENATE SELECT COMM. TO STUDY GOVERNMENTAL OPERATIONS WITH
   RESPECT TO INTELLIGENCE ACTIVITIES, FINAL REPORT:
   INTELLIGENCE ACTIVITIES AND THE RIGHTS OF AMERICANS, S. REP.
   NO. 755, 94th Cong., 2d Sess. bk. II (1976) ...........................................24

TAYLOR BRANCH, AT CANAAN'S EDGE: AMERICA IN THE KING YEARS
   1965-68 (2006)..................................................................................22

*The Law and Psychology of Jury Instructions*,
   69 Neb. L. Rev. 71, 95 (1990) ....................................................... 92, 93

www.nytimes.com/2000/03/17/us/2-deputies-are-shot-while-seeking-
   arrest-of-ex-black-panther.html ..........................................................35

Petitioner Jamil Abdullah Al-Amin ("Petitioner" or "Mr. Al-Amin"), by and through undersigned counsel, respectfully submits his Third Amended Petition for a Writ of Habeas Corpus ("Petition") under 28 U.S.C. § 2254.

Mr. Al-Amin respectfully requests this Court issue an Order granting his Petition.  Mr. Al-Amin seeks this Court's intercession because the Georgia state courts have violated, and unreasonably and arbitrarily refused to correct violations of, Mr. Al-Amin's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  These violations prejudiced Mr. Al-Amin's defenses and infected the jury verdict.  Mr. Al-Amin further requests this Court afford him all protections provided by the federal habeas corpus statutes, the Rules governing § 2254 actions, and all other pertinent statutes, court rules, and case law.  Mr. Al-Amin seeks discovery and an evidentiary hearing in order to present necessary evidence in support of his claims.

Mr. Al-Amin seeks adjudication on the merits of the first three claims in this Petition at this time, and seeks discovery in support of his fourth claim based on *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194 (1963).

## I.    INTRODUCTION

Mr. Al-Amin seeks federal habeas review of three constitutional violations occurring in his state court criminal trial and discovery in support of a *Brady* claim relating to ongoing FBI surveillance of him at the time of the crime:

1.    The Prosecution violated Mr. Al-Amin's Fifth and Fourteenth Amendment rights against self-incrimination by engaging in an extensive mock cross-examination deliberately calculated to cause the jury to construe Mr. Al-Amin's silence as an implicit admission he had committed the crimes and to divert the jury's attention away from the extensive evidence showing reasonable doubt.

2.    The state trial court denied Mr. Al-Amin his Sixth and Fourteenth Amendment rights to confront a central Prosecution witness by restricting his cross-examination of Federal Bureau of Investigation ("FBI") Special Agent Ronald Campbell regarding a similar incident directly supporting the defense theory that FBI Agent Campbell planted evidence against Mr. Al-Amin.

3.    Mr. Al-Amin's Sixth and Fourteenth Amendment rights to effective assistance of counsel were violated when his trial counsel failed to investigate adequately the confession of Otis Jackson.  In his deposition in the state habeas action, Mr. Jackson swore under oath that he alone shot Deputies Aldranon English and Ricky Kinchen, consistent with Jackson's repeated prior confessions.

4.     Mr. Al-Amin claims he was not provided all exculpatory evidence to which he was entitled before or during the trial, in violation of *Brady v. Maryland,* 373 U.S. 83, 88, 83 S. Ct. 1194, 1197 (1963).  As addressed in Mr. Al-Amin's contemporaneously-filed motion for discovery, Mr. Al-Amin's trial counsel sought information regarding any ongoing FBI investigation of Mr. Al-Amin at the time of the crime; received testimony from the FBI that no such investigation was ongoing; but thereafter received information through FOIA requests showing that, in fact, Mr. Al-Amin was the subject of an ongoing FBI investigation at the time.

## II.     SUMMARY OF MR. AL-AMIN'S HABEAS CLAIMS

### A.     Mr. Al-Amin's Fifth Amendment Claim

In the direct appeal, the Georgia Supreme Court unanimously held the Prosecution violated Mr. Al-Amin's Fifth Amendments rights by engaging in an extended and visually aided "mock cross-examination" of Mr. Al-Amin during its closing argument.  *Al-Amin v. State*, 278 Ga. 74, 85, 597 S.E.2d 332, 346 (2004). Each question deliberately was intended to persuade the jury that Mr. Al-Amin's failure to testify constituted an implicit admission he had committed the crimes and to divert its attention from the serious evidentiary questions raised by the defense.

The visual aid shown to the jury in connection with the Prosecution's mock cross-examination displayed the heading "QUESTIONS FOR THE DEFENSE."

Tr 19817 [Dkt. 36-3, at 57.]  Here are a few examples of the mock cross-examination questions addressed to Mr. Al-Amin by the Prosecution:

> "Why would the FBI care enough to frame you?"

> "Mr. Defendant, how did those murder weapons get there to White Hall?"

> "How did your Mercedes get to White Hall?  How did it get to White Hall?  Did you drive it there?"

> "Why run if you didn't do it?  If you're innocent, just turn yourself in."

> "Where were you at 10 p.m. on March 16?"

Tr. 3696-3711 [Dkt. 32-5, at 23-38].  Compounding the devastating impact of this improper commentary on Mr. Al-Amin's right to remain silent, the Prosecution rhetorically answered its final question to ensure the jury drew the desired adverse inference:  "He was standing outside his black Mercedes murdering Deputy Ricky Kinchen and trying to murder Deputy Aldranon English.  That is the only evidence you have heard and will hear in this case as to where Jamil Abdullah Al-Amin was at 10 p.m. on March 16, 2000.  That's it."  *Id.* at 3711 [Dkt. 32-5, at 38].

  These questions sought to cause the jury to hold Mr. Al-Amin's silence against him and to treat his failure to answer as an admission of guilt.  The effects were exacerbated, not cured, by the tepid instruction given by the court after Mr. Al-Amin moved for a mistrial, particularly since the trial court failed to terminate

the mock cross-examination.  Not surprisingly, the jury focused heavily on Mr. Al-Amin's failure to testify, as stated in an affidavit from one of the jurors filed in the state habeas action:  "main thing Mr. Al-Amin should have made a statement or at least come to the witness stand say out of his own mouth that he was not guilty if that statement could have been made it could have swayed votes in the other direction."  Aff. of Terry Walker, Jr., State Habeas Ex. P-7 [Dkt. 1-4, at 60.]

Despite acknowledging these repeated constitutional violations, the Georgia Supreme Court dismissed them as "harmless."  The U.S. Supreme Court, however, has held that "[s]uch a machine-gun repetition of a denial of constitutional rights, designed and calculated to make petitioners' version of the evidence worthless, can no more be considered harmless than the introduction against a defendant of a coerced confession." *Chapman v. California,* 386 U.S. 18, 26, 87 S. Ct. 824, 829 (1967).  The Georgia Supreme Court was required to consider whether the improper comments were "extensive"; whether "an inference of guilt from silence [was] stressed to the jury as a basis of conviction"; and whether "there is evidence that could have supported acquittal." *Anderson v. Nelson*, 390 U.S. 523, 523-24,

88 S. Ct. 1133, 1133-1134 (1968).   In this case, all of these factors confirm the error was not "harmless."[1]

Moreover, in determining whether the constitutional violations were "harmless beyond a reasonable doubt," the Georgia Supreme Court was required to consider the "entire state trial record."  *Chapman,* 386 U.S. at 56, 87 S. Ct. at  844. Contrary to this mandate, the state court considered only the evidence supporting the Prosecution in the light most favorable to the Prosecution, ignoring Mr. Al-Amin's substantial challenges to that evidence and his own exculpatory evidence. As has been explained in several dissenting opinions by Georgia Supreme Court justices, this flawed analysis ensured the prosecution's evidence would be "overwhelming" and rendered any constitutional error – no matter how egregious – "harmless."  *See, e.g., Braithwaite v. State*, 275 Ga. 884, 899, 572 S.E.2d 612, 625 (2002) (Hunstein, J., dissenting, joined by Benham and Thompson, JJ.).

---

[1] It cannot be disputed the Prosecution planned a systematic attack on Mr. Al-Amin's Fifth Amendment rights, given its preparation of a chart listing seven "QUESTIONS FOR THE DEFENDANT" shown to the jury throughout the closing argument (the Prosecution did make "one cosmetic change" of "DEFENDANT" to "DEFENSE" after Mr. Al-Amin moved for a mistrial).  *See* Tr. 3704 [Dkt. 32-5, at 31].  Compounding this blatant misconduct, the Prosecution ended its closing by telling the jury "Don't stand for him," an explicit appeal to ignore the evidence and instead to rely on anti-Islamic sentiment in a trial that occurred just six months after the 9/11 attacks.  *See Al-Amin v. State*, 278 Ga. 74, 86, 597 S.E.2d 332, 347 (2004).

As shown below, the defense raised serious challenges to each aspect of the allegedly "overwhelming" evidence against Mr. Al-Amin.  Moreover, the Georgia Supreme Court completely ignored the substantial exculpatory evidence presented during the trial that Mr. Al-Amin was not the person who shot Deputies English and Kinchen (citations for all statements provided below in the fact discussion):

- Deputy English testified unambiguously and repeatedly that he looked the suspect "in the eyes" ("as my Mom always told me") and that his assailant had "grey eyes."  Mr. Al-Amin has dark brown eyes, not grey eyes as erroneously stated in the bench warrant.

- Both Deputies claimed they shot and wounded the assailant.  Medics were on hand at the time of Mr. Al-Amin's arrest to document his gunshot wounds.  Mr. Al-Amin, however, had not been shot.

- Several 911 calls reported a wounded and bleeding man in the area, and a security video shows a man other than Mr. Al-Amin attempting to gain entry to an elder care facility not far from the scene.

- The police relied on a blood trail leading from the scene to secure a search warrant of Mr. Al-Amin's nearby store for "blood, bloody clothing, and evidence of medical intervention."

- Imhotep Shaka, who resided in a house with a direct view of the crime scene and who was the only eyewitness to the shootings other than the Deputies, testified the body type of the shooter (average height and build) differed from Mr. Al-Amin's build (tall and slender).

- Two eyewitnesses saw an individual other than Mr. Al-Amin flee the scene of the crime in a light-colored van shortly after the incident, and one eyewitness (Fareed Jihad) saw a man get into the van who matched the description of the shooter given by Mr. Shaka.

In addition to confirming the unreasonableness of the state court's "harmless error" finding, this exculpatory evidence illustrates the ineffectiveness of Mr. Al-Amin's trial counsel in failing to investigate the confession of Otis Jackson, who has grey-tinted eyes, matches Mr. Shaka's physical description of the shooter, and claims to have scars from gunshot wounds on the night of the crime.

### B.    Mr. Al-Amin's Confrontation Clause Claim

In support of its "overwhelming evidence" finding, the Georgia Supreme Court asserted there was a "vast amount of physical evidence tying [Mr. Al-Amin] to the crime." *Al-Amin*, 278 Ga. at 86, 597 S.E.2d at 346.  The most critical items of "physical evidence" were the guns used in the shooting, which were found "[i]n the vicinity" of the location where Mr. Al-Amin was arrested. *Id.* at 76, 597

S.E.2d at 340.  There were no fingerprints on the guns, Tr. 1274 [Dkt. No. 30-2, at 122], and no gunpowder residue was found on Mr. Al-Amin at the time of his arrest (despite allegations he recently had fired 15 or more shots at the arresting officers).  *See id.* at 2330, 2342, 2362-63 [Dkt. 31-2, at 107, 119, 139-140].

Mr. Al-Amin argued FBI Agent Campbell had "planted evidence to incriminate Mr. Al-Amin."  *Al-Amin*, 278 Ga. at 83, 597 S.E.2d at 345.  Among other evidence, the defense elicited testimony FBI Agent Campbell had "fallen behind" and become separated from the group of officers searching for Mr. Al-Amin shortly before the arrest.  Tr. 2628-2630 [Dkt. No. 31-5 at 43-45].  As the Georgia Supreme Court noted, there is no dispute about FBI Agent Campbell's animosity towards Mr. Al-Amin:  "The undisputed evidence shows that after Al-Amin had been arrested and handcuffed, Campbell spit at him and kicked him."  *Al-Amin*, 278 Ga. at 82, 597 S.E.2d at 344.

Consistent with the theory FBI Agent Campbell had planted the guns, Mr. Al-Amin's defense team sought to confront him about a 1995 incident in Philadelphia in which he similarly was accused of planting a gun (there, after shooting a Muslim African-American suspect in the back of the head).  *See id.* at 84, 597 S.E.2d at 345-46.  The Georgia Supreme Court affirmed the refusal to allow this inquiry because "Campbell had not been prosecuted for the alleged

misconduct, and . . . any probative value was far outweighed by the danger of unfair prejudice." *Id.* at 84, 597 S.E.2d at 346.

This ruling violated Mr. Al-Amin's Confrontation Clause rights. "'[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in an otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.''" *Olden v. Kentucky*, 488 U.S. 227, 231, 109 S. Ct. 480, 483 (1988) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S. Ct. 1431, 1436 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 1111 (1974))). Denial of effective cross-examination constitutes "'constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.'" *Davis*, 415 U.S. at 318, 94 S. Ct. at 1111 (quoting *Brooklyn v. Janis*, 384 U.S. 1, 3, 86 S. Ct. 1245, 1246 (1968)).

The state courts' rulings refusing to allow Mr. Al-Amin to cross-examine FBI Agent Campbell regarding the prior incident rested on a fundamentally flawed legal analysis. Both the trial court and the Georgia Supreme Court treated Mr. Al-Amin's proffer of the Philadelphia shooting as pure impeachment of FBI Agent Campbell's character, which required "conviction of a crime involving moral

turpitude." *Al-Amin*, 278 Ga. at 84, 597 S.E.2d at 345 (citations omitted).  As Mr. Al-Amin repeatedly argued, however, he sought to cross-examine FBI Agent Campbell based on the similarity between the evidence-planting incident in Philadelphia and the evidence-planting defense theory in this case.  *See, e.g.*, Supp. Br. of Appellant, at 28-30 (Ga. S. Ct. filed Jan. 16, 2004) [Dkt. 36-3,  at 41-43]; *see also Davis*, 415 U.S. at 316, 94 S. Ct. at 1110 (differentiating between general attack on character based on prior crime and specific attack intended to reveal "biases, prejudices, or ulterior motives of the witness").  Because Mr. Al-Amin sought cross-examination to establish "motive, bias, intent and bent of mind" [Dkt. 36-3, at 29] – issues as to which prior similar incidents always are relevant, even when offered against a criminal ***defendant*** – the state courts violated Mr. Al-Amin's Confrontation Clause rights by precluding this line of inquiry entirely.

### C.   Mr. Al-Amin's Ineffective Assistance Claim

Otis Jackson has been confessing to the crimes for which Mr. Al-Amin was convicted since shortly after the crimes and continuing through the present.  In the state habeas case, Mr. Jackson was deposed at length and cross-examined by the State regarding his confession.  He testified to innumerable specific details of the crimes, showed the scars he claimed resulted from being shot by the deputies, and confirmed his eyes had a grey tint.  Moreover, at the time of the crime Mr. Jackson

had weapons and would have been violating the ankle-monitoring conditions of his parole, and thus had the motivation and disposition to commit the crimes for which Mr. Al-Amin was convicted.  Mr. Al-Amin's counsel was ineffective for failing to investigate Mr. Jackson's confession adequately before the trial.

A party claiming ineffective assistance of counsel must show (1) counsel's performance fell below an objective standard of reasonableness and (2) that deficiency prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668,  687, 104 S. Ct. 2052, 2064 (1984).  Numerous federal habeas decisions have found trial counsel's inadequate investigation of a third-party confession to fall below *Strickland*'s standard.

In rejecting Mr. Al-Amin's ineffective assistance claim, the state habeas court focused on an ankle monitoring report provided by the Prosecution to the defense allegedly showing Mr. Jackson could not have committed the crime.  According to the only sworn testimony received on the issue (from Thomas J. Ward, who helped found the company responsible for administering Mr. Jackson's ankle monitoring), this report did not conclusively establish Mr. Jackson could not have committed the crime.  The state habeas court's other reasons for rejecting Mr. Al-Amin's ineffective assistance claims also rest on unreasonable fact determinations belied by the evidence provided in the state habeas action.

- 12 -

Defense counsel's failure to present Mr. Jackson's confession materially prejudiced Mr. Al-Amin's defense, as confirmed by other evidence presented at the state habeas hearing.  Mere days after the crime, Mr. Jackson's parole was revoked for multiple ankle monitoring violations, including violations the week of the crime.  A warrant issued for Mr. Jackson's arrest on March 22, 2000, six days after the crime.  Ammunition consistent with that used in the crime was found at Mr. Jackson's apartment on March 28, 2000.  Following the revocation of his parole, Mr. Jackson was sent back to Nevada, where he confessed again to having committed the crimes and had a "cop killer" sign hung outside his cell.

Mr. Al-Amin's trial lawyers neither developed nor presented any of this evidence at the trial, even though Mr. Jackson's sworn confession comports with the trial evidence exculpatory of Mr. Al-Amin.  This failure constituted ineffective assistance under *Strickland*, entitling Mr. Al-Amin to habeas relief.

### D.      Mr. Al-Amin's *Brady* Claim and Request for Discovery

Before trial, Mr. Al-Amin's attorneys repeatedly pressed the FBI to disclose information regarding any ongoing investigation of Mr. Al-Amin at the time of the crime.  After four hearings, an FBI representative designated to address these issues testified at a hearing on June 28, 2001 that no such investigation was ongoing:  "Are you aware of any, any, that means anything, whether its local,

- 13 -

national, out of Washington, out of the Atlanta office, out of anywhere, any investigation by the FBI of Mr. Al-Amin in March of 2000?"  The Agent responded, "No, sir, I am not."  Tr. 110-11 [Dkt. No. 18-4, at 112-13].  Mr. Al-Amin's trial counsel again asked:  "Are you aware of any surveillance or surveillances, any, by anybody in the FBI, Washington, Islamic investigation, anything, any type of investigation conducted of Mr. Al-Amin in March of 2000?"  Again, the Agent responded, "No, sir."  *Id.* 111 [Dkt. No. 18-4, at 113].

The Agent then clarified there was a "fugitive" investigation of Mr. Al-Amin immediately after the crime (of which all parties were fully aware).  In response, Mr. Al-Amin's trial counsel again re-confirmed, "and to your knowledge, that was the only investigation in March 2000?"  The Agent again responded "Yes, sir."  *Id.*  Thus, the FBI Agent repeatedly testified that, other than the fugitive investigation initiated after the crime, the FBI did not have an ongoing investigating of Mr. Al-Amin in March 2000.

In contrast to these statements, documents received through FOIA confirm Mr. Al-Amin remained under ongoing FBI investigation through March 2000. These documents (attached to Mr. Al-Amin's contemporaneously-filed motion to expand the record) include (a) a report dated March 6, 2000 (10 days before the crime) regarding the issuance of the warrant the Deputy Sheriffs were attempting

- 14 -

to serve at the time of the crime; (b) a report dated January 26, 2000, regarding the expiration of Mr. Al-Amin's driver's license (with a "lead covered" handwritten notation dated February 26, 2000); and (c) a report dated April 14, 1999 regarding a "spot check on subject's business located @ 1128 Oak Street, Atlanta" (the scene of the crime), in which Mr. Al-Amin was "observed unloading unidentified items" from the same vehicle (a "dark green Ford Explorer with dealer tags") he was driving at the time of the Cobb County traffic stop giving rise to the warrant.

After receiving the FOIA documents, Mr. Al-Amin raised his *Brady* claim in his state habeas action.  Despite acknowledging the later-discovered FOIA documents indicated ongoing surveillance of Mr. Al-Amin at the time of the crime, the state habeas court rejected the claim as procedurally defaulted.  *See* State Habeas Order, at 30.  The state court also cited the Georgia Supreme Court's ruling in the direct appeal regarding other FBI documents Mr. Al-Amin had pursued, ruling that "the appropriate route to obtain these documents lies in federal court, not the state habeas court."  *Id.* (citing *Al-Amin*, 278 Ga. at 83, 597 S.E.2d at 345).

For these and the other reasons stated in Mr. Al-Amin's motion for discovery, he seeks leave to served limited discovery on the FBI, requesting production of any exculpatory evidence in the FBI's possession indicating that another individual or individuals committed the crime for which he was convicted.

- 15 -

### E.     The Relatedness of Mr. Al-Amin's Constitutional Claims

Taken individually, any of the constitutional errors infecting Mr. Al-Amin's trial support habeas relief.  All four errors, however, relate to and support each other.  Allowing the cross-examination of FBI Agent Campbell regarding the Philadelphia incident would have developed evidence answering several of the Prosecution's mock cross-examination questions (such as "Why would the FBI care enough to frame you?" and "Mr. Defendant, how did those murder weapons get there to White Hall?").  Similarly, the confession of Otis Jackson and any exculpatory evidence from the FBI's investigation of Mr. Al-Amin at the time of the crime would answer the question of who actually shot Deputy Sheriffs Kinchen and English on March 16, 2000.  Together, these errors compel habeas relief.

Accordingly, Mr. Al-Amin respectfully requests that his petition for habeas corpus be granted.

## III.   HISTORY OF PROCEEDINGS

Mr. Al-Amin currently is serving a life sentence, imposed on March 13, 2002, without the possibility of parole, following his conviction for murder and other crimes by a jury impaneled by the Fulton County Superior Court of the State of Georgia.  Mr. Al-Amin's continued incarceration violates his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

Mr. Al-Amin has exhausted the remedies provided to him by the State of

Georgia.  He timely appealed his conviction, asserting 16 errors.[2] The Supreme

Court of Georgia upheld the conviction on May 24, 2004, and denied Mr. Al-

Amin's timely-filed motion for reconsideration on June 28, 2004.  *See Al-Amin v.*

*State*, 278 Ga. 74, 597 S.E.2d 332 (2004).  A copy of this decision was attached to

Mr. Al-Amin's original Petition as Exhibit 3 [Dkt. 1-10].  Mr. Al-Amin timely

filed a Petition for Writ of Certiorari to the U.S. Supreme Court, which was denied

on November 15, 2004.  *Al-Amin v. Georgia*, 543 U.S. 992, 125 S. Ct. 509 (2004).

---

[2] In the direct appeal, Mr. Al-Amin asserted:  (1) equal protection violations due to forced balancing of the Grand Jury Wheel; (2) equal protection violations due to exclusion of certain potential jurors over age 65; (3) Sixth and Fourteenth Amendment violations due to underrepresentation of Hispanic/Latino individuals in the jury pool; (4) Sixth and Fourteenth Amendment violations due to the use of voter registration records to compose the jury pool; (5) other violations relative to the selection of jurors; (6) due process violations based on the failure to sever certain counts of the indictment; (7) due process violations based on improper admission of character evidence; (8) due process violations based on the admission of dog-tracking evidence; (9) failure to conduct a *Harper* hearing as to certain ballistics evidence; (10) due process violations arising out of misleading testimony by FBI Agent Campbell; (11) *Brady* violations based on the failure to disclose information related to FBI Agent Campbell; (12) due process violations based on improper limitations of the cross-examination of FBI Agent Campbell; (13) due process and Fifth Amendment violations based on the Prosecution's referencing of his decision not to testify and making other improper comments during closing argument; (14) due process violations based on exclusion of evidence relating to his good character and community involvement; (15) due process and *Miranda* violations regarding pre-*Miranda* custodial statements; and (16) due process violations based on the improper exclusion of exculpatory evidence.  *See Al-Amin v. State*, 278 Ga. 74, 76-89, 597 S.E.2d 332, 340-49 (2004).

On November 14, 2005, Mr. Al-Amin timely filed an Application for Writ of Habeas Corpus pursuant to O.C.G.A. § 9-14-40 in the Superior Court of Tattnall County, State of Georgia.[3]  A copy of Mr. Al-Amin's Application for Writ of Habeas Corpus was attached to Mr. Al-Amin's original Petition as Exhibit 2-D [Dkt. 1-6].  Mr. Al-Amin filed an Amendment to his Petition for Writ of Habeas Corpus on February 27, 2007, in open court during a hearing in the state habeas proceeding.[4]  A copy of Mr. Al-Amin's Amendment to Petition for Writ of Habeas

[3] At that time, Mr. Al-Amin was incarcerated at the Georgia State Prison in Reidsville, Georgia, which is located in Tattnall County, Georgia.

[4] As amended, Mr. Al-Amin's state habeas petition alleged:  (1) ineffective assistance of counsel based on, *inter alia*, the failure to investigate the confession of Otis Jackson and the failure to allow Mr. Al-Amin to testify; (2) violations of his right to counsel of choice based on the court's restriction of his attorneys' participation during voir dire; (3) due process violations based on the court's failure to grant a mistrial after improperly questioning the jurors regarding a bomb scare; (4) violations of his rights under *Brady* and state discovery statutes based on the failure to turn over information related to the investigation of FBI Agent Campbell, surveillance reports of White Hall, Alabama, information concerning an informant in the Atlanta Muslim community, Michael Warren's association with the Yasin Mosque, and surveillance reports regarding Mr. Al-Amin on the night of the offense; (5) Establishment Clause and the First Amendment violations based on the oath taken by the jurors and witnesses; (6) violations of his right to present favorable evidence under the Confrontation Clause and his right to present a defense under the Fifth and Sixth Amendments due to the refusal to allow evidence relating to his community leadership, the testimony of Detectives Glazier and Bacon about what witnesses heard the night of the shooting, and the 911 tapes that supported the defense; (7) due process violations based on the State's destruction of the police vehicle of Deputies Kinchen and English; (8) violations of his right to due process and his rights under the Confrontation Clause based on the court's

- 18 -

Corpus (hereinafter "Am. to State Habeas Pet'n") was attached to Mr. Al-Amin's

original Petition as Exhibit 2-E [Dkt. 1-7].[5]

Mr. Al-Amin's state habeas petition was denied in an order dated July 28,

2011, which order was mailed to the parties on July 29, 2011.  A copy of the

Tattnall County Superior Court's "Final Order" denying his state habeas petition

(hereinafter "State Habeas Order") was attached to Mr. Al-Amin's original Petition

as Exhibit 2-A [Dkt. 1-2].

Mr. Al-Amin timely filed a Notice of Appeal of the order denying his state

habeas petition on August 26, 2011, and timely filed an Application for a

Certificate of Probable Cause with the Supreme Court of Georgia on August 29,

---

limitation of FBI Agent Campbell's cross-examination relative to the 1995 shooting of Glenn Thomas; (9) due process violations based on FBI Agent Campbell's misleading testimony; (10) equal protection violations due to forced balancing of the Grand Jury Wheel; (11) equal protection violations due to the exclusion of certain potential grand jurors over age 65; (12) Sixth and Fourteenth Amendment violations due to underrepresentation of Hispanic/Latino individuals in the jury pool; (13) Sixth Amendment violations due to the exclusion of Hispanic/Latino individuals who were not United States citizens; (14) Sixth and Fourteenth Amendment violations due to the use of voter registration records to compose the jury pool; (15) other violations relative to the selection of jurors; (16) due process and Fifth Amendment violations based on the Prosecution's referencing of his decision not to testify and making other improper comments during closing argument; and (17) due process violations based on the introduction of the invalid warrant into evidence.  [Dkt. 1-6 & 1-7.]

[5] Mr. Al-Amin incorporates and does not waive any of the claims asserted in his direct appeal, his initial state habeas petition, or his amended state habeas petition.

2011.  A copy of Mr. Al-Amin's "Application for Certificate of Probable Cause to Appeal Denial of Petition for Writ of Habeas Corpus" was attached to Mr. Al-Amin's original Petition as Exhibit 1 [Dkt. 1-1].

Mr. Al-Amin's Application for a Certificate of Probable Cause was denied by the Supreme Court of Georgia on May 7, 2012, with Chief Justice Hunstein dissenting from the denial.  A true and correct copy of the Supreme Court of Georgia's order denying Mr. Al-Amin's Application for a Certificate of Probable Cause was attached to Mr. Al-Amin's original Petition as Exhibit 4 [Dkt. 1-11].

Mr. Al-Amin was incarcerated in the Georgia State Prison in Reidsville, Georgia until late July 2007.  Mr. Al-Amin was transferred from the state to the federal prison system and, from August 2007 until the fall of 2014, Mr. Al-Amin was incarcerated in Florence, Colorado.  For this reason, Mr. Al-Amin originally filed this federal habeas action in the District of Colorado, the federal district in which he was "in custody."  28 U.S.C. § 2241(d).  Mr. Al-Amin timely filed this federal habeas action on May 8, 2012 [Dkt. 1].  *See* 28 U.S.C. § 2242(d)(2).

On May 15, 2012, the District of Colorado transferred this action to this Court, ruling "the Georgia Department of Corrections is Petitioner's 'true custodian.'"  [Dkt. 3.]  Thus, jurisdiction and venue in this Court are proper.

Mr. Al-Amin filed an Amended Petition for Writ of Habeas Corpus [Dkt. 38] and a supporting brief [Dkt. 38-2] on September 18, 2012.  Mr. Al-Amin then filed a Second Amended Petition on May 17, 2013 [Dkt. 53], and filed a "Corrected" Second Amended Petition on July 22, 2013 [Dkt. 57].  The parties thereafter located and reviewed materials that had been sealed by the trial court during Mr. Al-Amin's underlying criminal case.  Redacted versions of certain of these sealed materials pertinent to the claims and defenses in this federal habeas action have been, or will be, made part of the record in this action.

Since October 2014, Mr. Al-Amin has been incarcerated at USP Canaan in Waymart, Pennsylvania.  Mr. Al-Amin names as Respondents David Ebbart, the current Warden of USP Canaan, and Homer Bryson, the current Commissioner of the Georgia Department of Corrections.

## IV.   FACTS RELEVANT TO MR. AL-AMIN'S HABEAS CLAIMS

Before turning to the facts directly relevant to Mr. Al-Amin's habeas claims, facts pertinent to Mr. Al-Amin's background and standing in the community are summarized.  These facts confirm his utter lack of motive to engage in the crimes for which he was convicted and provide context for his allegations relative to the FBI's involvement and conduct in the underlying arrest and trial.

A.    **After Achieving Notoriety as H. Rap Brown in the 1960s, Mr. Al-Amin Converts to Islam and Becomes a Community Leader in Atlanta's West End Neighborhood.**

In the 1960s, Mr. Al-Amin was widely known by his name at that time, H. Rap Brown, as a civil rights activist.  At the age of 17, he became engaged in efforts to free his brother (Ed Brown) from jail following an arrest for demonstrating against segregation.  Tr. 4246 [Dkt. 33-3, at 24].[6]  During the summer of 1962, Mr. Al-Amin became active in the work of Howard University's Nonviolent Action Group ("NAG").  *Id.* at 4249-50 [Dkt. 33-3, at 27-28].  Mr. Al-Amin ultimately was elected the Chair of NAG and, along with other civil rights leaders, visited the White House in 1965 to meet with President Lyndon Johnson.[7]

By 1966, Mr. Al-Amin had become a full-time worker for the Student Nonviolent Coordinating Committee ("SNCC"), organizing drives in rural,

---

[6] "Tr." will be used to cite pages from the underlying criminal trial transcript. "HT" will be used to cite pages from the state habeas hearing transcript.  A copy of the state habeas hearing transcript, with exhibits, was attached the original federal habeas petition as Exhibit 2B thereto [Dkt. 1-3; Dkt. 1-4].

[7] TAYLOR BRANCH, AT CANAAN'S EDGE: AMERICA IN THE KING YEARS 1965-68, at 93 (2006), previously submitted as **Exhibit 12** [Dkt. 57-3, at 5].  *See also* Ekwueme Michael Thelwell, *H. Rap Brown/Jamil Al-Amin: A Profoundly American Story*, THE NATION, at 29, Mar. 18, 2002 (describing Mr. Al-Amin's famous statement to President Johnson, in response to a statement about his family's sleep having been interrupted by demonstrations, that "black people in the South have been unable to sleep in peace and security for a hundred years"), *available at* http://www.thenation.com/article/h-rap-brownjamil-al-amin-profoundly-american-story#, previously submitted as **Exhibit 13** [Dkt. 57-4, at 5].

- 22 -

predominantly African-American towns such as White Hall, Alabama. Tr. 4054-57

[Dkt. 33-1, at 138-141].  Mr. Al-Amin was elected to serve as the fifth chairman of

SNCC from 1967-1969, succeeding such luminaries as now-Congressman John

Lewis.  *Id.* at 4064-65 [Dkt. 33-1, at 148].[8]  By his early 20s, Mr. Al-Amin had

become an "articulate spokesman" for SNCC.  Tr. 4254 [Dkt. 33-3, at 32].

　　　Mr. Al-Amin's leadership, however, was accompanied by harassment and

persecution by the federal authorities.  *Id.*  In fact, Mr. Al-Amin was one of a

handful of civil rights leaders (including Dr. Martin Luther King Jr.) specifically

identified in the FBI memorandum outlining the counterintelligence program

known as "COINTELPRO," the purpose of which was to "expose, disrupt,

misdirect, discredit, or otherwise neutralize" civil rights leaders and organizations.[9]

As detailed in a 1976 Senate Report examining the activities of COINTELPRO,

this program frequently targeted many persons who "were concededly nonviolent,

---

[8] *See also* Thelwell (**Exhibit 13)** at 29 [Dkt. 57-4, at 5].

[9] Memorandum of Aug. 25, 1967, *Counterintelligence Program*; *Black Nationalist-Hate Groups*; *Internal Security*, *reprinted in* WARD CHURCHILL & JIM VANDER WALL, THE COINTELPRO PAPERS: DOCUMENTS FROM THE FBI'S SECRET WARS AGAINST DISSENT IN THE UNITED STATES 92-93 (2d ed. 2002), previously submitted as **Exhibit 14** [Dkt. 57-5, at 4-5].

were not controlled by a foreign power, and posed no threat to 'national security.'"[10]

By the summer of 1967, Mr. Al-Amin had gained notoriety as a dynamic public speaker.  Following a speech he gave that year in Cambridge, Maryland, a local elementary school was burned down, after which a warrant was issued for his arrest for, *inter alia*, inciting a riot.[11]  Congress thereafter passed the Anti-Riot Act of 1968, which makes it a crime to cross state lines with the intent to incite a riot.[12]

The day before Mr. Al-Amin was scheduled to appear at a hearing regarding the charges, two of his associates were killed by a car bomb two miles from the

---

[10] SENATE SELECT COMM. TO STUDY GOVERNMENTAL OPERATIONS WITH RESPECT TO INTELLIGENCE ACTIVITIES, FINAL REPORT: INTELLIGENCE ACTIVITIES AND THE RIGHTS OF AMERICANS, S. REP. NO. 755, 94th Cong., 2d Sess. bk. II, at 213 (1976), copy previously attached as **Exhibit 15** [Dkt. 57-6, at 9].

[11] In 1968, a report prepared by the staff of the President's Advisory Commission on Civil Disorders stated that over-reaction by Cambridge police and city officials, rather than anything Mr. Al-Amin said or did, resulted in the riot.  The report stated that "[a] good deal of the difficulty stems from the strong segregationist attitudes held by local officials."  Gail Bensinger & Maurine McLaughlin, *Report Says Rap Brown Didn't Cause Md. Riot*, WASH. POST, Mar. 5, 1968, at A1, copy previously attached as **Exhibit 16** [Dkt. 57-7].

[12] Pub. L. No. 90-284, 82 Stat. 75 (codified as amended at 18 U.S.C. §§ 2101-2102 (1996)).  This Act was knows as the "Rap Brown Act" *See* John Kifner, *Court Voids 5 Convictions in 1968 Convention Case*, N.Y. TIMES, Nov. 22, 1972, at A1, copy previously attached as **Exhibit 18** [Dkt. 57-9, at 3].

courthouse.[13]   After Mr. Al-Amin failed to appear for the re-scheduled hearing and disappeared from public view, he was placed on the FBI's Most Wanted List.[14]

In 1971, Mr. Al-Amin was arrested and convicted of participating in a robbery in New York.[15]   During a five-year incarceration in the New York State prison system, Mr. Al-Amin converted to Islam.  According to Mr. Al-Amin's brother (Ed Brown), Mr. Al-Amin expanded his focus to include not only "racial equality," but also "issues of spirituality, issues of God, issues related to behavior." Tr. 4254-55 [Dkt. 33-3, at 32-33].  One prisoner at Attica, John Ducksworth (who became a Salvation Army Officer after release), describes Mr. Al-Amin as having been one of the most significant influences on his life – someone who "helped [him] make a difference."  *Id.* at 4222, 4224 [Dkt. 33-2, at 154; Dkt. 33-3, at 2].

Mr. Al-Amin was known as a "peacemaker" in prison.  *Id.* at 4226-27 [Dkt. 33-3, at 4-5].  In one notable instance, correctional officials anticipated an imminent disruption between racial and ethnic groups, and locked down the prison.

---

[13] Jim Mann, *No Sign of Rap Brown on Bel Air Trial Eve*, WASH. POST, Mar. 16, 1970, at A1, copy previously attached as **Exhibit 19** [Dkt. 57-10, at 2-3].

[14] Clive Lawrence & Gil Scott, *'Rap' Arrest: Blacks Hurting for Leadership,* CHRISTIAN SCIENCE MONITOR, OCT. 18, at 1, 1971, copy previously attached as **Exhibit 20** [Dkt. 57-11, at 2].

[15] Thelwell (**Exhibit 13**), at 30 [Dkt. 57-4, at 6].

Mr. Al-Amin successfully mediated a dispute between the sparring racial and ethnic groups.  *Id.* at 4227 [Dkt. 33-3, at 5].

Upon his release from prison, Mr. Al-Amin made a pilgrimage to Mecca, after which he settled in Atlanta's West End community and established a mosque and a small store.[16]  Over the next two decades, Mr. Al-Amin became well-known as a community leader and a force of positive change, not only throughout the West End community, but in greater Atlanta and beyond.[17]  Throughout the 1980s, Mr. Al-Amin led the West End community in significantly decreasing the incidence of violence, drugs, and prostitution.[18]

Mr. Al-Amin was particularly well-regarded for his efforts in mentoring Atlanta youth from troubled backgrounds, and discouraging violence among them.[19]  Several witnesses testified the West End community changed for the better

---

[16] Tr. 4255-56 [Dkt. 33-3, at 33-34]; Thelwell (**Exhibit 13**), at 31 [Dkt. 57-4, at 7].

[17] Tr. 4153 [Dkt. 33-2, at 85] (testimony of William Abdur-Rahim that Mr. Al-Amin's "reputation preceded him as a community leader," in "[n]ot just the Muslim community, but the overall community").

[18] *See id.* at 4154 [Dkt. 33-2, at 86] (testimony of William Abdur-Rahim that Mr. Al-Amin's store became a "model" for a safe, wholesome place where a parent could send his or her child "without being offered some drugs [or] prostitution").

[19] *Id.* at 4177 [Dkt. 33-2, at 109] (testimony of Wilkie Jordan that Mr. Al-Amin "had a hands-on attitude towards [troubled] young people in [the West End] community"); *see also id.* at 4181 [Dkt. 33-2, at 113] (testimony of Robert Reece that Mr. Al-Amin spoke out against children's exposure to violent video games).

as a result of Mr. Al-Amin's leadership.[20]  His efforts made the community safer

and contributed to the growth of business in the community.[21]

In the late 1980s and 1990s, while continuing to serve as a community

leader, Mr. Al-Amin became involved in national Muslim efforts.  In 1987, he

submitted an *amicus* brief in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987),

which involved a challenge to the constitutionality of certain prison regulations

that impacted Muslim inmates.[22]  Mr. Al-Amin has served as head of the American

Muslim Council and of the Majlis Ash-Shura of North America, and was elected

Vice President of the American Muslim Council in 1990.

In 1995, Mr. Al-Amin was arrested by a joint task force of the ATF, FBI,

and local police for the shooting of William Miles.  Thelwell (**Exhibit 13**), at 32

[Dkt. 57-4, at 8].  Shortly after the arrest, Mr. Miles recanted, stating that law

---

In the 1990s, Mr. Al-Amin, a college athlete himself, volunteered to coach young
men in basketball at Adams Park Recreation Center in southwest Atlanta.  *Id.* at
4162-63 [Dkt. 33-2, at 94-95] (testimony of Lionel Moltimore); Mr. Al-Amin was
actively involved at the recreational center, and became known for his "genuine
love" for the youth.  *Id.* at 4163 [Dkt. 33-2, at 95].

[20] *Id.* at 4177 [Dkt. 33-2, at 109]; *see also id.* at 4235 [Dkt. 33-3, at 13] (testimony
of Ambassador Andrew Young about the increased safety of the West End
community beginning in the mid-1980s after Mr. Al-Amin's arrival).

[21] *Id.* at 4177 [Dkt. 33-2, at 109].

[22] Brief for Imam Jamil Abdullah Al-Amin, *et al.* as Amici Curiae Supporting
Respondents, *available at* 1987 WL 880917.

enforcement officials pressured him to identify Mr. Al-Amin even though Mr. Miles had not actually seen the shooter. *Id.* The charges against Mr. Al-Amin were dropped. *Id.* Various national Muslim organizations (including the Council for American Islamic Relations, the Islamic Society of North America, the American Muslim Council, and the Muslim Public Affairs Council) urged the Department of Justice to investigate the event.[23]

Thus, by the late 1990s, Mr. Al-Amin had served as a community leader in the West End for years and had become a leader in several national Muslim organizations. When Mr. Al-Amin briefly had been charged in the William Miles shooting, national groups rallied around him. Mr. Al-Amin's life and activities as an icon in his community are inconsistent with his engaging in a gunfight with police officers over a minor traffic offense.

**B.    In Mr. Al-Amin's Criminal Trial, the Trial Judge Rules The Traffic Stop Leading to the Issuance of the Warrant Violated the Fourth Amendment.**

On May 31, 1999, Mr. Al-Amin was pulled over by Cobb County Police Officer Johnny Mack for driving a vehicle with a "drive-out tag," meaning a temporary tag affixed to a vehicle pending issuance of a license plate. [Dkt. 15-6,

---

[23] *Muslim Groups Demand Probe into Arrest of H. Rap Brown,* WASH. POST, Aug. 29, 1995, at A8, copy attached as **Exhibit 22** [Dkt. 57-13].

at 43-44.]  Although Mr. Al-Amin produced a valid Georgia driver's license to

Officer Mack, his insurance card allegedly was expired.  [*Id.* at 44.]  According to

Officer Mack, the vehicle had been reported as stolen, and Mr. Al-Amin was

removed from the car and patted down.  [*Id.*]  After discovering Mr. Al-Amin's

honorary police badge from White Hall, Officer Mark arrested Mr. Al-Amin.  [*Id.*]

The items seized at the time of this arrest included a "bill of sale."  [*Id.* at 46.]  Mr.

Al-Amin ultimately was charged with driving a stolen car, driving with expired

insurance, and impersonating a police officer.

      In the criminal trial, the trial court ruled the traffic stop of Mr. Al-Amin

violated the Fourth Amendment because "there was no evidence Defendant

violated any traffic laws, nor was there evidence that the drive-out tag itself was

somehow suspicious.  It is clear that the Defendant was stopped simply because the

car he was driving bore a drive-out tag."  [Dkt. 15-6, at 45.]  Thus, the trial court

ruled "the evidence sized from the Defendant as a direct result of the stop and

subsequent detention may not be introduced into evidence."  [*Id.* at 46.]  Although

the state court also excluded the Cobb County indictment as "fruit of the poisonous

tree," it did not exclude the warrant [*Id.* at 47], which listed Mr. Al-Amin's height

as 6' 5" and his eyes as (erroneously) "GRY" (grey).  Tr. 17279 [Dkt. 33-5, at 13]**.**

### C.   In the State Habeas Case, Mr. Al-Amin Testified He Did Not Shoot the Deputy Sheriffs and Explained Why He Went to White Hall, Alabama Immediately After the Shooting.

At the state habeas hearing, Mr. Al-Amin testified he spent much of March 16, 2000 in his West End neighborhood, where he operated a neighborhood store and served as Imam of the masjid (usually leading five prayers a day).  HT 120 [Dkt. 1-3, at 122].  That night, after leading four prayers, he did not lead the final prayer (around 9/9:30 p.m.) because he had dinner with his family at Red Lobster. *Id.*  He then drove his 1978 Mercedes back to the neighborhood and parked on West End Place near the intersection with Oak Street, intending to go by his store and visit the masjid before he returned home.  *Id*. at 120-21 [Dkt. 1-3, at 122-23].

As he was crossing a field heading towards the masjid, Mr. Al-Amin heard two gunshots, then an exchange of gunfire rounds.  *Id.* at 121 [Dkt. 1-3, at 123]. The gunfire was behind him and to his right.  *Id.*  Alarmed, he ran for cover, circling the neighborhood and staying behind buildings until he could approach his parked car.  *Id.* at 122-23 [Dkt. 1-3, at 124-25].

By this time the shooting had ended, and Mr. Al-Amin quickly entered his car and left.  *Id.* at 125 [Dkt. 1-3, at 127].  After he began driving down West End Place toward Ralph David Abernathy Drive, the window in a rear door of the car collapsed, apparently as a result of gunshots.  *Id*. at 150 [Dkt. 1-3, at 152].

Earlier that day, Mr. Al-Amin had a heated discussion with four young men he thought might be trying to sell drugs in the neighborhood.  *Id.* at 139 [Dkt. 1-3, at 141].  This altercation caused him to be concerned the gunshots might have constituted an attempt by the young men to retaliate against him.  *Id.*

Worried the shooter or shooters were still looking for him, Mr. Al-Amin did not go home but instead traveled to a location he considered safe.  *Id.* at 125, 139 [Dkt. 1-3, at 127, 141].  He called his wife to tell her what had happened and that he was going to the Muslim community he had helped develop in White Hall, Alabama.  *Id.* at 125-26 [Dkt. 1-3, at 127-128].

**D.  Deputy English, the Only Eyewitness Who Specifically Identified Mr. Al-Amin, Stated He Shot the Assailant (Mr. Al-Amin Was Not Injured) and that the Assailant had Grey Eyes (Mr. Al-Amin's Eyes are Brown).**

On March 16, 2000, Fulton County Deputy Sheriffs Ricky Kinchen and Aldranon English arrived in the West End neighborhood around 10:00 p.m. to serve the Cobb County bench warrant on Mr. Al-Amin.  It is not clear why service was attempted at this hour, rather than during the hours Mr. Al-Amin operated the store or at the multiple times he led prayers at the masjid during the day.[24]

---

[24] *See* Thelwell (**Exhibit 13**), at 34 [Dkt. 57-4, at 9] (describing questions raised after the shooting, including "'[W]hy would they wait till 10 o'clock at night?  The man certainly wasn't hard to find.'"); *see also* Tr. 3411-12 [Dkt. 32-2, at 101-102].

Deputy English testified that, after attempting to locate Mr. Al-Amin earlier that evening, he and Deputy Kinchen made a last visit to Mr. Al-Amin's store on Oak Street around 10 p.m..  As they were leaving the area, they saw a vehicle pull to the curb on West End Place near the Oak Street intersection.  Even though this vehicle was spotted in a rear view mirror at a distance of 200 yards, Deputy English testified he recognized the individual who exited the vehicle as someone fitting the description on the warrant.  *See* Tr. 307-09 [Dkt. 29-3, at 51-53].  The Deputies turned their marked police car around and drove back down the street until their car was nose-to-nose with a black Mercedes.  Standing on the curb next to the door on the driver's side was a man who, in English's opinion, matched the description in the warrant for Mr. Al-Amin.  *Id.*

After the Deputies simultaneously exited their car, Deputy English asked the man to show them he had nothing in his right hand, which was out of sight.  The man allegedly produced an automatic rifle and began firing at the officers. Deputies English and Kinchen fired back with their service revolvers.  The shooters were only a few feet apart, according to English, and both deputies thought they wounded the man.  *See, e.g.,* Tr., at 336 [Dkt. 29-3, at 80] (testimony of Deputy English he thought he shot his assailant after firing two rounds to the

chest and one to the head); *id.* at 812, 910-11 [Dkt. 29-6, at 79, 177-78] (testimony regarding statements of Deputy Kinchen that he had shot the assailant).

Deputy English was able to radio for help, and both Deputies English and Kinchen described the assailant to the police who arrived on the scene.  *See* Tr. 340-42 [Dkt. 29-3, at 84-86].  Consistent with the information on the warrant (but inconsistent with Mr. Al-Amin's dark brown eyes), Deputy English repeatedly claimed the assailant had "grey eyes."  *Id.* at 525 [Dkt. 29-4, at 121]; *see also id.* at 572 [Dkt. 29-5, at 3] ("I looked him in the eyes" because "my mom always told me, look a man in his eyes, always look a man in his eyes"; "I was looking at him in his eyes"; "I remember them grey eyes . . . I couldn't forget that.").

In the direct appeal, the Georgia Supreme Court stated Mr. Al-Amin's guilt was "overwhelming established through the eyewitness identification by Deputies Kinchen and English . . . . "  *Al-Amin*, 278 Ga. at 85, 597 S.E.2d at 346.  Deputy Kinchen, however, did not specifically identify Mr. Al-Amin as the assailant before he passed away.[25]  Deputy Kinchen told the paramedic at the scene that he

---

[25] Although Deputy English stated the suspect was 6' 4", the limited identifying information provided on the warrant listed Mr. Al-Amin's height as 6' 5" (and erroneously stated his eyes were grey), and thus this allegedly identifying information could have been suggested by the warrant.  *See id.* 740 [Dkt. 29-6, at 7]; State's Trial Ex. 9 [Dkt. 53-2, at 2].

was in the process of serving a warrant when "the suspect" opened fire.  Tr. 1496-98 [Dkt. 30-4, at 27-29].[26]

Moreover, Deputy Kinchen also told policemen on the scene he had wounded the shooter.  *See* Tr. 812, 911 [Dkt. 29-6, at 79, 178] (testimony of Captain Jerome Hull that Kinchen told him, "I shot him, I think I shot him"); Tr. 911 [Dkt. 29-6, at 178] (testimony of Sergeant Heard that Kinchen said, "I think I shot someone").  Deputy English likewise told Police Department Sergeant Bennett immediately after the incident, "he felt like he had to have hit him because it was close range."  Tr. 1160 [Dkt. 30-2, at 9].[27]

As explained by one of the first officers to respond to Deputy English's calls for help, the responding officers followed a trail of blood from the intersection of West End Place and Oak Street to an empty house a few blocks away on Eggleston Street. Tr. 675-80 [Dkt. 29-5, at 106-11] (testimony of Sergeant Lacoss); *id*. at 747-48 [Dkt. 29-6, at 14-15] (testimony of Sergeant Weaver).  Sergeant Bennett

---

[26] Later in its decision, the Georgia Supreme Court acknowledged the Prosecutor incorrectly described Deputy Kinchen as identifying his assailant as "the guy on the warrant" (as opposed to correctly citing him as referring to "the suspect") but nevertheless stated Kinchen had provided an "eyewitness identification" of Mr. Al-Amin.  *See Al-Amin*, 278 Ga. at 85-86, 597 S.E.2d at 346-47.

[27] Additional record cites discuss statements by the deputies that they "had to have" shot the assailant.  *See* Tr. 511, 513-14, 830, 910-11, 1060, 1068-70, 1074 [Dkt. 29-4, at 107, 109-110; Dkt. 29-6, at 97, 177-178; Dkt. 30-1, at 64, 72-74, 78].

stated there were "blood droppings leading away from the scene and on the
sidewalk where English believed the suspect to be standing during the exchange of
gun fire."  Tr. 1042 [Dkt. 30-1, at 46].  Sergeant Bennett also believed the person
was likely injured "due to the number of rounds fired and the proximity, and the
deputy actually saying I had to have hit him."  *Id.* 1070 [Dkt. 30-1, at 74].  Dogs
were brought in to follow the blood trail, *id.* 821, 846 [Dkt. 29-6, at 88, 113], and
the blood trail supported issuance of a search warrant for the nearly store owned by
Mr. Al-Amin.  Tr. 1070-76 [Dkt. 30-1, at 74-80]; *see also* Tr. 17302-04 [Dkt. 33-5,
at 36-38] (affidavit of Sgt. Bennett seeking warrant to search Mr. Al-Amin's store
for "blood, bloody clothing, and evidence of medical intervention").

As discussed below, several 911 callers also reported seeing a wounded man
around the neighborhood who was still bleeding.  *Id.* at 3127-33 [Dkt. 31-8, at 48-
54].  Contemporaneous press coverage likewise described a blood trail at the scene
attributed to the assailant's wounds.[28]

---

[28] *See* David Firestone, *2 Deputies Are Shot While Seeking Arrest Of Ex-Black
Panther*, N.Y. TIMES, Mar. 17, 2000 (reporting "[t]he gunman escaped after being
wounded by one of the deputies . . . " and that SWAT teams and police dogs had
followed "a trail of blood"), www.nytimes.com/2000/03/17/us/2-deputies-are-shot-
while-seeking-arrest-of-ex-black-panther.html, copy submitted as **Exhibit 24** [Dkt.
57-15]; Doug Payne, *2 Fulton Deputies Shot in 'Ambush'*, ATL. J. CONST., Mar. 17,
2000, at A1 (stating police did not know whether Mr. Al-Amin was shooter but
Sheriff's Department was "following a blood trail"), copy submitted as **Exhibit 25**

### E.    Imhotep Shaka, the Only Eyewitness to the Actual Shootings Other than the Deputies, Testified he Was "Absolutely Positive" Mr. Al-Amin Was Not the Shooter.

At the time of trial, eyewitness Imhotep Shaka resided at 1153 Oak Street, the house with the most direct view of the intersection of Oak Street and West End Place.  Tr. 3569 [Dkt. 32-3, at 84]   Mr. Shaka's house is the closest house with a direct view of the intersection where the crimes occurred; the commercial building in which Mr. Al-Amin's store was located faces West End Park, and the lot across West End Place from the store is vacant (this is the vacant lot referenced in the habeas testimony of Mr. Al-Amin).

Mr. Shaka testified he was in bed at the time the shooting began.  Tr. 3570-71 [Dkt. 32-3, at 85-86].  When he realized he was hearing shooting he went to a ground floor window in his house facing the intersection of Oak Street and West End Place.  *Id.* at 3571 [Dkt. 32-3, at 86.]  He immediately spotted the shooter and saw him fire three shots.  *Id.* at 3571-72 [Dkt. 32-3, at 86-87].  Mr. Shaka described the shooter as being of "average height, average build," later describing

---

[Dkt. 57-16]; Lyda Longa, *Officers Vow to Find Former Black Panther*, ATL. J. CONST., Mar. 18, 2000, at A1, A10 (reporting the "gunman was also injured" and "investigators searching for him followed a trail of blood that led to an abandoned house near the scene"), copy submitted as **Exhibit 26** [Dkt. 57-17, at 2-3].

the shooter's build as "medium."  Tr., at 3573 [Dkt. 32-3, at 88].  He thought the

shooter was wearing "brownish" clothing.  *Id.* at 3573-74 [Dkt. 32-3, at 88-89].

Mr. Shaka had lived in the community "[a]t least six years," and saw Mr. Al-

Amin on a "regular basis."  Tr., at 3574 [Dkt. 32-3, at 89].  He twice replied

"absolutely" when asked whether he would recognize Mr. Al-Amin and his distinct

physical build, which Mr. Shaka described as "tall and slender."  *Id.*  Mr. Shaka

then testified he was "absolutely positive" the assailant was not Mr. Al-Amin:

> Q:    The person that you saw firing a pistol near this
>        intersection toward the park, was that Jamil Al-Amin?
>
> A:    No, sir.
>
> Q:    Why?
>
> A:    Because it wasn't the same stature.  It wasn't – it wasn't
>        that build.  Jamil has a distinctive – Jamil is tall.
>
> Q:    Are you certain that it was not Jamil Al-Amin?
>
> A:    I'm ***absolutely positive***.

*Id.* at 3574-75 [Dkt. 32-3, at 89-90] (emphasis added).

### F.    Other Evidence Showing Mr. Al-Amin was Not the Shooter.

At least three other eyewitnesses, as well as other evidence from the night of

the crime, support Mr. Shaka's testimony that Mr. Al-Amin was not the shooter.

- 37 -

###### 1.    Fareed Jihad Sees a Man Fitting Mr. Shaka's Description of the Shooter Fleeing the Scene in a Van.

Fareed Jihad lives at 1151 Eggleston Street with his wife and five children. Tr., at 3518 [Dkt. 32-3, at 33].  He and his son were watching a basketball game when the shootout began, at which point they turned the lights out and "hit the floor."  *Id.* at 3519 [Dkt. 32-3, at 34].  After the shots ended, and with his children still laying on the floor, Mr. Jihad exited his house and walked towards West End Place.  *Id.*  As he approached West End Place, Mr. Jihad saw a light-colored van and then "saw a person coming up the street [and] getting into the van."  *Id.* at 3522 [Dkt. 32-3, at 37.]  This individual was "about 5' 8", 5' 9", somewhere in that area, I wouldn't think more than 6," and was wearing "either a light beige jacket or shirt."  *Id.*

Mr. Jihad testified the van "started backing up, and the lights came on, the reverse lights."  Tr., at 3523 [Dkt. 32-3, at 38].  The van was backing up towards the intersection of West End Place and Eggleston, away from the scene of the shooting at the intersection of West End Place and Oak Street.  *Id.*  The van backed up West End Place past the intersection with Eggleston Street, then turned and

sped away down Eggleston Street.  *Id.*  Mr. Jihad believed the driver of the van

"cut his lights on as he got past me."  *Id.*[29]

### 2.    Rose Mitchell Also Sees the Van Fleeing the Scene.

Rose Mitchell lives at 562 West End Place, which is the fifth house behind

the store heading south on West End Place from Oak Street (and the house directly

across from the intersection of West End Place and Eggleston Street).  Tr., at 3494-

95 [Dkt. 32-3, at 9-10].  Ms. Mitchell testified that after hearing the gunfight, she

went to her door and witnessed a light-colored van rapidly backing down West End

Place away from the Oak Street intersection.  Tr. 3499-3508 [Dkt. 32-3, at 14-23].

Ms. Mitchell testified the van "almost hit my car" as it backed up West End Place,

was "cream color[ed]," and was a "club van," which she described as "larger than a

regular van."  Tr. 3504-3505 [Dkt. 32-3, at 19-20].  The last thing Ms. Mitchell

witnessed was the van "swerv[ing] around my car and [going] up Eggleston."  *Id.*

---

[29] Although not referenced in the "harmless error" section of its decision, the
Georgia Supreme Court elsewhere acknowledged testimony that "a vehicle
(dissimilar to Al–Amin's) was seen driving away from the scene several minutes
later" when it affirmed the trial court's exclusion of a similar statement by another
witness as cumulative.  *Al-Amin*, 278 Ga. at 89, 597 S.E.2d at 349.

### 3.     George Wilson Hears Deputy Kinchen Exclaim "I hit him, I hit him" and Testifies to Mustafa's Presence at the Scene.

George Wilson had been with Mr. Al-Amin for the first four prayers on March 16, 2000, but testified (consistent with Mr. Al-Amin's state habeas testimony) that Mr. Al-Amin did not lead the fifth prayer.  Tr., at 3415 [Dkt. 32-2, at 105].  Following this prayer at 9:00 or 9:30, Mr. Wilson stayed at the masjid to tutor a student in reading, and he was still at the masjid when the gunfight began.  *Id.* at 3421 [Dkt. 32-2, at 111].  He and the student hit the floor and stayed there for a few minutes, after which he crawled over to a window overlooking the open field next to the masjid.  *Id.* at 3421-22 [Dkt. 32-2, at 111-112].

There he saw a police officer laying in the field and exclaiming to other officers arriving on the scene, "I'm hit, I'm hit."  Tr., at 3423 [Dkt. 32-2, at 113].  The officer then stated "'I hit him, I hit him.  He went that away, he went that away.'"  *Id.*  According to Mr. Wilson, the officer was pointing towards Ralph David Abernathy Boulevard (*i.e.*, heading south on West End Place).  *Id.*

Mr. Wilson also testified regarding the presence of Mustafa (legal name Lamar Tanner) at the masjid the night of the crime.  Tr., at 3425 [Dkt. 32-2, at 115].  Mr. Wilson had seen Mr. Tanner a/k/a Mustafa before and knew who he was.  *Id.*  At the final prayer, Mustafa had been asked to leave the masjid, because

he "had a bulge in his back" when he offered prayer that Mr. Wilson believed looked like "a weapon."  *Id.* at 3426-27 [Dkt. 32-2, at 116-117].[30]

### 4.   The 911 Calls Describing an Injured Assailant.

Helen Lane, a 911 operator on the night of the shooting, testified there were multiple 911 calls regarding the crime but stated that two "stand out to me."  Tr. 3127 [Dkt. 31-8, at 48.]  In the first, the caller stated that a man who had been "involved in the shooting of the deputies" was "bleeding on the corner begging for a ride."  *Id.* at 3127-28 [Dkt. 31-8, at 48-49.]  In the second, the caller stated the shooter was "hiding behind this brick building," which is why "dogs are barking" (dogs audibly were barking in the background).  *Id.* at 3129 [Dkt. 31-8, at 50].

In a later examination by the Prosecution, Ms. Lane defended her description of the first call as describing an injured suspect:  "He didn't say the person that was shot.  But he did – when I asked him was the person bleeding he did say the person was bleeding."  Tr., at 3353 [Dkt. 32-2, at 43].

---

[30] Although there was some confusion as to the prayer when this occurred, Mr. Wilson clarified at the end of his testimony Mustafa had the bulge in his back at the last prayer.  *See* Tr., at 3426-37 [Dkt. 32-3, at 116-117]; *see also id.* at 3436-37 [Dkt. 32-2, at 126-27] (confirming on cross-examination it was the final prayer).

### 5. The Chiles Home Security Tape Showing a Man Other than Mr. Al-Amin Scaling a Fence and Trying to Break into a Nearby Medical Facility a Few Hours After the Crime.

The West End Medical Center at John O. Chiles is located at 456 Joseph E. Lowery Boulevard (formerly Ashby Street), approximately 0.5 mile from the crime scene (1128 Oak Street). On the night of the shooting Teresa North was working at the front desk at the John O. Chiles, which she described as "a high rise for senior citizens." Tr., at 3611 [Dkt. 32-3. At 126]. Part of her responsibilities included watching the security cameras. *Id.* at 3613 [Dkt. 32-3, at 128].

Ms. North testified that, a few hours after the crime, she saw a man "approach the fence," "jump over," and then attempt to enter the facility through both the front and back door. Tr., at 3614 [Dkt. 32-3, at 129]. This man "appeared to be injured" as he "climbed over the fence." *Id.*

### 6. The Failure to Investigate Leads Other than Mr. Al-Amin.

Less than five hours after the shooting, and despite the blood trail and other evidence of a wounded assailant, police stopped searching the area, instead initiating a nationwide manhunt for Mr. Al-Amin. *See* Tr. 3082 [Dkt. 31-8, at 3]; *see also id.* 1181 [Dkt. 30-2, at 30] (within 24 hours of shooting, Mr. Al-Amin was primary suspect). In addition to ignoring all other leads, officials also chose to dismiss the confession of a recently paroled violent criminal, Otis Jackson.

### G. Otis Jackson's Swears to Committing the Crimes in a Deposition Taken in the State Habeas Proceeding.

Otis Jackson, also known as James Santos, has been convicted of numerous violent crimes, and at the time of his deposition was incarcerated on charges including robbery with a deadly weapon.  Jackson Dep., at 5 [Dkt. 1-5, at 3].  In 1998, Mr. Jackson had been convicted by the State of Nevada for "Battery with Use of Deadly Weapon."  [Dkt. 1-4, at 31.] This conviction arose out of Mr. Jackson's shooting of a man who had accused Mr. Jackson of stealing a dog.  *Id.* Mr. Jackson was paroled by the State of Nevada on or about January 31, 2000.  *Id.*

In February 2000, Mr. Jackson submitted an "Application for Compact Services and Agreement to Return," seeking to be allowed to return to Atlanta, Georgia (where his mother resided) while he completed his parole.  *Id.*  Mr. Jackson's request was granted, and he returned to Atlanta.  [Dkt. 1-4, at 32.]  His parole officer in Atlanta, Sara Bacon, testified at the state habeas hearing that Mr. Jackson was "[c]ombative . . . a difficult parolee."  HT, at 42 [Dkt. 1-3, at 44].

As a condition of his parole, Mr. Jackson was supposed to wear an ankle monitor supplied by a security company called the Sentinel Company.  *Id.* at 38 [Dkt. 1-3, at 40].  Mr. Jackson was permitted to work at a local restaurant called Mick's.  *Id.*  Otherwise, Mr. Jackson was to remain at his Georgia residence or within a short perimeter around the home.  Jackson Dep., at 6-7, 14 [Dkt. 1-5, at 4,

6].  Mr. Jackson repeatedly violated the ankle monitoring condition of his parole, and was arrested for these violations shortly after the March 16, 2000 shooting. HT, Ex. P-1 [Dkt. 1-4, at 19-33].[31]   Less than two weeks after the shooting, on March 28, 2000, Mr. Jackson's parole was revoked.  *Id.* [Dkt. 1-4, at 31].

Within days of the shooting, Mr. Jackson had confessed to committing the crime.  Jackson Dep., at 44-45 [Dkt. 1-5, at 13].  He claimed the shootout resulted because he was trying to avoid arrest for parole violations.  *See, e.g., id.* at 19 [Dkt. 1-5, at 7] ("I got this gun on me and I'm on parole and on house arrest.  So I can't take the chance of allowing him [one of the deputies] to search me and to find this gun and find out I'm on house arrest.").  According to Mr. Jackson, after pulling the patrol car up to a parked Mercedes and getting out of the car, the Deputies had drawn their guns and directed Mr. Jackson to raise his hands.  *Id.*  Mr. Jackson tried to explain that he was not trying to rob the store, but that he was simply looking for someone.  *Id.*

When the Deputies did not accept his explanation, Mr. Jackson moved to the side of the parked Mercedes to use it as cover, drew his .9 millimeter gun, and

---

[31] Mr. Jackson explained in his deposition, taken for the first time in the state habeas proceedings, that the ankle monitoring violations arose from various actions he took in the wake of the crime, including dealing with his gunshot wound and getting rid of the weapons.  Jackson Dep., at 35-43 [Dkt. 1-5, at 11].

began shooting at the Deputies, who returned fire.  Jackson Dep., at 20-21[Dkt. 1-5, at 7].  Mr. Jackson then crossed the street to his own car and opened the trunk, where he had a fully-loaded .223 millimeter semi-automatic weapon, and he continued to fire at the Deputies.  *Id.* at 21-23 [Dkt. 1-5, at 7-8].  Deputy Kinchen fell in the street near the patrol car.  *Id.* at 25 [Dkt. 1-5, at 8].  Deputy English, struck by several shots, went into the nearby vacant lot.  Mr. Jackson confirmed shooting Deputy English because he heard him scream.  *Id.* at 26 [Dkt. 1-5, at 9].

After being wounded by one of the deputies, Mr. Jackson testified his "mind was gone" and he fired multiple shots at an officer who had fallen in the street.  Jackson Dep. 25-26 [Dkt. 1-5, at 8-9].  Mr. Jackson's description of the injuries to the other officer (including hitting him "in the leg") matches the trial evidence regarding Deputy English's injuries.  *See id.* at 27 [Dkt. 1-5, at 9].

Mr. Jackson testified that he was shot "[t]wice in the arm," which left visible scars.  Jackson Dep. 24-25 [Dkt. 1-5, at 8].  Mr. Jackson was "in shock" from his injuries, and wandered around the crime scene trying to "stop some cars" and "knock[ing] on three doors to people's houses."  *Id.* at 27-28 [Dkt. 1-5, at 9].  This testimony is consistent with statements of 911 emergency callers who testified that a wounded man was in the streets seeking assistance shortly after the shootings.  Tr. 3330-57, 3563-3623 [Dkt. 32-2, at 20-47; Dkt. 32-3, at 78-138].

Mr. Jackson described his own eyes as having "a gray tint around the edges."  Jackson Dep. 11 [Dkt. 1-5, at 5].  Deputy English described the assailant as having "grey eyes," stating, "I remember them grey eyes . . . I couldn't forget that."  Tr. 525, 572 [Dkt. 29-4, at 121; Dkt. 29-5, at 3].  Mr. Al-Amin's eyes, in contrast, are dark brown, with no "grey" tint.  Furthermore, Mr. Jackson is 5'8", 165 pounds (*see* HT Ex. P-2 [Dkt. 1-4, at 41),  whereas Mr. Al-Amin is 6'5" and thin (*see* State's Trial Ex. 9 [Dkt. 53-2]).  Mr. Jackson thus fits the description of the shooter given by Mr. Shaka, who testified he knew Mr. Al-Amin's body type and the shooter was much shorter and stockier.  Tr. 3563-77 [Dkt. 32-3, at 78-92].

When Mr. Jackson was arrested for violating the conditions of his parole, law enforcement officials searched his residence.  They found both .223 and .9 mm caliber ammunition – the same caliber of ammunition used in the crime.  *See* Ex. 2B Part 2 to Mr. Al-Amin's original Petition, at 19924-19932 [Dkt. 1-4, at 19-27].

Consistent with the reports that the assailant was wounded, the FBI had a medic present in Alabama, so that Mr. Al-Amin could be examined and his wounds documented.  *See id.* at 1877-78, 1923, 1934-35 [Dkt. 30-7, at 43-44, 89, 100-101].  Mr. Al-Amin, however, had no gunshot wounds and no bruises (as would be typical) from being shot while wearing a bulletproof vest.  *Id.* at 1923, 1934, 2979-80 [Dkt. 30-7, at 89, 100; Dkt. 31-7, at 60-61].

- 46 -

In his deposition, Mr. Jackson also explained the circumstances surrounding his earlier recanting of his confession while incarcerated.  After he confessed to an FBI Agent while incarcerated in the Clark County Jail, police treatment of Mr. Jackson began to change.  *See* Jackson Dep. 44-48 [Dkt. 1-5, at 13-14].  Mr. Jackson "missed a lot of meals" and "a white sign . . . saying cop killer" was placed on his door.  *Id.* at 47-48 [Dkt. 1-5, at 14].  "[O]fficers would forget to feed [Mr. Jackson]," and "took [his] Koran, pray[er] rug, things of that nature."  *Id.* at 47 [Dkt. 1-5, at 14].  Then, another FBI agent visited Mr. Jackson and "advised [him] that . . . it wouldn't be wise to take responsibility . . . for this crime."  *Id.* at 49 [Dkt. 1-5, at 14]; *see also id.* at 50 [Dkt. 1-5, at 15].

Mr. Jackson also confirmed he did not speak with any of the attorneys representing Mr. Al-Amin in his criminal trial either before or during the trial, but only spoke with an investigator, Watani Tyehimba, working on behalf of Mr. Martin.  *Id.* at 54-56 [Dkt. 1-5, at 16].  During this interview, Mr. Jackson drew a map for Mr. Tyehimba detailing aspects of the shootout.  *Id.* at 55 [Dkt. 1-5, at 16].

### H.   Deputy English's Eyewitness Identification of Mr. Al-Amin.

Deputy Kinchen died from his wounds.  The day after the shooting, Deputy English identified Mr. Al-Amin out of a single photo array in which five other individuals were pictured.  *Id.* at 364 [Dkt. 29-3, at 108].  In addition to the

inherent concerns presented where officers eager to secure an identification to

support an arrest warrant present a single photo line-up with only six pictures, the

defense raised numerous questions regarding the reliability of Deputy English's

eyewitness identification.[32]   Deputy English was under close-range armed assault

and only had a few seconds to view the person he confronted at night on the street

before his O.C. pepper spray canister was shot, releasing spray essentially blinding

him for the remainder of gunfight.  Tr. 516-518 [Dkt. 29-4, at 112-114].  As

discussed in detail above, moreover, both Deputies claimed at the time they had

shot and wounded the assailant, and Deputy English repeatedly claimed the eyes of

the man the Deputies confronted were "grey."  *See esp*. Tr., at 572 [Dkt. 29-5, at 3]

("My Mom always told me, look a man in his eyes . . . I remember them grey

---

[32] In a lengthy dissent, Justice Brennan collected numerous authorities recognizing
eyewitness identification as "notoriously unreliable."  *Watkins v. Sowders*, 449
U.S. 341, 349-60, 100 S. Ct. 654, 659-65 (1981) (Brennan, J., dissenting).
According to studies conducted by the Innocence Project (a non-profit dedicated to
the use of DNA evidence to set aside wrongful convictions imposed before DNA
evidence was available), "mistaken eyewitness identifications contributed to
approximately 72% of the more than 300 wrongful convictions in the United States
overturned by post-conviction DNA evidence."  *See* article available at
http://www.innocenceproject.org/free-innocent/improve-the-law/fact-
sheets/eyewitness-identification-reform.   The Innocence Project identifies several
best practices for eyewitness identifications that were not utilized in connection
with the photo line-up shown to English.  *Id.*

eyes.").  Deputy English also admitted he did not know whether more than one person fired at the Deputies.  Tr. 521-24 [Dkt. 29-4, at 117-20].

The defense also presented evidence that Deputy English's mental faculties would have been impaired at the time by medications he was taking (including morphine) at the time of the identification.  *See* Tr., at 2737, 2741, 3176-77, 3188, 3222 [Dkt. 31-5, at 152, 156; Dkt. 32-1, at 35-36; Dkt. 32-1, at 47, 81].[33]

## I.    FBI Agent Campbell's Involvement in Mr. Al-Amin's Arrest.

A warrant was issued for Mr. Al-Amin's arrest for the March 16, 2000 shootings.  Police received information that Mr. Al-Amin was in Alabama, and a federal "UFAP" (Unlawful Flight to Avoid Prosecution) warrant issued. Following the issuance of the UFAP warrant, agents of the FBI, including FBI Special Agent Ron Campbell, participated in the search for Mr. Al-Amin.  Tr. 1691-96 [Dkt. 30-6, at 22-27] (testimony of FBI Agent Campbell regarding his participation in case).

Mr. Al-Amin was arrested on March 20, 2000.  The federal officers who arrested Mr. Al-Amin claimed he fired shots at them and fled into the woods.

---

[33] *See also* Tr. 3176-7, 3188, 3222 [Dkt. 32-1, at 35-36; Dkt. 32-1, at 47, 81] (testimony of David Benjamin, clinical pharmacologist and toxicologist, that Deputy English's "cognitive or [ ] mental facilities would have been impaired by those medications" and that the drugs alone would have raised doubts about the reliability of a photo identification).

Several civilian witnesses, however, testified at the underlying trial that only federal officers fired weapons.  *Id.* at 3234-38, 3246-49, 3278-82, 3304-07 [Dkt. 32-1, at 93-97, 105-108, 137-141, 163-166].[34]

    At the time Mr. Al-Amin was arrested, he did not have any guns in his possession.  Tr., at 1927-28 [Dkt. 30-7, at 93-94] (testimony of FBI Special Agent Sosebee).   Nor did he show any evidence of having being shot by the Deputy Sheriffs.  *Id.* at 1900 [Dkt. 30-7, at 66].  In fact, the FBI had a medic on hand to document Mr. Al-Amin's injuries, only to find he had none.  *See id.* at 511, 513-14, 830, 911, 1060, 1068-76, 1877, 1923, 1934-35, 2979-80 [Dkt. 29-4, at 107, 109-110; Dkt. 29-6, at 97, 178; Dkt. 30-1, at 64, 72-80; Dkt. 30-7, at 43, 89, 100-101; Dkt. 31-7, at 60-61].  Furthermore, in contrast with the allegations he recently had fired on the arresting officers, no gun residue was found on Mr. Al-Amin.  *See id.* at 2330, 2342, 2362-63 [Dkt. 31-2, at 107, 119, 139-140].

    The next day, other items were found in the vicinity of the arrest, including: several .223 caliber shell casings; a green canvas bag containing a cell phone; clothing; a magazine containing .223 caliber ammunition,  the registration

---

[34] The allegations of the federal officers prompted the filing of a separate, sealed indictment against Mr. Al-Amin in the United States District Court for the Middle District of Alabama.  These charges were dismissed in December of 2002.  *See United States v. Al-Amin*, Case No. 2:01-cr-00152-MHT-CSC-1, Order [granting Government's Mot. to Dismiss Without Prej.] (M.D. Ala. Dec. 6, 2002).

documents for a Mercedes-Benz automobile (showing Mr. Al-Amin as the owner);

and a .223 caliber semi-automatic Ruger assault rifle with two magazines of .223

caliber ammunition.  *Id.* at 2244-80, 2345 [Dkt. 31-2, at 21-57, 122] (testimony of

FBI Agent Greene).  Ballistics evidence offered during the trial (including

testimony from Bernadette Davy as Firearms Examiner for the State Crime Lab)

showed that bullets and casing found at the scene in Atlanta matched the weapons

found in White Hall.  *Id.* at 2948-57 [Dkt. 31-7, at 29-38] (testimony of Bernadette

Davy).  Several days after his arrest, Mr. Al-Amin's Mercedes was located in the

White Hall area.  *Id.* at 2391 [Dkt. 31-3, at 2].  Evidence was presented that bullets

removed from the Mercedes were fired from the service revolvers of Deputies

English and Kinchen, *id.* at 2939-47 [Dkt. 31-7, at 20-28], consistent with Otis

Jackson 's testimony the officers fired on him when he was behind the Mercedes.

　　　Despite allegations he recently had fired at members of the search team, Mr.

Al-Amin's fingerprints were not on the weapons or the ammunition, Tr. at 2844

[Dkt. 31-6, at 93], and there is no physical evidence (other than the actual presence

of the guns in White Hall) linking Mr. Al-Amin to the .223 caliber or .9 millimeter

weapons.  One of the defense theories in the underlying case was that FBI Agent

Campbell was a "rogue" agent who had "planted" these weapons to implicate Mr.

Al-Amin on occasions when Campbell was separated from the rest of the members

of the search team in the Alabama woods, in locations where they would be found by other members of the search party.  *See* Tr. 2628 [Dkt. 31-5, at 43] (testimony that FBI Agent Campbell "fell behind" the other agents in Whitehall and could not be observed).[35]  At the time of his arrest, Mr. Al-Amin was kicked and spat upon by FBI Agent Campbell.  *Id.* at 1718-19 [Dkt. 30-6, at 49-50]; *see also Al-Amin*, 278 Ga. at 82, 597 S.E.2d at 344.

FBI Agent Campbell shot Glenn Thomas, a Muslim, African-American man, in Philadelphia in 1995.[36]  According to contemporaneous news stories, Mr. Thomas was unarmed at the time FBI Agent Campbell shot him in the back of the head.  Several witnesses to the Philadelphia incident claimed that FBI Agent Campbell had planted a gun at the scene intending to implicate Thomas as armed.[37]

---

[35] HT, at 97 [Dkt. 1-3, at 99] (testimony of Attorney Martin).

[36] Tr. 139 [Dkt. 29-2, at 25] (Attorney Warren:  "We have strong reason to believe that Mr. Campbell back in June the 1st of 1995 shot a young African-American who was also a Muslim in the head, the back of the head."), *id.* at 401-02 [Dkt. 29-3, at 145-146] (Judge Manis indicating that materials regarding incident will be sealed and made part of the record).

[37] *See* Myung Oak Kim & Joe O'Dowd, *Doubts Linger Residents Still Seek Answers in Shooting by FBI Agent*, PHILLY.COM (June 6, 1995), *available at* http://articles.philly.com/1995-06-06/news/25690736_1_gun-fbi-agent-fingerprints (noting that the gun recovered near Glenn Thomas's body contained no identifiable fingerprints), copy attached as **Exhibit 27** [Dkt. 57-18]; Thomas J. Gibbons Jr., *Fugitive is Shot to Death*, PHILLY.COM (June 2, 1995), *available at* http://articles.philly.com/1995-06-02/news/25690197_1_fbi-agent-veteran-police-officers (describing allegations by community members that Glenn Thomas did not

As with the guns found in the vicinity of Mr. Al-Amin's arrest, the gun found next to Mr. Thomas's dead body did not carry any fingerprints.  *See id.*

During the trial below, defense counsel repeatedly attempted to introduce this evidence to impeach FBI Agent Campbell, to show his history of misconduct and to corroborate the defense claim that FBI Agent Campbell similarly had planted the guns attributed to Mr. Al-Amin.  The trial court barred counsel from doing so.

**J.**   **Mr. Al-Amin's Defense Lawyers File a Motion to Prohibit Prosecutorial Misconduct Specifically Discussing the Dangers of Improper Prosecutorial Argument.**

Before trial, Mr. Al-Amin's attorneys filed a motion directed to "Prosecutorial Misconduct" that proved to be uncannily prescient relative to Mr. Al-Amin's Fifth Amendment claim.  *See* Motion to Prohibit Prosecutorial Misconduct, etc. [Dkt. 12-6, at 36-73].  This motion argued to the trial court that improper  prosecutorial argument "rises to the level of fundamental unfairness and requires retrial."  *Id.* at 4 [Dkt. 12-6, at 39] (citing *United States v. Jorn*, 400 U.S. 470, 485, 91 S. Ct. 547, 557 (1971)).   This motion also noted the need to preempt improper prosecutorial argument "because a 'curative' instruction at trial will

---

have a gun), copy attached as **Exhibit 28** [Dkt. 57-19].  The actual newspaper articles proffered to the trial court during the underlying trial should be among the additional state court record materials to be filed by Respondent.

generally exacerbate, rather than cure, the prejudiced caused by improper argument." *Id.* at 7 [Dkt. 12-6, at 42].

Continuing, the motion cautioned: "'The naïve assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction . . .'" *Id.* at 8 [Dkt. 12-6, at 43] (quoting *Burton v. United States*, 391 U.S. 123, 129, 88 S. Ct. 1620 (1968) (further citation omitted)). "'The risk that the jury will not, or cannot, follow instructions is so great, and the consequence of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.'" *Id.* (quoting *Cruz v. New York*, 481 U.S. 186, 190, 107 S. Ct. 1714 (1987) (further citation omitted)).

### K.     The Trial

On March 28, 2000, Mr. Al-Amin was charged in a 13-count indictment with malice murder, felony murder (four counts), aggravated assault on a peace officer (two counts), obstruction of a law enforcement officer (two counts), aggravated battery on a peace officer, possession of a firearm by a convicted felon, and possession of a firearm in the commission of a felony (two counts). Tr. 156-66 [Dkt. 29-2, at 42-52].

The trial occurred in early 2002, six months after the 9/11 terrorist attacks on the World Trade Center. Mr. Al-Amin was represented in the underlying criminal

trial by John R. ("Jack") Martin, Martin Brothers P.C., 44 Broad Street, Suite 202, Atlanta, Georgia 30303; Bruce Harvey, Harvey Law Firm, 146 Nassau St. NW, Atlanta, Georgia 30303; Tony L. Axam, Axam Law, P.O. Box 115238, Atlanta, Georgia 30310; and Michael W. Warren, 580 Washington Avenue, Brooklyn, New York 11238-2705.  Messrs. Martin, Harvey, Axam, and Warren are referred to collectively as the "Defense Lawyers."

The key trial events relative to the current habeas claims are the state court's ruling prohibiting the Defense Lawyers from cross-examining FBI Agent Campbell regarding the Philadelphia incident and the Prosecution's extended mock cross-examination of Mr. Al-Amin in closing arguments, after he had exercised his right not to testify.

### 1.    The Trial Court's Ruling Precluding Cross-Examination of FBI Agent Campbell Regarding the Philadelphia Incident.

The Defense Lawyers sought to cross-examine FBI Agent Campbell regarding his 1995 shooting of Glenn Thomas in Philadelphia, to support the defense theory FBI Agent Campbell had planted the weapons and ammunition in Alabama.  *See* HT, at 97 [Dkt. 1-3, at 99] (testimony of Attorney Martin).

Shortly after the criminal trial began, the Defense Lawyers alerted the trial court that when FBI Agent Campbell testified, the defense intended to cross-examine him about an incident in Philadelphia, Pennsylvania in 1995, in which

FBI Agent Campbell allegedly (a) shot Glenn Thomas, an African-American Muslim, without provocation and (b) planted a weapon on him.  *See* Tr. 139-141, 258-59, 401-02 [Dkt. 29-2, at 25-27; Dkt. 29-3, at 2-3, 145-146]; *see also id.* at 1725-28 [Dkt. 30-6, at 55-59].

The trial court did not allow this line of cross-examination even after the State was permitted to introduce evidence that another FBI agent (Harris) thought that FBI Agent Campbell's assault of Mr. Al-Amin after his arrest was merely "unprofessional" and a "mistake."  Tr., at 2159, 2161 [Dkt. 31-1, at 101, 103].  Mr. Martin argued that "Agent Harris testified today that he didn't do anything or didn't report anything about Agent Campbell's incident because he thought . . . he was just in the heat of battle, and it was a small thing, a first-time thing.  The way he was implying it was just a little – an aberration, an unusual thing."  *Id.* at 2313 [Dkt. 31-2, at 90].  Mr. Martin argued that Agent Harris's testimony opened the door for the defense to contradict that testimony by asking Agent Harris about FBI Agent Campbell's prior similar misconduct as evidence of a pattern of deceptive misconduct.  *See id.*

The state court barred the defense from pursuing this line of questioning, on the grounds that "[s]pecific instances of prior misconduct may not be used to impeach the character or veracity of a witness 'unless the misconduct has resulted

- 56 -

in the conviction of a crime involving moral turpitude.'"   *Al-Amin*, 278 Ga. at 84,

597 S.E.2d at 345 (quoting *Allen v. State*, 275 Ga. 64, 68, 561 S.E.2d 397 (2002)).

The Defense Lawyers, however, sought to introduce this evidence of FBI Agent

Campbell's conduct under a "similar transaction" theory.   Tr. 1724-29, 2313-18

[Dkt. 30-6, at 55-60; Dkt. 31-2, at 90-95]; *see also* New Trial Hrg. 86-92 [Dkt. 35-

1, at 88-94].   Under this theory, evidence is not offered to tarnish the witness's

character (*i.e.*, for pure impeachment), but to show the witness acted in a certain

manner previously and, therefore, the jury can infer that he acted in a similar

manner in this case.   *See, e.g.*, *United States v. Cohen*, 888 F.2d 770 (11th Cir.

1989) (reversing judgment and remanding for new trial where trial court excluded

evidence of a similar scheme); *see also* New Trial Hrg. 87 [Dkt. 35-1, at 89].

### 2.   Prosecutorial Misconduct During Closing Arguments

#### a.   The Prosecutor's Mock Cross-Examination

On the advice of the Defense Lawyers, Mr. Al-Amin did not testify during

the criminal trial.   Nevertheless, in closing arguments, the Prosecution utilized a

mock cross-examination "chart" and directly addressed Mr. Al-Amin with pointed

questions unambiguously calculated to cause the jury to infer Mr. Al-Amin's guilt

from his failure to testify.

The Prosecutor began by stating it had some questions for Mr. Al-Amin. *See* Tr. 3696 [Dkt. 32-5, at 23] ("I want to leave you [the jury] with a few questions you should have for the defendant."). These questions were displayed on a chart to the jury, under the title, "Questions for the Defendant." Tr. 19817 [Dkt. 36-3, at 57]. The Prosecutor then proceeded, one by one, to ask Mr. Al-Amin pointed questions deliberately calculated to focus the jury's attention on Mr. Al-Amin's failure to testify:

> "The first question. Who is Mustafa?"[38]

> "So who is Mustafa? That's question one."

> "Question two. Why would the FBI care enough to frame you?"

> "Third question. How did the murder weapons end up in White Hall?"

> "Mr. Defendant, how did those murder weapons get there to Whitehall?"

---

[38] In addition to the testimony from Mr. Wilson regarding Mustafa (a/k/a Lamar Tanner) being asked to leave the final prayer at the masjid due to the suspected presence of a weapon, FBI surveillance records indicate a man matching Mustafa's description was in White Hall around the time of the arrest. *See* Am. to State Habeas Pet'n at 3 [Dkt. 1-7, at 4] (noting that the SWAT Report containing surveillance reports of White Hall Alabama, including one of a "black male, 6'2," dressed all in white" seen in that area were not produced until after the trial); *see also* Tr. of Hrg. on Mot. for New Trial, at 145-46 ("New Trial Hrg.") [Dkt. 35-1, at 147-148] (Dec. 13, 2002) (describing recently discovered documents).

"Next question.  How did your Mercedes get to White Hall?
How did it get to Whitehall?  Did you drive it there?"

"So how did your Mercedes get to Whitehall?  More important,
how did your Mercedes get shot up?"

"But the question is either your car was there at the scene
parked in front of your store – "

"[W]hy did the Defendant run?  Why did the Defendant run?
Why not just gather up members of your community and turn
yourself in?"

"Why run to Alabama, leaving your family behind, both your
wives, your family?"

"Why run if you didn't do it?  If you're innocent, just turn
yourself in."

"Where were you at 10 p.m. on March 16?"

Tr., at 3696-3711 [Dtk. No. 32-5, at 23-38].

After this lengthy cross-examination (over the repeated objections of the

Defense Lawyers), the Prosecution made explicit the adverse inference of guilt he

wanted the jury to draw against Mr. Al-Amin:  "He was standing outside his black

Mercedes murdering Deputy Ricky Kinchen and trying to murder Deputy

Aldranon English.  That is the *only* evidence you have heard and will hear in this

case as to where Jamil Abdullah Al-Amin was at 10 p.m. on March 16, 2000,

*that's it*."  Tr., at 3711 [Dkt. 32-5, at 38] (emphasis added).  The obvious

implication was that Al-Amin has chosen to exercise his Fifth Amendment

- 59 -

privilege rather than explain where he was at the time of the gunfight, and

therefore must have been there, involved, and guilty.

Mr. Martin objected to this entire line of questioning and the court asked the

jury to leave the courtroom.  *Id*. at 3700 [Dkt. 32-5, at 27].  Defense counsel then

moved for a mistrial, noting that "it is improper argument for the state to make any

type of comment that would imply or infer to the jury that the defendant has a

responsibility to testify or to present any evidence."  *Id.*  Defense counsel

specifically objected to the Prosecution's asking questions posed to the

"defendant" and "you," because it "clearly impl[ied] to the jury that the defendant

had some obligation to take the stand and to answer these questions."  *Id.* at 3700-

01[Dkt. 32-5, at 27-28].  The Prosecution briefly responded, stating "I think the

record will speak for itself," and did not refute defense counsel's points

specifically.  *Id.* at 3701 [Dkt. 32-5, at 28].

The trial court denied the motion, stating:

> The line that has to be drawn is between an improper comment
> on the failure of the defendant to testify and a proper closing
> argument which may comment on the failure to present certain
> evidence.  The distinction is one of substance and not of form.
> It is correct that [the Prosecution] used the word Defendant
> when he should have clarified that it was in fact a failure to
> present evidence.

*Id.* at 3702 [Dkt. 32-5, at 29].

The court then asked Mr. Al-Amin's attorney if there was anything he would like the court to say to the jury, to which he responded, "I think any type of instruction at this point would only compound the error, and therefore I don't think it would correct any problems so I am not asking you to do anything at this point." *Id.* The court then instructed counsel for the State "to clarify or emphasize, it is his or the State's commenting on a failure to present evidence as opposed to commenting on the failure of the defendant to testify." *Id.*

The Prosecution changed the chart to read "Questions for the defense" (Tr. 19818 [Dkt. 36-3, at 58]) but then continued unabated with his closing argument, without clarifying he was only "commenting on a failure to present evidence as opposed to commenting on the failure of the Defendant to testify." *Id.* Instead, the Prosecutor argued to the jury that the "question that you should be asking the defense in this case, and that is how did the Defendant's Mercedes get shot up?" *Id.* at 3705 [Dkt. 32-5, at 32]. The Prosecution then again asked another question directly to Mr. Al-Amin:  "But the question is either **your** car was there at the scene parked in front of **your** store." *Id.* at 3706 [Dkt. 32-5, at 33] (emphasis added). Mr. Al-Amin's attorney again moved for a mistrial. *Id.*

Given the continuing egregiousness of the Prosecution's blatant violation of Mr. Al-Amin's Fifth Amendment rights and the trial court's refusal to grant a

- 61 -

mistrial,  Mr. Al-Amin's counsel had no choice but to request an instruction to the

jury.  Tr., at 3707 [Dkt. 32-5, at 34] ("With this type of chart we believe it's

improper.  We would request instruction to the jury about the impropriety of it.").

The court corrected defense counsel, in front of the jury, commenting, "Of what

***you believe*** is an impropriety."  *Id.* (emphasis added).  Counsel then approached

the bench (with the jury still in the courtroom), and defense counsel asked the court

to give an instruction to the jury that (1) "the defendant has no burden to present

any evidence whatsoever in any case," and (2) "the defendant has no obligation to

testify . . . and no adverse [ ] inference should be drawn against the defendant for

his failure to testify."  *Id.* at 3707-08 [Dkt. 32-5, at 34-35].  The court responded,

"All right.  I'm going to do what I'm going to do."  *Id.* at 3708 [Dkt. 32-5, at 35].

 The court then instructed the jury, but de-emphasized the importance of the

instruction and emphasized it had overruled Mr. Al-Amin's objection:

> I'm going to give you a clarifying instruction now ***just in an
> abundance of caution***.
>
> There has been an objection to some of [the State's] closing
> ***which the court has overruled***.  However, in order to clarify,
> I'm going to make very clear what I believe is appropriate.
>
> This is closing argument.  Closing argument is not evidence.
> Attorneys may draw inferences and urge you to draw inferences
> from the evidence.  It is proper for the attorneys to argue a
> failure to present certain evidence.  However, you must keep in
> mind that a defendant in a criminal case is under no duty to

present any evidence to prove innocence and is not required to take the stand and testify in the case.

If a defendant elects not to testify, no inference hurtful, harmful or adverse to him shall be drawn by you, and no such fact shall be held against him.

However, it is proper for one side or the other to comment on failure to present certain evidence, but not to comment on the failure of the defendant to testify.

And I'm clarifying this, that, as you know, the burden of proof always remains on the state to prove the guilt of a defendant as to any charge beyond a reasonable doubt.

You'll hear many of these concepts when you receive the instructions of the law.  But just to clarify this area now I'm giving you this instruction.

Tr., at 3708-09 [Dkt. 32-5, at 35-36] (emphasis added).  As Mr. Al-Amin's defense counsel feared, far from "curing" the Prosecution's misconduct, this instruction compounded the constitutional error:  (1) it downplayed the significance of Mr. Al-Amin's objection by stating the instruction was being given "just in an abundance of caution"; (2) it then immediately reiterated that the court had "overruled" Mr. Al-Amin's objection; (3) it assisted the Prosecution's effort to cause the jury to draw an adverse inference against Mr. Al-Amin based on his failure to testify by stating it was entirely proper for the Prosecution to "urge you to draw inferences from the evidence"; (4) it sandwiched the reference to Mr. Al-Amin's Fifth Amendment rights between two separate acknowledgements it was perfectly

acceptable for the Prosecution "to argue a failure to present certain evidence"; and

(5) it weakly articulated Mr. Al-Amin's Fifth Amendment rights, confusingly

using multiple negatives in the critical purported curative statement:  "If a

defendant elects not to testify, no inference hurtful, harmful or adverse to him shall

be drawn by you, and no such fact shall be held against him."  *See id.*  Finally, the

trial court's concluding statement diminished the import of giving the instruction at

the time (during the middle of closing arguments), by telling the jury it was one of

many legal instructions they would receive at the end of the case.

Despite the trial court's instruction, moreover, the Prosecution continued to

direct its questions to Mr. Al-Amin specifically: "[W]hy did the ***defendant*** run?  . .

.  Why not just gather up members of ***your*** community and turn ***yourself*** in?"  *Id.*

at 3710 [Dkt. 32-5, at 37] (emphasis added).  The Prosecution added: "Why run to

Alabama, leaving ***your*** family behind, both ***your*** wives, ***your*** family?  Why run if

***you*** didn't do it?  If ***you're*** innocent, just turn yourself in."  *Id.* at 3711 [Dkt. 32-5,

at 38] (emphasis added).

The Prosecution then asked the last question on the chart (which remained in

front of the jury):  "Where were ***you*** at 10 p.m. on March 16?"  Tr., at 3711 [Dkt.

32-5, at 38] (emphasis added).  In what can only be viewed as a direct attack on

Mr. Al-Amin's right to remain silent, the prosecutor rhetorically answered his own

- 64 -

question:  "He was standing outside his black Mercedes murdering Deputy Ricky Kinchen and trying to murder Deputy Aldranon English.  That is the only evidence you have heard and will hear in this case as to where Jamil Abdullah Al-Amin was at 10 p.m. on March 16, 2000, that's it."  *Id.* [Dkt. 32-5, at 38].

Defense counsel renewed its objection and its motion.  Tr., at 3711-12 [Dkt. 32-5, at 38-39].  The Court again overruled it.  *Id.* at 3712 [Dkt. 32-5, at 39].

### b.    Other improper commentary by the Prosecution

The Prosecution made additional improper statements in closing arguments.

On eleven different occasions, the Prosecution argued that the State's evidence was "Uncontested."  Tr. 3680-3683 [Dkt. 32-5, at 7-10].  The clear import was that Al-Amin had not offered any evidence, including his own testimony or explanation.

The Prosecutor also stated, "You haven't heard anyone testify that this is a case of self-defense."  *Id*. at 3684 [Dkt. 32-5, at 11].  It could not have been lost on the jury such a defense would be presented by Mr. Al-Amin, and thus this argument again reminded the jury Mr. Al-Amin had elected not to testify.

The Prosecution argued that only one eyewitness to the shooting testified.  Tr., at 3820 [Dkt. 32-6, at 5].  According to the Prosecution (which ignored the eyewitness testimony of Mr. Shaka regarding the shooter), three people witnessed

the alleged events:  Mr. Al-Amin; Deputy English; and the late Deputy Kinchen (who died shortly after the crime).  Again, this argument served to remind the jury that Mr. Al-Amin did not testify.

Finally, in perhaps the most egregious example of prosecutorial misconduct calculated to secure Mr. Al-Amin's conviction at any cost, the Prosecution urged the jury, "Don't stand for him," a clear reference to Mr. Al-Amin's religiously-based decision to remain seated throughout the trial, made with the permission of the court.  Tr., at 3828-29 [Dkt. 32-6, at 13-14].  This comment could not have been intended to relate to the claims or defenses in the criminal case, but instead can only be viewed as an attempt to inflame the jurors regarding Mr. Al-Amin's Muslim faith just six months after the World Trade Center attacks.

### L.    Conviction and Sentencing

Mr. Al-Amin was convicted on the counts on which he was charged.  After hearing testimony from seventeen witnesses regarding Mr. Al-Amin's contributions to and leadership of the West End community for nearly twenty years, his national and international contributions to peaceful Islamic efforts, and his overall character, the jury rejected the death penalty and instead sentenced him to life imprisonment without the possibility of parole.  Tr. 3973-4268, 4406-08 [Dkt. 33-1, at 57-152 through Dkt. 33-3, at 46; Dkt. 33-4, at 32-34].

## M.     Post-Trial and Appellate Briefing

Mr. Al-Amin was represented on his direct appeal by Mr. Martin; Donald F.

Samuel, Garland Samuel & Loeb, 3151 Maple Drive, N.E., Atlanta, GA 30305;

and William Charles Lea, 231 Peachtree St. SW, A2, Atlanta, Georgia 30303.

Because Mr. Martin represented Mr. Al-Amin in both the underlying trial and the

direct appeal, Mr. Al-Amin had good cause for not raising ineffective assistance of

counsel in the direct appeal.[39]

In both post-trial briefing and in Appellant's Brief, Mr. Al-Amin preserved

his challenges to the violations of his Fifth Amendment rights arising from the

Prosecution's improper mock cross-examination and the violations of his Sixth

Amendment rights arising from the trial court's refusal to allow cross-examination

of FBI Agent Campbell regarding the Philadelphia incident.

Mr. Al-Amin's Supplemental Motion for New Trial, for example, explained

at length the intended questioning of FBI Agent Campbell went to "a 'similar

transaction' theory," and not just "pure impeachment."  Supp. Mot. for New Tr., at

---

[39] *See, e.g., Hopkinson v. Shillinger*, 866 F.2d 1185, 1203 n.12 (10th Cir. 1989)
(holding ineffective assistance of counsel claim not raised on direct appeal by same
attorney could be considered in habeas action and explaining, "we could not expect
counsel in that situation to prove their own incompetency"), *rev'd on other
grounds*, 888 F.2d 1286 (10th Cir. 1989); (en banc) *Riner v. Owens*, 764 F.2d
1253, 1257 (7th Cir. 1985); *Alston v. Garrison*, 720 F.2d 812, 816 (4th Cir. 1983).

16-17 [Dkt. 15-7, at 48-49].   Mr. Al-Amin cited *United States v. Cohen*, 888 F.2d

770 (11th Cir. 1989), which specifically differentiated mere impeachment evidence

and similar transaction evidence.   *Id.*   Where a criminal defendant seeks to

challenge a key prosecution witness based on similar transaction evidence, the

exclusion of such evidence deprives the defendant "from presenting an adequate

defense and thus deprived [him] of a fair trial."  888 F.2d at 777.  Mr. Al-Amin

also cited multiple Georgia appellate decisions following *Davis v. Alaska*, 418 U.S.

308, 94 S. Ct. 1105 (1974), including a Georgia Supreme Court case holding  a

state criminal defendant's Confrontation Clause rights are violated where the trial

court improperly limits cross-examination of a critical prosecution witness.  *See*

Supp. Mot. for New Tr., at 17 [Dkt. 15-7, at 49] (citing, *inter alia*, *Mangum v.*

*State*, 274 Ga. 573, 576-77, 555 S.E.2d 451, 455-56 (2001) (holding limitation on

cross-examination of key prosecution witness violated defendant's Confrontation

Clause rights), and *Bowen v. State*, 252 Ga. App. 382, 382-383, 556 S.E.2d 252,

253-54 (2001)).[40]

In the direct appeal, Mr. Al-Amin included a section of his opening brief

entitled:  "The Trial Court's Limitation of Appellant's Cross-Examination of

---

[40] This Supplemental Motion for New Trial also contained an extended argument
regarding the Prosecution's improper commentary on Mr. Al-Amin's failure to
testify.  Supp. Mot. for New Trial, at 17-22 [Dkt. 15-7, at 49-56].

Special Agent Ronald Campbell Relating [to] His Prior Assault Upon a Suspect in

Philadelphia Violated Appellant's Rights to Due Process and Confrontation

Guaranteed by the United States Constitution."  Br. of Appellant, at 68-70 [Dkt.

36-1, at 71-73].  Again, Mr. Al-Amin relied on *Cohen* and Georgia appellate

authorities following the U.S. Supreme Court's Confrontation Clause ruling in

*Davis v. Alaska.*.  *Id.*  And Mr. Al-Amin offered an extended argument challenging

the Prosecution's mock cross-examination.  *Id.* at 70-76, 80-81 [Dkt. 36-1, at 73-

79, 83-84].

In a "Supplemental Brief" filed in the direct appeal, Mr. Al-Amin again

clarified the cross-examination of FBI Agent Campbell was not simply an attempt

to "impeach" him based on a prior incident of wrongdoing.  Supp. Br. of

Appellant, at 28-30 [Dkt. 36-3, at 41-43].  Mr. Al-Amin explained:

> This is not [Mr. Al-Amin's] position at all.  To the contrary,
> [Mr. Al-Amin] believes that it was his right to present "similar
> transaction" type evidence for the same reasons that it is
> allowed to be presented against a defendant, *i.e.*, to show
> motive, bias, intent and bent of mind.

*Id.* at 29 [Dkt. 36-3, at 42].  Mr. Al-Amin further explained that the evidence

"regarding a prior incident where Special Agent Campbell acted inappropriately in

pursuing a fugitive and in falsifying evidence related thereto" was highly relevant to FBI Agent Campbell's "conduct, motive, intent, bias, and bent of mind." *Id.*[41]

Following oral argument in the direct appeal, Mr. Al-Amin submitted a 12-page "Post-Argument Supplemental Brief" specifically addressing the issue of whether the trial court's instruction "cured" the Prosecution's repeated violations of Mr. Al-Amin's Fifth Amendment rights. *See* Post-Argument Supp. Br. [Dkt. 36-3, at 61-76]. This brief provides additional details regarding the exchange between the trial court, the Prosecution, and the Defense Lawyers regarding the improper mock cross-examination, the "chart" of questions placed in front of the jury that the trial court refused to order the Prosecution to remove, the multiple defects in the purported curative instruction given by the trial court, and the elimination of any possible "curative" value resulting from the Prosecution's continuation of its mock cross-examination after the instruction. *See id.*

---

[41] At the time of Mr. Al-Amin's trial, Georgia courts admitted similar transaction evidence against a criminal defendant to show the defendant's "bent of mind" to commit the crime at issue. *See, e.g., Reese v. State*, 252 Ga. App. 650,652, 556 S.E.2d 150, 153-54 (2001). Mr. Al-Amin argued that, if similar transaction evidence could be offered against a criminal defendant to show "bent of mind," a criminal defendant should be able to utilize similar transaction evidence to cross-examine a key prosecution witness regarding his "bent of mind."

### N.     The Georgia Supreme Court's Decision in the Direct Appeal

The Georgia Supreme Court denied Mr. Al-Amin's claims and affirmed his conviction on May 24, 2004.  *Al-Amin v. State*, 278 Ga. 74, 597 S.E.2d 332 (2004). Even though Mr. Al-Amin had not raised a challenge to the sufficiency of the evidence supporting his conviction, the state court nevertheless reviewed the evidence "in a light most favorable to the verdict" and applied the deferential standard of *Jackson v. Virginia* to the verdict.  *Id.* at 74, 597 S.E.2d at 339 (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781 (1979)).

Regarding Mr. Al-Amin's argument "the trial court improperly restricted cross-examination of Special Agent Campbell regarding his shooting of another suspect in an unrelated case in Philadelphia in 1995," the Georgia Supreme Court focused entirely on the standard applicable where a party relies on "prior misconduct . . . to impeach the character or veracity of a witness."  *Id*. at 84, 597 S.E.2d at 345.  Under this inapposite line of authorities, the evidence is allowed only where the witness actually has been convicted of a crime.  *See id.*

As noted above, this ruling misapprehends the basis of Mr. Al-Amin's challenge to the limitation on FBI Agent Campbell's cross-examination.  Mr. Al-Amin was not relying on the Philadelphia incident to demonstrate FBI Agent Campbell's general "bad character in the form of reputation."  O.C.G.A. § 24-9-84

(now superseded), cited in *Al-Amin*, 278 Ga. at 84, 597 S.E.2d at 345.  Rather, Mr. Al-Amin sought to introduce evidence FBI Agent Campbell had planted a gun after shooting Mr. Thomas to show Campbell had engaged in similar conduct by planting the weapons in the vicinity of Mr. Al-Amin.  Mr. Al-Amin's Confrontation Clause rights demanded that he be allowed to utilize similar transaction evidence to the same extent as the State would have been allowed to use such evidence against a defendant.  *See Reese v. State*, 252 Ga. App. 650, 652, 556 S.E.2d 150, 153 (2001) (describing limited showing required for State to introduce similar transaction evidence against a criminal defendant).[42]

Regarding the improper mock cross-examination in closing arguments, the Georgia Supreme Court agreed that the Prosecution violated Mr. Al-Amin's "Fifth Amendment right against self-incrimination."  *Id.* at 84, 597 S.E.2d at 346.  But the state court found this violation "harmless beyond a reasonable doubt."  *Id.*

The Georgia Supreme Court acknowledged the Prosecution had placed in front of the jury a chart entitled "Questions for the defendant," with seven different

---

[42] *See also Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974) (contrasting general discrediting of witness with specific impeachment "directed towards revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand.  The partiality of a witness is subject to exploration at trial, as is 'always relevant as discrediting the witness and affecting the weight of his testimony.'") (quoting 3A J. Wigmore, *Evidence* § 940, at 775 (Chadbourn rev. 1970) ).

questions for Mr. Al-Amin listed on the chart. *Id.*; *see also* Tr. 19817 [Dkt. 36-3, at 57]. Noting the Prosecution had changed the title of the chart to "Question for the defense" after Mr. Al-Amin's counsel moved for a mistrial (but acknowledging the Prosecution nevertheless "continued with his closing"), the state court then summarized the trial court's curative instruction in a one-sided fashion, ignoring the multiple aspects of that instruction that undermined any possible curative value (as discussed above). *See id.* at 85, 597 S.E.2d at 346; *see also* Tr. 19817 [Dkt. 36-3, at 57] (original chart); *id.* 19818 [Dkt. 36-3, at 58] (modified chart).

Given the U.S. Supreme Court's mandate that "the State does not impose 'a penalty' for or make 'costly' the exercise of the constitutional right to remain silent," the Georgia Supreme Court agreed that Mr. Al-Amin's "constitutional and statutory rights were violated when the prosecutor in effect engaged in a mock cross-examination of the accused who had invoked his right to remain silent." *Id.* at 85, 597 S.E.2d at 346 (quoting *Griffin v. California*, 380 U.S. 609, 614, 85 S. Ct. 1229, 1232-33 (1965)). But the state court dismissed the error as "harmless":

> Improper reference to a defendant's silence, however, does not automatically require reversal. Assuming that a defendant has preserved the point by proper objection, the error may be harmless beyond a reasonable doubt. The determination of harmless error must be made on a case by case basis, taking into consideration the facts, the trial context of the error, and

the prejudice created thereby as juxtaposed against the strength
of the evidence of defendant's guilt.

*Id.* (quoting *Hill v. State*, 250 Ga. 277, 283(4), 295 S.E.2d 518 (1982), and citing

*Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967)).

In three sentences, the Georgia Supreme Court deemed the Prosecution's

egregious violation of Mr. Al-Amin's Fifth Amendment rights "harmless error":

Al–Amin's guilt was overwhelmingly established through the
eyewitness identification by Deputies Kinchen and English, as
well as by the vast amount of physical evidence tying defendant
to the crimes.  The jury was promptly given a lengthy
instruction setting forth the correct principles of law.  The
strength of the evidence against Al–Amin coupled with the
contemporaneous curative instruction leads this Court to
conclude that the violation here was harmless beyond a
reasonable doubt.

*Id.* at 85-86, 597 S.E.2d at 346-47.  Thus, the sole grounds for the state court's

finding of harmlessness were (1) the "eyewitness identification by Deputies

Kinchen and English"; (2) the "vast amount of physical evidence tying [Mr. Al-

Amin] to the crimes"; and (3) the "lengthy curative instruction setting forth the

correct principles of law."  *Id.*

The Georgia Supreme Court similarly found "harmless" the Prosecution's

misconduct in telling the jury "don't stand for him" at the end of its closing

argument.  *Id.* at 86, 597 S.E.2d at 347.  Noting Mr. Al-Amin's religious beliefs

"prevented him from rising when the jury entered the courtroom," the state court

- 74 -

(1) criticized the Defense Lawyers for not accepting the trial court's earlier offers to tell the jury – in a trial conducted just six months after 9/11 – that "as an observant Muslim, Al-Amin is prevented by his religious beliefs from standing in the courtroom"; and (2) ruled that, because the defense ultimately agreed to an instruction (explicitly informing the jury Mr. Al-Amin was a "practicing Muslim") during the jury charge – *i.e.*, after the Prosecution already had commented on Mr. Al-Amin's religiously-based refusal to stand – this error also was "harmless." *Id.* at 86, 597 S.E.2d at 347.

### O.   The State Habeas Proceedings

Following the denial of Mr. Al-Amin's Petition for a Writ of Certiorari in his direct appeal, he timely filed a state habeas petition in the Superior Court of Georgia, Tattnall County.  Mr. Al-Amin originally was represented in his state habeas proceedings by G. Terry Jackson, Jackson & Schiavone, 1111 Bull Street, P.O. Box 8876, Savannah, Georgia 31412, and Linda S. Sheffield, 6600 Peachtree Dunwoody Rd, 400 Embassy Row, Suite 470, Atlanta, Georgia 30328.

At Mr. Al-Amin's request, A. Stephens Clay and C. Allen Garrett Jr. of Kilpatrick Townsend & Stockton LLP, 1100 Peachtree Street, Suite 2800, Atlanta, Georgia 30309 (who had been appointed by the Eleventh Circuit to represent Mr. Al-Amin *pro bono* in connection with a civil rights action) later appeared in the

state habeas action.  When the state habeas court abruptly denied Mr. Al-Amin's

state habeas petition without conducting an anticipated further evidentiary hearing,

Messrs. Clay, Garrett, and Ronald L. Raider assisted with the preparation of Mr.

Al-Amin's Application for a Certificate of Probable Cause to the Georgia Supreme

Court.  [Dkt. 1-1.]Following Terry Jackson's death from cancer in 2012,

undersigned *pro bono* counsel has served as Mr. Al-Amin's sole habeas counsel.

On February 27, 2007, the state habeas court held an evidentiary hearing,

during which several exhibits were filed and several witnesses (Mr. Al-Amin, Mr.

Al-Amin's lead counsel Jack Martin, and T.J. Ward, who held found the company

that administered Otis Jackson's ankle monitoring) provided live testimony.  In

addition to filing several exhibits regarding Otis Jackson's confession and the

revocation of his parole, Mr. Al-Amin's state habeas lawyers filed an "Affidavit of

Terry Walker Jr."  State Habeas Tr., Ex. P-7 [Dkt. 1-4, at 60].  Mr. Walker had

served as one of the jurors in Mr. Al-Amin's criminal case and provided the

following details regarding the deliberations of the jury (grammatical errors in Mr.

Walker's statement have been left uncorrected):

> A major part of the decision we made as a juror to find Jamil
> Al-Amin guilty was based on Jamil Al-Amin choice not to
> testify.  We as jurors wanted to hear from Jamil Al-Amin.  I
> personally wanted to hear from Jamil Al-Amin.  The majority
> of the juror expressed the same opinion regarding Mr. Al-

> Amin's decision not to testify.  We discussed Jamil Al-Amin
> choice not testifying in the deliberating room.  Jamil Al-Amin
> not testifying played a major role in our decision to find Mr. Al-
> Amin guilty.  We as jurors considered other factors but him not
> testifying was definitely one factor in which we weighed when
> making the final decision of guilt in the deliberating room.  I
> don't recall all the names of the particular juror but the majority
> felt Mr. Al-Amin should have said something.
>
> things we as jurors felt should have be done main thing Mr. Al-
> Amin should have made a statement or at least come on the
> witness stand say out of his own mouth that he was not guilty if
> that statement could have been made it could have swayed
> votes in the other direction.

*Id.*  Thus, exactly as the Prosecution intended when it engaged in its extended and

visually-aided mock cross-examination, the "main thing" on which the jury

focused in their deliberations was Mr. Al-Amin's exercise of his Fifth Amendment

right not to testify.  A more injurious effect on the verdict is hard to imagine.

Mr. Al-Amin also presented evidence during the state habeas hearing

regarding the Defense Lawyers' failure to investigate the confession of Otis

Jackson.  During the criminal trial, the Prosecution told the Defense Lawyers that

Otis Jackson could not have committed the crimes because ankle monitoring (a

condition of his parole) proved he was home that night.  T.J. Ward, one of the

founders of the company that administered Mr. Jackson's ankle monitoring system,

testified at the evidentiary hearing in Mr. Al-Amin's state habeas action that Mr.

Jackson would have been able to leave his house on the evening of the shooting and avoid detection as he claimed.  *See* HT 48-70 [Dkt. 1-3, at 50-72].

### P.     The State Habeas Court's Final Order

On July 28, 2011, the state habeas court issued its "Final Order."  **Exhibit 2-A** [Dkt. 1-2].  In rejecting Mr. Al-Amin's ineffective assistance of counsel claim based on his trial counsel's failure to investigation Otis Jackson's confessions, the state habeas court relied on (1) the ankle monitoring data indicating Mr. Jackson had been home at the time of the crime; (2) Mr. Jackson's retraction of his confession; and (3) the interview of Mr. Jackson by an investigator for the Defense Lawyers.  *Id.* at 10 [Dkt. 1-2, at 11].  These rulings completely ignored (1) the evidence presented at the state habeas hearing (including sworn testimony by T.J. Ward, who had helped start the ankle monitoring company) disputing the State's characterization of the ankle monitoring data as furnishing Otis Jackson with an air-tight alibi (the Defense Lawyers had not investigated the correctness of the State's representations); (2) the deposition testimony of Mr. Jackson explaining the mistreatment and duress that led him briefly to recant his confession; and (3) the testimony of Mr. Al-Amin's lead defense attorney agreeing he should have investigated Mr. Jackson's confession further.

Regarding Mr. Al-Amin's Confrontation Clause challenge to the limitation on his cross-examination of FBI Agent Campbell, the state habeas court summarily followed the Georgia Supreme Court's ruling in the direct appeal. *Id.* at 25 [Dkt. 1-2, at 26]. The state habeas court similarly followed the ruling in the direct appeal relative to Mr. Al-Amin's challenge to the mock cross-examination in the Prosecution's closing arguments. *Id.* at 27-28 [Dkt. 1-2, at 28-29].

As addressed more fully in Mr. Al-Amin's motion for discovery, the state habeas court ruled as follows relative to his *Brady* claim:

> FOIA documents show there was surveillance of [Mr. Al-Amin], which means there must have been surveillance on the night of the office in question since the FBI was immediately on the scene, but said surveillance records were never produced to [Mr. Al-Amin], despite containing exonerating evidence.

*Id.* at 30 [Dkt. 1-2, at 31]. The state habeas court ruled the *Brady* claim "procedurally defaulted" because it was not raised in the direct appeal. *Id.* The state court further held it could not compel the FBI to turn over information, and thus "the appropriate route to obtain these documents lies in federal court, not the state habeas court" (a route Mr. Al-Amin has attempted to pursue). *Id.*

## V.    CLAIMS FOR RELIEF

### CLAIM I

**THE STATED VIOLATED MR. AL-AMIN'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS WHEN THE PROSECUTION ENGAGED IN A MOCK CROSS-EXAMINATION OF MR. AL-AMIN AFTER HE HAD INVOKED HIS CONSTITUTIONAL RIGHT NOT TO TESTIFY.**

For purposes of § 2254(d)(1), a state court decision "involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner." *Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432, 1439 (2005).

### A.    The Rigorous Standards for Finding "Harmless Error"

The Georgia Supreme Court correctly identified *Griffin* as the U.S. Supreme Court precedent that prohibits a prosecutor from treating a defendant's silence as substantive evidence of guilt. *See Al-Amin v. State*, 278 Ga. 74, 85, 597 S.E. 2d 332, 346 (2004) (citing *Griffin v. California*, 380 U.S. 609, 615, 85 S. Ct. 1229 (1965)). In fact, the Georgia Supreme Court held that Mr. Al-Amin's constitutional rights under *Griffin* were violated when "the prosecutor in effect engaged in a mock cross-examination." *Id.* at 85, 597 S.E.2d at 346.

To find this error harmless, the state court had to "declare a belief that [the violation] was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S. Ct. 824 (1967). In the context of improper commentary on a

defendant's Fifth Amendment rights, courts must consider the nature of the error, including whether the comments were "extensive"; whether "an inference of guilt from silence [was] stressed to the jury as a basis of conviction"; and whether "there is evidence that could have supported acquittal." *Anderson v. Nelson*, 390 U.S. 523, 523-24, 88 S. Ct. 1133 (1968). The "beneficiary of a constitutional error" – *i.e.,* the State – must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 368 U.S. at 24, 87 S. Ct. at 828; *see also O'Neal v. McAninch*, 513 U.S. 432, 438-39, 115 S. Ct. 992, 995-96 (1995) (State bears "risk of doubt" as to whether error harmless). "[W]hen a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." *Id.* at 445, 115 S. Ct. at 999.

The Georgia Supreme Court based its determination on the "strength of the evidence against Al-Amin coupled with the contemporaneous curative instruction." *Al-Amin*, 278 Ga. at 85-86, 597 S.E.2d at 346-47. The state court found Mr. Al-Amin's "guilt was overwhelmingly established through the eyewitness identification by Deputies Kinchen and English, as well as by the vast amount of physical evidence tying defendant to the crimes." *Id.* The Georgia Supreme Court also found that "[t]he jury was promptly given a lengthy instruction setting forth

the correct principles of law." *Id.*  Based on the record, These determinations were manifestly inaccurate and unreasonable.

### B.   The Repetitive Nature of the Prosecution's Violations of Mr. Al-Amin's Fifth Amendment Rights Should Have Been Considered.

In the direct appeal, the Georgia Supreme Court considered the extensive nature of the Prosecution's improper commentary on Mr. Al-Amin's invocation of his Fifth Amendment rights only in determining whether a constitutional error occurred.  *See Al-Amin*, 278 Ga. at 84-85, 597 S.E.2d at 346.  The state court made no further reference to the quality and quantity of the violations in its evaluation of whether the error was "harmless."  *Id.* at 85-86, 597 S.E.2d at 346-47.  It was objectively unreasonable for the Georgia Supreme Court to ignore the repetitive and egregious nature of the prosecutorial misconduct in determining whether the error was harmless.  *See Chapman*, 386 U.S. at 24, 87 S. Ct. at 828 (finding "no doubt" error was harmful in light of "prosecutorial comments" themselves),

In stating the harmless error standard, the Georgia Supreme Court favorably quoted its statement of the rule in *Hill v. State*, 250 Ga. 277, 283(4), 295 S.E.2d 518 (1982).  *See id.*  But the Eleventh Circuit ultimately granted federal habeas relief to the defendant in *Hill.  See Hill v. Turpin*, 135 F.3d 1411 (11th Cir. 1998).

In *Hill*, the Eleventh Circuit emphasized that while an "isolated" improper prosecutorial statement (in *Hill*, improper commentary on the accused's post-

*Miranda* silence and request for counsel) may be deemed harmless error, repeated prosecutorial violations of a defendant's constitutional rights are much more likely to be found harmless.  *See* 135 F.3d at 1416-18.  In fact, the *Hill* court noted that "even a single improper reference might not be harmless under the *Chapman* standard where the defendant's exculpatory story – on which the prosecution's comment cast doubt – was not implausible, the government's evidence was not overwhelming, and the reference was purposeful."  *Id.* at 1418.

In this case, the Prosecution repeatedly and deliberately commented on Mr. Al-Amin's failure to testify.  "Such a machine-gun repetition of a denial of constitutional rights, designed and calculated to make petitioners' version of the evidence worthless, can no more be considered harmless than the introduction against a defendant of a coerced confession."  *Chapman***,** 386 U.S. at 25-26, 87 S. Ct. at 829 (finding repeated improper comments on failure to testify not harmless despite a "reasonably strong 'circumstantial web of evidence'" against defendants). *See also Gamache v. California*, 131 S. Ct. 591, 593 (2010) (Statement of Sotomayor, J., joined by Ginsburg, Breyer, and Kagan, JJ., regarding denial of certiorari) (citing, *inter alia*, *State v. Ball*, 675 N.W.2d 192, 203-04 (S.D. 2004) (holding, where state made "extensive and repetitive comments" on defendant's failure to testify, state had not demonstrated harmlessness beyond a reasonable

doubt)); *United States v. Meneses-Davila*, 580 F.2d 888, 895-96 (5th Cir. 1978) (holding prosecutor's repeated comments on pre-trial silence not harmless).

"The rule against adverse inferences is a vital instrument for teaching that the question in a criminal case is not whether the defendant committed the acts of which he is accused.  The question is whether the Government has carried its burden to prove its allegations while respecting the defendant's individual rights." *Mitchell v. United States*, 526 U.S. 314, 330, 119 S. Ct. 1307, 1316 (1999).  In Mr. Al-Amin's case, there can be no doubt the Prosecution deliberately set out to cause the jury to draw an adverse inference against Mr. Al-Amin based on his failure to testify and not to focus on the defense's arguments the State had not demonstrated Mr. Al-Amin's guilt beyond a reasonable doubt.

By failing even to consider the extensive, intentional, repetitive nature of the Prosecution's improper commentary on Mr. Al-Amin's right not to testify, the Georgia Supreme Court unreasonably applied *Chapman*'s harmless error standard.

### C.   The Georgia Supreme Court Unreasonably Concluded the Evidence of Mr. Al-Amin's Guilt was "Overwhelming."

In finding Mr. Al-Amin's guilt "overwhelmingly established," the Georgia Supreme Court relied on (1) the "eyewitness identification by Deputies Kinchen and English" and (2) the "vast amount of physical evidence tying [Mr. Al-Amin] to the crimes."  278 Ga. at 85-86, 597 S.E.2d at 346.

The state court's analysis, in addition to ignoring the egregious nature of the prosecutorial misconduct, also failed to consider the entire record, not just the evidence favorable to the Prosecution.  Federal courts have found determinations of fact unreasonable when state courts failed to consider key evidence in the record.  *See Miller-El v. Cockrell*, 537 U.S. 322, 346, 123 S. Ct. 1029 (2003); *Cooper v. Sec'y for Dept. of Corr.*, 646 F.3d 1328, 1353 (11th Cir. 2011); *Taylor v. Maddox*, 366 F.3d 992, 1008 (9th Cir. 2004) (holding state courts were not entitled to act as through exculpatory evidence "didn't exist").

Here, as set forth in detail above, the evidence that Mr. Al-Amin did not shoot the Deputies included at least the following:

- Deputy English testified unambiguously and repeatedly that he looked the suspect "in the eyes" ("as my Mom always told me") and that his assailant had "grey eyes."  Mr. Al-Amin has dark brown eyes.

- Both Deputies claimed they shot and wounded the assailant.  Medics were on hand at the time of Mr. Al-Amin's arrest to document his gunshot wounds.  Mr. Al-Amin, however, had not been shot.

- The police relied on a blood trail leading from the scene to secure a search warrant of Mr. Al-Amin's nearby store for "blood, bloody

clothing, and evidence of medical intervention." Consistent with Mr. Al-Amin's uninjured state, no such evidence was found.

- Imhotep Shaka, the only eyewitness to the shooting other than the Deputies, testified the body type of the shooter (average height and build) differed from Mr. Al-Amin's build (tall and slender).

- Two eyewitnesses saw an individual other than Mr. Al-Amin flee the scene of the crime in a light-colored van shortly after the incident, and one eyewitness (Fareed Jihad) saw a man get into the van who matched the description of the shooter given by Mr. Shaka.

- Several 911 calls from civilians reported a wounded man in the area, and a security video shows a man other than Mr. Al-Amin attempting to gain entry to an elder care facility.

Rather than consider the entire record, the Georgia Supreme Court relied entirely on the Prosecution's best evidence, viewed in the light most favorable to the Prosecution, and without regard to Mr. Al-Amin's challenges to that evidence. The Defense Lawyers developed substantial evidence disputing each aspect of this evidence:

- The state court relied on "eyewitness identification by Deputies Kinchen and English." *Al-Amin*, 278 Ga. at 85, 597 S.E.2d at 346. Deputy

Kinchen, however, did not specifically identify Mr. Al-Amin as the assailant before he passed away, but only told the paramedic at the scene that he was in the process of serving a warrant when the suspect opened fire.  Tr. 1496-98 [Dkt. 30-4, at 27-29].

- As discussed above, both Deputy Kinchen and Deputy English told policemen on the scene they had wounded the shooter.  Consistent with these statements, the responding officers found a trail of blood away from the scene of the crime and used that blood trail to secure a search warrant of Mr. Al-Amin's nearby store.

- Moreover, Deputy English was under immediate armed assault by the shooter and only had a few seconds to view the person he confronted at night on the street before his O.C. pepper spray canister was shot, releasing spray essentially blinding him for the remainder of gunfight.

- In addition to claiming the assailant had grey eyes and that he had shot the suspect, Deputy English admitted he did not know whether more than one person fired at the Deputies.  Tr. 521-24 [Dkt. 29-4, at 117-20].

- The defense also presented evidence Deputy English's mental faculties would have been impaired at the time by medications he was taking (including morphine) at the time of the post-shooting identification.

- 87 -

The state court also relied on the "vast amount of physical evidence tying [Mr. Al-Amin] to the crimes." *Al-Amin*, 278 Ga. at 86, 597 S.E.2d at 346. But the non-eyewitness identification evidence was far from "vast," consisting only of the (fingerprint-less) guns and ammunition; unproven, disputed, and ultimately dismissed allegations Mr. Al-Amin had fired on the search team shortly before his arrest; and bullets from the shooting in Mr. Al-Amin's car. There was no DNA evidence; no eyewitness other than Deputy English who identified Mr. Al-Amin (to the contrary, Mr. Shaka, the only other eyewitness, identified another shooter); and no confessions (to the contrary, Mr. Al-Amin proclaimed his innocence until the trial court entered a gag order, *see* Thelwell (**Exhibit 13**) [Dkt. 57-4]).

Leaving aside the limitation on Mr. Al-Amin's ability to cross-examine FBI Agent Campbell regarding the defense theory that Campbell had planted the guns, there are serious questions about each of the handful of facts constituting the "vast amount of physical evidence tying [Mr. Al-Amin] to the crimes":

- The guns found in the "vicinity" of Mr. Al-Amin's arrest did not carry any fingerprints, and there was no physical evidence Mr. Al-Amin owned or fired the weapons.

- Despite allegations Mr. Al-Amin had fired at least 15 shots at members of the Alabama search team shortly before his arrest, no gun residue was

found on him (charges based on Mr. Al-Amin allegedly having fired

shots at the search team were dismissed in December of 2002).

- Mr. Al-Amin's habeas testimony explained the presence of his 1978

  Mercedes at the scene of the crime as well as his reasons for going to

  Alabama.  Had the Defense Lawyers known the Prosecution would have

  engaged in a "mock cross-examination" of Mr. Al-Amin during closing

  arguments, they would have recommended that he testify.  *See*

  Declaration of John R. Martin (attached to Mr. Al-Amin's

  contemporaneously-filed Motion to Expand the Record).

The Georgia Supreme Court ignored the egregiousness of the Prosecution's

misconduct, ignored all of the defense evidence showing Mr. Al-Amin was not the

shooter, and ignored all of the defense's challenges to the evidence of the State.

Although this highly deferential review of the evidence in the light most favorable

to the Prosecution may be appropriate for a direct challenge to the sufficiency of

the evidence, it is not appropriate when determining under *Chapman* whether an

egregious constitutional error was harmless beyond a reasonable doubt.

Mr. Al-Amin did not challenge the sufficiency of the  evidence in the direct

appeal.  Nevertheless, the Georgia Supreme Court undertook a sufficiency of the

evidence review under *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781 (1979),

viewing the evidence "in the light most favorable to the verdict." *Al-Amin*, 278 Ga. at 74, 597 S.E.2d at 339. The state court then erroneously used that one-sided review of the evidence to find the Prosecution's intentional violation of Mr. Al-Amin's Fifth Amendment rights "harmless," in violation of *Chapman*.

Justice Hunstein of the Georgia Supreme Court (who dissented from the denial of Mr. Al-Amin's Application for a Certificate of Probable Cause in his state habeas case) specifically has criticized the improper conflation of the deferential standard applied to a sufficiency of the evidence challenge and the far more rigorous review applied to determine whether a constitutional error was "harmless." *See Braithwaite v. State*, 275 Ga. 884, 899, 572 S.E.2d 612, 625 (2002) (Hunstein, J. dissenting, joined by Benham and Thompson, JJ.). Justice Hunstein explained that the standard of "overwhelming evidence" becomes meaningless where the evidence adduced at trial first is viewed by the appellate court through the deferential prism accorded to criminal convictions. *See id.* at 624-25, 572 S.E.2d at 899-900. In this context, the evidence always will be "overwhelming" in favor of the Prosecution. *See id.* at 625, 572 S.E.2d at 900 ("the bottom line is that when the evidence adduced at trial meets the *Jackson v. Virginia* standard, this Court will not reverse a criminal conviction," even where violation was "extensive or damaging").

Justice Hunstein further explained this approach to "harmless error" ensures future prosecutors will engage in misconduct, because "this Court does not hold them accountable." *See id.* ("We gum the words of prohibition but there are no teeth to nip prosecutors into obedience."). This "rubber stamp approach to the State's improper behavior" encourages "'those who represent the state in the application of its lawful penalties to themselves ignore the precepts of their profession and their office.'" *Id.* (citation omitted).

Justice Hunstein rearticulated her concerns in a later dissent. *See Jackson v. State*, 282 Ga. 494, 499, 651 S.E.2d 702, 707 (2007) (Hunstein, P.J., dissenting, joined by Thompson, J.). Similar to Mr. Al-Amin's case, *Jackson* involved improper prosecutorial comments on a defendant's pre-trial silence. Despite "flagrant and repeated prosecutorial misconduct," the Georgia Supreme Court "refuses to hold the State accountable by, yet again, excusing this misconduct as harmless under the rubric of 'overwhelming evidence.'" *Id.* at 501, 651 S.E.2d at 708. Justice Hunstein could not be clearer in her explanation of the Supreme Court's improper conflation of the applicable standards of review: "Yes, I agree with the majority that the evidence adduced at trial was ***sufficient*** to enable a rational trier of fact to find appellant guilty of the charged crimes beyond a

reasonable doubt . . . ; but in no sense can the evidence adduced in this case be considered 'overwhelming.'"  *Id.*

### D.   The Trial Court's Instruction Exacerbated, Rather than Cured, the Prosecution's Repeated Fifth Amendment Violations.

While courts generally presume that jurors follow their instructions, this presumption is overcome where there is an "'overwhelming probability' that the jury will be unable to follow the court's instructions . . . and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant."  *United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993) (citing *Greer v. Miller*, 483 U.S. 756, 766 n.8, 107 S. Ct. 3102, 3109 n.8 (1987)).  As recognized in *Bruton v. United States*, 391 U.S. 123, 135, 88 S. Ct. 1620, 1627 (1968), "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."

Consistent with the Supreme Court's warnings, empirical research "clearly demonstrates that instructions to disregard are ineffective in reducing the harm caused by inadmissible evidence and improper arguments."  J. Alexander Tanford, *The Law and Psychology of Jury Instructions*, 69 Neb. L. Rev. 71, 95 (1990). Admonitions are especially troublesome because they are not only difficult for jurors to understand, but they "often provoke[] the opposite of the intended effect"

because the judge emphasizes the error by instructing the jurors to disregard it.  *Id*

at 86, 96.  As explained in one binding Fifth Circuit decision, "one 'cannot unring

a bell'; 'after the thrust of the saber it is difficult to say forget the wound'; and

finally, 'if you throw a skunk into the jury box, you can't instruct the jury not to

smell it.'"  *Dunn v. United States*, 307 F.2d 883, 886 (5th Cir. 1962).

      As discussed above, the trial court's instruction to the jury sent, at best, a

mixed message regarding the Prosecution's violations of Mr. Al-Amin's Fifth

Amendment rights.  The trial court characterized Mr. Martin's objection as "what

you believe is an impropriety," and it prefaced its instructions with the phrase "just

in an abundance of caution."  Tr. 3707-08 [Dkt. 32-5, at 34-35].  The trial court did

not sustain Mr. Al-Amin's objections; did not require the Prosecution to take down

the "Questions for the defendant" chart (although the title of the chart was changed

to "Questions for the defense"); and did not instruct the jury to disregard the

Prosecution's improper commentary on Mr. Al-Amin's rights.  To the contrary, it

overruled the objections in front of the jury and allowed the Prosecution's mock

cross-examination to continue, with the Defense Lawyers' further objections

"denied" or "overruled."  *Id.* at 3708-12 [Dkt. 32-5, at 34-39].  The Prosecution did

not stop the improper argument nor admit any error to the jury.

This is not a case where the trial court promptly, forthrightly and forcefully, corrected improper argument by sustaining objections, chastising the Prosecution, requiring the removal of the visual aid, and instructing the jury the entire line of questioning was improper and should be disregarded.  The jury was never told to disregard the improper argument; improper argument was allowed to occur after the cautionary instruction, the chart remained in clear view of the jury with the trial court's expressed permission after the instruction, and repeated objections were overruled both before and after the instruction.

It defies common sense and human nature to believe that the trial court's tepid instruction, given at the same time the defense objections were being overruled, adequately remedied the gross violation of Mr. Al-Amin's Fifth Amendment rights.  The Georgia Supreme Court's reliance on this instruction to find the constitutional error harmless was objectively unreasonable.

### E.    The Mock Cross-Examination Had A Substantially and Injurious Effect on the Jury's Verdict.

Under *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710 (1993), Mr. Al-Amin must cause this court to be "in grave doubt" about whether the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict."  *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S. Ct. 992 (1995).

Here, the Prosecution engaged in an extended mock cross-examination of Mr. Al-Amin at the most critical stage of the case (closing arguments), after he had elected not to testify, all the while aided by a chart of "Questions" for Mr. Al-Amin that remained before the jury throughout the closing.  The trial court denied multiple motions for a mistrial, overruled multiple defense objections to the line of questioning, and issued a legalistic and ineffectual instruction before allowing the constitutional violations to continue.

The nature and extent of the Prosecution's misconduct; the highly-disputed evidence presented during the criminal trial; and the weakness of the trial court's curative instruction should be more than sufficient to cause any reasonable jurist grave doubt about the effect of the constitutional violation on the jury.   The affidavit of juror Terry Walker, Jr. confirms the Prosecution's misconduct had its intended effect, because the jury considered Mr. Al-Amin's failure to testify to be the "main thing" in finding him guilty.  *See* HT Ex. P-7 [Dkt. 1-4, at 60].

Contemporaneously with this Petition, Mr. Al-Amin is moving to expand the record to include certain materials relevant to his *Brady* claim and also to include a Declaration from John R. "Jack" Martin, Mr. Al-Amin's lead defense attorney in the underlying trial.  Mr. Martin details his extensive experience as a defense lawyer and explains that, in cases where he believes the prosecution has not proven

its case beyond a reasonable doubt, he advises the defendant not to testify.  *See*

Martin Decl. ¶¶ 2-3.  Mr. Martin so advised Mr. Al-Amin in this case, because he

and the other Defense Lawyers "believed there were multiple facts in evidence that

should have created at least a reasonable doubt as to Mr. Al-Amin's guilt."  *Id.* ¶ 3.

Mr. Martin's strategy of advising a defendant not to testify is predicated on

the prosecution not violating the constitutional prohibition against commenting on

the failure to testify.  *Id.* ¶ 4.  In his extensive experience, a prosecutor has never

"engaged in the type of extensive and obvious comment on the accused's failure to

testify remotely similar to the prosecution's mock cross-examination of Mr. Al-

Amin during closing arguments in the underlying criminal trial."  *Id.*

In Mr. Martin's opinion as the lead defense attorney for Mr. Al-Amin:

> The prosecutor's conduct was extremely prejudicial to Mr. Al-
> Amin's defense.  Among other things, if I had known that the
> prosecutor would be allowed to conduct a mock cross-
> examination of Mr. Al-Amin even though he did not testify, I
> would have recommended that Mr. Al-Amin testify on his own
> behalf, as he strongly desired to do.  Had Mr. Al-Amin testified
> and been cross-examined during trial, he could have provided
> answers to the questions presented in the prosecutor's mock
> cross-examination, rather than having those questions go
> completely unanswered.
>
> I believe there is at least a reasonable likelihood that the jury's
> verdict would have been different had the prosecution not
> engaged in its mock cross-examination of Mr. Al-Amin in
> closing arguments.  The apparent intent of the prosecution's
> strategy was to divert the jury's attention away from the

>reasonable doubt in the prosecution's case to Mr. Al-Amin's
>failure to testify.  Based on my experience and my participation
>in the trial, I believe this strategy was successful.

*Id.* ¶¶ 5-6.

Regarding the trial court's instruction to the jury, Mr. Martin questions whether any instruction possibly could cure the prejudicial impact of the mock cross-examination and then discussing the trial court's instruction in particular:  "I believe the instruction that was given exacerbated the negative impact of the mock cross-examination, by indicating to the jury that the trial court did not concur fully in the objections of defense counsel.  To the extent the jury instruction might have had any curative impact, which is itself doubtful, such impact was negated when the trial court allowed the prosecution to continue with the mock cross-examination without unequivocally conveying to the jury the impropriety of that line of questioning."  *Id.* ¶ 7.

Mr. Martin concluded:  "I firmly believe that, as a result of the prosecution's improper mock cross-examination of Mr. Al-Amin, Mr. Al-Amin did not receive a fair trial.  I believe that the mock cross-examination caused the jury to interpret Mr. Al-Amin's failure to testify as evidence of guilt.  I also believe the mock cross-examination caused the jury to focus on Mr. Al-Amin's failure to testify rather

than the prosecution's failure to demonstrate Mr. Al-Amin's guilt beyond a reasonable doubt." *Id.* ¶ 8.

## CLAIM II

### THE STATE COURT VIOLATED MR. AL-AMIN'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS BY PRECLUDING HIM FROM CROSS-EXAMINING FBI AGENT CAMPBELL REGARDING THE 1995 SHOOTING OF GLENN THOMAS IN PHILADELPHIA.

"Cross examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974). Subject to the trial court's authority to preclude "preclude repetitive and unduly harassing interrogation, "the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness." *Id.* In addition to a "general attack" on a witness through "evidence of a prior crime," a "more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" *Id.* (quoting 3A J. Wigmore, *Evidence* § 940, at 775 (Chadbourne rev. 1970)). For such a cross-examination to be effective, "defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole

triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.* at 318, 94 S. Ct. at 1111. Denial of effective cross-examination "'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.'" *Id.* (quoting *Smith v. Illinois*, 390 U.S. 129, 131, 88 S. Ct. 748, 750 (1968) (further citations omitted))).

The Supreme Court later clarified the prejudice inquiry: "[T]he focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial." *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S. Ct. 1431, 1435 (1986). A defendant states a Confrontation Clause violation "by showing that he was prohibited in engaging in other appropriate cross-examination designed to show a prototypical form of bias on the part of the witness . . . ."*Id.* at 680, 106 S. Ct. at 1436. The burden is met where "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defendant's] counsel been permitted to pursue his proposed line of cross-examination." *Id. See also Olden v. Kentucky*, 486 U.S. 227, 231, 109 S. Ct. 480, 483 (1988) (finding violation of Confrontation Clause based on limitation of cross-examination of key witness); *Secretary, Fla. Dep't of Corrs. v. Baker*, 406 Fed. Appx. 416 (11th Cir.

2010) (affirming grant of habeas relief where state court precluded defendant from pursuing line of cross-examination of key witness).

Here, Mr. Al-Amin sought to cross-examine FBI Agent Campbell regarding the critical physical evidence allegedly tying Mr. Al-Amin to the crimes – the guns which had been used in the crimes.  The only evidence linking Mr. Al-Amin to the guns was their alleged discovery by the FBI "in the vicinity" after he was arrested. There was no evidence the guns belonged to Mr. Al-Amin, had ever been seen in his possession, or had ever been touched by him (there were no fingerprints on the guns or the ammunition, despite allegations by officers in the search party Mr. Al-Amin had fired 15 shots at them shortly before his arrest, and no gun residue on Mr. Al-Amin).  Conversely, there was evidence FBI Agent Campbell had become separated from the other officers searching for Mr. Al-Amin, and the evidence was undisputed that Campbell viciously kicked and spat at Mr. Al-Amin after his arrest.  *See Al-Amin*, 278 Ga. at 82, 597 S.E.2d at 344.

FBI Agent Campbell's 1995 shooting of Glenn Thomas in Philadelphia – particularly the allegations reported in multiple contemporaneous press accounts that he had planted a fingerprint-less gun next to Mr. Thomas's body after shooting him in the back of the head – were highly relevant to Mr. Al-Amin's defense theory that FBI Agent Campbell had planted the weapons discovered in the

- 100 -

vicinity of Mr. Al-Amin's arrest.  Had FBI Agent Campbell been required to answer questions about the Philadelphia incident in front of the jury, the jurors almost certainly would have had a different view of his reliability and of the credibility of the Defense Lawyers' conspiracy theory.

The Georgia state courts completely ignored the Confrontation Clause dimension of the trial court's refusal to allow the cross-examination of FBI Agent Campbell.  Instead, the Georgia Supreme Court relied on a completely inapposite line of authorities applicable where a defendant attempts to impeach a witness generally based on an unrelated crime involving moral turpitude.  This fundamentally flawed analysis was objectively unreasonable.

At both the trial court and in the direct appeal, Mr. Al-Amin's lawyers argued Mr. Al-Amin had the right to question FBI Agent Campbell regarding the Philadelphia incident under a "similar transaction" theory.  Tr. 1724-29, 2313-18 [Dkt. 30-6, at 55-60; Dkt. 31-2, at 90-95]; *see also* New Trial Hrg. 86-92 [Dkt. 35-1, at 88-94]; New Trial Hrg. 87 [Dkt. 35-1, at 89].  As they explained, even the State can cross-examine a criminal defendant regarding a prior incident that shows the defendant's "bent of mind" to engage in the conduct at issue.  *See Reese v. State*, 252 Ga. App. 650, 652, 556 S.E.2d 150, 153 (2001) (allowing "bent of mind" evidence where, *inter alia*, there is sufficient evidence defendant committed

the prior act and "sufficient similarity between the two acts that proof of the former tends to prove the latter").  Given this settled Georgia law, Mr. Al-Amin should have permitted to cross-examine a key prosecution witness regarding his "bent of mind" to plant evidence.  Mr. Al-Amin relied not only on Georgia appellate authorities following *Davis v. Alaska* in finding a Confrontation Clause violation, but also *United States v. Cohen*, 888 F.2d 770 (11th Cir. 1989), in which the Eleventh Circuit held the defendant should have been permitted to cross-examine a key prosecution witness to show "he had the opportunity and ability to concoct and conduct the fraudulent scheme" for which the defendant was being prosecuted. *See id.* at 776.  In *Cohen*, the Eleventh Circuit reversed the conviction because of a similar limitation on cross-examination:  "By preventing the introduction of relevant evidence of the prior conduct of an essential government witness, the court deprived the [defendants] from presenting an adequate defense and thus deprived them of a fair trial."  *Id.* at 777.

The Georgia Supreme Court mistakenly ignored this argument and the authorities cited by Mr. Al-Amin.  Instead, as with the trial court, the state court treated the issue as involving a general attempt to impeach a witness's reputation for truthfulness.  *See Al-Amin*, 278 Ga. at 84, 597 S.E.2d at 345.  In this context, Georgia courts limited such impeachment to cases in which the witness had been

convicted of a crime involving moral turpitude.  *See id.*  These authorities had

nothing to do with the argument being urged by Mr. Al-Amin, and the state court's

reliance on this inapposite line of authorities was objectively unreasonable.

In addition to affirming the trial court's limitation of the cross-examination

because "Campbell had not been prosecuted for the alleged misconduct," the

Georgia Supreme Court also agreed "any probative value was far outweighed by

the danger of unfair prejudice."  *Al-Amin*, 278 Ga. at 84, 597 S.E.2d at 345-46.

Again, this ruling conflicts with U.S. Supreme Court precedent and constitutes an

unreasonable determination of the facts.

As the Eleventh Circuit noted in *Cohen*, the Supreme Court has recognized

that in enacting the Federal Rules of Evidence governing similar transaction

evidence, "'Congress was not nearly so concerned with the potential prejudicial

effect of [similar transaction] evidence as it was with ensuring that restrictions

would not be placed on the admission of such evidence.'"  888 F.2d at 777

(quoting *Huddleston v. United States*, 485 U.S. 681, 106 S. Ct. 1496 (1988)).

Thus, "[w]hen the defendant offers similar acts evidence of a witness to prove a

fact pertinent to the defense, the normal risk of prejudice is absent."  *Id.* (citation

omitted).  "The trial court's discretion does not extend to exclusion of crucial

relevant evidence.  In this case, the evidence was crucial to the defense and its exclusion was error." *Id.*

It is manifestly unreasonable to view evidence directly supporting a key defense theory as "unfairly prejudicial" and thus off-limits for cross-examination. The FBI generally and FBI Agent Campbell in particular were a critical focus of the defense team's conspiracy theory.  Evidence FBI Agent Campbell had planted a weapon next to an African-American Muslim suspect he had just shot in the back of the head directly supports the defense team's theory that Campbell similarly planted the weapons used in the crime in the vicinity of Mr. Al-Amin's arrest. Particularly given that Mr. Al-Amin was facing the death penalty, the Defense Lawyers should have been given all possible leeway relative to cross-examining critical prosecution witnesses, rather than having an entire defense theory obliterated based on concerns of "undue prejudice" to the ***Prosecution***.

The magnitude of error and unfairness of this ruling is amplified by the Prosecution's mock cross-examination of Mr. Al-Amin in closing arguments. During the trial, Mr. Al-Amin was not allowed to pursue a relevant line of cross-examination to support the defense theory that FBI Agent Campbell had planted the weapons in Alabama.  But during closing arguments, the Prosecution was allowed to engage in a mock cross-examination of Mr. Al-Amin regarding the

weapons being found in Alabama.  *See* Tr., at 3699 [Dkt. 32-5, at 26] ("Mr.
Defendant, how did those murder weapons get there to Whitehall?").  Thus, in a
criminal prosecution in which the State sought the death penalty:  (a) the defendant
***was not allowed*** to cross-examine a key prosecution witness as to whether that
witness had planted evidence (due to concerns with "undue prejudice" to the
Prosecution), but (b) the Prosecution ***was allowed*** to engage in a mock cross-
examination of the defendant (after the defendant had invoked his right not to
testify) regarding the very evidence the defense sought to argue had been planted.
This is not how our judicial system can be permitted to operate if defendants are to
have a fair trial.

　　　This Court need not "speculate as to whether the jury would have accepted
this line of reasoning had counsel been permitted to fully present it."  *Davis*, 415
U.S. at 317, 94 S. Ct. at 1111.  It is enough that "the jurors were entitled to have
the benefit of the defense theory before them so that they could make an informed
judgment" as to the weight to place on the witness's testimony.  *Id.*  Accordingly,
by limiting Mr. Al-Amin's cross-examination of FBI Agent Campbell, the state
courts violated Mr. Al-Amin's Confrontation Clause rights.

# CLAIM III

## THE DEFENSE LAWYERS VIOLATED MR. AL-AMIN'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO INVESTIGATE THE CONFESSION OF OTIS JACKSON ADEQUATELY.

To prevail on a claim of ineffective assistance of trial counsel, a petitioner must show (1) that his trial counsel's performance fell below an objective standard of reasonableness and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

Where there is a complete failure of counsel to investigate diligently, ineffectiveness is "generally clear," because "counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989).  Numerous federal habeas decisions have held that a failure by counsel to conduct a thorough investigation into a third party who has confessed to the crimes of which a defendant is accused constitutes a failure to meet the professional performance standards of counsel and prejudices the defendant. *See, e.g.*, *Farmer v. Ratelle*, 131 F.3d 146 (Table), 1997 WL 730314, at *4-5 (9th Cir. 1997) (failure to investigate confession constituted ineffective assistance of counsel); *Sanders v. Ratelle*, 21 F.3d 1446, 1456-57 (9th Cir. 1994) (failure to investigate confession by brother of defendant constituted

ineffective assistance of counsel); *see also Smith v. Wainwright*, 799 F.2d 1442, 1443 (11th Cir. 1986) (failure to confront Prosecution's key witness with prior inconsistent statements implicating the witness constituted ineffective assistance of counsel); *Jones v. Wood*, 114 F.3d 1002, 1010-11 (9th Cir. 1997) (failure to investigate potential suspect after learning alibi was not true constituted ineffective assistance of counsel).

In this case, none of the lawyers on Mr. Al-Amin's trial team interviewed Mr. Jackson. Instead, they sent an investigator (Mr. Tyehimba) to interview Mr. Jackson and accepted, without further inquiry or investigation, representations by the Prosecution that Mr. Jackson was "crazy" and would embarrass the Defense Lawyers if he testified at trial. The evidence presented in Mr. Al-Amin's state habeas proceeding presented shows the Defense Lawyers' failure to investigate Mr. Jackson's confession adequately deprived Mr. Al-Amin of effective assistance of counsel and prejudiced his defense.

### A.    Mr. Jackson's Confession Tracks Key Trial Evidence.

The primary defense theory was that Mr. Al-Amin did not shoot Deputies English and Kinchen and that someone else committed those crimes. Otis Jackson's repeated confessions to committing this crime, and the details provided in those confessions, directly supported this primary defense theory.

- 107 -

Multiple details of Mr. Jackson's confession correspond to defense evidence presented at Mr. Al-Amin's trial:

- Mr. Jackson's average height and build (5' 8" and 165 pounds) matches the description of the shooter provided by Imhotep Shaka, the only eyewitness to the shootings other than the Deputies. *Compare* Tr. 3563-77 [Dkt. 32-3, at 78-92] (testimony of Mr. Shaka as to average height and built of shooter), *with* State's Trial Ex. 9 [Dkt. 53-2 at 2] (warrant describing Mr. Al-Amin's height as 6' 5").

- Mr. Jackson convincingly explained why the confrontation quickly escalated to a gunfight – his concern that he would be caught violating parole by possessing firearms and evading the ankle monitoring system. *See id.* at 19 [Dkt. 1-5, at 7].  In the state habeas proceedings, Mr. Martin testified that Mr. Jackson's criminal background "would have supported why [Mr. Jackson] would have overreacted in this situation."  HT 113 [Dkt. 1-3, at 115].

- Both Deputies claimed they shot and wounded the assailant.  Mr. Jackson testified he was shot in the gunfight and indicated his scars during his deposition.  *See id.* at 24-25 [Dkt. 1-5, at 8].  In contrast, Mr. Al-Amin

did not have any gunshot wounds whatsoever when he was arrested four days after the incident.  *See* Tr. 1900 [Dkt. 30-7, at 66].

- Mr. Jackson testified to knocking on doors and begging for help after he was injured in the shootout.  *See, e.g.,* Jackson Dep. 26-29 [Dkt. 1-5, at 9].  This testimony is consistent with the blood trail at the scene used by the police to secure the search warrant of Mr. Al-Amin's store and the 911 tapes and other evidence of a wounded man trying to gain access to several buildings near the scene after the crimes.

A third-party confession to a capital crime should be given the utmost scrutiny by effective trial counsel, particularly when the primary defense theory is that the accused did not commit the crimes.  Not surprisingly, Mr. Al-Amin "really did want to call" Mr. Jackson as a witness, which he "repeatedly said . . . during the trial."  *Id.* at 82-83 [Dkt. 1-3, at 84-85]; *id.* at 130 [Dkt. 1-3, at 132] (testimony of Mr. Al-Amin that he thought Mr. Jackson's confession was "an essential part of the case" and had raised the issue "on many occasions" with his lawyers).  The Defense Lawyers should have investigated Mr. Jackson's confession fully before electing to abandon what would have been direct testimonial evidence that someone other than Mr. Al-Amin shot the Deputies.

**B.**     **The Defense Lawyers Should Not Have Accepted the Assertion of the Prosecution Mr. Jackson Was Home at the Time of the Crime and Simply Abandoned Their Investigation of Mr. Jackson.**

The Prosecution initially took the position information regarding Mr. Jackson's confession did not need to be turned over at all, but the trial court disagreed and ordered it produced.  HT, at 79 [Dkt. 1-3, at 81].  Then, in an e-mail sent to Mr. Martin (Mr. Al-Amin's lead defense attorney) on October 3, 2001, the Prosecution claimed Mr. Jackson was "sort of like Homer (and probably just as crazy)" – a reference to Homer Lewis, a mentally ill individual who claimed to have shot the Deputies.  State Habeas Ex. P-3 [Dkt. 1-4, at 55].[43]  The Defense Lawyers ultimately required the help of the trial court to force the Prosecution to provide information permitting the defense to locate Mr. Jackson, even though the State originally had listed him as a witness.  *See State v. Al-Amin*, No. 00-SC-03563, Tr. 16 (Ga. Super. Ct., Fulton Cnty. Oct. 16, 2001) [Dkt. 19-4, at 87-94].  The Prosecution's actions regarding Mr. Jackson's whereabouts should have raised a red flag with the Defense Lawyers that his confession should be taken seriously.

Despite the Prosecution's reticence to cooperate with the defense in locating Mr. Jackson, the Defense Lawyers accepted the Prosecution's representation that

---

[43] Sara Bacon, Mr. Jackson's parole office, testified she believed Mr. Jackson to be competent and "of reasonable intelligence."  HT, at 42 [Dkt. 1-3, at 44].

ankle monitoring data showed Mr. Jackson was home at the time of the crime.  *See* State Habeas Order 10 [Dkt. 1-2, at 11].  The only sworn testimony presented at the state habeas hearing (from T.J. Ward, who helped found the company responsible for the ankle monitoring), however, was that the data ***did not*** establish Mr. Jackson's inability to commit the crime. See HT 48-70 [Dkt. 1-3, at 50-72].

Moreover, in the days following the crime, Mr. Jackson was arrested, and his parole was revoked, for repeated ankle monitoring violations.  State Habeas Exs. P-1 & P-2 [Dkt. 1-4, at 2-33 & 34-54]; *see also* HT, at 41 [Dkt. 1-3, at 43] (testimony of Sara Bacon, Mr. Jackson's parole officer, regarding Mr. Jackson's multiple ankle monitoring violations the week of the crime, which resulted in his parole being revoked at a hearing on March 28, 2000); *id.* at 43 [Dkt. 1-3, at 45] (testimony Mr. Jackson had a "pattern" of monitoring violations).  All these facts could and should have been learned by the Defense Lawyers before the underlying trial, to make an informed decision about calling Mr. Jackson as a witness.

The state habeas court also excused the Defense Lawyers' failure to investigate because "Mr. Jackson had retracted and repeated his confession numerous times."  State Habeas Order 10 [Dkt. 1-2, at 11].  In his deposition testimony, however, Mr. Jackson explained the circumstances leading to his recantation.  *See* Jackson Dep. 44-50  [Dkt. 1-5, at 13-15] (testimony of Mr.

Jackson that, after his confession, meals were withheld from him, a "cop killer" sign was placed on his door, his religious belongings were taken away from him, and an FBI agent pressured him to recant).  Mr. Martin likewise noted "there was some sort of pressure on him" to recant.  HT 82 [Dkt. 1-3, at 84].  These uncontested facts were completely ignored by the state habeas court.

The third reason the state habeas court gave for rejecting Mr. Al-Amin's ineffective assistance claim was the Defense Lawyers' use of an investigator who "personally interviewed Mr. Jackson and doubted the reliability of his testimony." State Habeas Order 10 [Dkt. 1-2, at 11].  At the state habeas evidentiary hearing, Mr. Martin testified an investigator (Mr. Tyehimba) had met with Mr. Jackson and found him a "little kooky," as a result of which Mr. Martin simply abandoned any further investigation of Mr. Jackson.  *See* HT, at 83 [Dkt. 1-3, at 85] (admitting he may have "jumped to a conclusion" based on Mr. Tyehimba's report).  Thus, and despite the fact Mr. Al-Amin had four separate attorneys, no attorney personally met with Mr. Jackson – who repeated confessed to the crimes – before trial.  *Id.*

It was not until July 17, 2009 – more than five years after Mr. Al-Amin's conviction had been affirmed – that a lawyer for Mr. Al-Amin finally deposed Mr. Jackson.  *See* Jackson Dep. [Dkt. 1-5]. By that time, Mr. Jackson was again imprisoned, for multiple crimes including robbery with a deadly weapon.  *See id.*

The state habeas court should not have ignored (1) the uncontested testimony at the evidentiary hearing that the ankle monitoring data did not establish Mr. Jackson was home at the time of the crime; and (2) Mr. Jackson's deposition, in which he both provided extensive detail regarding the crimes and indicated his scars from being shot by the Deputies  The failure to consider this evidence renders the state courts' ruling unreasonable.

### C.   The Defense Lawyers' Failure to Investigate Mr. Jackson's Confession Prejudiced Mr. Al-Amin's Defense.

Failure to investigate a third-party confession repeatedly has been found to satisfy *Strickland*'s prejudice requirement.  In *Smith v. Wainwright*, trial counsel failed to make the jury aware of the fact that another man "had given a detailed statement to the police confessing that he was the principal actor in the killing of the victim and making no assertion that [the defendant] was either present or involved in the crime."  799 F.2d 1442, 1443 (11th Cir. 1986).  Affirming the grant of habeas relief to the petitioner, the Eleventh Circuit found that there was a "reasonable probability that, had [the other man's] original statements been used at trial, the result would have been different."  *Id.* at 1444-45 (citing *Strickland*).

Similarly, in *Jones v. Wood*, the Court of Appeals reversed a denial of habeas relief where trial counsel presented a mistaken identity defense but failed to investigate the other potential perpetrator.  In a striking resemblance to Mr. Al-

Amin's case, trial counsel in *Jones* "felt that [the other man] had an 'ironclad alibi,'" based solely on police reports stating that the other man was at home on the night of the murder.  114 F.3d 1002, 1006 (9th Cir. 1997).  This prejudiced the defense "because raising the specter of [the other man's] involvement in the murder attacks the heart of the Prosecution's case."  *Id.* at 1011.  Other failure to investigate cases similarly have found the prejudice prong met.[44]

Here, Mr. Jackson's confession would have supported the defense's theory that Mr. Al-Amin was not the shooter and would have attacked the heart of the Prosecution's case.  Consistent with Mr. Al-Amin's testimony at the state habeas hearing, the other Defense Lawyers agreed Mr. Jackson's testimony would have constituted critical evidence for Mr. Al-Amin's defense.  *See, e.g.,* Dep. of Michael Warren, at 8 [Dkt. 53-5, at 9] ("the fact that the investigation was not conducted prevented us from obtaining what I consider to be significantly valuable information that may have materially affected the outcome of the proceeding had the jury received that information"); *see also id.* at 14-15 [Dkt. 53-5, at 15-16]

_____

[44] *See also Sanders v. Ratelle*, 21 F.3d 1446, 1454-55 (9th Cir. 1994) (reversing denial of habeas relief where counsel did not interview brother of defendant, who had confessed to crime, noting "the defense that [the brother] was the shooter obviously would have been more effective if [the brother] himself so had testified"); *Farmer v. Ratelle*, 131 F.3d 146 (Table), 1997 WL 730314, at *5 (9th Cir. 1997) (evidence of another person's confession "would have substantially strengthened the persuasive force of the mistaken identity defense").

(describing failure to investigate confession as "a material error"); Dep. of Bruce Harvey, at 9 [Dkt. 63-3, at 87] (agreeing ankle monitoring data was a key reason Mr. Jackson did not testify);  Dep. of Tony Axam, at 10-11 [Dkt. 68-3 at 67-68] (explaining Mr. Jackson's testimony would have allowed direct impeachment of lead detective regarding failure to investigate Mr. Jackson).  According to Mr. Warren, the presentation of Mr. Jackson's confession also would have altered the Defense Lawyers' recommendation that Mr. Al-Amin not testify on his own behalf, despite his strong desire to do so.  *See* Warren Dep. 15 [Dkt. 53-5, at 16] ("If I had known these facts, I would have insisted . . . that Mr. Al-Amin testify."); Aff. of Michael Warren ¶ 11 [Dkt. 53-3, at 5] (stating that, if Defense Lawyers had "carried out a proper investigation," they would have "advised Jamil Al-Amin that he should testify in his own defense, which he very much wanted to do"); *see also* HT, at 129-130 [Dkt. 1-3, at 131-132] (testimony of Mr. Al-Amin he repeatedly told his attorneys he wanted to testify on his own behalf).

The Defense Lawyers' failure to investigate adequately and introduce Mr. Jackson's confession significantly prejudiced Mr. Al-Amin's defense.

# CLAIM IV

## MR. AL-AMIN'S *BRADY* CLAIM REGARDING EVIDENCE OF AN ONGOING FBI INVESTIGATION OF HIM AT THE TIME OF THE CRIMES.

The Prosecution has an affirmative obligation to provide exculpatory evidence to a criminal defendant under the Due Process Clause of the Fourteenth Amendment. *Brady v. Maryland*, 373 U.S. 83, 88, 83 S. Ct. 1194, 1197 (1963). The usual remedy for withholding exculpatory evidence is a new trial.

Placing the burden on the Prosecution to disclose exculpatory information "illustrate[s] the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 281, 119 S. Ct. 1936, 1948 (1999). Requiring the Prosecution to share exculpatory information ensures that seeking justice motivates the Prosecution, rather than the desire to win the case. *Id.* (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629 (1935)). Where the Prosecution does not fulfil its duty, there is a substantial risk the defendant will not receive a fair trial and that a miscarriage of justice will occur. *United States v. Bagley*, 473 U.S. 667, 675, 105 S. Ct. 3375, 3379 (1985).

A binding Fifth Circuit decision addressed the applicability of *Brady* where state and federal authorities "pooled their investigative energies to a considerable extent" and "state officers were important witnesses in the federal prosecution."

*United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979).  Rejecting the Government's urged demarcation between the authorities, the Court of Appeals ruled that "[i]mposing a rigid distinction between federal and state agencies which have cooperated intimately from the outset of an investigation would artificially contort the determination of what is mandated by due process."  *Id.* at 570.

The Eleventh Circuit has followed *Antone* in holding that, where government agencies have cooperated in the investigation or prosecution of a defendant, all cooperating entities are subject to *Brady*.  *See, e.g., Hays v. State of Alabama*, 85 F.3d 1492, 1497 & n.2 (11th Cir. 1996) (rejecting state's challenge to trial court's ruling that "knowledge of statements in the possession of federal agents could be imputed to the state," given "the level of cooperation between the state prosecutors and the FBI") (citing *Antone*); *United States v. Spagnoulo*, 960 F.2d 990, 994 (11th Cir. 1992) (noting government's concession "that the report was in the possession of an FBI agent is of no consequence," given that proper focus is on the "'prosecution team' which includes both investigative and prosecutorial personnel") (citing *Antone*).[45]

---

[45] *See also, e.g., Arnold v. McNeil*, 622 F. Supp. 2d 1294, 1312-13 (M.D. Fla. 2009) ("*Brady* applies to exculpatory and impeachment evidence that is in the possession of the 'prosecution team,' which includes investigators and the police") (citing, *inter alia, Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555 (1995), and

### A.   The FBI's Involvement in the Investigation and Prosecution of Mr. Al-Amin's Underlying Criminal Case.

In this case, "[t]he Fulton County District Attorney, as well as a state and local task force, worked closely with the FBI in the investigation and prosecution of this case, and information was shared."  *State v. Al-Amin*, No. 00SC03563, Order on Def.'s Request for Access to a Sealed File of the Prosecution's Personal Notes, at 2-3 (Ga. Super. Ct., Fulton Cty. Oct. 22, 2014) [Dkt. 80, at 12-13].   At least two FBI agents, Special Agents Campbell and Harris, testified during the criminal trial on behalf of the Prosecution.  Tr. 1690-1782, 2611-62 [Dkt. 30-6, at 21-113; Dkt. 31-5, at 26-27] (testimony of FBI Special Agent Campbell); *id.* at 2139-99 [Dkt. 31-1, at 81-141] (testimony of FBI Agent Harris).   Thus, under *Antone* and authorities applying its holding, the FBI remains fully subject to *Brady*.

The FBI acknowledged its *Brady* obligations in the underlying case.  In a post-trial hearing held on March 26, 2003, there is a reference to the FBI having reviewed certain "files" and determined "none of the materials satisfy the requirements of *Brady*."  Tr., at 3-4 [Dkt. 35-2, at 8-9].  The context of this hearing confirms that the "files" that had been reviewed by the FBI consisted of "all

---

*Antone*), *aff'd for reasons stated by district court*, 595 F.3d 1324 (11th Cir. 2010); *United States v. Risha*, 445 F.3d 298, 303-06 (3d Cir. 2006) (discussing prosecutors' duty "'to learn of any favorable evidence known to others acting on the government's behalf in the case'" [quoting *Kyles*] and following *Antone*).

documents related to [FBI Agent Ron Campbell's] conduct on the day [of Mr. Al-Amin's arrest] – and the following investigation." *Id.* at 9 [Dkt. 35-2, at 14].[46] The FBI likewise was subject to *Brady* relative to information generated as a result of the ongoing investigation of Mr. Al-Amin at the time of the crimes.

### B.    The FBI's Testimony In June 2001 That There Was No Ongoing Investigation of Mr. Al-Amin at the Time of the Crimes.

Mr. Al-Amin's *Brady* claim focuses on information directly pertaining to: (a) the incident in which Fulton County Deputies Aldranon English and Ricky Kinchen were shot on March 16, 2000 in the West End area of Atlanta, including events immediately leading up to this event or immediately after this event; and (b) the arrest of Mr. Al-Amin in the Whitehall Community, Alabama area on March 20, 2000 and the events surrounding this arrest.

During the underlying trial, there were at least four pretrial hearings at which Mr. Al-Amin's trial counsel attempted to determine conclusively whether Mr. Al-

---

[46] The state trial court agreed to review these files to confirm they did not contain any exculpatory evidence. *Id.* at 8 [Dkt. 35-2, at 13] ("This is going to happen. I'm going to review the records."). Following this review, the trial court ruled that the documents did not contain any *Brady* information; sealed a box containing "all of the FBI document regarding the OPR investigation of Agent Ron Campbell"; and returned the box to the FBI with instructions to "retain the sealed box of documents in its possession until the conclusion of this case." *State v. Al-Amin*, Order Sealing Contents (Ga. Super. Ct. July 2, 2003) [Dkt. 15-7].

Amin was under investigation by the FBI at the time of the crime.[47]  It was not

until a hearing on June 28, 2001, that an FBI Agent addressed the issue directly.

At the June 28, 2001 hearing, an FBI Agent testified the FBI's investigation

of Mr. Al-Amin ended in 1996.  Tr. 67 [Dkt. No. 18-4, at 69].  Mr. Al-Amin's trial

counsel asked, "Are you aware of any, any, that means anything, whether its local,

national, out of Washington, out of the Atlanta office, out of anywhere, any

investigation by the FBI of Mr. Al-Amin in March of 2000?"  The Agent

responded, "No, sir, I am not."  Tr. 110-11 [Dkt. No. 18-4, at 112-13].  Mr. Al-

Amin's trial counsel again asked:  "Are you aware of any surveillance or

surveillances, any, by anybody in the FBI, Washington, Islamic investigation,

anything, any type of investigation conducted of Mr. Al-Amin in March of 2000?"

Again, the Agent responded, "No, sir."  *Id.* 111 [Dkt. No. 18-4, at 113].

The Agent then clarified that there was a "fugitive" investigation of Mr. Al-

Amin immediately after the crime (of which all parties were fully aware).  In

response, Mr. Al-Amin's trial counsel again re-confirmed, "and to your

knowledge, that was the only investigation in March 2000?"  The Agent again

responded "Yes, sir."  *Id.*  Thus, the FBI Agent repeatedly testified that, other than

---

[47] Tr. (Apr. 18, 2001) [Dkt. Nos. 17-1, 17-2]; Tr. (May 18, 2001) [Dkt. No. 18-2];
Tr. (June 4, 2001) [Dkt. Nos. 18-2, 18-3]; and Tr. (June 28, 2001) [Dkt. No. 18-4].

the fugitive investigation initiated after the crime, the FBI did not have an ongoing investigating of Mr. Al-Amin in March 2000.

### C. FOIA Documents Showing the FBI's Ongoing Investigation of Mr. Al-Amin at the Time of the Crime.

In contrast to these statements of the FBI to Mr. Al-Amin's trial counsel, documents received through FOIA confirm that Mr. Al-Amin remained under ongoing FBI investigation from 1996 up through the date of the crime.[48]  These documents include (a) a report dated March 6, 2000 (10 days before the crime) regarding the issuance of the warrant the Deputy Sheriffs were attempting to serve at the time of the crime; (b) a report dated January 27, 2000, asserting that Mr. Al-Amin was the leader of a Muslim organization that "uses its religious activity to mask criminal activity"; (c) a report dated January 26, 2000, regarding the expiration of Mr. Al-Amin's driver's license (with a "lead covered" handwritten notation dated February 26, 2000); and (d) a report dated April 14, 1999 regarding a "spot check on subject's business located @ 1128 Oak Street, Atlanta" (the scene of the crime), in which Mr. Al-Amin was "observed unloading unidentified items"

---

[48] Although other FBI File numbers are referenced in the FOIA materials, the FBI investigation file number most frequently referenced is 199H [or 199Q]-AT-84770, the title of which often is given as: "Jamil Al-Amin, aka H. Rapp Brown, dba The National Community IT - Hamas."  The File number assigned to the fugitive investigation initiated after the crime is 88A-AT-90026.

from the very same vehicle (a "dark green Ford Explorer with dealer tags") he was driving at the time of the Cobb County traffic stop giving rise to the warrant. Copies of these and other pertinent FOIA documents are attached to Mr. Al-Amin's contemporaneously-field Motion to Expand the Record.

### D.   The U.S. Marshal Declaration Regarding "Other Individuals" Involved in the Crime.

Additionally, in connection with a now-resolved civil rights action in which undersigned counsel represented Mr. Al-Amin, a Deputy U.S. Marshal submitted a Declaration in opposition to Mr. Al-Amin's request to appear personally at the trial.  The Marshal described the Marshal Service's asserted security concerns with Mr. Al-Amin attending the trial in person and stated that, with respect to the crime for which Mr. Al-Amin was convicted, "[s]everal other individuals charged in that case remain at large."[49]  The district court relied on this aspect of the Marshal's Declaration when it denied Mr. Al-Amin's request to appear at trial, stating that "even if [Mr. Al-Amin] does not present a security concern, ***his associates may***."[50]

Thus, the FBI appears to have maintained an ongoing investigation of Mr. Al-Amin up through and including the date of the crime (March 16, 2000).

---

[49] *Al-Amin v. Hugh Smith, et al.*, Decl. of Deputy U.S. Marshal Kenneth J. Staub, No. 6:05-cv-00025-JEG (S.D. Ga. filed June 26, 2012) [Dkt. No. 131-1].

[50] *Al-Amin v. Hugh Smith, et al.*, Order, No. 6:05-cv-00025-JEG (S.D. Ga. filed July 16, 2012) [Dkt. No. 134] (emphasis added).

Moreover, federal authorities have sworn that other (unidentified) individuals involved in the crime for which Mr. Al-Amin was convicted "remain at large." Mr. Al-Amin respectfully submits he should be allowed to see that information.

### E.   The State Habeas Court's Ruling Regarding the *Brady* Claim

After receiving the FOIA documents contradicting the FBI's testimony in the underlying trial, Mr. Al-Amin pressed a *Brady* claim in the state habeas action. The state habeas court summarized the claim as follows:

> FOIA documents show there was surveillance of [Mr. Al-Amin], which means there must have been surveillance on the night of the office in question since the FBI was immediately on the scene, but said surveillance records were never produced to [Mr. Al-Amin], despite containing exonerating evidence.

State Habeas Order, at 30 [Dkt. 1-2, at 31].

The state habeas court did not adjudicate Mr. Al-Amin's claim on the merits, but instead ruled it was procedurally defaulted because it was not raised at trial and on direct appeal.  *Id.* (citing O.C.G.A. § 9-14-48(d)).  The Court further ruled Mr. Al-Amin failed to establish cause and prejudice for failing to raise it prior to the state habeas proceedings.  *Id.*

As addressed more fully in Mr. Al-Amin's Motion for Discovery, Mr. Al-Amin did attempt to secure this information from the FBI before trial, only to be informed under oath the FBI did not have an ongoing investigation of Mr. Al-

Amin at the time of the crimes.  The diligence of Mr. Al-Amin's trial counsel to secure this information before trial should excuse any procedural default.

The state habeas court also followed a ruling in the direct appeal holding that, if Mr. Al-Amin was aggrieved by the failure to the FBI to turn over information, he was obliged to challenge that non-disclosure in federal court.  State Habeas Order, at 30 [Dkt. 1-2, at 31] ("the appropriate route to obtain these documents lies in federal court, not the state habeas court").

Both before and after the state habeas hearing, Mr. Al-Amin has endeavored to secure all information from the FBI pertinent to the crimes for which he was convicted.  In addition to the efforts that led to the initial disclosure of documents showing the ongoing investigation, at least two efforts remain ongoing.

First, Karima Al-Amin (Mr. Al-Amin's wife and an attorney) has been endeavoring to secure all FOIA documents for well over two years.  *See* Decl. of Karima Al-Amin, attached to Mot. for Discovery.  In response to a letter from Ms. Al-Amin dated March 27, 2013, the FBI stated it had located 21,649 pages of records "potentially responsive to your request" and requested Ms. Al-Amin's commitment to paying for copies of the documents (either in hard copies or as CDs).  *See id.* A week later, Ms. Al-Amin agreed to pay $650.00 to receive 44 CDs of information.  *Id.*  When no information was forthcoming, Ms. Al-Amin

submitted a Request for Expedited Processing.  *Id.*  To date, Ms. Al-Amin has received only a single CD, containing 400 of 542 pages, with a cover letter stating the FBI was consulting with other agencies regarding the information.  *Id.*

Second, Jeremy Pinson (Federal Inmate Register No. 16267-064) received authorization from Mr. Al-Amin to pursue FOIA information on his behalf and has been litigating FOIA claims in the District of the District of Columbia since November 12, 2012.  In this long-running litigation, Mr. Pinson has survived multiple challenges to his claims, and recently the district court appointed an attorney to represent him.  *See Pinson v. U.S. Dep't of Justice*, No. 1:12-cv-01872-RC (D.D.C.), Docket Report, attached to Motion for Discovery.  Given these extensive efforts remain unsuccessful, Mr. Al-Amin simultaneously is moving for limited discovery from the FBI.

If and to the extent the FBI has any information indicating someone other than Mr. Al-Amin shot the Deputies, such evidence necessarily would have "put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. 263, 290, 119 S. Ct. 1936, 1952 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555 (1995)); *see also Spagnoulo*, 960 F.2d at 995 (holding withheld evidence material "because it could have fundamentally

altered the defense's strategy"). Information showing someone else shot the Deputies should lead to dismissal of the charges against Mr. Al-Amin.

## VI.   PRAYER FOR RELIEF

For all of the reasons stated above, Mr. Al-Amin respectfully prays that this Court:

1.   Issue a writ of habeas corpus to have Petitioner brought before it to the end that he may be discharged from his unconstitutional confinement and restraint;

2.   Conduct a hearing at which proof may be offered concerning the allegations of this petition;

3.   Allow discovery pursuant to Rule 6, Rules Governing Section 2254 Cases in the United States District Courts;

4.   Grant Petitioner the authority to obtain subpoenas for witnesses and documents necessary to prove the facts as alleged in this second amended petition;

5.   Allow Petitioner to amend the *Brady* claim in this petition following discovery;

6.      Allow Petitioner to file a reply or traverse addressing any issues of

law raised by Respondent in response to this Third Amended Petition;

and

7.      Grant such other relief as may be just and proper.

Respectfully submitted, July 22, 2015.

|  | s/ C. Allen Garrett Jr. |
|---|---|
| KILPATRICK TOWNSEND | Miles J. Alexander (Ga. Bar 009000) |
| & STOCKTON LLP | A. Stephens Clay (Ga. Bar 129400) |
| 1100 Peachtree Street, Suite 2800 | C. Allen Garrett Jr. (Ga. Bar 286335) |
| Atlanta, Georgia 30309-4528 | Ronald L. Raider (Ga. Bar 592192) |
| Telephone: (404) 815-6500 | |
| Facsimile: (404) 815-6555 | |

*Attorneys for Petitioner Jamil Abdullah Al-Amin*

- 127 -

## **VERIFICATION**

Mr. Al-Amin verified the information in a draft of his original Petition, and his Verification was attached to his original Petition as Exhibit 5 thereto.  Mr. Al-Amin has authorized me, C. Allen Garrett Jr., Esq., to verify subsequent versions of the Petition on his behalf.  I repeatedly have conferred with Mr. Al-Amin regarding the information in this Third Amended Petition for Writ of Habeas Corpus by a Person in State Custody, including in multiple telephonic conferences with Mr. Al-Amin throughout the period July 13, 2015 through July 21, 2015.

Dated:  July 22, 2015.

|  |  |
|---|---|
|  | s/ C. Allen Garrett Jr. |
| KILPATRICK TOWNSEND | C. Allen Garrett Jr. |
|    & STOCKTON LLP | Georgia Bar No. 286335 |
| 1100 Peachtree Street, Suite 2800 | agarrett@kilpatricktownsend.com |
| Atlanta, Georgia 30309-4528 |  |
| Telephone: (404) 815-6500 | *One of the Attorneys for Petitioner* |
| Facsimile: (404) 815-6555 | *Jamil Abdullah Al-Amin* |

## <u>CERTIFICATE OF FONT AND POINT SELECTION</u>

I hereby certify that the foregoing was prepared in Times New Roman font,

14 point type, in compliance with Local Rule 5.1(B).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been filed

with the U.S. District Court's CM/ECF System and that pursuant thereto, a copy of

this pleading has been served upon the following persons by electronic mail:

> Paula K. Smith, Esq.
> psmith@law.ga.gov
>
> Lori M. Beranek
> Lori.Beranek@usdoj.gov

Dated:  July 22, 2015.

|  | s/ C. Allen Garrett Jr. |
|---|---|
| KILPATRICK TOWNSEND | C. Allen Garrett Jr. |
| & STOCKTON LLP | Georgia Bar No. 286335 |
| 1100 Peachtree Street, Suite 2800 | agarrett@kilpatricktownsend.com |
| Atlanta, Georgia 30309-4528 | |
| Telephone: (404) 815-6500 | *One of the Attorneys for Petitioner* |
| Facsimile: (404) 815-6555 | *Jamil Abdullah Al-Amin* |

- 129 -