# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| JAMIL ABDULLAH AL-AMIN, BOP ID 99974-555, | HABEAS CORPUS 28 U.S.C. § 2254 |
| Petitioner, | |
| v. | CIVIL ACTION NO. 1:12-CV-1688-AT-GGB |
| DAVID EBBART, Warden, and HOMER BRYSON, Commissioner, Georgia Department of Corrections, | |
| Respondents. | |

**PETITIONER'S REPLY IN SUPPORT OF THIRD AMENDED PETITION**

In accordance with this Court's order dated October 7, 2015 [Dkt. 118], Petitioner Jamil Al-Amin respectfully submits this Reply in support of his "Third Amended Petition for Writ of Habeas Corpus by a Person in State Custody" ("Third Am. Pet.") [Dkt. 99], to address the arguments in Respondent Bryson's "Third Supplemental Answer-Response" ("Third Answer") and "Brief in Support of Third Supplemental Answer-Response" ("Third Answer Br.").[1]

---

[1] As with Mr. Al-Amin's prior petitions, the Federal Respondent who currently has custody of Mr. Al-Amin (Respondent David Ebbart, Warden of USP Canaan in Waymart, Pennsylvania) has not filed any response to Mr. Al-Amin's Third Amended Petition. *See also* Third Answer, at 2 n.2 (noting lack of response).

**Claim I**

**The State violated Mr. Al-Amin's Fifth and Fourteenth Amendment rights when the prosecution engaged in a mock cross-examination of Mr. Al-Amin after he had invoked his constitutional right not to testify.**

In Mr. Al-Amin's direct appeal, the Georgia Supreme Court unanimously ruled the Prosecution violated Mr. Al-Amin's Fifth Amendment rights by engaging in an extended and visually aided "mock cross-examination" of Mr. Al-Amin in its closing. *Al-Amin v. State*, 278 Ga. 74, 85, 597 S.E.2d 332, 346 (2004). The state court, however, dismissed this violation as "harmless error." *Id.* at 85-86. Mr. Al-Amin raised multiple challenges to this ruling, including disputing the Supreme Court's failure to consider the entire record in holding "overwhelming" evidence supported the conviction. Third Am. Pet., 3-8, 80-98 [Dkt. 99, at 14-19, 91-109].

A.     **Mr. Al-Amin relied on United States Supreme Court authorities in showing the Georgia Supreme Court's failure to consider the entire trial record constituted an objectively unreasonable application of the harmless error standard of *Chapman v. California*, 386 U.S. 18 (1967).**

Respondent factually distinguishes *Miller-El v. Cockrell*, 537 U.S. 322 (2003), and dismisses *Cooper v. Sec'y for Dept. of Corr.*, 646 F.3d 1328 (11th Cir. 2011), and *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004), as "circuit court cases." Third Answer Br., at 17-18. Mr. Al-Amin's Petition, however, also relied upon the U.S. Supreme Court's decision in *Anderson v. Nelson*, which held that "comment on a defendant's failure to testify cannot be labeled harmless error in a

case where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis of conviction, and ***where there is evidence that could have supported acquittal***." 390 U.S. 523, 523-24 (1968) (emphasis added) (cited in Third Am. Pet., at 5-6, 81 [Dkt. 99, at 16-17, 92]. Justice Harlan's dissent in *Chapman v. California* likewise recognized reviewing courts would be required to undertake a "*de novo* assessment of the ***entire state trial record***." 386 U.S. 18, 56 (1968) (emphasis added).

Regarding the citations criticized by Respondent, Mr. Al-Amin did not cite *Miller-El* for the substantive standard governing "harmless error" review, but rather for the proposition that state court determinations could be found objectively unreasonable where the state courts failed to consider key evidence in the record. *See* 537 U.S. at 346 (finding state court decision objectively unreasonable where state court "had before it, and apparently ignored" critical evidence). The cited Court of Appeals decisions likewise found state court factual determinations objectively unreasonable. *See Cooper*, 646 F.3d at 1353 (holding state court's decision was "'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding'" under 28 U.S.C. § 2254(d)(2)); *Taylor*, 366 F.3d at 1008 ("Failure to consider key aspects of the record is a defect in the fact-finding process.") (citing *Miller-El*, 546 U.S. at 346).

In this case, the Georgia Supreme Court failed to address the extensive evidence favoring the defense and authorizing acquittal, including (1) Deputy English's repeated testimony the assailant had "grey eyes"; (2) both Deputies' statements they had shot and wounded the assailant (Mr. Al-Amin was uninjured at the time of his arrest); (3) the blood trail at the scene of the crime on which police relied to secure a search warrant of Mr. Al-Amin's nearby store for "blood, bloody clothing, and evidence of medical intervention"; (4) eyewitness testimony by Imhotep Shaka that the body type of the shooter (average height and build) differed from Mr. Al-Amin's distinctive tall and slender build; (5) eyewitness testimony by Fareed Jihad that a man matching Mr. Shaka's description left the crime scene in a van shortly after the incident; (6) several 911 calls the night of the incident reporting a wounded man in the area; (7) a security video from a few hours after the incident showing an apparently injured man trying to gain entry into an elder care facility; (8) the lack of fingerprints on the weapons discovered in Alabama; (9) the lack of any gun residue on Mr. Al-Amin, despite allegedly having fired at officers shortly before his arrest; and (10) Mr. Al-Amin's complete lack of motive to commit the crimes.  All of this evidence – in addition to the confessions of Otis Jackson (who did have a motive to commit the crime) and the belatedly-produced *Brady* documents – "supported acquittal."  *Anderson*, 390 U.S. at 523-24.

**B.      Respondent ignores Justice Hunstein's repeated explanation of the state court's fundamentally flawed "harmless error" analysis.**

Mr. Al-Amin cited Justice Hunstein's repeated concerns with the flawed "harmless error" analysis regularly employed by the state court.  *See* Third Am. Pet., at 6, 89-02 [Dkt. 99, at 17, 100-102].  Respondent ignores Justice Hunstein's analysis because it occurred in "another case."  Third Answer Br., at 20.

In *Braithwaite v. State*, 275 Ga. 884, 572 S.E.2d 612 (2002), Justice Hunstein, joined by Justices Benham and Thompson, explained that evidence always will be "overwhelming" (rendering constitutional errors "harmless") where the evidence at trial first is reviewed by the appellate court under the "light most favorable to the verdict" standard of *Jackson v. Virginia*, 443 U.S. 307 (1979).  *See* 275 Ga. at 624-25, 572 S.E.2d at 899-900 ("[T]he bottom line is that when the evidence adduced at trial meets the *Jackson v. Virginia* standard, this Court will not reverse a criminal conviction.").  Justice Hunstein reiterated her concerns five years later (after Mr. Al-Amin's conviction had been affirmed in 2004), explicitly condemning the Supreme Court's improper conflation of the standards of review: "Yes, I agree with the majority that the evidence adduced at trial was ***sufficient*** to enable a rationale trier of fact to find appellant guilty of the charged crimes beyond a reasonable doubt …; but in no sense can the evidence adduced in this case be

considered 'overwhelming.'"  *Jackson v. State*, 282 Ga. 494, 501, 651 S.E.2d 702,

708 (2007) (Hunstein, J., dissenting, joined by Thompson, J.).

    Justice Hunstein dissented from the denial of Mr. Al-Amin's Application for

a Certificate of Probable Cause.  [Dkt. 1-11.]  The concerns she repeatedly has

noted with the Georgia Supreme Court's flawed "harmless error" analysis apply

equally to Mr. Al-Amin's direct appeal.  Here, as in *Brathwaite*, and *Jackson*, the

Georgia Supreme Court opened its decision in the direct appeal with a deferential

*Jackson v. Virginia* review of the evidence adduced at trial (even though Mr. Al-

Amin had not challenged the sufficiency of the evidence supporting the

conviction).  *Al-Amin*, 278 Ga. at 74-76, 597 S.E.2d at 339-40.  Based on this one-

sided review (which necessarily ignored all evidence favorable to the defense), the

state court easily found "overwhelming evidence":  "Al-Amin's guilt was

overwhelming established through the eyewitness identification by Deputies

Kinchen and English, as well as by the vast amount of physical evidence tying

defendant to the crimes."  *Id.* at 85-86, 597 S.E.2d at 346.  As explained in the next

sections, Mr. Al-Amin vigorously disputed both the eyewitness identifications and

the "vast amount of physical evidence" noted by the Georgia Supreme Court (in

addition to challenging the state court's failure to consider the extensive evidence

in the record supporting acquittal of Mr. Al-Amin).

**C.      Both Deputies testified they shot the assailant, and Deputy English repeatedly testified to the shooter's "grey eyes."**

Respondent disputes Mr. Al-Amin's challenge to his alleged "identification" by Deputy Kinchen before he passed away.  Third Answer Br., at 18.  But Deputy Kinchen only told an attending paramedic that "the suspect" open fired, as opposed to identifying "the guy on the warrant" (as erroneously stated by the Prosecution during the closing).  *See Al-Amin*, 278 Ga. at 86, 597 S.E.2d at 347.  Even though the Georgia Supreme Court agreed Deputy Kinchen only referred to "the suspect," it nevertheless relied on his identification to show "overwhelming evidence."

The Georgia Supreme Court, moreover, disregarded all eyewitness testimony of Deputies English and Kinchen showing Mr. Al-Amin's innocence. Two officers on the scene testified to Deputy's Kinchen's statements that he thought he wounded the shooter.  *See* Tr. 812, 911 [Dkt. 29-6, at 79, 178].  Deputy English likewise told Police Department Sergeant Bennett immediately after the incident, "he felt like he had to have hit him because it was at close range."  *Id.* 1160 [Dkt. 30-2, at 9].  Consistent with both Deputies' statements, the police spotted and followed a fresh trail of blood leading away from the scene of the crime to a house a few blocks away.  *See* Third Am. Pet., at 34-35 & n.28 [Dkt. 99, at 45-46 & n.28].  And 911 calls reported a bleeding man in the area.  *Id.*  Mr. Al-Amin, however, was uninjured when he was arrested a few days later in Alabama.

The Georgia Supreme Court also ignored Deputy English's repeated statements that the shooter had "grey eyes" (Mr. Al-Amin's eyes are brown). *See esp.* Tr. at 572 [Dkt. 29-5, at 3] ("I looked him in the eyes" because "my mom always told me, look a man in his eyes, always look a man in his eyes"; "I remember them grey eyes . . . I couldn't forget that."). In addition to the warrant for Mr. Al-Amin's arrest erroneously listing his eyes as "grey," Otis Jackson (who repeatedly confessed to the crime) testified in his deposition that his eyes have a "grey tint around the edges." Jackson Dep. 11 [Dkt. 1-5, at 5.]

The Georgia Supreme Court's recitation of the "overwhelming evidence" also omitted the eyewitness testimony of Imhotep Shaka (the only witness who saw the shooting other than the Deputies), who described the shooter as "average height, average build." Tr. 3573 [Dkt. 32-3, at 88]. Mr. Shaka specifically contrasted this "medium" build with Mr. Al-Amin's distinctive "tall and slender" build when he testified he was "absolutely positive" the shooter was not Mr. Al-Amin. *Id.* 3574-75 [Dkt. 32-2, at 89-90]. Another eyewitness, Fareed Jihad, likewise identified an individual "about 5' 8", 5' 9", somewhere in that area" leaving the scene of the crime. *Id.* 3522 [Dkt. 32-3, at 37.] As explained below, this information not only matches Otis Jackson's build, but also the description of the shooter disseminated by the authorities the day after the crime. *See infra* § IV.

The Georgia Supreme Court also ignored Mr. Al-Amin's challenges to the eyewitness identification by Deputy English, in which he (a) picked Mr. Al-Amin out of a photo array picturing only five other individuals while (b) impaired by morphine and other medications.  Tr. 364 [Dkt. 29-3, at 108]; Third Am. Pet., at 48-49 & nn.32-33.  It is undisputed that, seconds after confronting the suspect, Deputy English's O.C. pepper spray canister was shot, releasing spray that essentially blinded him for the remainder of the gunfight.  Tr. 516-518 [Dkt. 29-4, at 112-114].  Indeed, Deputy English did not even know whether more than one person fired at the Deputies.  *Id.* at 521-524 [Dkt. 29-4, at 117-120].   None of these facts were acknowledged when the Georgia Supreme Court found Deputy English's eyewitness identification to constitute "overwhelming evidence" supporting Mr. Al-Amin's conviction notwithstanding the Court's determination the Prosecution deliberately violated Mr. Al-Amin's Fifth Amendment rights.

**D.    Mr. Al-Amin vigorously disputes the state court's assertion that a "vast amount of physical evidence" linked him to the crime.**

Respondent asserts that Mr. Al-Amin "has not challenged [the state court's] additional observation that a 'vast amount of physical evidence' linked Petitioner to the crime."  Third Answer Br., at 19.  Mr. Al-Amin respectfully disagrees and directs the Court to pages 49-51 and 88-89 of his Third Amended Petition [Dkt. 99, at 60-62, 99-100], where he shows (1) his fingerprints were not on the weapons or

ammunition found in Alabama (Tr. 2844 [Dkt. 31-6, at 93]; (2) no evidence (other than the guns' presence in Alabama) linked Mr. Al-Amin to the guns; (3) despite allegations Mr. Al-Amin had fired at least 15 shots at members of the Alabama search team shortly before his arrest, no gun residue was found on Mr. Al-Amin (Tr. 2330, 2342, 2362-63 [Dkt. 31-2, at 107, 119, 139-140]); and (4) Mr. Al-Amin explained in his habeas testimony the presence of his 1978 Mercedes at the scene of the crime as well as his reasons for going to Alabama (HT 120-126, 139 [Dkt. 1-3, at 122-128, 141]).  Most tellingly, in contrast to the statements of both Deputies that they shot the assailant and the blood trail at the scene of the crime, Mr. Al-Amin had not been shot, as confirmed by the FBI medic on hand to document his (absent) wounds.  *See* Third Am. Pet., at 50 [Dkt. 99, at 61] (collecting citations).

It also is relevant the Prosecution obviously did not consider the case against Mr. Al-Amin to be based on "overwhelming evidence," but rather to rest on a sufficiently questionable evidentiary record such that the Prosecution felt the need to engage in a deliberate, systematic violation of Mr. Al-Amin's right not to testify. Respondent cannot dispute the Prosecution intentionally planned its attack on Mr. Al-Amin's Fifth Amendment rights, given the preparation of a supporting visual aid entitled "Questions for the Defendant" for use during the closing argument. *See* Tr. 19817 [Dkt. 36-3, at 57].

- 10 -

**E.      Mr. Al-Amin disputes a curative instruction could ameliorate the enormous harm from the Prosecution's mock cross-examination and argues that, in context, the trial court's instruction exacerbated rather than cured the Fifth Amendment violations.**

Mr. Al-Amin acknowledged the general presumption jurors follow their instructions, but relied on the United States Supreme Court's recognized exception to this rule:  "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton v. United States*, 391 U.S. 123, 135 (1968) (cited in Third Am. Pet., at 92 [Dkt. 99, at 103]).  *See also, e.g., Simmons v. South Carolina*, 512 U.S. 154, 171 (1994) (discussing *Bruton*'s exception to the general rule that jurors are presumed to follow the court's instructions).[2]

Respondent cites *Romano v. Oklahoma*, 512 U.S. 1, 13 (1994), which cited *Richardson v. Marsh*, 481 U.S. 200, 206-207 (1987), for the proposition the Court would "presume" that jurors followed the trial court's instruction.  The *Richardson*

---

[2] *See also, e.g., United States v. Doherty*, 233 F.3d 1275, 1282-1283 (11th Cir. 2000) (following *Bruton* and further holding error addressed by instruction was not harmless); *United States v. One Parcel of Real Estate*, 963 F.2d 1496, 1502 (11th Cir. 1992) (following *Bruton* in holding instruction insufficient to cure prejudice). In the context of a defendant's pre-trial silence, the Eleventh Circuit has held "a curative instruction will not undo the prejudice inflicted by a clear comment on a defendant's silence." *United States v. O'Sullivan*, 255 Fed. Appx. 407, 409 (2007) (citing, *inter alia*, *United States v. Hale*, 422 U.S. 171, 172-73, 175 n.3 (1975)).

court, however, acknowledged and quoted *Bruton*'s exception to the presumption that jurors follow instructions, distinguishing it because the prejudicial evidence at issue in *Richardson* (a statement by a co-defendant) was not incriminating on its face but only became so when linked to other evidence at trial.  481 U.S. at 208 ("Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence.").

Respondent next defends the trial court's instruction as "not misleading or improper."  Third Answer Br., at 21-22.  But Mr. Al-Amin identified multiple deficiencies in the instruction, including (1) his attorney's initial desire to avoid any instruction, due to concerns it would "compound the error," only to have no choice but to request an instruction after the court allowed the Prosecution's mock cross-examination to continue (*compare* Tr. 3702 [Dkt. 32-5, at 29] *with id.* 3707 [Dkt. 32-5, at 34]); (2) the court downplayed the significance of Mr. Al-Amin's objection by stating the instruction was being given "just in an abundance of caution" (Tr. 3708-09 [Dkt. 32-5, at 35-36]); (3) the court then immediately reiterated that the court had "overruled" Mr. Al-Amin's objection (*id.*); (4) the instruction assisted the Prosecution's effort to cause the jury to draw an adverse inference against Mr. Al-Amin based on his failure to testify by stating it was entirely proper for the Prosecution to "urge you to draw inferences from the

evidence" (*id.*); (5) the court sandwiched the reference to Mr. Al-Amin's Fifth Amendment rights between two separate acknowledgements it was perfectly acceptable for the Prosecution "to argue a failure to present certain evidence" (*id.*); and (6) the instruction weakly articulated Mr. Al-Amin's Fifth Amendment rights, confusingly using multiple negatives in the critical purportedly curative statement: "If a defendant elects not to testify, no inference hurtful, harmful or adverse to him shall be drawn by you, and no such fact shall be held against him" (*id.*).

The trial court's concluding statement further diminished the impact of giving the instruction during the middle of closing arguments, by telling the jury it was one of many legal instructions they would receive at the end of the case  Tr. 3709 [Dkt. 32-5, at 36].  And despite the court's instruction, the Prosecution continued to direct questions to Mr. Al-Amin specifically, repeatedly using "your" and "you." *Id.* 3710-11 [Dkt. 32-5, at 37-38].  The Prosecution concluded his assault on Mr. Al-Amin's Fifth Amendment rights by rhetorically answering his own question: "Where were ***you*** at 10 p.m. on March 16?  He was standing outside his black Mercedes murdering Deputy Ricky Kinchen and trying to murder Deputy Aldranon English. ***That is the only evidence you have heard and will hear in this case*** as to where Jamil Abdullah Al-Amin was at 10 p.m. on March 16, 2000, that's it." *Id.* 3711 [Dkt. 32-5, at 38] (emphasis added).

- 13 -

**F.      The juror affidavit confirms the Prosecution's attack on Mr. Al-Amin's Fifth Amendment rights had its intended substantial and injurious effect on the jury's verdict.**

At the state habeas hearing, Mr. Al-Amin presented an affidavit from a juror confirming that, as intended by the Prosecution, "[a] major part of the decision we made as a jur[y] to find Jamil Al-Amin guilty was based on Jamil Al-Amin['s] choice not to testify.  ….  Jamil Al-Amin not testifying played a major role in our decision to find Mr. Al-Amin guilty.  … [¶] [T]hings we as jurors felt should have been done main thing Mr. Al-Amin should have made a statement or at least come on the witness stand say out of his own mouth that he was not guilty …."  State Habeas Tr., Ex. P-7 [Dkt. 1-4, at 60].

Respondent disputes that this affidavit can be considered under *Cullen v. Pinholster*, 563 U.S. 170 (2011).  Third Answer Br., at 22.  As Mr. Al-Amin explained in his Reply in Support of his Motion to Expand the Record, however, *Pinholster* only limits a federal habeas court to the state court record when determining the unreasonableness of the state decision under 28 U.S.C. § 2254(d). [*See* Dkt. 111.]  The juror's affidavit, as with the Declaration from Jack Martin (Mr. Al-Amin's lead trial counsel), were offered to meet the ***separate*** federal habeas burden of showing a "substantial and injurious effect or influence in determining the jury's verdict" under *Brecht v. Abrahamson*, 507 U.S. 619, 627

(1993).  Numerous Eleventh Circuit decisions confirm that federal habeas courts

may consider evidence not before the state court once a petitioner has met his

threshold burden under § 2554(d).  [Dkt. 111, at 4-5 (collecting cases).]

Respondent next argues the juror affidavit should be rejected as inconsistent

with the federal policy prohibiting "jury testimony to impeach a verdict."  Third

Answer Br., at 22.  But Mr. Al-Amin was convicted by a Georgia jury in Georgia

Superior Court in a proceeding governed by Georgia law.  As the Supreme Court

of Georgia has explained, "our laws provide that the general prohibition against

allowing a jury to impeach its verdict cannot be applied to emasculate a

defendant's constitutional right to a fair trial, particularly when his life hangs in the

balance" (as Mr. Al-Amin's did).  *Turpin v. Todd*, 268 Ga. 820, 822, 493 S.E.2d

900, 903 (1997) (citing, *inter alia*, *Watkins v. State*, 237 Ga. 678, 229 S.E.2d 465

(1976)).  Because the juror affidavit addresses whether the Prosecution's mock

cross-examination impermissibly undermined Mr. Al-Amin's constitutional right

to a fair trial, the prohibition against impeaching a verdict must yield.[3]

---

[3] Moreover, at least some federal habeas courts have noted a petitioner's ***failure*** to
secure a juror affidavit to show a "substantial and injurious effect."  *See Scott v.
Calderon*, 39 F.3d 1188 (Table), 1999 WL 621905 (9th Cir. 1994) (affirming
denial of habeas relief where petitioner failed to secure supporting affidavits from
any juror); *see also Perez v. Marshall*, 946 F. Supp. 1521, 1537-1538 (S.D. Cal.
1996) (considering and discussing juror declarations submitted by both the
prosecution and the defense in analyzing injurious effect of claimed error).

**G.    Mr. Martin's Declaration describes the relationship of the Prosecution's constitutional violations upon Mr. Al-Amin's trial strategy and confirms the egregious and deliberate nature of the violations.**

Respondent's final challenge to Mr. Al-Amin's first claim targets the Declaration of John R. Martin, Mr. Al-Amin's lead trial counsel.  Third Answer Br., at 23.  Mr. Martin, who has participated in well over 100 trials in 35 years of practice, described his "long-standing practice of advising criminal defendants not to testify where the prosecution has not carried its burden of proof."  Martin Decl. ¶¶ 2-4 [Dkt. 101-3, at 3.]  This practice assumes "the prosecution's complying with the Fifth Amendment guarantee against self-incrimination."  *Id.* ¶ 4.

According to Mr. Martin, "in no other criminal trial in which I have participated has the prosecution engaged in the type of extensive and obvious comment on the accused's failure to testify remotely similar to the prosecution's mock cross-examination of Mr. Al-Amin …."  *Id.*  Mr. Martin considers this constitutional violation "extremely prejudicial" to Mr. Al-Amin's defense, because he would have acceded to Mr. Al-Amin's strong desire to testify had he know the Prosecution would engage in the mock cross-examination.  *Id.* ¶ 5.  Moreover, Mr. Martin believes the Prosecution utilized the deliberate violation of Mr. Al-Amin's right to remain silent to "divert the jury's attention away from the reasonable doubt in the prosecution's case to Mr. Al-Amin's failure to testimony."  *Id.* ¶ 6.

- 16 -

Mr. Martin questioned whether any jury instruction could cure the prejudice from the Prosecution's misconduct and explained his view that "the instruction that was given exacerbated the negative impact of the cross-examination, by indicating to the jury that the trial court did not concur fully in the objections of defense counsel." *Id.* ¶ 7.  Mr. Martin concluded that Mr. Al-Amin "did not receive a fair trial," because "the mock cross-examination caused the jury to interpret Mr. Al-Amin's failure to testify as evidence of guilt." *Id.* ¶ 8.

Respondent's *Pinholster*-based challenge to Mr. Martin's Declaration fails for the same reason it does not preclude consideration of the juror's affidavit.  *See supra* § I.F; Dkt. 111.  Respondent also claims a decision to consider Mr. Martin's Declaration would constitute a "new" constitutional rule of criminal procedure that cannot be applied retroactively under *Teague v. Lane*, 489 U.S. 288 (1989).  Third Answer Br., at 23.  But no U.S. Supreme Court ruling prohibits consideration of a declaration from trial counsel in all circumstances.[4]  Moreover, the Supreme Court has held that, in case of doubt regarding "injurious effect" of a constitutional error,

---

[4] Indeed, *Brecht* itself recognizes that, in unusual circumstances, "a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict."  507 U.S. at 638 n.9.  Mr. Al-Amin respectfully submits that the deliberate and egregious Fifth Amendment violation of the Prosecution in his case presents the unusual circumstances contemplated by the *Brecht* footnote.

a "tie" goes to the petitioner.  *See O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)

("When a federal judge in a habeas proceeding is in grave doubt about whether a

trial error of federal law had a 'substantial and injurious effect or influence in

determining the jury's verdict,' that error is not harmless.  And, the petitioner must

win.").  Because Mr. Martin's Declaration supports Mr. Al-Amin's argument this

Court should have "grave doubt" about whether the mock cross-examination had a

"substantial and injurious effect" on the jury's verdict, the Court should consider it.

### Claim II

**The State court violated Mr. Al-Amin's Sixth and Fourteenth Amendment rights by precluding him from cross-examining FBI Agent Campbell regarding Campbell's 1995 shooting of Glenn Thomas in Philadelphia.**

Mr. Al-Amin sought to cross-examine FBI Agent Ron Campbell regarding

his shooting of Glenn Thomas in Philadelphia in 1995, in which Agent Campbell

allegedly planted a fingerprint-free gun next to the victim (an African-American

Muslim) after shooting him in the back of the head.  Tr. 139-141, 258-29, 401-402

[Dkt. 29-2, at 25-27; Dkt. 29-3, at 2-3, at 146].  The Defense Lawyers intended to

use this cross-examination to support the defense theory FBI Agent Campbell had

planted the weapons used in the crime in Alabama.  HT, at 97 [Dkt. 1-3, at 99].

The trial court refused to allow the cross-examination, and the Georgia Supreme

Court affirmed on direct appeal.  *Al-Amin*, 278 Ga. at 85, 597 S.E.2d at 345.

A.    **Mr. Al-Amin adequately preserved his Confrontation Clause challenge in his direct appeal, relying on Georgia decisions following the U.S. Supreme Court's seminal ruling in *Davis v. Alaska*, 418 U.S. 308 (1974).**

Respondent first questions whether Mr. Al-Amin adequately preserved a Confrontation Clause claim.  Third Answer Br., at 27.  In the trial court, counsel for Mr. Al-Amin argued the cross-examination was proper under a "similar transaction" theory, citing an Eleventh Circuit case which held that precluding a defendant from cross-examining a key prosecution witness deprives the defendant "from presenting an adequate defense and thus deprived [him] of a fair trial." *United States v. Cohen*, 888 F.2d 770, 777 (11th Cir. 1989) (cited in Supp. Mot. for New Trial, at 16-17 [Dkt. 15-7, at 48-49].  Mr. Al-Amin also cited several Georgia appellate cases following the U.S. Supreme Court's seminal Confrontation Clause ruling in *Davis v. Alaska*, 418 U.S. 308 (1975), including a Georgia Supreme Court case holding a state criminal defendant's Confrontation Clause rights are violated where the trial court improperly limits cross-examination of a critical prosecution witness.  *See* Supp. Mot. for New Trial, at 17 [Dkt. 15-7, at 49] (citing, *inter alia*, *Magnum v. State*, 274 Ga. 573, 576-77, 555 S.E.2d 451, 455-56 (2001)).

On direct appeal, Mr. Al-Amin titled a section of his opening brief "The Trial Court's Limitation of Appellant's Cross-Examination of Special Agent Ronald Campbell Relating [to] His Prior Assault Upon a Suspect in Philadelphia

- 19 -

Violated Appellant's Rights to Due Process and Confrontation Guaranteed by the United States Constitution."  Br. of Appellant, at 68-70 [Dkt. 36-1, at 71-73]. Again, Mr. Al-Amin cited *Cohen* and Georgia cases following *Davis v. Alaska.  Id.*

Thus, Mr. Al-Amin specifically raised a Confrontation Clause challenge to the limitation on his cross-examination of Agent Campbell and cited Georgia cases following *Davis v. Alaska*, 418 U.S. 308 (1974).  This was more than sufficient to preserve the Confrontation Clause issue in his direct appeal.

**B.     Mr. Al-Amin sought to cross-examine FBI Agent Campbell to show similar transaction evidence supporting the defense theory Campbell planted the weapons in Alabama, not merely to impeach him.**

Respondent briefly defends the merits of the state court's ruling affirming the limitation on the cross-examination, arguing trial judges retain discretion "'to impose reasonable limits on such cross-examination based on concerns about . . . interrogation that is repetitive or only marginally relevant.'"  Third Answer Br., at 28 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).  Mr. Al-Amin submits his intended cross-examination was highly relevant and not repetitive.

The discovery of the weapons in Alabama constituted the critical "physical evidence" allegedly tying Mr. Al-Amin to the crimes.  The defense argued FBI Agent Campbell planted the weapons, presenting evidence Campbell "fell behind" other FBI agents in Alabama and could not be observed.  Tr. 2628 [Dkt. 31-5, at

43]; *see also* HT, at 97 [Dkt. 1-3, at 99].  When the weapons ultimately were found

"in the vicinity" following Mr. Al-Amin's arrest, Mr. Al-Amin's fingerprints were

not on the weapons or the ammunition (Tr. 2844 [Dkt. 31-6, at 93]), despite

(disputed) allegations Mr. Al-Amin had fired on several officers shortly before his

arrest.  Tr. 2330, 2342, 2362-63 [Dkt. 31-2, at 107, 119, 139-140].[5]

Against this background, cross-examination evidence showing FBI Agent

Campbell had been involved in a previous incident in which he similarly had been

accused of planting a fingerprint-less weapon next to another African-American

Muslim suspect would have been highly relevant.  As the *Cohen* court explained,

in enacting Federal Rule of Evidence 404(b) (which Georgia has now followed by

enacting O.C.G.A. 24-4-404(b)), "'Congress was not nearly so concerned with the

potential prejudicial effect of [similar transaction] evidence as it was with ensuring

that restrictions would not be placed on the admission of such evidence.'"  888

F.2d at 777 (quoting *Huddleston v. United States*, 485 U.S. 681, 688-689 (1988)).

Thus, "[w]hen the defendant offers similar acts evidence of a witness pertinent to

the defense, the normal risk of prejudice is absent."  *Id.* (citation omitted).  "In this

case, the evidence was crucial to the defense and its exclusion was error."  *Id.*

---

[5] Federal charges against Mr. Al-Amin related to these allegations were dismissed
in December 2002.  Third Am. Pet., at 50 n.34 [Dkt. 99, at 61 n.34].

Here, the state court precluded Mr. Al-Amin from cross-examining FBI Agent Campbell regarding a similar incident highly pertinent to the defense theory Campbell planted the weapons in Alabama on the grounds such cross-examination would be "unfairly prejudicial" to the Prosecution.  Mr. Al-Amin respectfully submits that, where a criminal defendant's life hangs in the balance (as his did at the time the trial court prohibited the cross-examination), his attorneys should be given all possible leeway relative to cross-examining key prosecution witnesses.

Further illustrating that the state courts turned the Constitution "upside down" in affirming this cross-examination limitation, the Georgia Supreme Court also deemed harmless the mock cross-examination in which the Prosecution asked, "Mr. Defendant, how did those murder weapons get there to Whitehall?"  Thus, the state court (a) prohibited Mr. Al-Amin from cross-examining a critical prosecution witness regarding a similar transaction in which he had planted fingerprint-free weapons next to a Muslim African-American suspect, while (b) excusing the Prosecution's mock cross-examination that specifically challenged Mr. Al-Amin's failure to explain how the fingerprint-free guns got to Alabama.  Mr. Al-Amin respectfully submits this juxtaposition of constitutional violations does not satisfy the fundamental due process requirements for a fair trial.

**Claim III**

**The Defense Lawyers violated Mr. Al-Amin's Sixth and Fourteenth Amendment rights to effective assistance of counsel by failing to investigate the confession of Otis Jackson adequately.**

Otis Jackson has been confessing to the crimes for which Mr. Al-Amin was convicted since shortly after they occurred.  After the trial court forced the Prosecution to turn over information about these confessions to Mr. Al-Amin (HT, at 79 [Dkt. 1-3, at 81], the Prosecution sought to discredit Jackson as "sort of like Homer (and probably just as crazy)" – a reference to Homer Lewis, a mentally ill individual who claimed to have shot the Deputies.  State Habeas Ex. P-3 [Dkt. 1-4, at 55].  The Defense Lawyers ultimately required the trial court's assistance in forcing the Prosecution to provide information permitting the defense to locate Mr. Jackson.  [Dkt. 19-4, at 87-94.]  These multiple "red flags" should have alerted the Defense Lawyers to investigate Mr. Jackson's confessions fully.  Instead, the Defense Lawyers (a) sent an investigator to meet with Mr. Jackson a single time and (b) accepted uncritically the Prosecution's representation that ankle monitoring data showed Mr. Jackson could not have committed the crimes.

**A.      Mr. Al-Amin's claim challenging the failure adequately to investigate Otis Jackson's repeated confessions does not depend on "hindsight."**

Respondent challenges Mr. Al-Amin's ineffective assistance claim as being based on "hindsight."  Third Answer Br., at 32, 33.  According to Respondent, Mr.

Al-Amin cannot rely on the testimony of his Defense Lawyers that they should have investigated Mr. Jackson more fully, or the testimony given by Mr. Jackson when he finally was deposed, because that testimony post-dates his criminal trial. This misses the point of a "failure to investigate" claim:  had the Defense Lawyers adequately investigated Mr. Jackson's confession before trial, they would have had known the substance of his testimony then, in time to evaluate whether to call him.

As Respondent acknowledges, *Strickland v. Washington* itself discusses the duty to investigate:  "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  466 U.S. 668, 691 (1984).  Here, the Defense Lawyers engaged in minimal investigation of Mr. Jackson (a single interview by one investigator) before abandoning his confessions entirely, based on an assertion by the Prosecution regarding the meaning of ankle monitoring data that the Defense Lawyers immediately accepted without independent verification.

Particularly given the Prosecution's reticence to reveal Mr. Jackson or his whereabouts, reasonable diligence required greater scrutiny of the Prosecution's assertions.  Had they done so, they would have discovered that Mr. Jackson has

grey-tinged eyes; that his build matched that of the shooter identified by Messrs.

Shaka and Jihad; and that he claimed to have wounds (or scars) from being shot by

the Deputies.  Given that his confession carried the risk of the death penalty, the

Defense Lawyers should have evaluated Mr. Jackson's veracity more fully.

**B.     The state habeas court ignored, rather than discounting the credibility of, the undisputed testimony of Mr. Al-Amin's ankle monitoring expert.**

Respondent does not dispute that the Defense Lawyers accepted uncritically

the Prosecution's representation that ankle monitoring data precluded Mr. Jackson

from committing the crimes.  State Habeas Order 10 [Dkt. 1-2, at 11].  Respondent

likewise does not dispute that the only sworn testimony presented at the state

habeas hearing (from T.J. Ward, who helped found the company responsible for

the ankle monitoring) was that the data did ***not*** establish Mr. Jackson's inability to

commit the crime.  HT, at 48-70 [Dkt. 1-3, at 50-72].

Respondent argues instead the state habeas court "was not required to credit

the testimony of any witness, even it if was not rebutted in kind."  Third Answer

Br., at 33-34.  The basis for this rule, however, is that "witness credibility is a

matter for the court."  *Johnson v. State*, 290 Ga. 382, 384, 721 S.E.2d 851, 854

(2012).  Here, the state habeas court gave no indication it was "discrediting" Mr.

Al-Amin's ankle monitoring expert; to the contrary, it never mentioned the

unrebutted testimony at all.  *See* State Habeas Order [Dkt. 1-2].  The state habeas

court's omission of any discussion of the ankle monitoring expert's undisputed

testimony should not be interpreted as an implicit discrediting of that testimony.

## Claim IV

**The State failed to produce exculpatory evidence to Mr. Al-Amin, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).**

Mr. Al-Amin has pressed *Brady* claims in his direct appeal and in his state

habeas action.  He now asserts a new *Brady* claim, based on three documents

produced for the first time after the conclusion of his trial, direct appeal, and state

habeas action:  (1) a Declaration of a U.S. Marshal dated June 26, 2012, which

states that "[s]everal other individuals charged in [Mr. Al-Amin's criminal] case

remain at large" [Dkt. 116-1, at 3]; (2) a BOLO ("be on the lookout") bulletin

issued to "ALL LAW ENFORCEMENT AGENCIES" on March 17, 2000 (the day

after the crimes), which describes the height and weight of the shooter as "5' 8"-5'

9", 150-160 LBS." [Dkt. 117-1, at 10]; and (3) handwritten notes of an interview

with Sergeant Paul Rogers, the member of the Alabama dog tracking team who

found the .9 mm Browning pistol used in the crimes, which states that Sergeant

Rogers felt the pistol "was placed" [Dkt. 117-3, at 3].  The FBI produced the latter

two documents for the first time on September 24, 2015 (two days after the close

of discovery on this action), as part of a 700-page Freedom of Information Act

("FOIA") production mailed to Karima Al-Amin, Esq. (Mr. Al-Amin's wife).

**A.    Even though the Prosecution represented it had an "open file" policy, Mr. Al-Amin diligently sought exculpatory information during the underlying trial, during the state habeas action, and thereafter.**

At the outset of the case, Mr. Martin raised the issue of the Prosecution's duty to produce all *Brady* material, including "anything that's in the investigative agencies' files as well." Tr. 30-32 [Dkt. 16-4, at 2-4]. On November 13, 2000, Mr. Al-Amin filed a "Motion for Discovery of Exculpatory Information and Information to Impeach or Discredit State Witnesses." [Dkt. 12-7, at 57-63.] Mr. Al-Amin's Motion specifically relied on *Brady v. Maryland*, 373 U.S. 83 (1963), and *United States v. Agurs*, 427 U.S. 97 (1976). [*Id.* at 58.] It also notified the Prosecution of its duty "to seek out and discover evidence or information within the knowledge or custody or other state, government, or law enforcement agencies." [*Id.* at 59-60.] Finally, because Mr. Al-Amin faced the death penalty, the Motion identified "a particularly urgent need for prompt and full discovery of any evidence which is in any way exculpatory or which in any way casts doubt on any aspect of the state's case." [*Id.* at 60.]

**1.    The Prosecution stated that it maintained an "open file" policy.**

The Prosecution responded to Mr. Al-Amin's Motion on March 22, 2001. [Dkt. 14-4, at 90-91.] Without acknowledging the presence of any *Brady* material, the Prosecution represented it had produced "a copy of the entire State's file." [*Id.*

at 90.]  Thus, the Prosecution urged the Court to find "the defendant's motion be deemed satisfied."  [*Id.* at 91.]  Consistent with its written position, the Prosecution repeatedly represented to the trial court and Mr. Al-Amin that it would maintain an "open file" policy.  *See* Tr. 5 (Mar. 14, 2001) [Dkt. 103-4, at 11]; Tr. 7 (Mar. 28, 2001) [Dkt. 103-5, at 13]; Tr. 3 (Apr. 18, 2001) [Dkt. 103-6, at 9].

### 2. Mr. Al-Amin sought to obtain information from the FBI in the underlying criminal trial and raised a *Brady* claim on appeal.

As the state trial court recognized, "[t]he Fulton County District Attorney, as well as a state and local task force, worked closely with the FBI in the investigation and prosecution of this case, and information was shared."  [Dkt. 80, at 12-13.]  Thus, under *United State v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979), and authorities applying its holding, *Brady* applied to the FBI.  *See* Third Am. Pet., at 116-117 [Dkt. 99, at 127-128].  The FBI acknowledged its *Brady* obligations with respect to files relating to FBI Agent Campbell's conduct on the day of Mr. Al-Amin's arrest and the ensuing investigation.  Tr., at 3-4 [Dkt. 35-2, at 8-9].

Mr. Al-Amin explains in detail in his Third Amended Petition the Defense Lawyers' efforts to secure information from the FBI regarding its ongoing investigation of Mr. Al-Amin at the time of the crime.  Third Am. Pet., at 119-121 [Dkt. 99, at 130-132.]  Despite repeated statements by the FBI denying any such investigation, later-produced FOIA documents confirmed the FBI's ongoing

investigation of Mr. Al-Amin at the time of the crime. *Id.* at 121-122 [Dkt. 99, at 132-133]; *see also* Pet.'s Mot. to Expand the R., Exs. 1-2 [Dkt. 101, 101-1, 101-2].

In his direct appeal, Mr. Al-Amin pressed a *Brady* claim challenging the failure to produce all information regarding the FBI's investigation of Agent Campbell's conduct at the time of Mr. Al-Amin's arrest (when Agent Campbell kicked and spat upon Mr. Al-Amin, *Al-Amin*, 278 Ga. at 82, 597 S.E.2d at 344). The Supreme Court affirmed the trial court's ruling and rejected the argument the Prosecution was obliged to produce all exculpatory evidence in the possession of the FBI, ruling that Mr. Al-Amin's remedy for any non-production by the FBI "lies in federal court." 278 Ga. at 83, 597 S.E.2d at 345.

### 3. Mr. Al-Amin presses a *Brady* claim in his state habeas action regarding the FBI's investigation of him at the time of the crimes.

In his state habeas action, Mr. Al-Amin asserted a *Brady* claim asserting, *inter alia*, that the FBI failed to produce exculpatory information from its ongoing investigation of Mr. Al-Amin at the time of the crime. Am. to State Habeas Pet., at 4 [Dkt. 1-7, at 5]. Mr. Al-Amin also served a subpoena on the FBI, in response to which the FBI moved to quash and objected to the state habeas court's jurisdiction over it. *See* HT, at 11-21, esp. 14 ("The Court: So your position is I simply don't have the authority? [The FBI]: That's correct, Your Honor."). The state court agreed and quashed Mr. Al-Amin's subpoena to the FBI: "I'm bound by the

decision rendered by the supreme court.  So I'm going to deny this motion.

However, I will note for the record that you have raised this issue and you haven't

waived it in any manner whatsoever."  *Id.* at 17.

At the end of the state habeas evidentiary hearing, the state habeas court held

open the record and suspended the hearing "to reconvene at a later date."  HT, at

153, 155.  Following the completion of additional depositions (including the

deposition of Otis Jackson), Mr. Al-Amin's state habeas counsel wrote the state

habeas court asking to schedule the hearing and establish a final briefing schedule

following the completion of his cancer treatment in May 2011.  *See* Dkt. 1-8, at 2.

Without scheduling a further hearing or receiving further briefing, the state habeas

court entered a "Final Order" denying the state habeas on July 28, 2011.

In its Final Order, the state habeas court summarized Mr. Al-Amin's *Brady*

claim relative to the FBI's ongoing investigation of him:  "FOIA documents show

there was surveillance of the Petitioner, which means there must have been

surveillance on the night of the offense in question since the FBI was immediately

on the scene, but said surveillance records were never produced to the Petitioner,

despite containing exonerating evidence." State Habeas Order, at 30 [Dkt. 1-2, at

31].  The state habeas court found this claim procedurally defaulted because "it

could have been raised at trial and on direct appeal."  *Id.*

The state court also cited the ruling in the direct appeal regarding Mr. Al-Amin's separate *Brady* claim (challenging the FBI's failure to produce information regarding the internal investigation of FBI Agent Campbell), ruling that "the appropriate route to obtain these documents lies in federal court, not the state habeas court." *Id.* (citing *Al-Amin*, 278 Ga. at 83, 597 S.E.2d at 345). Thus, as correctly acknowledged by Respondent, "[b]oth the Georgia Supreme Court and the state habeas court have suggested to Petitioner that the appropriate route for his access to federal documents lay in the federal courts." [Dkt. 107, at 2.]

### 4. FOIA efforts to secure information regarding Mr. Al-Amin from the FBI and other federal agencies have continued unabated since the state habeas court's decision.

Following the state habeas court's ruling, multiple FOIA efforts seeking information regarding Mr. Al-Amin from the FBI and other federal agencies have continued. *See* Third Am. Pet., at 124-125 [Dkt. 99, at 134-135]; *see also* Mot. for Discovery [Dkt. 100], at 8-10. As pertinent to Mr. Al-Amin's current *Brady* claim, Karima Al-Amin, Esq., has been pursuing production of nearly 22,000 pages of documents from the FBI since March 2013. [*See* Dkt. 100-4.] In response to Ms. Al-Amin's FOIA requests, the FBI produced the BOLO bulletin and the interview notes reflecting Sergeant Rogers' comment the pistol "was placed" on September 24, 2015. *See* Pet.'s Supp. to Second Mot. to Expand R. [Dkt. 117].

**B.    In a separate civil rights action brought by Mr. Al-Amin, a U.S. Marshal submits a Declaration stating that "several other individuals charged" in Mr. Al-Amin's criminal case "remain at large."**

In connection with a now-resolved civil rights action, a Deputy U.S. Marshal submitted a Declaration in opposition to Mr. Al-Amin's request to appear personally at the trial.  The Marshal described the Marshal Service's asserted security concerns with Mr. Al-Amin attending the trial in person and stated that, with respect to the crime for which Mr. Al-Amin was convicted, "[s]everal other individuals charged in that case remain at large."  *Al-Amin v. Hugh Smith, et al.*, Decl. of Deputy U.S. Marshal Kenneth J. Staub, No. 6:05-cv-00025-JEG (S.D. Ga. filed June 26, 2012) [Dkt. [Dkt. 116-1, at 3].  The district court relied on this aspect of the Marshal's Declaration when it denied Mr. Al-Amin's request to appear at trial, ruling "even if [Mr. Al-Amin] does not present a security concern, ***his associates may***."  *Al-Amin v. Hugh Smith, et al.*, Order, No. 6:05-cv-00025-JEG (S.D. Ga. filed July 16, 2012) [Dkt. No. 134] (emphasis added).

Ms. Al-Amin thereafter requested documents from the U.S. Marshal's Service under FOIA.  [*See* Dkt. 116-3.]  As detailed in her Declaration dated September 29, 2015, none of the documents produced by the U.S. Marshal's Service in response to her FOIA request describes any other individuals as having been charged in the underlying criminal case.  [*Id.*]

**C.      This Court grants Mr. Al-Amin leave to serve a subpoena on the FBI requesting exculpatory information, in response to which the FBI produces neither the BOLO bulletin nor the "it was placed" notes.**

Contemporaneously with Mr. Al-Amin's filing of his Third Amended Petition, he simultaneously served his Motion for Leave to Conduct Discovery. [Dkt. 100.]  Mr. Al-Amin sought leave to subpoena the FBI for exculpatory information showing (1) Mr. Al-Amin was not the person or among the persons who shot the Deputy Sheriffs on March 16, 2000; and (2) FBI Agent Campbell planted weapons in the vicinity of the location where Mr. Al-Amin was arrested in White Hall, Alabama on March 20, 2000.  [Dkt. 100-7, at 4.]  Respondent Bryson did not oppose the Motion for Leave to Conduct Discovery [Dkt. 107], which the Court granted on August 6, 2015 [Dkt. 108].  Mr. Al-Amin served the FBI with the subpoena the next day, August 7, 2015.  [Dkt. 109.]

**1.      The FBI produces limited information, as a result of which Mr. Al-Amin does not seek to extend the discovery period nor to further amend his habeas petition.**

Following two extensions, the FBI produced limited materials in response to Mr. Al-Amin's subpoena on September 11, 2015.  Given the limited nature of this production, Mr. Al-Amin did not seek to extend the limited discovery period beyond September 22, 2015 [Dkt. 115], nor did he seek to further amend his habeas petition by the deadline of September 29, 2015 [Dkt. 116].

    2.    **The FBI produces the BOLO bulletin and the "it was placed" note to Ms. Al-Amin after the close of discovery in this action.**

On September 24, 2015 (two days after the close of discovery), the FBI mailed its latest FOIA production to Ms. Al-Amin.  This FOIA response included (1) the initial BOLO bulletin describing the height and weight of the shooter as "5' 8"-5' 9", 150-160 LBS." (Mr. Al-Amin is 6' 5", 187 lbs.); and (2) handwritten notes of an interview with Sergeant Paul Rogers, the Alabama officer who found the pistol used in the crimes in Alabama, in which he stated that he felt the pistol "was placed."  [Dkt. 117.]  On October 7, 2015, Mr. Al-Amin brought these documents to the attention of the Court and Respondent by a "Supplement" to the Second Motion to Expand the Record.  [*Id.*]

    a.    **The BOLO bulletin identifies the shooter as having an average height and build, completely unlike Mr. Al-Amin's distinctive tall and slender body type.**

The BOLO bulletin issued on March 17, 2000 (the day after the crime) described the height and weight of the shooter as being within the range of "5' 8"-5' 9", 150-160 LBS."  [Dkt. 117-1, at 10.]  According to State's Trial Exhibit 9, Mr. Al-Amin stands 6' 5" and weighs 187 pounds.  [Dkt. 53-2.]

The attributes of the assailant given in the initial BOLO bulletin parallel the trial testimony of eyewitness Imhotep Shaka.  Mr. Shaka described the individual whom he saw fire three shots as "average height, average build."  Tr. 3571-73

[Dkt. 32-3, at 86-88].  A long-time resident of West End, Mr. Shaka was familiar

with Mr. Al-Amin and his unique "tall and slender" build.  Tr. 3574 [Dkt. 32-3, at

89].  When Mr. Shaka testified he was "absolutely positive" that the person he saw

firing the three shots was not Mr. Al-Amin, he specifically relied on the fact that

"Jamil has a distinctive – Jamil is tall."  Tr. 3574-75 [Dkt. 32-3, at 89-90].

Trial witness Fareed Jihad likewise testified at trial that shortly after the

shooting ended, he saw an individual leaving the scene of the shooting who was

"about 5' 8", 5' 9", somewhere in that area."  Tr. 3522 [Dkt. 32-3, at 37].[6]

Neither Mr. Shaka nor Mr. Jihad had been interviewed by the police before

the BOLO bulletin issued on March 17, 2000.  According to Mr. Shaka, none of

the police on the scene after the shooting asked him what he heard or saw that

night.  Tr. 3578 [Dkt. 32-3, at 93].  It was not until about "a month later" that Mr.

Shaka first was interviewed by an investigator working for Mr. Al-Amin's defense

attorneys.  Tr. 3604 [Dkt. 32-3, at 119].  Mr. Jihad similarly testified that the police

did not try to speak with him the night of the shooting, other than telling him to

"get off the street."  Tr. 3530 [Dkt. 32-3, at 45].

---

[6] Other trial evidence (presented by the State) demonstrated that an injured
individual who climbed a chain link fence and attempted to gain entrance to the
West End Medical Center a few hours after the crime was "between 5'5 and 5'7."
Tr. 1189 [Dkt. 30-2, at 38].

Otis Jackson, the individual who has been confessing to committing the crimes since they occurred, also matches the description disseminated in the initial BOLO bulletin.  According to the records of the Nevada Department of Correction, at the time Mr. Jackson was returned to their custody on July 12, 2000 (less than four months after the crime occurred on March 16, 2000), he measured 5' 8" and weighed 165 pounds.  [Dkt. 1-4, at 41.]

### b.   The notes of the interview with Sergeant Rogers in which he states the pistol he found "was placed."

Mr. Al-Amin was arrested in White Hall, Alabama on March 20, 2000. Later that evening, at approximately 9:05 pm CT, a group of officers retraced the path Mr. Al-Amin had taken shortly before his arrest.  FBI Report (Mar. 29, 2000) [Dkt. 117-2, at 2].  This group included three FBI Special Agents and Sergeant Paul Rogers, Kilby Correctional Facility, Dog Tracking Team Member, Mount Meigs, Alabama.  *Id.*  After crossing a barbed-wire fence, Sergeant Rogers notified the FBI Agents he located a .9 mm Browning pistol "in a black holster, wrapped with a black belt."  *Id.*  Additional ammunition was "located next" to the pistol.  *Id.*

The FBI's recent FOIA production to Ms. Al-Amin includes handwritten notes of an interview with Sergeant Rogers dated September 6, 2000.  [*See* Dkt. 117-3].  At the bottom of the second page of the notes the following statements had

been placed in brackets (the first word of the second line of this note may be "feel" rather than "felt"):

> [Sgt. [redacted]     found 9mm
>                      felt ***it was placed***.]

[*See id.* at 3 (emphasis added).]  Thus, the Alabama Sergeant who discovered the pistol after Mr. Al-Amin's arrest felt the weapon had been "placed."  *Id.*

As noted above, Mr. Al-Amin's fingerprints were not on the weapons or the ammunition, and there is no physical evidence other than the presence of the guns in White Hall linking Mr. Al-Amin to the weapons.  Third Am. Pet., at 51 [Dkt. 99, at 62] (citing Tr. 2844 [Dkt. 31-6, at 93]).  Mr. Al-Amin's defense team argued the weapons from the crime had been planted in Alabama and focused on FBI Special Agent Ron Campbell as the individual who had planted the weapons.

The opening statement by Mr. Martin (Mr. Al-Amin's lead trial attorney) specifically discussed the discovery of the pistol as photographed by the FBI: "Look at the picture of it as you hear the evidence.  ***Look at how it's wrapped up as if it has almost been placed there***."  Tr. 248 [Dkt. 29-2, at 134] (emphasis added).  Although Sergeant Rogers testified and was cross-examined, the handwritten notes regarding the September 2000 interview had not been produced to Mr. Al-Amin, and thus Sergeant Rogers was not asked about his ***own*** statement the pistol had been "placed."  *See* Tr. 2210-2222 [Dkt. 31-1, at 152-164.]

**D.    Under *Banks v. Dretke*, 540 U.S. 668 (2004), Mr. Al-Amin can establish cause and prejudice sufficient to overcome any procedural default of his current *Brady* claim.**

Respondent has challenged Mr. Al-Amin's current *Brady* claim as defaulted because it was not raised in Mr. Al-Amin's state habeas proceeding.  Third Answer ¶¶ 2 & 7(d); Third Answer Br., at 38.  Under the U.S. Supreme Court's decision in *Banks v. Dretke*, 540 U.S. 668 (2004), Mr. Al-Amin has demonstrated cause and prejudice sufficient to overcome any procedural default.

In *Banks*, as in Mr. Al-Amin's criminal case, the prosecution represented it had an "open file" policy.  540 U.S. at 675.  Despite this assurance, the prosecution withheld evidence discrediting two key prosecution witnesses.  In its introduction, the Court explained:  "When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight."  *Id.* at 675-76.

In *Banks*, the refusal to produce exculpatory information continued through state collateral proceedings, until the exculpatory materials finally were produced in response to federal discovery and in a federal evidentiary hearing.  *Id.* at 682-86.  Here, despite the Court authorizing Mr. Al-Amin to serve a subpoena on the FBI for exculpatory evidence, two *Brady* documents were not provided with the FBI's response and were not produced until after the close of discovery.

- 38 -

Despite the petitioner not having presented the newly-disclosed evidence to the state court, the *Banks* court held he would be entitled to an evidentiary hearing in federal court "'if he could show cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure.'"  *Id.* at 690 (quoting *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11 (1992)).  The Court explained this showing would track the substantive elements of his *Brady* claim:

> *Brady*, we reiterate, held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  We set out in *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999), the three components or essential elements of a *Brady* prosecutorial misconduct claim:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  527 U.S. at 281-282.  "[C]ause and prejudice" in this case "parallel two of the three components of the alleged Brady violation itself."  *Id.* at 282.  Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows "cause" when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the "cause and prejudice" requirement exists when the suppressed evidence is "material" for *Brady* purposes.  527 U.S. at 282.

540 U.S. at 691.  Mr. Al-Amin respectfully submits his *Brady* claim satisfies these interrelated procedural and substantive requirements.

**1.      The BOLO bulletin, the "it was placed" note, and the Marshal's Declaration Constitute Evidence Favorable to Mr. Al-Amin.**

All three documents on which Mr. Al-Amin bases his current *Brady* claim constitute evidence favorable to him:

- The BOLO bulletin issued the day after the crime identified physical characteristics of the shooter sharply inconsistent with Mr. Al-Amin's body type.  These characteristics, moreover, match the description of the shooter given by a trial eyewitness to the shooting as well as the description of a man leaving the scene provided by another trial eyewitness.  Neither of these eyewitnesses had been interviewed by the authorities at the time the BOLO bulletin issued.  Otis Jackson also fits the BOLO bulletin description.

- The "it was placed" handwritten note regarding the interview with Sergeant Rogers directly supports Mr. Al-Amin's defense theory the weapons from the crime had been placed or planted in Alabama.  Indeed, Mr. Martin (Mr. Al-Amin's lead trial counsel) referred to the pistol discovered by Sergeant Rogers as being "placed" in his opening statement.  Had the handwritten notes been produced, they would have constituted critical evidence to be used in the cross-examination of Sergeant Rogers and would have made the defense theory that the guns had been planted far more plausible to the jury.

- The U.S. Marshal's Declaration that others charged in the crime "remain at large" directly undercuts the Prosecution's theory that Mr. Al-Amin alone shot Deputy Sheriffs Kinchen and English.  Particularly Given Deputy English's inability to state whether there had been more than one assailant (Tr. 521-524 [Dkt. 29-4, at 117-120]), this document "could reasonably be taken to put the whole case in a different light as to undermine confidence in the verdict."  *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

   **2.    The failure of the Prosecution and the FBI to turn over the exculpatory information constitutes cause for Mr. Al-Amin's failure to raise the *Brady* claim in state court.**

In finding "cause," the *Banks* court emphasized the prosecution's "open file" policy, holding the facts of the case before it were fully "congruent" with *Stricker* (where cause similarly was found due to the prosecution's "open file" policy).  540 U.S. at 692-693 (discussing *Strickler*, 527 U.S. at 283-284, 289).  The Court also quoted *Kyles*'s recognition that prosecutors are responsible for "'any favorable evidence known to the others acting on the government's behalf in the case, including the police'"  *Id.* at 693 (quoting *Kyles*, 514 U.S. at 437).  In Mr. Al-Amin's case, the Prosecution represented it had an "open file" policy.  In addition to *Brady*'s applicability to the FBI, the FBI itself failed to produce the BOLO bulletin or the "it was placed" note in response to Mr. Al-Amin's subpoena.

As with Respondent here, the State in *Banks* argued the petitioner had failed to exercise "appropriate diligence" in pursuing the *Brady* claim in state court. 540 U.S. at 695. The Court rejected this argument: "Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed." *Id.* "The 'cause' inquiry, we have observed, turns on events or circumstances 'external to the defense.'" *Id.* at 696 (quoting *Amadeo v. Zant*, 486 U.S. 214, 222 (1988)).

The *Banks* court explained:

> The State here nevertheless urges, in effect, that "the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence. A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process. "Ordinarily, we presume that public officials have properly discharged their official duties." We have several times underscored the "special role played by the American prosecutor in the search for truth in criminal trials." Courts, litigants, and juries properly anticipate that "obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed." Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation.

*Id.* (citing, *inter alia Bracy v. Gramley*, 520 U.S. 899, 909 (1997), *Stricker*, 527 U.S. at 281, *Kyles*, 514 U.S. at 439-440, *United States v. Bagley*, 473 U.S. 667, 675 n.6 (1985), and *Berger v. United States*, 295 U.S. 78, 88 (1935)).

In this case, the Prosecution represented it maintained an "open file" policy. Nevertheless, Mr. Al-Amin moved for production of all exculpatory information and pursued information from the FBI regarding its ongoing investigation of Mr. Al-Amin at the time of the crime. Thereafter, when proof of the investigation came to light through FOIA, Mr. Al-Amin pressed a *Brady* claim in his state habeas, only to have his subpoena to the FBI quashed. When this Court granted leave for Mr. Al-Amin to subpoena the FBI, he still did not receive the exculpatory documents. It was not until two days after the close of discovery the FBI finally produced the documents in response to Ms. Al-Amin's FOIA requests.

In these circumstances, Mr. Al-Amin respectfully submits he has established cause for his failure to present his current *Brady* claim to the state court.

### 3. The documents could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

To satisfy the prejudice/materiality prong of *Brady*, Mr. Al-Amin must show the withheld evidence "'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Banks*, 540 U.S. at 698 (quoting *Kyles*, 514 U.S. at 435). "In short, Banks must show a 'reasonable probability of a different result.'" *Id.* at 699 (quoting *Kyles*, 514 U.S. at 434) (citing *Bagley*, 473 U.S. at 678). Mr. Al-Amin submits the *Brady* documents meet this standard, certainly when considered collectively. *Kyles*, 514 U.S. at 436.

The BOLO bulletin supports Mr. Al-Amin's claim he did not shoot Deputies Kinchen and English.  It matches perfectly eyewitness trial testimony favorable to the defense given by Imhotep Shaka and Fareed Jihad.  But unlike these witnesses – long-time residents of the West End neighborhood who knew Mr. Al-Amin well – the BOLO bulletin was issued by law enforcement, increasing the likelihood it would have had a significant impact on the jury.

The "it was placed" note similarly comes from law enforcement officials, rather than from Mr. Al-Amin's neighbors or attorneys.  Having such a crucial admission by a key witness (the law enforcement officer who found the pistol used in the shooting) could have moved a juror's view of the defense's theory that the weapons were planted across the line from speculative to plausible.  The document also would have answered one of the Prosecution's mock cross-examination questions to Mr. Al-Amin, "How did the murder weapons end up in White Hall?"

The Marshal's Declaration likewise purports to reflect the knowledge of federal law enforcement officials regarding the actual participants in the crime for which Mr. Al-Amin was convicted.  It drastically impacts the significance of Deputy English's admission he did not know whether there were multiple assailants.  Tr. 521-524 [Dkt. 29-4, at 117-120].  At a minimum it casts doubt on the "lone shooter" theory under which the Prosecution convicted Mr. Al-Amin.

- 44 -

**4.      Although *Banks* strongly suggests Mr. Al-Amin need not move to amend his petition to re-state his *Brady* claim based on the newly-produced evidence, Mr. Al-Amin can do so promptly if desired.**

In *Banks*, the lower courts relied upon the habeas petitioner's failure to move to amend his habeas petition to address the belatedly-revealed facts as a reason for denying a certificate of appealability as to one component of the *Brady* claim.  540 U.S. at 689.  Addressing petitioner's argument the pleadings had been amended to include the new facts under Federal Rule of Civil Procedure 15(b), *Banks* noted "[w]e have twice before referenced Rule 15(b)'s application in federal habeas proceedings."  *Id.* at 703-704.  The Court found that, at a minimum, a certification of appealability should have issued as to the Rule 15(b) issue.  *Id.* at 705.

Here, Mr. Al-Amin has pled his "new" *Brady* claim in his Reply, a pleading authorized in Rule 5(e) of the Rules Governing Section 2254 Cases.  Moreover, Respondent has requested a brief period of time to file a further brief addressing the *Brady* following this Reply.  Third Answer Br., at 5 n.2, 38.  Mr. Al-Amin does not oppose Respondent's request, although as Petitioner he respectfully requests an equally short period of time to file a further "Sur-Reply" to the State's brief.

In any event, Mr. Al-Amin hereby offers to move for leave to file the *Brady* section of this Reply separately as a proposed further amendment to his habeas petition (*see* Local Rule 15.1), if desired by the Court.

**E.      Mr. Al-Amin requests a status conference with the Court to discuss any further exhaustion requirements relative to his *Brady* claim.**

Respondent asserts Mr. Al-Amin's *Brady* claim "was not previously raised in the state courts and would clearly be deemed successive under O.C.G.A. § 9-14-51 if now raised in a second collateral attack."  Third Answer ¶ 7(d) (citing *Chambers v. Thompson*, 150 F.3d 1324 (11th Cir. 1998)).  Georgia's successive petition statute, however, allows a successive petition where "the Constitution of the United States or of this state otherwise requires or unless any judge to whom the petition is assigned, on considering a subsequent petition, finds grounds for relief asserted therein which could not reasonably have been raised in the original or amended petition."  O.C.G.A. § 9-14-51.  Thus, habeas claims not presented to state courts should not be considered "unless there is some indication that a state court judge would find the claims in question 'could not reasonably have been raised in the original or amended [state habeas] petition.'"  *Chambers*, 150 F.3d at 1327 (quoting O.C.G.A. § 9-14-51).  All the reasons set forth above to demonstrate Mr. Al-Amin's "cause" for not presenting his current *Brady* claim to the state habeas court likewise indicate that the claim "could not reasonably have been raised in the original or amended [state habeas] petition."

Respondent further asserts that the State "does not waive exhaustion."  Third Answer ¶ 8 (citing 28 U.S.C. § 2254(b)(3)).  The cited statute requires an express

waiver of exhaustion by counsel for the State.  28 U.S.C. § 2254(b)(3).  To the

extent (a) Mr. Al-Amin's showing of cause and prejudice does not excuse any

further exhaustion requirements and (b) Respondent continues to refuse to waive

any further exhaustion, the circumstances would appear to authorize a "stay and

abeyance" under *Rhines v. Weber*, 544 U.S. 269 (2005).

In light of the length of time this action has been pending and Mr. Al-

Amin's advanced age and health status, counsel for Mr. Al-Amin respectfully

requests a status conference with the Court and counsel for Respondent regarding

any "stay and abeyance" proceedings relative to his *Brady* claim.

### This Court should apply the cumulative error doctrine.

At the end of Mr. Al-Amin's summary of his habeas claims in his Third

Amended Petition, he noted that all four of his claims "relate to and support each

other" and argued that "[t]ogether, these errors compel habeas relief."  Third Am.

Pet., at 16 [Dkt. 99, at 27].  Respondent challenges Mr. Al-Amin's invocation of

the "cumulative error" doctrine, noting the Eleventh Circuit has "reserved ruling"

on the availability of cumulative error in the habeas context and arguing the

doctrine is "not fair to the states."  Third Answer Br., at 39-40 (citing *Morris v.

Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 n.3 (11th Cir. 2012), and *Williams v.

Anderson*, 460 F.3d 789, 816 (6th Cir. 2006)).

Although the Eleventh Circuit acknowledged the state's challenge to the cumulative error doctrine in *Morris*, it did not reach the issue, because the habeas petitioner had not shown any individual errors.  677 F.3d at 1132 n.3.  Moreover, while the *Morris* court acknowledged the Sixth Circuit's statement the United States Supreme Court had not spoken to the issue (*id*, citing *Williams*), it also cited a contrary Ninth Circuit decision analyzing the issue at length and concluding a federal habeas court could review a state court decision for cumulative error.  *See id.* (citing *Parle v. Runnels*, 505 F.3d 922, 928-29 (9th Cir. 2007), which in turn relied upon *Donnelly v DeChristoforo*, 416 U.S. 637, 643 (1974), and *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973), in utilizing a cumulative error analysis).

Furthermore, the cited Sixth Circuit decision criticized the earlier panel decision rejecting cumulative error, stating it may have recognized the doctrine given that "[t]he Supreme Court has repeatedly stated that fundamentally unfair trials violate due process, and common sense dictates that cumulative errors can render trials fundamentally unfair."  *Williams*, 460 F.3d at 816 (citations omitted). "Additionally, the Supreme Court has expressly cumulated prejudice from distinct errors under the Due Process Clause."  *Id.* (citing *Chambers*, 410 U.S. at 298). Nevertheless, because a prior panel already had rejected the doctrine, the *Williams* court was bound, "[n]o matter how misguided this case law may be."  *Id.*

Consistent with the reasoning of both Circuits cited in the Eleventh Circuit's footnote in *Morris*, Mr. Al-Amin urges the Court to employ a cumulative error analysis in the event it does not grant relief on any individual habeas claim.  The first two errors – the mock cross-examination of Mr. Al-Amin by the Prosecution and the limitation on Mr. Al-Amin's cross-examination of FBI Agent Campbell – complementarily illustrate unfairness at two critical junctures in the criminal case (cross-examination of the critical witness at the heart of a key defense theory and a mock cross-examination during closing arguments).  The Defense Attorneys' failure to investigate adequately the repeated confessions of Otis Jackson similarly dovetails with Mr. Al-Amin's *Brady* claim, which relies on a document produced just one month ago showing authorities initially were "on the lookout for" an individual matching Mr. Jackson's description.  And the belatedly-produced "it was placed" document not only supports the defense theory the guns were placed in Alabama, it also answers the Prosecution's mock cross-examination question, "How did the murder weapons end up in White Hall?"

In light of the entire record, moreover, Mr. Al-Amin cannot agree that application of the cumulative error doctrine would be unfair.  As confirmed by the visual aid entitled "QUESTIONS FOR THE DEFENDANT?," the Prosecution deliberately planned its violation of Mr. Al-Amin's Fifth Amendment rights.  After

the trial court's instruction, the Prosecution continued with its improper

commentary on Mr. Al-Amin's failure to testify.  And the Prosecution ended its

closing by urging the jury, "Don't stand for him," a reference to Mr. Al-Amin's

religiously-based decision (with permission of the trial court) to remain seated

throughout the trial.  [Dkt. 32-6, at 13-14].  This final comment can only be viewed

as an attempt to inflame the jurors regarding Mr. Al-Amin's Muslim faith, in a trial

occurring just six months after the World Trade Center attacks.

## Conclusion

For the foregoing reasons and the reasons stated in the Third Amended

Petition, and based on the entire record in this action, the Court should grant Mr.

Al-Amin's petition for a writ of habeas corpus.

Dated:        October 28, 2015.

KILPATRICK TOWNSEND &         s/ C. Allen Garrett Jr.
   STOCKTON LLP               A. Stephens Clay (Ga. Bar 129400)
1100 Peachtree Street, Suite 2800   Miles J. Alexander (Ga. Bar 009000)
Atlanta, Georgia 30309-4528   Ronald L. Raider (Ga. Bar 592192)
Telephone:  (404) 815-6500    C. Allen Garrett Jr. (Ga. Bar 286335)

*Counsel for Petitioner Jamil Abdullah Al-Amin*

## <u>CERTIFICATE OF FONT AND POINT SELECTION</u>

I hereby certify that the foregoing was prepared in Times New Roman font,

14 point type, in compliance with Local Rule 5.1(C).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been filed

with the U.S. District Court's CM/ECF System and that pursuant thereto, a copy of

this pleading has been served upon the following persons by electronic mail:

> Paula K. Smith, Esq.
> psmith@law.ga.gov
>
> Lori M. Beranek
> Lori.Beranek@usdoj.gov

Dated:  October 28, 2015.


KILPATRICK TOWNSEND
   & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4528
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

s/ C. Allen Garrett Jr.
C. Allen Garrett Jr.
Georgia Bar No. 286335
agarrett@kilpatricktownsend.com

*One of the Attorneys for Petitioner*
*Jamil Abdullah Al-Amin*