IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JAMIL ABDULLAH AL-AMIN, | * | CIVIL ACTION NO. |
| | * | 1:12-CV-1688-AT-GGB |
| Petitioner, | * | |
| | * | |
| v. | * | HABEAS CORPUS |
| | * | 28 U.S.C. § 2254 |
| David EBBART, Warden, and | * | |
| HOMER BRYSON, Commissioner, | * | |
| Georgia Department of Corrections, | * | |
| | * | |
| Respondents. | * | |

## BRIEF IN SUPPORT OF FOURTH SUPPLEMENTAL ANSWER-RESPONSE

### I.  PROCEDURAL HISTORY

Petitioner, Jamil Abdullah Al-Amin, was indicted by a Fulton County grand jury on March 28, 2000, for thirteen counts: malice murder (count 1) and felony murder (counts 2, 4, 7, 10); aggravated assault on a peace officer (counts 3, 8); obstruction of law enforcement officer (counts 5, 6); aggravated battery on a peace officer (count 9), possession of a firearm by a convicted felon (count 11), and possession of a firearm during the commission of a felony (counts 12, 13), stemming from the shooting death of Deputy Sheriff Ricky Kinchen and the

shooting of Deputy Aldranon English on March 16, 2000.  (Doc. 60-1 at 59-63).[1]

On May 4, 2000, the state filed notice of its intent to seek the death penalty. (Doc. 60-2 at 22-24).

At a bifurcated jury trial on February 19-March 13, 2002, the jury found Petitioner guilty of all thirteen counts at the conclusion of the guilt/innocence phase, where Petitioner had elected not to testify but presented 19 witnesses in his behalf.[2]  (Doc. 15-6 at 38-39; Doc. 32-6 at 84-85).  Petitioner then presented 21 witnesses in his behalf at the sentencing phase.  (Doc. 33-1 at 89-152; Doc. 33-2 at 1-154; Doc. 33-3 at 1-36).  The jury found the existence of four statutory aggravating circumstances and fixed the sentence for malice murder (count 1) as life without parole.  (Doc. 15-6 at 49-51; Doc. 33-4 at 33-34, 49).  In accord with that verdict, the trial court sentenced Petitioner to life without parole for count 1; and then sentenced Petitioner to five years to serve on count 5, to run concurrently with count 9; 20 years to serve on count 9, to run consecutively to count 1; and five

---

[1] Respondent filed volumes 2 through 48 of the 48 volumes of the state habeas corpus hearing transcript, which are sequentially re-numbered and end at page 19,965, in Doc. 13 through 36.  With his original petition, Petitioner filed pages 1-155 of volume 1 of the habeas transcript, which contains the testimony presented at the hearing and lists the exhibits admitted at the hearing.  (Doc. 1-3).  Respondent filed the remainder of volume 1, less the 155 pages.  (Doc. 60).

[2] See Doc. 1-2 at 13-14; Doc. 31-7 at 147, 153; Doc. 31-8 at 15, 47, 28, 84, 116, 132, 159; Doc. 32-1 at 28, 84, 116, 132, 159; Doc. 32-2 at 20, 47, 59, 79, 98, 167; Doc. 32-3 at 9, 31, 60, 78, 125.

years each on counts 12 and 13, to run consecutively.  (Doc. 15-6 at 52-64).  The other counts merged for sentencing.  Id.

On direct appeal, Petitioner enumerated seventeen errors, two of which are now asserted as grounds for relief as Grounds I and II, alleging respectively that the prosecutor violated Petitioner's fifth amendment rights in closing argument and the trial court violated Petitioner's sixth amendment right of confrontation by restricting his cross-examination of FBI Agent Campbell.  (Doc. 36-1 at 3, 17-18). The Georgia Supreme Court found that any error in the prosecutor's closing argument was harmless beyond a reasonable doubt, found no error in the trial court's ruling on the scope of cross-examination, affirmed the judgment of conviction on May 24, 2004, and denied reconsideration on June 28, 2004.  Al-Amin v. State, 278 Ga. 74, 597 S.E.2d 332, cert. denied, 543 U.S. 992 (2004). Certiorari was denied on November 15, 2004.  Id.

On November 14, 2005, Petitioner filed a state habeas corpus petition, through counsel, challenging his Fulton County convictions, and raised fourteen grounds, including claims of ineffective assistance of counsel.  (Doc. 1-6 at 1-13). He amended the petition at the start of the February 27, 2007, evidentiary hearing. (Doc. 1-7 at 1-7).  Petitioner, his lead trial counsel John R. Martin, and two other witnesses testified at the February 2007 hearing.  (Doc. 1-3 at 36, 50, 73, 122). Respondent submitted records from the trial and appeal as Exhibits 1-101.  (Doc.

1-3 at 157).  <u>See</u> Exhibit List (Doc 60-1 at 3-8).  The record was left open for either an additional hearing or for depositions of the other members of the trial defense team and appellate counsel, as well as Otis Jackson, a/k/a James Santos. (Doc. 1-3 at 4-5, 155-156).  Depositions of appellate counsel Don Samuel and trial counsel Bruce Harvey and Tony Axam (Doc. 53-4 at 1-21) were taken in February 2008.  The deposition of Otis Jackson was taken in July 2009 at the State of Florida prison where he was incarcerated.  (Doc 1-5 at 1-54).  They were filed on Petitioner's behalf.

On July 28, 2011, the state habeas corpus court denied relief.  (Doc. 1-2 at 1-32).

On August 15, 2011, the habeas court granted Petitioner's motion, over Respondent's objection, to expand the record to include Petitioner's pro se Freedom of Information Act ("FOIA") request and response and the deposition of trial counsel Michael Warren.  (Doc. 53-5 at 1-28).[3]

---

[3] In the fourth petition, Petitioner asserts for the first time that the state habeas corpus court "abruptly" denied the petition.  (Doc. 129 at 92).  However, he did not make such an assertion in the motion to expand the record nor move to reopen the state habeas corpus record.  Moreover, he did not raise such a complaint in his application for a certificate of probable cause to appeal filed in the Georgia Supreme Court.  (Doc. 1-1 at 1-39).  <u>See</u>, <u>e.g.</u>, <u>Stevens v. Kemp</u>, 254 Ga. 228, 230(2), 327 S.E.2d 185 (1985) ("If, in his first habeas proceeding, the appellant was denied a full and fair hearing on these claims, he could have raised this complaint in his application for certificate of probable cause to appeal.").

Petitioner filed his application for a certificate of probable cause to appeal on August 29, 2011.  (Doc. 1-1 at 1-39).  The Georgia Supreme Court denied his application on May 7, 2012.  (Doc. 1-11 at 1-2).

Petitioner originally filed his federal habeas corpus petition on May 8, 2012, in the United States District Court of Colorado, as he had been transferred by agreement to the "Supermax" Administrative Maximum Security Prison in Florence, Colorado, to continue serving his Fulton County sentences.  (Doc. 1). The case was transferred to this Court and a show-cause order entered.  (Doc. 3, 5). Pursuant to the show-cause order, in August 2012 then Corrections Commissioner Brian Owens filed an answer and brief in support, addressing the grounds of the original petition.  (Doc. 8).  Respondent Sam Olens, Attorney General of Georgia, moved to be dismissed as an improper party, and his motion was granted in December 2012.  (Doc. 9, 39, 42).

Since then, Petitioner filed an amended petition in September 2012, a second amended petition in May 2013, a corrected second amended petition in July 2013, a third amended petition in July 2015 and a fourth amended petition in November 2015, which was prompted by Petitioner's raising a new claim in his reply brief to Respondent's responsive pleadings for the third amended petition[4].  (Doc. 38, 53,

---

[4] In his third amended answer and brief Respondent reserved the right to file a supplemental brief since the substance of ground IV of the third amended petition was new and relied almost exclusively on documents which are not part of the

57, 99, 128, 129).  Respondent filed answers and supporting briefs in response to the first, the corrected second amended and the third amended petitions.  (Doc. 43, 61, 121).

Prior to the filing of the fourth amended petition, additional transcripts from the state criminal trial, which remain under seal in the state courts, were filed in redacted form.  (Doc. 103, 104, 1015).

In July 2015 Petitioner filed a motion for limited discovery, which Respondent did not oppose, and the motion was granted.  (Doc. 100, 107, 108). Petitioner has since filed motions to expand the record to include new documents which are not part of the record in the state courts, and Respondent has opposed those motions.  (Doc. 101, 106, 116, 117).  These motions to expand were pending decision as the parties addressed the four grounds of the third amended petition, per the October 7, 2015, show-cause order (Doc. 118) and are pending decision as the parties address the five claims of the fourth amended petition (Doc. 128, redocketed as Doc. 129).

## II. <u>STATEMENT OF FACTS</u>

Respondent adopts and incorporates by reference herein the facts found by the Georgia Supreme Court on direct appeal as to Petitioner's crimes.  <u>Al-Amin</u>,

---

record from the state collateral attack, and Petitioner had indicated he would address that ground in his reply brief.  (Doc. 119).  The Court had a conference call

278 Ga. at 74(1).  Those fact findings are entitled to a presumption of correctness

under 28 U.S.C. § 2253(e)(1).

When viewing the evidence in a light most favorable to the verdict, the

Georgia Supreme Court found:

> [T[he evidence established that Fulton county Deputy Sheriffs
> Aldranon English and Ricky Kinchen went to the home of Al-Amin in
> the West End community of Atlanta to execute a bench warrant for his
> his arrest issued by the Cobb County Superior Court.  [Fn.]  The
> warrant was issued when Al-Amin failed to appear at an arraignment
> in that court to answer charges of theft by receiving stolen property,
> impersonating an officer, and operating a motor vehicle without proof
> of insurance.  The Fulton County deputies were in uniform with their
> badges displayed and they were driving a marked Fulton County
> Sheriff's patrol car.
>
> Al-Amin's residence was unlit and it appeared to the deputies that he
> was not at home.  Instead of possibly "blowing the warrant" by
> alerting neighbors of their attempt to find the subject, the deputies
> decided to leave the area.  [Fn.]  They had driven a short distance
> when they saw a black car pull up and park near Al-Amin's residence,
> and they observed a man exit the vehicle.  Although it was after dark,
> the street lights provided good illumination so that the deputies were
> able to discern that the individual, dressed in Muslim attire, appeared
> to fit the description of their subject as provided in the warrant.
> Deputy Kinchen made a U-turn, drove toward Al-Amin's residence,
> and parked the patrol car nose-to-nose with Al-Amin's vehicle, a
> black Mercedes-Benz.  Al-Amin stood next to his vehicle and kept his
> gaze on the patrol car as it approached; his left hand was on his car
> door and he held a brown bag in his right hand.  Deputy English
> exited from the passenger side and walked toward Al-Amin; the
> officer had not drawn his service revolver.  Deputy Kinchen
> simultaneously exited the patrol car from the driver's side; he was to
> provide cover for his partner.  Deputy English directed that Al-Amin

with the parties and set deadlines for a fourth amended petition, responsive
pleadings and a reply brief.  (Doc. 125, 127).

place his right hand in view, whereupon Al-Amin suddenly produced an assault rifle and began firing at the two officers.  After shooting both deputies numerous times, using both the assault rifle and a pistol, Al-Amin drove away from the scene.

A neighbor who heard repeated gunfire called 911 and reported that there was an officer down in the street begging for his life.  The neighbor described a dark-colored vehicle (he believed to be a Cadillac) speed away from the scene.

Deputy English radioed for help and alerted the dispatcher that the perpetrator left the scene in a black Mercedes.  When police arrived at the scene, Deputy Kinchen was able to describe his assailant as an African-American male, 6'4" in height, wearing a long trenchcoat, a "beanie" type hat, and armed with an assault rifle.

The next day Deputy English gave the investigating officers a statement describing the events, and he identified Al-Amin in a photo line-up.  Later that afternoon, Deputy Kinchen died from his injuries. A Fulton County warrant was issued for the arrest of Al-Amin on charges of murder, aggravated assault, and other crimes stemming from the shooting.  In addition, federal authorities, acting on information that Al-Amin had left Georgia, issued a warrant for unlawful flight to avoid prosecution (UFAP warrant).

Within a day of the shooting, federal authorities received information that Al-Amin might have fled to Whitehall, Alabama; a multi-agency surveillance team was deployed to that area.  On the fourth day after the shooting, Al-Amin was spotted on foot in Whitehall by a team of three United States marshals who were part of the surveillance operation.  When the uniformed marshals observed Al-Amin walk toward a wooded area, they exited their vehicle and identified themselves as law enforcement officers.  Al-Amin immediately opened fire on them, and then retreated into the woods; the marshals were uninjured.

Al-Amin was captured about three hours later after a team of tracking dogs was brought in to assist in the search.  He was wearing a bulletproof vest, and he had in his possession a wallet containing $1,000 in cash and three driver's licenses issued in his name by three

different states.  In the vicinity, officers located a .9 millimeter pistol, holster, belt, a magazine of .9 millimeter ammunition, and a piece of fabric on a barbed wire fence that had been torn from the shirt Al-Amin was wearing.  The next morning, officers conducted a further search of the area and located the following:  several .223 caliber shell casings (both expended and live); a green canvas bag containing a cellular phone, clothing, a magazine containing .223 ammunition, and the registration documents for a Mercedes-Benz automobile showing Al-Amin as the owner and reflecting his Fulton County address; a brown day planner containing a bank statement issued to Al-Amin at the same address; and a .223 caliber semi-automatic Ruger assault rifle and two magazines of .223 ammunition.

Nine days after Al-Amin's arrest, his black Mercedes automobile was recovered on private property in the Whitehall area; the license plate was found in a nearby shed.  Numerous bullet holes were visible on the car.  Bullets which had been fired from the service revolvers of both Deputies Kinchen and English were removed from the wheel rim, frame, windshield, and rear seat of the vehicle.

Ballistics evidence also established that two .9 millimeter metal jacket bullets which had been removed from Deputy Kinchen's abdomen and femur had been fired from the .9 millimeter pistol recovered at the time of Al-Amin's arrest, had been ejected from the .223 caliber Ruger rifle found along with Al-Amin's personal belongings on the morning after his arrest in Whitehall.

The evidence was sufficient for a rational trier of fact to have found Al-Amin guilty of the crimes for which he was convicted.

Al-Amin, 278 Ga. at 74-76 (citing Jackson v. Virginia, 443 U.S. 307 (1979)).

The Court noted that Petitioner "served as an Iman (prayer leader) at a Muslim Masjid (house of worship) which was established in a small renovated house" and that the address on the warrant, which Petitioner had listed with Cobb County authorities at his residence, was the same location as the Masjid.  Al-Amin,

278 Ga. at 74 n.2.  The Court also noted this was the second attempt by Deputy English and another deputy the week before to serve the warrant, and the residence appeared unoccupied, so they left.  Id. at 75 n.3

### III. THE STANDARD OF DEFERENCE

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as Petitioner filed this petition after the 1996 effective date, so that the threshold question is whether the Georgia courts' merits adjudications of Petitioner's constitutional claims warrant deference under 28 U.S.C. § 2254(d). Renico v. Lett, ___ U.S. ___, 130 S.Ct. 1855, 1862 (2010).

28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

This provision "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." Williams v. Taylor, 529 U.S. 362, 412 (2000).  This standard "forecloses relief unless" the state court's merits

adjudication of the constitutional claim is either contrary to, or an unreasonable

application of, clearly established United States Supreme Court precedent or is an

unreasonable determination of the facts.  Early v. Packer, 537 U.S. 3, 7 (2002).

The phrase "clearly established Federal law, as determined by the Supreme

Court of the United States" "refers to the holdings, as opposed to the dicta, of this

Court's decisions as of the time of the relevant state-court decision."  Williams,

529 U.S. at 412; Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).

> With one caveat, whatever would qualify as an old rule under our
> Teague[5] jurisprudence will constitute "clearly established Federal law,
> as determined by the Supreme Court of the United States under §
> 2254(d)((1).  [Cit.]  The one caveat, as the statutory language makes
> clear, is that § 2254(d)(1) restricts the source of clearly established
> law to this Court's jurisprudence.

Williams, 529 U.S. at 412.  "A federal court of appeals decision, even one with a

holding directly on point, does not clearly establish federal law for § 2254(d)(1)

purposes."  Allen v. Sec'y, Dep't of Corr., 611 F.3d 740, 764 (11th Cir. 2010).

"Where, as here, the state court's application of federal law is challenged, it

must be shown to be not only erroneous, but objectively unreasonable."

Yarborough v. Gentry, 540 U.S. 1, 5 (2003).  The standard "objectively

unreasonable" is "a substantially higher threshold."  Schriro v. Landrigan, 550 U.S.

465, 473 (2007).  See also Johnson v. Upton, 615 F.3d 1318, 2010 U.S. App.

LEXIS 17606 at *25 (11th Cir. 2010) (the standard of review "is a 'highly

deferential' one that 'demands that state-court decisions be given the benefit of the doubt'") (quoting <u>Renico</u>, 130 S.Ct. at 1862)); <u>Suggs v. McNeil</u>, 609 F.3d 1218, 1227 (11th Cir. 2010) (the AEDPA "'prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts'") (quoting <u>Renico</u>, 130 S.Ct. at 1866)).

Further, "the range of reasonable judgment can depend in part on the nature of the rule." <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004). Evaluating whether the state court's application of a clearly established rule was unreasonable turns on how specific the rule may be, as, "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Id</u>. A federal court may not simply substitute its judgment for that of the state court. <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002).

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." <u>Harrington v. Richter</u>, ___ U.S. ___, 131 S.Ct. 770, 784 (2011). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." <u>Id</u>. at 786.

---

[5] <u>Teague v. Lane</u>, 489 U.S. 288 (1989).

In looking to whether the state court's merits decision warrants deference, review is limited "to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, ___ U.S. ___, 131 S.Ct. 1388, 1398 (2011).

"AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.' § 2254(e)(1)." Schriro, 550 U.S. at 473-74.  A decision on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is "objectively unreasonable" in light of the evidence presented.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); Jones v. Walker, 496 F.3d 1216, 1226 (11th Cir. 2007) (en banc).  A federal court can disagree with a state court and, when guided by the AEDPA, conclude the state court's decision was unreasonable because the factual premise was incorrect by clear and convicting evidence.  Id.  However, nothing in Miller-El authorizes a federal court, as a routine matter, to substitute its own credibility determination, based on a cold record, for that of the state fact finder who was in the best position to assess the credibility of the witnesses before it.

## IV.   ARGUMENT AND CITATION OF AUTHORITY

### A.  THE PROSECUTOR'S CLOSING ARGUMENT

In Claim I, Petitioner alleges that the prosecution violated Petitioner's fifth amendment right against self-incrimination in closing argument at the guilt-innocence phase of the bifurcated trial when the prosecutor "engaged in a mock cross-examination of Mr. Al-Amin after he had invoked his constitutional right not to testify." (Doc. 129 at 94-103).  Respondent submits that the Georgia Supreme Court's decision on direct appeal, finding that any fifth amendment violation was harmless beyond a reasonable doubt, warrants deference, that de novo review will also show that the purported error had no substantial and injurious effect or influence on the verdict, and that Petitioner has failed to show that relief is warranted on this ground.

In enumeration "n" on direct appeal, Petitioner claimed the prosecutor's closing argument violated his due process and fifth amendment rights when the prosecution:  (1) repeatedly referenced Petitioner's failure to testify; (2) expressed personal opinion as to the quantum and quality of evidence; (3) misstated the evidence; and (4) urged the jury to consider Petitioner's conduct during trial. (Doc. 36-1 at 18-19, 73-84).  He also raised a state law claim.  Id.

In Claim I of the current petition, he challenges the same portions of the prosecutor's argument regarding the alleged comment on his failure to testify that

he raised on direct appeal.  (Doc. 129 at 94-103).[6]  The Georgia Supreme Court

found that the prosecutor "impermissibly commented on the failure of Al-Amin to

testify" in violation of his fifth amendment right against self-incrimination, but

found the error was harmless beyond a reasonable doubt in light of the

overwhelming evidence of Petitioner's guilt.  Al-Amin, 278 Ga. at 84(15) (citing

Chapman v. California, 386 U.S. 18 (1967)).  The Court specifically found a

violation occurred when "the prosecutor in effect engaged in a mock cross-

examination of the accused who had invoked his right to remain silent."  Al-Amin,

278 Ga. at 85.  Citing Chapman for the proposition that this type of issue is subject

to harmless error analysis, the Court found:

> Al-Amin's guilt was overwhelmingly established through the
> eyewitness identification by Deputies Kinchen and English, as well
> as by the vast amount of physical evidence tying defendant to the
> crimes.  The jury was promptly given a lengthy instruction setting
> forth the correct principles of law.  [Cits. omitted].  The strength of
> the evidence against Al-Amin coupled with the contemporaneous
> curative instruction leads this Court to conclude that the violation
> here was harmless beyond a reasonable doubt.

Al-Amin, 268 Ga. at 85-86.

   Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), makes it clear that

Chapman is the standard to be used by state courts on direct review.  See

---

[6] Petitioner does not reassert in the federal petition the issues raised on direct
appeal in subsections (2), (3), (4).  The Georgia Supreme Court found no error as
to these claims.  Al-Amin, 278 Ga. at 86(16).

Brecht, 507 U.S. at 636 ("State courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process under Chapman, and state courts often occupy a superior vantage point from which to evaluate the effect of trial error. . . . For these reasons, it scarcely seems logical to require federal habeas courts to engage in the identical approach to harmless-error review that Chapman requires state courts to engage in on direct review.").

Under AEDPA's (d)(1) unreasonable application prong, federal habeas relief "may only be granted if the state court's application of the Chapman harmless error standard on direct review was 'objectively unreasonable.'"  Mansfield v. Sec'y, Dept. of Corr., 679 F.3d 1301, 1307 (11th Cir. 2012) (quoting Mitchell v. Esparza, 540 U.S. 12, 18 (2003)).  However, a federal habeas court applies a different harmless error standard from Chapman's, and that is the "actual prejudice" standard of Brecht v. Abrahamson, 507 U.S. at 637.  Mansfield, 679 F.3d at 1307.  Under Brecht, a court looks to whether the error had a "substantial and injurious effect or influence" on the jury's verdict, and that is a "question of law" which a federal court reviews de novo.  Mansfield, 679 F.3d at 1307.

The upshot is that, in order for a federal habeas court to **grant** relief, "it must be true both that the state court's application of the Chapman harmless beyond a reasonable doubt standard was objectively unreasonable and that the error had a

substantial and injurious effect or influence on the verdict." Mansfield, 679 F.3d at 1307-08.

> Similarly, a federal court may **deny** habeas relief based solely on a determination that the constitutional error is harmless under the Brecht standard. Because the petitioner must satisfy both tests in order to obtain habeas relief, it necessarily follows that relief may be denied on the basis of Brecht alone.

Mansfield, 679 F.3d at 1308 (emphasis added).

Here, Petitioner has not made either showing, much less both, in order to prevail. The Georgia Supreme Court's fact findings are presumed correct under 28 U.S.C. § 2254(e)(1), and Petitioner has not rebutted that presumption by clear and convincing evidence. He has presented only his own versions of events and argues that the state Supreme Court did not fairly consider all of the "evidence" in the record, including testimony of defense witnesses that the jury obviously chose not to credit when the jury found Petitioner guilty of the crimes.

As noted, the Georgia Supreme Court found that Petitioner was identified by both victims as the shooter, and there was additional physical evidence linking Petitioner to the crimes which "overwhelmingly established" Petitioner's guilt, the jury "was promptly given a lengthy instruction setting forth the principles of law," and concluded that the strength of the evidence coupled with the contemporaneous curative instruction "leads this Court to conclude that the violation here was harmless beyond a reasonable doubt." Al-Amin, 278 Ga. at 85-86.

Unlike <u>Mansfield</u>, which involved the erroneous admission of evidence in the form of an un-Mirandized[7] confession, the fifth amendment issue here involves closing argument.  Petitioner has not shown that the challenged portion of the prosecutor's closing argument had a substantial and injurious effect on the jury's verdict to satisfy the <u>Brecht</u> standard, nor shown that the Georgia Supreme Court unreasonably applied the <u>Chapman</u> standard.

In the current petition, Petitioner contends that the Georgia Supreme Court's decision was wrong and does not warrant deference.  First, he claims the Court's fact findings were "unreasonable" because the Court allegedly failed to consider "key evidence in the record," this being evidence allegedly showing Petitioner did not shoot the deputies.  He relies on <u>Miller-El</u>, 537 U.S. at 346, nd two circuit court cases.  (Doc. 129 at 99-100).  Respondent submits that Petitioner's reliance on these cases is misplaced.

<u>Miller-El</u> did not involve the issue of a prosecutor's closing argument, but whether the jury selections procedures at the defendant's state trial violated the equal protection clause and the holding in <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), and whether he should have been granted a certificate of appealability ("COA") on this issue.  <u>Miller-El</u>, 537 U.S. at 326.  The Court noted that, in the context of a <u>Batson</u> claim, the issuance of a COA "can be supported by any evidence

---

[7] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

demonstrating that, despite the neutral explanation of the prosecution, the peremptory strikes in the final analysis were race based." Id. at 340.  The Supreme Court found that Miller-El should have been granted a COA on this issue and remanded the case for further proceedings.  Id.

Petitioner's reliance upon two circuit cases – i.e., Cooper v. Sec'y for Dept. of Corr., 646 F.3d 1328 (11th Cir. 2011), and Taylor v. Maddox, 366 F.3d 992 (9th Cir. 2004), is misplaced, as these circuit court cases do not establish the "clearly established Federal law" for § 2254(d), purposes.  Only United States Supreme Court decisions establish the "Federal law" for deference purposes.  Williams, 529 U.S. at 412; Allen, 611 F.3d at 764.

Petitioner also claims that the Georgia Supreme Court's decision is objectively unreasonable and its fact findings are erroneous, as he claims the Court erroneously found that both deputies identified Petitioner as the shooter but only one deputy did.  (Doc. 57, p. 66).   Respondent disagrees, as a review of the appellate court's decision will show.

Earlier in the Georgia Supreme Court's opinion, in setting out the facts which authorized to jury to find Petitioner guilty beyond a reasonable doubt, the Court found, "When police arrived at the scene, Deputy Kinchen was able to describe his assailant as an African-American male, 6'4" in height, wearing a long trenchcoat, a 'beanie' type hat, and armed with an assault rifle."  Al-Amin, 278 Ga.

at 75.  The Court noted that, the following day, Deputy English gave a statement about the events and "identified Al-Amin in a photo line-up."  Id.

The trial transcript shows both deputies provided a description of the shooter as a tall black male wearing a long tan or black trenchcoat-like garment and Muslim hat who headed towards West End Place and Ralph David Abernathy in a black Mercedes.  (Doc. 29-5 at 27-28, 109, 138; Doc. 29-6 at 7-8, 84; Doc. 30-1 at 62; Doc. 30-2 at 98).  Deputy English identified Petitioner as the shooter in a photo line-up.  (Doc. 29-3 at 106-109; Doc. 29-4 at 123-124; Doc. 30-1 at 26-39; Doc. 30-2 at 11-19).  Since both deputies gave the same description of the shooter, and Deputy English identified Petitioner as the shooter from the line-up, the Georgia Supreme Court's statement that both deputies identified Petitioner was an inference to be drawn from that evidence.  Petitioner has not challenged Court's additional observation that a "vast amount of physical evidence" linked Petitioner to the crimes.

The "clearly established Federal law" for a state court to apply to alleged federal constitutional violations is Chapman v. California, where the Supreme Court held that such alleged violations are subject to a "harmless error" analysis. 386 U.S. at 22, 24.  The Georgia Supreme Court applied Chapman, and nothing in Chapman states that a state court must employ the analysis put forth by Petitioner.

The issue in <u>Chapman</u> was whether the prosecutor violated Chapman's fifth amendment rights (and his co-defendants) by commenting upon Chapman's failure to testify. <u>Id</u>. at 19. The trial court also charged the jury that "it could draw adverse inferences from petitioners' failure to testify." <u>Id</u>. The United States Supreme Court looked to the text of the prosecutor's argument coupled with the trial court's instructions and concluded that the error was not harmless beyond a reasonable doubt, despite the "reasonably strong" circumstantial evidence. <u>Id</u>. at 25. It is clear from a reading of <u>Chapman</u> that the Georgia Supreme Court's analysis comports with that decision.

Petitioner's reliance upon the dissent of one Georgia Supreme Court Justice in another case is misplaced. (Doc. 129 at 105-06). Her dissent is not the opinion of the Court, and what matters is what the Georgia Supreme Court decided in Petitioner's case. Similarly, his reliance upon a Seventh Circuit case is misplaced, as it, too, does not establish the "Federal law" for deference purposes, nor it is binding precedent in this circuit. (Doc. 129 at 107).

Petitioner also claims that the trial court's curative instructions did not "cure" but "exacerbated" the prosecutor's remarks. (Doc. 129 at 108). Respondent submits this argument lacks merit, particularly when those remarks are examined. He cites to a study which purportedly found that curative instructions allegedly do not cure. <u>Id</u>. However, he cites no decision from the United States Supreme Court

which has accepted that notion and retreated from its long standing rule that jurors are presumed to follow the law as they are instructed.  Romano v. Oklahoma, 512 U.S. 1, 13 (1994).  For this Court to hold otherwise would contravene Teague v. Lane, 489 U.S. 288 (1989), as this Court have to create a new rule and apply it retroactively, and would be applying a rule that is contrary to United States Supreme Court authority.

The Georgia Supreme Court's consideration of the curative instruction and its contents is in accord with the principle announced in Romano.  As noted above, the Georgia Supreme Court found that the trial court's curative instruction was given promptly and set forth "the correct principles of law."  Al-Amin, 278 Ga. at 86.  The instruction provided:

> All right.  Ladies and gentlemen, I'm going to give you a clarifying instruction now just in an abundance of caution.

> There has been an objection to some of Mr. McBurney's closing which the Court has overruled.  However, in order to clarify, I'm going to make very clear what I believe is appropriate.

> This is closing argument.  Closing argument is not evidence.  Attorneys may draw inferences and urge you to draw inferences from the evidence.  It is proper for the attorneys to argue a failure to present certain evidence.  However, you must keep in mind that a defendant in a criminal case is under no duty to present any evidence to prove innocence and is not required to take the stand and testify in the case.

> If a defendant elects not to take the stand, no inference hurtful, harmful or adverse to him shall be drawn by you, and no such fact shall be held against him.

However, it is proper for one side or the other to comment on the failure to present certain evidence, but not to comment on the failure of the defendant to testify.

And I'm clarifying this, that, as you know, the burden of proof always remains on the state to prove the guilt of a defendant as to any charge beyond a reasonable doubt.

You'll hear many of these concepts when you receive the instructions of the law. But just to clarify this area now I'm giving you this instruction.

(Doc. 32-5 at 35-36). This instruction is not misleading or improper, as the Supreme Court found.

Petitioner also claims he is entitled to relief, as the affidavit of a juror, which was admitted into evidence over objection in the state collateral attack (Doc. 1-3 at 152-53; Doc. 1-4 at 6) affidavit purportedly satisfies the Brecht standard. (Doc. 99 at 106). This affidavit was not part of the record on direct appeal before the Georgia Supreme Court, and it may not be used under Cullen v. Pinholster in the deference analysis. Nothing in Brecht itself authorizes or requires proof of jurors' actual mental processes to determine if an argument had a substantial and an injurious effect or influence on the jury's verdict. Such a practice would run afoul of the common-law rule against the admission of jury testimony to impeach a verdict and the policy reasons behind it upon which Fed.R.Evid. 606(b) is grounded. See, e.g., Tanner v. United States, 483 U.S. 107 (1987).

Instead, the Supreme Court in Brecht looked to the record of evidence *at trial* in determining whether, in light of the record as a whole, the state's improper

use of <u>Brecht</u>'s post-<u>Miranda</u> silence had a substantial and injurious effect or influence in determining the jury's verdict.  <u>Brecht</u>, 507 U.S. at 637, 638. <u>Mansfield</u> notes this review is a question of law.  679 F.3d at 1307.  Respondent submits that this Court's review should be confined to the record of evidence at trial and further submits that review will show that the prosecutor's closing argument had no substantial and injurious effect or influence on the jury's verdict.

Petitioner has also moved to expand the record to include the declaration of his lead trial attorney, John R. Martin, who was also appellate counsel[8], as to Mr. Martin's view of the impact of the closing argument.  (Doc. 129 at 113). Respondent has opposed that motion because lead counsel's declaration, like the juror's affidavit, were not part of the record on direct appeal when the Georgia Supreme Court reviewed this enumeration of error, and the self-serving declaration should not be considered by this Court in determining whether the state Supreme Court's decision warrants deference.  <u>Cullen v. Pinholster</u>.  Even if <u>Pinholster</u> did not bar the use of Mr. Martin's declaration, <u>Teague v. Lane</u> would, as neither <u>Chapman</u> nor <u>Brecht</u> permit a reviewing court to go outside the evidence of record from the trial to consider extraneous evidence in the form of the self-serving declaration of defense counsel – or, for that matter, a declaration from the

---

[8] Mr. Martin, Don Samuel and Charles Lea were appellate counsel.  <u>Al-Amin</u>, 278 Ga. at 90.

prosecutor stating what he thought about his own argument or its impact.  For all these reasons, Respondent urges the Court to deny relief on this issue.

### B. THE PURPORTED RESTRICTION ON CROSS-EXAMINATION

In Claim II, Petitioner contends that his right of confrontation was violated when the trial court did not allow him to ask FBI agent Campbell about a specific incident which occurred in Pennsylvania in 1995 when the agent allegedly shot a man without provocation.  (Doc. 129 at 118-26).  This issue was decided adversely to Petitioner on direct appeal, and Respondent urges the Court to give that decision deference under § 2254(d).

The record shows that, at the beginning of trial, Petitioner moved to cross-examine Agent Campbell on a prior incident from June 1, 1995, where Agent Campbell allegedly shot a young, black, Muslim man in the back of the head when Agent Campbell was part of a federal task force.  (Doc. 29-2 at 25-26).  Petitioner argued that the prior incident was relevant as Agent Campbell kicked and spit at Petitioner after Petitioner was arrested because the prior incidence would show bias and motive and would bear upon Agent Campbell's credibility as a witness. (Doc. 29-2 at 26-27).  After hearing argument in opposition from the state and further argument from Petitioner, the trial court deferred ruling until taking a closer look at the law and instructed Petitioner not to mention Agent Campbell's prior incident during the opening statement.  (Doc. 29-2 at 27-30).

Immediately prior to the commencement of opening statements, the trial court told Petitioner that his motion regarding Agent Campbell's prior incident would be denied. (Doc. 29-2 at 41-42). At the conclusion of opening statements, Petitioner renewed his motion. (Doc. 29-3 at 2). The trial court told Petitioner that his motion was not timely, but that the motion would be revisited later. (Doc. 29-3 at 2-3).

Later during trial, Petitioner again renewed his motion. (Doc. 29-3 at 146). The trial court stated:

> I looked very carefully at bias and prejudice. It has nothing to do with this defendant, it has to do with Ron Campbell's alleged prior incidents of bad conduct which under Georgia law are not admissible.

(Doc. 29-3 at 147, lines 6-10).

After Agent Campbell testified, Petitioner renewed his motion to cross-examine Agent Campbell about the prior incident, arguing that Agent Campbell's testimony made the prior incident relevant to show bias and motive. (Doc. 30-6 at 55-56). After the state argued in opposition, the trial court stated that Petitioner was in essence moving to introduce evidence of the witness' bad character and found that the prior incident was not admissible because it was too speculative to show bias or motive in this case. (Doc. 30-6 at 57-59). The trial court also found that the probative value of the evidence of the prior incident was outweighed by

the prejudice since there was a substantial danger that the evidence would divert the jury from the question of Petitioner's guilt or innocence.  (Doc. 30-6 at 59).

Later, during the testimony of FBI Special Agent Gary Harris, Petitioner sought to revisit the issue.  (Doc. 31-2 at 91).  Petitioner argued that Agent Harris's testimony that he did not report Agent Campbell's actions in kicking and spitting at Petitioner implied that Agent Campbell's actions were an aberration, which Petitioner argued opened the door to evidence of the prior incident.  (Doc. 31-2 at 90-91).  The state argued that Petitioner had mischaracterized Agent Harris' testimony and that, even if Petitioner's description of Agent Harris' testimony was accurate, it still did not open the door to evidence of the prior incident.  (Doc. 31-2 at 91).  The trial court again ruled that evidence of the prior incident was not admissible.  (Doc. 31-2 at 92-95).

As his thirteenth enumerated error on direct appeal, Petitioner alleged the trial court violated his right of confrontation when the court did not allow him to ask FBI agent Campbell about the 1995 incident.  (Doc. 36-1 at 3, 71-73).  In support, Petitioner cited a federal criminal case, United States v. Cohen, 888 F.2d 770 (11th Cir. 1989), as authority for the admission of the evidence to show that the witness "acted in a certain manner previously" and the jury could infer he acted in a similar manner in this case.  (Doc. 36-1 at 72).  Cohen relies on Fed.R.Crim.P.

404(b) and is clearly not binding on a state trial court.  No United States Supreme Court cases were cited.  (Doc. 36-1 at 72, 73).

The Georgia Supreme Court affirmed the trial court's ruling in not allowing cross-examination about an unrelated case.  Al-Amin, 278 Ga. at 84(14).  In Georgia, "Specific instances of prior misconduct may not be used to impeach the character or veracity of a witness 'unless the misconduct has resulted in the conviction of a crime involving moral turpitude.'"  Id. (cits. omitted).  The Supreme Court cited another case in which a defendant sought to show the purported misconduct of an investigator in an unrelated matter when he allowed a DUI suspect to avoid arrest and prosecution as a favor to another officer and found such evidence was inadmissible, despite the defendant's argument that the evidence was relevant to show the investigator "may" have tampered with evidence in the defendant's case.  Id.

> In the case now before the Court, the trial court excluded evidence of the 1995 incident on the basis that Campbell had not been prosecuted for the alleged misconduct, and that any probative value was far outweighed by the danger of unfair prejudice.  "While a defendant is entitled to effective cross-examination, he is not entitled to unfettered cross-examination, and the trial court has broad discretion in limiting its scope."  Allen [v. State, 275 Ga. 64, 68, 561 S.E.2d 397 (2002).]  We find no abuse of discretion for any of the reasons advanced.

Al-Amin, 278 Ga. at 84.

Respondent questions whether Petitioner has in fact preserved a sixth amendment confrontation claim for merits review, as he labeled the claim on direct

appeal as violating his right of confrontation, but he cited only a federal criminal case addressing a Federal Rule of Criminal Procedure.  Petitioner cited no Supreme Court authority construing the confrontation clause for the Georgia Supreme Court to consider.

Thus, assuming arguendo a sixth amendment confrontation claim is preserved, Respondent submits the state Supreme Court's decision should be given deference.  As the Court noted, a defendant has no unfettered right to cross-examination and that a trial court has discretion to limits the scope of cross.  That holding is in accord with Supreme Court precedent.  "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985).  "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about . . . interrogation that is repetitive or only marginally relevant."  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).

In Van Arsdall, the Court found constitutional error where the trial court permitted all inquiry into the possibility that the witness would be biased as a result of the state's dismissing his public drunkenness charge, an incident the jury "might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony. . ." Id. at 679.  Here, there was no pending or recently dismissed

charge against FBI agent Campbell, and the Georgia Supreme Court found Campbell had not been prosecuted for the alleged misconduct.

The record further shows that the jury did hear evidence about Campbell's own actions towards Petitioner after Petitioner had been arrested and handcuffed, Campbell "spit at him and kicked him," and Campbell was suspended.  Al-Amin, 278 Ga. at 82.

The Georgia Supreme Court found no improper restriction of cross-examination as to the unrelated 1995 incident.  Respondent urges the Court to give deference to that decision and deny relief.

C. THE STATE HABEAS COURT'S DECISION THAT COUNSEL WERE EFFECTIVE WARRANTS DEFERENCE

In Claim III Petitioner alleges he received ineffective assistance at trial when counsel did not sufficiently investigate Otis Jackson and his twice-recanted confessions.[9]  (Doc. 129 at 126-36).  Respondent submits that the state habeas corpus court's decision on the ineffective assistance of counsel claims warrants deference under § 2254(d).

---

[9] Jackson "confessed" twice and recanted twice before Petitioner's trial.  See Doc. 1-4 at 34-35, 39, 41-45, 47, 48.  Jackson gave yet a third confession in July 2009, well after the criminal case was over and after the evidentiary hearing in the state habeas corpus case, at the State of Florida prison where he was incarcerated in 2009.  (Doc. 1-5 at 1-54). His deposition was admitted in the state habeas corpus case, as noted in Part I.

As the state habeas court found, Petitioner was represented at his death penalty trial by John R. Martin, who was lead counsel; Bruce Harvey; Tony Axam and Michael Warren of New York.  (Doc. 1-2 at 6, n.5).[10]   The state habeas court found that Petitioner had elected not to testify at trial, and the record shows that the defense team but presented 19 witnesses in his behalf at the guilt-innocence phase and 21 witnesses in his behalf at the sentencing phase.[11]

In ground 1 of the state petition Petitioner alleged that trial counsel was ineffective "for failing to investigate the confession of Otis Jackson, an individual who confessed to the crimes charged in the instant indictment, and failed to learn information, or utilize known information, which would tend to exonerate Al-Amin."  (Doc. 1-6 at 6).  See Doc. 1-4 at 1-61; Doc. 1-5 at 1-54.  Petitioner added more specificity in the state amendment.  (Doc. 1-7 at 1-7).

 The habeas court implicitly credited the testimony of Mr. Martin in finding as fact that the defense team gave their "experienced" investigator the task of locating and interviewing Jackson, and the investigator did speak with Jackson.

---

[10] Attorneys Martin and Harvey entered their appearance in April 2000 and were appointed on May 4, 2000, with Martin designated lead counsel.  (Doc. 60-1 at 90; Doc. 60-2 at 81).  In August 2000 attorney Warren moved to appear pro hac vice and Petitioner moved to have attorney Axam appointed to the team.  (Doc. 60-4 at 46, 52).

[11] See Doc. 1-2 at 13-14; Doc. 31-7 at 147, 153; Doc. 31-8 at 15, 47, 28, 84, 116, 132, 159; Doc. 32-1 at 28, 84, 116, 132, 159; Doc. 32-2 at 20, 47, 59, 79, 98, 167; Doc. 32-3 at 9, 31, 60, 78, 125; Doc. 33-1 at 89-152; Doc. 33-2 at 1-154; Doc. 33-3 at 1-36)).

(Doc. 1-2 at 11, citing Doc. 1-3 at 81).  The court found as fact that the defense

team made the strategic decision not to use the information about Jackson for three

reasons:  (1) Jackson was being monitored by an ankle bracelet at the time of the

shooting and the documents for the monitor showed Jackson was home and could

not have been at the crime scene; (2) Jackson had retracted and repeated his

confession numerous times[12]; and (3) the investigator had personally interviewed

Jackson and doubted the reliability of Jackson's testimony.  (Doc. 1-2 at 11).  See

Doc. 1-3 at 85.  The court credited Mr. Martin's testimony in finding as fact that

the defense team ultimately opted not to use Jackson or his confession because

they feared the tactic would "'backfire'" and make Petitioner look "'desperate.'"

(Doc. 1-2 at 11, citing Doc. 1-3 at 83).  Based on that testimony and because

deciding which witnesses to call is a matter of trial tactics and strategy, the court

found this claim lacked merit.  (Doc. 1-2 at 11).

　　　Respondent submits that the state habeas court's decision warrants deference

under § 2254(d).  Though the court did not expressly cite Strickland in this portion

of its order, the court did cite Strickland in resolving other ineffective assistance

claims.  (Doc. 1-2 at 14).  However, the state court is not required to cite the

express Supreme Court standards in order for deference to apply, so long as

---

[12] See Doc. 36-4 at 52-67.

"neither the reasoning nor the result of the state-court decision contradicts them."
Early v. Packer, 537 U.S. at 8.

Respondent submits that the state habeas court did not apply a test which conflicted with Strickland nor unreasonably determine the facts. In Strickland itself, the Court noted that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. The record amply supports the habeas court's finding that counsel's investigation was reasonable.

Petitioner faults the defense team in sending an investigator to interview Otis Jackson and relying on the investigator's opinion that Jackson was "'a little kooky'" and would not have helped the defense. (Doc. 129 at 133). Nothing in Strickland places a duty upon an attorney to interview each and every potential witness personally before deciding whether to call the individual.

In arguing that the attorneys' performance was deficient, Petitioner asserts that Michael Warren now admits in hindsight that their investigation was not adequate and the defense would have changed their evaluation of Jackson as part of the defense theory had he known then what Jackson said in his latest version. (Doc. 129 at  135). This "latest" version of a

"confession" was given by Jackson in his July 2009 deposition from the
Florida prison where he was incarcerated and clearly did not exist at the time
of the trial in 2002 and was not available for use.  Hindsight is not part of the
Strickland standard.  466 U.S.  at 689.

The state habeas court did not reach the prejudice prong of Strickland as to
this claim.  Strickland itself says that a court need not do so.  466 U.S. at 697.

Petitioner asserts that counsel failed to conduct a thorough investigation into
Otis Jackson's confession(s), though Petitioner clearly ignores Jackson's
recantations which readily called Jackson's credibility into question and would
have been fodder for the prosecutor to use in cross-examination.  In addition, the
record shows that Detective Zimbrick testified at the guilt-innocence phase of the
trial that Otis Jackson was a potential suspect, confessed to the crimes, later
recanted, there were inconsistencies in his confessions, all leads provided about
Jackson were followed up and produced nothing, and he was eliminated as a
suspect.  (Doc. 30-2 at 39, 47-48, 118-19, 132-35).  Jackson was never considered
"a serious suspect."  Id. at 135.  Thus, the prosecution team apparently shared the
same views as Mr. Martin and Martin's investigator of Otis Jackson's viability as a
witness.

Petitioner also relies largely upon pre-AEDPA circuit court decisions as
authority in asserting that counsel's investigation was not adequate.  (Doc. 129 at

127-28, 134-35).  That reliance is misplaced, as circuit court decisions do not establish the "Federal law" for deference purposes.  Allen, 611 F.3d at 764.

Petitioner claims that counsel should have presented a defense asserting that Jackson was the shooter.  Petitioner ignores the fact that counsel presented testimony from numerous witnesses in the guilt-innocence phase, including seven residents of the West End area and four residents of Whitehall, Alabama, in support of his defense that a man named Mustafa could have committed the Atlanta shootings and that federal law enforcement officers were the only ones who fired shots in Whitehall.  See Doc. 32-1 at 28, 84, 116, 132, 159; Doc. 32-2 at 79, 98, 167; Doc. 32-3 at 9, 31, 60, 78, 125.  Petitioner also ignores the fact that the defense presented testimony from Imhotep Shaka who testified before the jury that he allegedly had witnesses the shootings of the two deputies and that the shooter was not Petitioner, who he did know.  (Doc. 32-2 at 84-86).  The defense also presented testimony from a pharmacologist/toxicologist in an attempt to undercut Deputy English's identification of Petitioner from a photo lineup while English was hospitalized.  (Doc. 32-1 at 28-83).  Petitioner's argument about "what should have been presented" is based on hindsight, which Strickland eschews.  Strickland, 466 U.S. at 689.

Petitioner claims that the state habeas court's decision does not warrant deference because the court credited Mr. Martin's testimony and concluded that

counsel's decisions were reasonable. (Doc. 129 at 134). He asserts that the habeas court's decision is based on an unreasonable determination of the facts because the court did not credit the testimony of his witnesses. Id. The habeas court was not required to credit the testimony of any witness, even if it was not rebutted in kind. Georgia law has long provided that the question of determining credibility of witnesses in a habeas corpus hearing is vested in the hearing judge, and the uncontradicted testimony of a witness does not have to be accepted. Jones v. Leverette, 230 Ga. 310, 311, 196 S.E.2d 885 (1973).

Petitioner contends that counsel's investigation was inadequate because they allegedly "accepted" the prosecutor's assessment of Jackson's credibility. The record belies this assertion. Counsel sent their investigator, a licensed individual "well known" in Atlanta, who was both Muslim and African-American and who they thought would be helpful in this case, to interview Jackson, and the investigator thought Jackson "was a little bit unreliable" or perhaps "a little kooky." (Doc. 1-3 at 77-78, 83). Mr. Martin concluded Jackson might have been someone "who loved Mr. Al-Amin, as many people did in the community, and was willing to sacrifice himself to save Mr. Al-Amin." Id. at 83.

Strickland imposes a duty upon counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."

Strickland, 466 U.S. at 691.  The habeas court's finding that counsel's

investigation of Otis Jackson was reasonable is in accord with Strickland.

Respondent urges the Court to deny relief on this ground.

### D. THE BRADY CLAIM IS NEW BUT DEFAULTED OR ALTERNATIVELY LACKS MERIT

Finally, Petitioner asserts that the prosecution violated his fourteenth

amendment right to due process by allegedly withholding Brady v. Maryland, 373

U.S. 83 (1963), information: (a) a declaration of a United States Marshall, given in

2012 for use in an unrelated § 1983 case, in which he states without foundation

that "Several other suspects charged in the case remain at large" (Doc. 129-1 at 3,

para.6); (b) a "BOLO" which names Petitioner by name (Doc. 129-2 at 2) and (c)

notes of an Alabama deputy about where a gun was found (Doc. 129-3).   (Doc.129

at 126-36).   Respondent submits that this precise ground is new but procedurally

defaulted under Georgia's successive petition rule as it was not previously raised in

the state courts and would clearly be deemed successive under O.C.G.A. § 9-14-51

if now raised in a second state collateral attack.  Chambers v. Thompson, 150 F.3d

1324 (11th Cir. 1998).  Respondent submits that Petitioner has not shown cause and

actual prejudice to overcome the default or met the miscarriage of justice

exception.  Respondent alternatively submits this ground lacks merit.

Petitioner has moved to expand the record as developed in the state courts to

include these documents as they do not appear to be part of the record as developed

in the state courts.  Clearly, the Marshall's declaration, prepared in June 2012 for use Petitioner's unrelated § 1983 case, did not exist at the time Petitioner was litigating his state collateral attack, as the Georgia Supreme Court denied his application for a certificate of probable cause to appeal in May 2012.  As to the BOLO, while it does not appear that a copy of the BOLO which identifies Petitioner by name as the suspect (Doc. 129-2 at 2) at is literally in the record, it is clear that the defense knew at trial that an all points bulletin had been issued for Petitioner as the defense cross-examined officer Bennet about it (Doc. 30-1 at 73, lines 6-7).  Sergeant Rogers, one of the doghandlers in Alabama, testified at trial. (Doc. 31-1 at 142-65).

Respondent submits that the current Brady claim is new but defaulted under Georgia's successive petition rule of O.C.G.A. § 9-14-51, as it was not presented to the state courts, and is the subject of Petitioner's pending motions to supplement the record.  Respondent submits that Petitioner has not established cause and actual prejudice to overcome the default, nor has he met the miscarriage of justice exception even if he could not overcome the procedural bar.  Respondent alternatively submits that Brady was not violated.

By way of background, Petitioner raised two Brady claims in the state courts before he amended his federal petition a third time to add the current version.  One related to information about FBI Agent Campbell, which was raised on direct

appeal, and the other was raised in ground 7 of his state habeas corpus petition as amended.

On direct appeal, as his twelfth error, Petitioner alleged the state violated his rights under Brady as well as under state discovery law by failing to obtain documents from the FBI concerning the investigation of Special Agent Campbell. (Doc 36-1 at 17, 70-71).  Petitioner admitted that certain records were provided to him, but he asserted he had no assurance he had been provided all documents and wanted copies of what had been provided to the trial court post-trial and received in camera.  Id.  The Georgia Supreme Court found no Brady violation.  Al-Amin, 278 Ga. at 83(13).  The Court affirmed the trial court's rulings which, after examining documents in camera, the trial court disclosed relevant portions to Petitioner and sealed the others as irrelevant, noting that not all documents were true Brady material; and found that the post-trial information was consistent with Agent Campbell's trial testimony.  Id.  The Court also noted the available remedy that Petitioner could still pursue directly against the FBI for the information.  Id.

When Petitioner reasserted this particular claim in his state habeas case, the court found it was bound by the Supreme Court's decision on appeal and that Petitioner still had the same available remedy to pursue against the FBI.  (Doc. 1-2 at 26-27).

In his state habeas corpus case, Petitioner alleged in ground 7 that "the State failed to provide discovery in violation of <u>Brady</u> . . . in violation of the Fifth and Fourteenth Amendments." (Doc. 1-6 at 7).  In his amended petition, he alleged that:  (a) a SWAT Report, about surveillance of a restaurant in Whitehall, Alabama, was not turned over to the defense until after trial; (b) certain issues had not been "fully developed" due to "uncooperative witnesses" and Petitioner's purported inability to get documents from the federal government, such as:  (i) whether defense attorney Michael Warren had a conflict of interest due to an FBI information in the Muslim community was passing information to the FBI, (ii) FOIA documents allegedly showed there was an informant in the Muslim community and that there was surveillance of Petitioner, including surveillance on the night in question, and (iii) a report of the investigation of FBI Special Agent Campbell regarding Petitioner's arrest.  (Doc. 107 at 5, 6).

The state habeas corpus court found that, apart from the reassertion of the <u>Brady</u> claim which was decided on direct appeal and precluded from the habeas court's review, the remainder of the <u>Brady</u> claim about the surveillance was defaulted under O.C.G.A. § 9-14-48(d), as it was not timely raised at trial and on direct appeal, and not before the habeas court for review on the merits.  (Doc. 1-2 at 23-24).  The court noted that Petitioner had an available federal remedy to obtain the information which he had not pursued.  <u>Id</u>. at 31.

"A state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim," if the state procedural ruling rests upon an independent and adequate state ground. Judd v. Haley, 250 F.3d 1308 (11th Cir. 2001). Georgia's procedural default rule, O.C.G.A. § 9-14-48(d), is an adequate and independent state procedural ground that is entitled to this Court's deference. See Ward v. Hall, 592 F.3d 1144 (11th Cir. 2010); Lynd v. Terry, 470 F.3d 1308, 1313-1314 (11th Cir. 2006). Thus, the Court should give deference to the state habeas court's finding of default as to the Brady claims presented to it.

The Current Brady Claims

Claim IV in the fourth petition is new. Respondent asserted that it is exhausted by virtue of being defaulted under O.C.G.A. § 9-14-51 and Chambers v. Thompson, 150 F.3d 1324 (11th Cir. 1998).

Under the doctrine of procedural default, this Court may not review the merits of a procedurally defaulted claim unless Petitioner establishes sufficient cause for the default *and* actual prejudice, or that he is actually innocent of his crime of conviction. Gore v. Crews, 720 F.3d 811, 816 (11th Cir. 2013) (per curiam).

To show cause, Petitioner must demonstrate "some objective factor external to the defense" that impeded his effort to raise the claim properly in state court.

Mize v. Hall, 532 F.3d 1184, 1190 (11th Cir. 2008) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).  Petitioner could show cause by demonstrating that a claim's legal basis was not reasonably available to counsel.  Reed v. Ross, 468 U.S. 1, 16 (1984).

If Petitioner cannot show cause, this Court is not required to examine prejudice.  See McCleskey v. Zant, 499 U.S. 467, 502 (1991).  Nonetheless, to show prejudice, Petitioner must prove "actual prejudice from the alleged constitutional violation."  Ward, 592 F.3d at 1157.  Petitioner must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness."  McCoy v. Newsome, 953 F.2d 1252, 1261 (11th Cir. 1992).  A possibility is insufficient; there must be "at least a reasonable probability that the result of the proceeding would have been different."  Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1180 (11th Cir. 2010).

Finally, Petitioner may be able overcome his default of a claim if he can establish the miscarriage of justice, or actual innocence, exception.  See McQuiggin v. Perkins, 133 S. Ct. 1924 (2013).

Respondent further notes that, in the event the Court were to grant the motion to expand to include these documents, and Respondent is not conceding that the Court should, Petitioner still cannot stablish cause and actual prejudice to overcome the default nor meet the miscarriage of justice exception.  Without

waiving any procedural bar, Respondent alternatively asserts that Petitioner has not

established that <u>Brady</u> has been violated.

The <u>Brady</u> Standard

In <u>Brady v. Maryland</u>, 373 U.S. 83, 87(1963), the Supreme Court held that

the suppression of material, exculpatory evidence by a prosecutor violates due

process. Evidence is "material" if "there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have

been different," with "reasonable probability" defined as "a probability sufficient to

undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. 667,

682(1985). As that Court has noted:

> [T]he term "<u>Brady</u> violation" is sometimes used to refer to any breach
> of the broad obligation to disclose exculpatory evidence – that is, to
> any suppression of so-called "<u>Brady</u> material" – although, strictly
> speaking, there is never a real "<u>Brady</u> violation" unless the
> nondisclosure was so serious that there is a reasonable probability that
> the suppressed evidence would have produced a different result.
> There are three components of a true <u>Brady</u> violation: The evidence
> at issue must be favorable to the accused, either because it is
> exculpatory, or it is impeaching; the evidence must have been
> suppressed by the State, either willfully or inadvertently; and
> prejudice must have ensued.

<u>Strickler v. Greene</u>, 527 U.S. 263, 281(1999).

<u>Brady</u> extends to impeachment evidence and to evidence affecting a witness'

credibility. <u>Bagley</u>, 473 U.S. at 676; <u>Napue v. Illinois</u>, 360 U.S. 264(1959).

43

However, <u>Brady</u> did not create a general right to discovery in a criminal case. <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559(1977).

Petitioner relies upon two pre-AEDPA circuit courts cases in asserting that any information in the control of the Federal Bureau of Investigation ("FBI") was imputed to and should have been provided to the defense prior to or at trial. (Doc. 129 at 138-39). The United States Supreme Court has not announced such a rule.

More importantly, the record shows that the FBI's role in this case was to assist Georgia law enforcement authorities in locating and apprehending Petitioner who had fled from Georgia. (Doc. 30-2 at 29-34; Doc. 31-2 at 3-4). According to Atlanta detective Zimrick, Petitioner was the primary suspect in the murder of deputy Kinchen by the close of business on March 17th. (Doc. 30-2 at 29-34). FBI Agent Green issued an "unlawful flight to avoid prosecution" or "UFAP" warrant, and Petitioner was flagged on the nationwide computer as wanted by the Atlanta Police Department for murder. (Doc. 30-2 at 29-34; Doc. 31-2 at 3-4). Through a computer Atlanta officers had located information about a Mercedes linked to Petitioner, and this vehicle was flagged on the computer by its tag number and the vehicle identification number. (Doc. 30-2 at 29-34). Agent Green asked the United States Marshalls for support, and a task force meeting with a multi-agency group ensued comprised of Atlanta Police officers, Fulton County depuies, the GBI, the Metro Fugitive Squad, and the United States Marshall Service. (Doc. 31-

2 at 5, 6).  The FBI asked for a United States Marshall team to go to Alabama, where Petitioner might be, and Petitioner was apprehended in Alabama, and his Mercedes Benz was later recovered in Alabama on March 29th.  (Doc. 30-2 at 34; Doc. 31-2 at 6-8).

The FBI was not involved in investigating the shooting of the two Fulton County deputies.  (Doc. 31-2 at 3-4).  Three members of the Unites States Marshall Service, Lowery, Parker, and Ergas, testified at the trial as to their efforts in trying to help locate and apprehend Petitioner in Alabama.  (Doc. 30-5 at 13, 80, 142).  FBI Agents Campbell, Sosebee, Sindall Harris, Greene, Graves, King, Murray, Samaniego and Faulkner testified as to their actions in locating and apprehending Petitioner in Alabama and finding his car.  (Doc. 30-6 at 21, 43, 156; Doc. 31-1 at 81; Doc. 31-2 at 1, 102, 116, 140, 157; Doc. 31-3 at 29).  Five Alabama officers, including three dog handlers and their dogs, assisted as well.  (Doc. Doc. 30-6 at 1783; Doc. 30-7 at 5, 114; Doc. 31-1 at 6, 142).

Against this backdrop, Respondent submits that Marshall's Staub's June 2012 declaration is neither material nor exculpatory.  (Doc. 129-1).  The declaration of Marshall Staub was clearly prepared a decade after the fact of the trial for use in Petitioner's unrelated civil rights case and expressed his concerns about security risks and expenses in transporting Petitioner from the federal "Supermax" facility to the Southern District of Georgia.  Id. at 1, 2.  This

declaration clearly did not exist prior to or at the time of the trial in 2002, Marshall Staub did not testify at Petitioner's trial, and nothing in the declaration shows that he was ever involved in efforts to locate and apprehend Petitioner.  Marshall Staub states generally that the information contained in his declaration was based on "my personal knowledge, my training and experience as a law enforcement officer, and information that has been provided by other law enforcement officers and agencies."  (Doc. 128-1 at 2, para. 2).  He later states that Petitioner was sentenced in 2002 to life without parole, after he was convicted of shooting two Fulton County deputies, one of whom was killed, who were attempting to execute an arrest warrant.  Id. at 3, para. 6.

Petitioner claims that the next sentence, "Several other individuals charged in that case remain at large," is Brady material that was not disclosed.   Respondent submits this argument lacks merit.  There is no scintilla of information showing that any other persons were in fact charged in this case, much less that they remain "at large."  At noted previously, detective Zimrick testified at trial about Otis Jackson, Jackson's confession and its inconsistencies as well as his recantation, and all of this same information was known to the defense.  Indeed, Petitioner's only claim of ineffective assistance of counsel is that is his attorneys did not investigate Jackson more extensively and did not call him at trial as a defense

witness.  Marshall Staub's declaration and its vagueness is not material, exculpatory evidence under Brady.

As to the BOLO, Petitioner conveniently ignores the fact the Petitioner is listed by name in the BOLO.  (Doc. 129-2 at 2).  Though it lists his height as "5'6"-5'8" he is still listed by name, and the BOLO also contained updated information that he was possibly "driving a dark color Mercedes Benz Ga. Tag No. 246MBG four door, tinted windows."  Id.  Again, the defense was aware that an all points bulletin had been issued, as that was broached by the defense in cross-examination. (Doc. 30-1 at 73, lines 6-7).  There is nothing to show that the defense was not aware of this BOLO at the trial.

Finally, Petitioner claims that handwritten notes of an interview with Sergeant Rogers, who found the gun, are Brady material, as the notes allegedly show he thought the gun "was placed" at a particular location.  (Doc. 129-3 at 2, 3).  The two words that Petitioner takes out of context are next to a drawing or a diagram, and not all of the writing is legible.  Nothing indicates that the author thought the gun had been placed there by law enforcement or other authorities – that is conjecture by Petitioner.  More importantly, a review of Sergeant Rogers' testimony at trial shows he had no personal knowledge of "when and who placed those items there."  (Doc. 31-1 at 164).

Rogers testified that he was part of the dog tracking team that was tracking the area in Whitehall, Alabama, about the time that Petitioner was taken into custody. (Doc. 31-1 at 141-64). Rogers was also involved in the search of the area after Petitioner was taken into custody, and a handgun was found in an area near a barbed wire fence he had crossed by earlier, along with a holster, a belt, and a green pouch. Id. at 148-49. The following day, near the same tracked area as evidenced by beagle footprints and a path beaten down through the briars, he saw a magazine clip on the ground and a rifle in a muddy puddle. Id. at 150-51.

The defense asked Rogers if he was interviewed by Agent Faulkner in September 2000 and showed Rogers Defendant's Exhibit 67 to refresh his recollection, but the defense did not tender this document into evidence, and elicited from him that he crossed over a fence, shined his flashlight and saw the handgun, holster, belt and pouch on the ground in an area he had passed by earlier and within two to three feet of where the dogs had passed under the fence. Id. at 156-62. He was asked if he had "any personal knowledge as to when and who placed those items there," and he replied no. Id. at 164. These unexplained and ambiguous notes do not constitute material and exculpatory evidence under Brady.

### E.  THE CUMULATIVE ERROR ARGUMENT IS NOT COGNIZABLE AND DOES NOT STATE A CLAIM FOR RELIEF

Finally, Petitioner asserted in Paragraph E that his four grounds are "related" and that, taken together, the four grounds "compel habeas relief." (Doc. 129 at 29-

30).  He cites no authority in support.  Id.  Respondent submits that Petitioner's

attempt to rely on a "cumulative error" theory does not provide a basis for relief, as

the United States Supreme Court has not adopted such an analysis for use in 28

U.S.C. § 2254 Cases and is not cognizable for that reason.

In 2006 the Sixth Circuit observed that the Supreme Court has not spoken on

this issue.  See Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006).  To the

best that Respondent can determine, the Supreme Court has still not done so.  In

2012 this circuit reserved ruling on this issue.  Morris v. Sec'y Dept. of Corr., 677

F.3d 1117, 1132 n. 3 (11th Cir. 2012). To the best that Respondent can determine,

this circuit has still not adopted a cumulative error analysis for 2254 cases since

then.  See, e.g., Hill v. Sec'y, Fla. Dept' of Corr., 578 F3d Appx. 805 (11th Cir.

2014).

Georgia does not recognize "cumulative error" analysis in any other context

except ineffective assistance of counsel claims in determining prejudice under

Strickland v. Washington, 466 U.S. 684 (1984):

> The combined effects of counsel's errors are considered in
> determining the prejudice prong of a claim of ineffective assistance of
> counsel.

Phillips v. State, 285 Ga. 213, 218, 675 S.E.2d 1 (2009) (citing Schofield v.

Holsey, 281 Ga. 809, 811 n.1, 642 S.E.2d 56 (2007)).  This "combined effect"

analysis, however, is not the equivalent of a cumulative error analysis.  <u>Holsey</u>,

281 Ga. at 811 n.1.

Respondent submits that it is not fair to the states to permit petitioners to try

to circumvent the application of the deference standard through use of a

"cumulative error" analysis, particularly when the Supreme Court has not

mandated such an analysis, where individual states may not follow such an

analysis, and where the claims were not raised and pled in the state courts on that

expanded basis.  To permit petitioners challenging state convictions to use the

"cumulative error" theory would seem contrary to Congress' intent in enacting the

deference standard in the first instance.  For these reasons, Respondent submits

that Paragraph E does not state a claim for relief under current Supreme Court

precedent and should not serve as a basis for federal habeas corpus relief.

<u>CONCLUSION</u>

WHEREFORE, Respondent prays that the Court deny habeas corpus relief.

Respectfully submitted,

SAMUEL S. OLENS                551540
Attorney General

BETH A. BURTON                 027500
Deputy Attorney General

s / Paula K. Smith _____
PAULA K. SMITH                 662160
Senior Assistant Attorney General

Please serve:

PAULA K. SMITH
Senior Assistant Attorney General
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia  30334-1300
Telephone: (404) 656-3351

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served the foregoing BRIEF, by filing

the same electronically with the CM/ECF system:

> A. Stephens Clay, Esq.
> Miles J. Alexander, Esq.
> Ronald L. Raider, Esq.
> C. Allen Garrett, Jr., Esq.
> Kilpatrick Townsend & Stockton LLP
> 1100 Peachtree Street, Suite 2800
> Atlanta, Georgia 30309-4528

This 1st day of December, 2015.


> s /Paula K. Smith_____
> Paula K. Smith
> Senior Assistant Attorney General