## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| JAMIL ABDULLAH AL-AMIN, | : | HABEAS CORPUS |
| BOP ID 99974-555, | : | 28 U.S.C. § 2254 |
| Petitioner, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:12-CV-1688-AT-GGB |
| JOHN "J.T." SHARTLE, Warden, | : | |
| and HOMER BRYSON, | : | |
| Commissioner, | : | |
| Respondents. | : | |

## <u>FINAL REPORT AND RECOMMENDATION AND ORDER</u>

This matter is before me for entry of a Final Report and Recommendation

("Final R&R") addressing (A) state inmate Jamil Al-Amin's Fourth Amended

Petition for Writ of Habeas Corpus by a Person in State Custody (Doc. 129),

(B) Georgia Department of Corrections ("GDOC") Commissioner Homer

Bryson's Fourth Supplemental Answer-Response (Doc. 130) and Brief (Doc. 131),

both as corrected (Doc. 132), (C) Al-Amin's Reply in Support of Fourth Amended

Petition (Doc. 133), and (D) Al-Amin's Unopposed Amendment to Withdraw and

Delete *Brady* Claim (Claim IV) (Doc. 135).  In addition, this matter is before me

for entry of an Order addressing (E) Al-Amin's Motion to Expand the Record

(Doc. 101), (F) Al-Amin's Second Motion to Expand the Record (Doc. 116), and

(G) Al-Amin's Supplement to Second Motion to Expand the Record (Doc. 117). For the reasons set forth below, I recommend that Al-Amin's Fourth Amended Petition, as further amended to delete Claim IV, be denied, and I deny each of Al-Amin's motions to expand the record.

## I.

### A.

As a preliminary matter, I note that although Al-Amin is a prisoner serving a state sentence, he is incarcerated in a federal prison pursuant to an agreement between the GDOC and the Federal Bureau of Prisons.  As a result, Al-Amin has named as respondents in his federal habeas petitions both the Commissioner of the GDOC (currently, Homer Bryson) and the wardens of the various federal penitentiaries in which he  has been incarcerated.  Al-Amin has advised the Court that he was recently transferred to the Federal Correctional Institution in Tucson, Arizona, and stated that both he and Commissioner Bryson consent to the substitution of that facility's Warden, John "J.T." Shartle, as a Respondent, in place of Warden David Ebbart.  *See* (Doc. 135 at 1 n.1).

The Clerk is **DIRECTED** to update the docket to add Warden Shartle as a Respondent and to terminate Warden Ebbart as a Respondent.

B.

For reasons that are discussed later in this Final R&R, Al-Amin sharply contests the Georgia Supreme Court's summary of the facts as proven at trial and the state habeas court's summary of facts as proven in collateral proceedings. To provide context at the outset, however, it is still useful to recite the Georgia Supreme Court's summary of the procedural history of this case:

> Jamil Abdullah Al-Amin was convicted of malice murder and various other offenses stemming from the shooting of two Fulton County Deputy Sheriffs, that resulted in the death of one and injury to the other.
>
> The crimes took place on March 16, 2000. On March 28, 2000, Al-Amin was charged in a 13-count indictment with malice murder, felony murder (four counts), aggravated assault on a police officer (two counts), obstruction of a law enforcement officer (two counts), aggravated battery on a police officer, possession of a firearm by a convicted felon, and possession of a firearm in the commission of a felony (two counts). The state sought the death penalty. Voir dire commenced on January 22, 2002, and on March 9, 2002, Al-Amin was found guilty on all counts. At the conclusion of the sentencing phase on March 13, 2002, the jury fixed punishment at life without possibility of parole. Al-Amin was sentenced accordingly on the same day. He filed a timely motion for new trial, which was amended on December 10 and 13, 2002, and denied on July 2, 2003. A notice of appeal was filed on July 18, 2003, and the case was docketed in [the Georgia Supreme] Court on September 26, 2003. Oral argument was heard on January 27, 2004.

*Al-Amin v. State*, 597 S.E.2d 332, 339 & 339 n.1 (Ga. 2004) (footnote moved).

3

The Georgia Supreme Court denied Al-Amin's direct appeal on May 24, 2004. *Id.* Later that year, the United States Supreme Court declined to grant a writ of certiorari. *See Al-Amin v. Georgia*, 543 U.S. 992 (2004).

Beginning in 2005, Al Amin attacked his convictions and sentence in state habeas proceedings. *See* (Doc. 1-6). Al-Amin received an evidentiary hearing on February 27, 2007. *See* (Doc. 1-7). The state habeas court denied relief by Order dated July 28, 2011. *See* (Doc. 1-2). The Georgia Supreme Court denied Al-Amin's application for a certificate of probable cause to appeal on May 7, 2012. *See* (Doc. 1-11). The following day, Al-Amin filed his initial federal habeas petition in Colorado. *See* (Doc. 1).

The District of Colorado case was transferred to this Court. Al-Amin ultimately filed the Fourth Amended Petition now pending before me on November 24, 2015, *see* (Doc. 129), amending it further on December 23, 2015, to delete one of his four numbered claims, *see* (Doc. 135).

## C.

Al-Amin's lawyers state that "[i]n the 1960s, Mr. Al-Amin was widely known by his name at that time, H. Rap. Brown, as a civil rights activist." (Doc. 129 at 37). Because of the nature of the crimes and the identity of the defendant,

4

this was a high-profile case, drawing pooled press coverage from the national media. *See, e.g.,* (Doc. 15-6 at 1; Doc. 20-2 at 86).

It is also noteworthy that Al-Amin has been represented by court-appointed or *pro bono* counsel at all relevant times. Before and at trial, Al-Amin was represented by John "Jack" Martin,  Bruce Harvey, Michael Warren, and Tony Axam. *See* Fourth Am. Pet. at 70. On direct appeal, Al-Amin was represented by Jack Martin, Don Samuel, and William Lea. *See id.* at 81. In state habeas proceedings, Al-Amin was initially represented by G. Terry Jackson and Linda Sheffield, *see id.* at 90, later adding A. Stephens Clay and C. Allen Garrett Jr. as counsel. *See id.* And in this federal habeas proceeding, Al-Amin continues to be represented by Messrs. Clay and Garrett, together with their partners Miles Alexander and Ronald Raider. *See id.* at cover page.

Because Al-Amin has been represented at all times by lawyers, the rule that a *pro se* litigant's filings ought to be liberally construed does not apply.

## D.

Commissioner Bryson has contested neither the timeliness of Al-Amin's federal habeas petitions, nor the adequacy of the exhaustion of available state remedies with respect to Al-Amin's three remaining numbered Claims.

AO 72A
(Rev.8/82)

II.

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA")

applies to this case.  AEDPA established new limits on the circumstances in which

federal habeas relief may be granted.  The relevant statutory text now provides, in

part, as follows:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall
> not be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of the
> claim–
>
> (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceedings.

28 U.S.C. § 2254(d).

The Supreme Court has observed that:

> If this standard is difficult to meet, that is because it was meant to
> be. . . . Section 2254(d) reflects the view that habeas corpus is a
> guard against extreme malfunctions in the state criminal justice
> systems, not a substitute for ordinary error correction through
> appeal.  As a condition for obtaining habeas corpus from a federal
> court, a state prisoner must show that the state court's ruling on
> the claim being presented in federal court was so lacking in

> justification that there was an error well understood and
> comprehended in existing law beyond any possibility for
> fairminded disagreement.

*Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (internal quotation marks and

citation omitted).

AEDPA also requires that deference be shown to state court findings of fact

and establishes limits on the introduction of new evidence and the scheduling of

evidentiary hearings during federal habeas proceedings.  The relevant statutory

text now provides, in part, as follows:

> (1) In a proceeding instituted by an application for a writ of habeas
> corpus by a person in custody pursuant to the judgment of a State
> court, a determination of a factual issue made by a State court shall
> be presumed to be correct.  The applicant shall have the burden of
> rebutting the presumption of correctness by clear and convincing
> evidence.
>
> (2) If the applicant has failed to develop the factual basis of a
> claim in State court proceedings, the court shall not hold an
> evidentiary hearing on the claim unless the applicant shows that–
>
>> (A) the claim relies on–
>>> (i) a new rule of constitutional law, made retroactive
>>> to cases on collateral review by the Supreme Court, that
>>> was previously unavailable; or
>>> (ii) a factual predicate that could not have been
>>> previously discovered through the exercise of due
>>> diligence; and

(B) the facts underlying the claim would be sufficient to
establish by clear and convincing evidence that but for
constitutional error, no reasonable factfinder would have found
the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e).  The proper application of the standards in § 2254(d)&(e)

have been elaborated on in many decisions handed down by the Supreme Court

since the enactment of AEDPA.  Those decisions are discussed further below,

where applicable.

## III.

The three numbered Claims Al-Amin asserts are as follows:

CLAIM I The State violated Mr. Al-Amin's Fifth and Fourteenth
Amendment rights when the prosecution engaged in a mock cross-
examination of Mr. Al-Amin after he had invoked his constitutional
right not to testify. . . .

CLAIM II The State court violated Mr. Al-Amin's Sixth and
Fourteenth Amendment rights by precluding him from cross-
examining FBI Agent Campbell regarding Campbell's 1995
shooting of Glenn Thomas in Philadelphia.

CLAIM III The Defense Lawyers violated Mr. Al-Amin's Sixth and
Fourteenth Amendment rights to effective assistance of counsel by
failing to investigate the confession of Otis Jackson adequately.

Fourth Am. Pet. at iv-v.

Al-Amin had initially included a Claim IV in his Fourth Amended Petition, but he withdrew it in an Unopposed Amendment to Withdraw and Delete *Brady* Claim (Claim IV). *See* (Doc. 135).

Al-Amin also included in his Fourth Amended Petition a "catch-all" claim for relief, *see* Fourth Am. Pet. at 15, and he sought to incorporate by reference the more than thirty other issues and grounds for relief that he had previously raised in his direct appeal or in state habeas proceedings, *see id.* at 17-19 nn. 3, 5 & 6.

Each of these numbered and unnumbered Claims is discussed below.

## A.

Al-Amin states his Claim I as follows: "The State violated Mr. Al-Amin's Fifth and Fourteenth Amendment rights when the prosecution engaged in a mock cross-examination of Mr. Al-Amin after he had invoked his constitutional right not to testify." Fourth Am. Pet. at 79; *id.* at iv. (same). This statement of the issue is incomplete, however, and obscures the question that must actually be answered in a federal habeas corpus proceeding.

During his trial, Al-Amin never took the stand, and he was not "examined" or "cross-examined." As he acknowledged in his brief on direct appeal in the Georgia Supreme Court, and acknowledged again in his application for a

9

certificate of probable cause to appeal in the state habeas proceeding, Al-Amin is actually complaining that the prosecutor improperly commented during closing argument on his election not to testify.

Indeed, the Georgia Supreme Court has already agreed with Al-Amin that the prosecutor "impermissibly commented on the failure of Al-Amin to testify, in violation of his Fifth Amendment right against self-incrimination." *Al-Amin*, 597 S.E.2d at 346. Thus, there is no dispute that Al-Amin's constitutional rights were violated. Rather, what is really at issue is the Georgia Supreme Court's further conclusion that "the error, although of constitutional magnitude, was harmless beyond a reasonable doubt." *Id.*

The Supreme Court's decision in *Chapman v. California*, 386 U.S. 18 (1967), set forth the "harmless error" standard that the Georgia Supreme Court was obliged to apply. Al-Amin is now arguing that the Georgia Supreme Court's application of the *Chapman* harmless-error standard either "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the

10

evidence presented in the State court proceedings" as those standards are set forth in § 2254(d).

Al-Amin's contention that the Georgia Supreme Court should not have summarized the facts proven at trial under the *Jackson v. Virginia*, 443 U.S. 307 (1979), "sufficiency-of-the-evidence" standard and relied on that summary as the basis for conducting its review pursuant to *Chapman* for "harmless error" is well-taken. Under *Chapman*, the reviewing court in a *direct appeal* should examine "the whole record," *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986), not just the portions of the record that support the convictions.

However, on federal habeas review this Court is required to apply a different test for "harmless error" than the one set forth in *Chapman* that the Georgia Supreme Court was required to apply.  As the Supreme Court has stated:

> The principle that collateral review is different from direct review resounds throughout our habeas jurisprudence. . . .  The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  Federal courts are not forums in which to relitigate state trials. . . .
>
> State courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process under *Chapman*, and state courts often occupy a superior vantage point from which to evaluate the effect of trial error.  For these reasons, it scarcely seems logical to require federal habeas courts to engage in the identical

approach to harmless-error review that *Chapman* requires the state courts to engage in on direct review. . . .

The test [on federal habeas review] is whether the error had substantial and injurious effect or influence in determining the jury's verdict.  Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice.

*Brecht v. Abrahamson*, 507 U.S. 619, 633, 636, 637 (1993) (internal quotations marks and citations omitted).

Moreover, as the Supreme Court explained very recently, obtaining federal habeas relief in the wake of AEDPA now also requires demonstrating that the state court's merits adjudication under *Chapman* is not entitled to deference under Section 2254(d).  *See generally Davis v. Ayala*, 135 S. Ct. 2187 (2015).  And even if deference pursuant to § 2254(d) is not warranted, the *Brecht*-standard still applies, and sets a very high bar for relief.

We assume for the sake of argument that [the petitioner's] federal rights were violated, but that does not necessarily mean that he is entitled to federal habeas relief. . . .  In the absence of the rare type of error that requires automatic reversal, relief is appropriate only if the prosecution cannot demonstrate harmlessness. . . .

The test for whether a federal constitutional error was harmless depends on the procedural posture of the case.  On direct appeal, the harmlessness standard is the one prescribed in *Chapman*:  Before a

federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

In a collateral proceeding, the test is different. For reasons of finality, comity, and federalism, habeas petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice. Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had a substantial and injurious effect or influence in determining the jury's verdict. There must be more than a reasonable possibility that the error was harmful. The *Brecht* standard reflects the view that a State is not to be put to the arduous task of retrying a defendant based on mere speculation that the defendant was prejudiced by trial error; the [federal habeas] court must find that the defendant was actually prejudiced by the error.

*Id.* at 2197-98 (internal quotations marks, brackets, and citations omitted).

A thorough review of the entire trial record reveals this: After Al-Amin failed to appear to answer criminal charges in Cobb County in January 2010, a bench warrant was issued for his arrest. *See* (Doc. 29-3 at 18-19 & 23; Doc. 29-6 at 107); State Tr. Ex. 9. Because Al-Amin resided in Fulton County, the Fulton County Sheriff's Office was assigned to serve the warrant. *See* (Doc. 29-3 at 8).

Shortly before 10:00 pm on March 16, 2000, Fulton County Deputy Sheriffs Ricky Kinchen and Aldranon English drove slowly by Al-Amin's address at 1128 Oak Street in Atlanta. *See* (Doc. 29-3 at 20, 24 & 42-43). Because no one

13

appeared to be there and they were concerned they would "blow the warrant," the deputies decided not to stop. *See* (Doc. 29-3 at 50). As the deputies continued up the street, Deputy Kinchen observed a black sedan pull up and park in front of 1128 Oak Street, and he brought the patrol car to a stop. *See* (Doc. 29-3 at 51). When, in the deputies' judgment, a man matching Al-Amin's general physical description in the warrant and wearing Muslim garb exited the black sedan, they turned around and drove back. *See* (Doc. 29-3 at 51-53).

The deputies identified the black sedan as a Mercedes-Benz and noted that it was parked facing the wrong-way on Oak Street in front of Al-Amin's address. *See* (Doc. 29-3 at 53-54). The deputies pulled their clearly-identified patrol car up nose-to-nose with the Mercedes-Benz and parked. *See* (Doc. 29-3 at 56).

Observing the man–whom they could now see was an older black male–still standing beside the driver's side door, both uniformed deputies exited the patrol car. *See* (Doc. 29-3 at 55-61). Deputy English, the passenger in the patrol car and the officer on the same side as the man, was the "contact officer." *See* (Doc. 29-3 at 45 & 61). Deputy Kinchen, the driver, stood beside the patrol car, and was the "cover officer." *See* (Doc. 29-3 at 61).

14

When Deputy English approached the man beside the Mercedes-Benz and asked him to show his right hand, the man said "yeah," frowned, swung up an assault rifle, and started shooting. *See* (Doc. 29-3 at 66-68, 70 & 78). Both deputies drew their handguns and returned fire. *See* (Doc. 29-3 at 77, 80-81 & 117; Doc. 29-4 at 109; Doc. 29-5 at 114). Deputy English ran between the patrol car and the Mercedes-Benz into an adjacent field. *See* (Doc. 29-3 at 76 & 79). While running and while in the field, Deputy English used his radio to call for assistance. *See* (Doc. 29-3 at 77 & 84; Doc. 29-4 at 23-28); State Tr. Ex. 10. Deputy Kinchen remained in the road, beside the patrol car. *See* (Doc. 29-5 at 13, 106-08 & 112; Doc. 29-6 at 5 & 176).

Both deputies were shot. *See* (Doc. 29-5 at 82-83). Deputy English was hit four times, and he was further incapacitated when a bullet ruptured the pepper spray canister on his utility belt, temporarily blinding him. *See* (Doc. 29-3 at 13, 81-82, 98 & 118-30; Doc. 29-4 at 112-14); State Tr. Exs. 18, 19, 22-27 & 229. Deputy Kinchen was also shot multiple times, receiving a fatal wound in his abdomen, just below the bottom of his bullet-proof vest. *See* (Doc. 31-3 at 144 & 157-58); State Tr. Exs. 338, 339, 341, 343-346, 348, 349, 351-355, 357, 358, 360-62. A gunshot had also rendered Deputy Kinchen's handgun inoperable. *See*

15

(Doc. 29-6 at 180-81; Doc. 30-1 at 105-09); State Tr. Exs. 141, 143, 144 & 213. As Deputy Kinchen lay defenseless on his back in the road, the man shot him in the groin with a 9mm handgun several more times.  *See* (Doc. 29-5 at 90; Doc. 30-3 at 146; Doc. 31-3 at 144).  The paramedic who found Deputy Kinchen testified that "there were literally like war wounds, like Vietnam War wounds," something outside her previous and subsequent experience, (Doc. 29-5 at 90), testimony echoed by the trauma surgeon who operated on Deputy Kinchen, *see* (Doc. 30-3 at 144-45).

Fearing that the shooter would come to find him in the field, Deputy English began pleading for his life. *See* (Doc. 29-3 at 87-88; Doc. 29-6 at 139).  After hearing a door slam and an engine start, Deputy English radioed in a report that the shooter had fled north in a black Mercedes-Benz toward Ralph David Abernathy Boulevard. *See* (Doc. 29-3 at 88-89; Doc. 29-6 at 84); State Tr. Ex. 10.

As officers from multiple law enforcement agencies flooded the area, Atlanta Police Department Officer Peavy found Deputy English lying in a fetal position. *See* (Doc. 29-3 at 84; Doc. 29-5 at 26-27 & 30; Doc. 29-7 at 40-42). *See also* (Doc. 29-5 at 84) (paramedic finds Deputy English in a "semi-fetal position").  Deputy English told Officer Peavy that the shooter was a tall

16

black male, about 6'4", wearing a tan trenchcoat.  *See* (Doc. 29-3 at 99); *see also* (Doc. 29-3 at 62 (Deputy English equating "trenchcoat" with Muslim attire)).

When responding officers found Deputy Kinchen lying in the road, he told one that "the subject was 6'4" in height and had on a tan or black trench-like coat." (Doc. 29-6 at 7).  Moments later, Deputy Kinchen told another that the shooter had been "a black male, with long black trenchcoat, some sort of hat on."  (Doc. 29-5 at 109).

The crime scene was chaotic.  *See* (Doc. 29-5 at 36, 41, & 95; Doc. 29-6 at 83).  There were difficulties with inter-agency communication and on-scene coordination.  *See* (Doc. 29-5 at 16 & 158; Doc. 31-7 at 155-56).  Evidence was disturbed, *see, e.g.,* (Doc. 30-1 at 113), in the rush to provide medical treatment to the deputies, *see, e.g.,* (Doc. 30-4 at 29).

One law enforcement officer noted that members of the community were much less forthcoming in response to queries for information than in previous instances.  *See* (Doc. 29-7 at 50).  Another noted that unlike a typical homicide investigation scene, where a crowd of onlookers often gathers, in this instance there were none.  *See* (Doc. 30-1 at 94).  Two witnesses called by the defense

acknowledged on cross-examination that they intentionally gave false answers to investigating officers. *See, e.g.,* (Doc. 32-2 at 98, 114 & 121).

The following day, Deputy Kinchen died. *See* (Doc. 29-6 at 91; Doc. 29-7 at 9-12). Deputy English, while hospitalized after surgery and receiving morphine and other medication, identified Al-Amin as the shooter in a photo line-up. *See* (Doc. 29-3 at 106-112; Doc. 30-1 at 37 & 39; Doc. 30-2 at 17-18); State Tr. Ex. 17. Deputy English also identified Al-Amin during the course of trial as the man who had shot him and Deputy Kinchen. *See* (Doc. 29-3 at 63 & 96-97).

After an arrest warrant for Al-Amin was issued, *see* (Doc. 30-2 at 22-23 (initial warrant for aggravated assault) & 24 (subsequent warrant for murder)), a federal unlawful flight to avoid prosecution warrant was also issued, *see* (Doc. 30-1 at 76; Doc. 30-2 at 32; Doc. 31-1 at 111; Doc. 31-2 at 3-4). The FBI tracked Al-Amin to White Hall, Alabama, a town just outside Montgomery. *See, e.g.,* (Doc. 30-5 at 17; Doc. 31-2 at 4-5).[1] Federal and local law enforcement officers then conducted intensive surveillance in White Hall to locate Al-Amin, *see, e.g.,* (Doc.

---

[1] As his trial lawyers acknowledged in their opening statement, White Hall is a community in which Al-Amin had close friends and contacts.

30-5 at 18-21 & 23-26; Doc. 30-6 at 116; Doc. 31-2 at 5-6), and the FBI

dispatched SWAT teams from Alabama and Georgia to assist with any arrest.

Four days after Deputies Kinchen and English had been shot, United States

Marshals involved in the surveillance spotted Al-Amin in White Hall, stated that

he fired an assault rifle at them, and reported that he fled into nearby woods. *See*

(Doc. 30-5 at 26, 29, 37-38, 146, 155-57). A local dog tracking team followed Al-

Amin into the woods, supported by three FBI agents who were to provide security

for the dog handlers. *See* (Doc. 30-6 at 43; Doc. 30-8 at 2-3). One of the

supporting FBI agents was Ron Campbell.

About three hours later, a Deputy Sheriff posted nearby apprehended Al-

Amin walking along a road near the woods, trailed by a dog from the tracking

team. *See* (Doc. 30-5 at 106; Doc. 30-7 at 12-15, 34, 87 & 137). *See also* (Doc.

31-1 at 15 (explaining why the tracking dog walked beside Al-Amin after finding

him). When arrested, Al-Amin was wearing torn blue jean overalls and a

bulletproof vest. *See* (Doc. 30-6 at 3; Doc. 30-7 at 65, 100 & 138; Doc. 31-2 at

21); State Tr. Ex. 75. Al-Amin was also carrying a pocketknife, several sets of

keys (including the key to the black Mercedes-Benz), three drivers' licenses issued

in his name by different states, and slightly more than $1,000 in paper currency

and change. *See, e.g.,* (Doc. 30-3 at 115-116; Doc. 30-7 at 65 & 103; Doc. 31-2 at 22-24). *See also* St. Tr. Exs. 56, 58-60, 78, 79 & 80.  Upon examination by an FBI medic, Al-Amin showed no signs of having been shot in the gunfight with the deputies in Atlanta. *See* (Doc. 30-7 at 63-66 & 89).

A few minutes later, three more dogs, the pursuing dog handlers, and the accompanying FBI agents arrived at the arrest site. *See* (Doc. 30-6 at 48-49 & 141).  While Al-Amin was handcuffed and facing sideways on the ground, Agent Campbell called Al-Amin a cop killer and kicked him; and, when Al-Amin responded verbally, Agent Campbell spat and Al-Amin spat back. *See* (Doc. 30-6 at 49-50 & 122; Doc. 30-7 at 16-17 & 125; Doc. 31-5 at 47).  A supervisory FBI agent intervened, immediately pushing Agent Campbell away and later directing him to leave Alabama. *See* (Doc. 30-8 at 18; Doc. 31-1 at 101-102).

That night and the following day, local and federal officers re-tracing Al-Amin's path through the woods discovered, among other things, a piece of fabric torn from his blue jean overalls on a barbed wire fence, a 9mm handgun and ammunition, an assault rifle and ammunition, shell casings, a nylon bag, paperwork listing Al-Amin as the Mercedes-Benz's owner, Al-Amin's day-planner, a bank statement for Al-Amin with the 1128 Oak address, a shooting

20

glove, a cellular telephone, and a field jacket with a passport in Al-Amin's name in one pocket. *See, e.g.,* (Doc. 30-3 at 115-16; Doc. 30-6 at 127 & 164-65; Doc. 30-7 at 1, 4 & 74-76; Doc. 30-8 at 24-30 & 50-60; Doc. 31-1 at 34-40, 106-08 &148-52; Doc. 31-2 at 25-53); State Tr. Exs. 77, 81, 81-A, 82-114A & 374. The assault rifle and handgun recovered in White Hall were determined to be the ones used to shoot Deputies Kinchen and English. *See* (Doc. 31-7 at 28-32 & 38-44).

Several days after that, investigators found the license plate for the black Mercedes-Benz secreted in a shed near where Al-Amin had first been spotted in White Hall. *See* (Doc. 31-2 at 149-51; Doc. 31-3 at 36); State Tr. Exs. 125 & 126. And, roughly a week after that, investigators searching by helicopter found the Mercedes-Benz itself, tagless, punctured with bullet-holes, and containing bullets fired from the deputies' handguns. *See, e.g.,* (Doc. 30-2 at 132; Doc. 31-3 at 1-8 & 35- 42; Doc. 31-5 at 90-103; Doc. 31-7 at 18-28); State Tr. Exs. 131-36, 248-68 & 382-88.  When found, the Mercedes-Benz was mixed in with abandoned vehicles on property owned by a friend of Al-Amin's. *See* (Doc. 30-6 at 135-36; Doc. 31-3 at 2-8, 18-19 & 36-40).

At trial, Al-Amin contended that he was the victim of mistaken identity. During the guilt/innocence phase of trial, he offered nineteen witnesses, including

Imhotep Shaka, who testified that he looked out his window after hearing gunfire on Oak Street and did not believe the shooter he saw had Al-Amin's tall, thin body-type. *See* (Doc. 32-3 at 88-90). Al-Amin further contended through an expert witness that Deputy English's photo line-up identification was unreliable because of the effects of post-surgical pain relief medication. *See* (Doc. 29-3 at 42-43; Doc. 30-1 at 58; Doc. 32-1 at 46-47, 50 & 78). And Al-Amin asserted that Deputy English's testimony that he "would never forget" the shooter's grey eyes, suggested that Al-Amin could not have been the shooter because his eyes are brown. *See* (Doc. 29-4 at 106-08 & 120-21; Doc. 29-5 at 3-4).

Al-Amin also sought to demonstrate that the investigation and investigators were inept and/or corrupt through direct and cross-examination of multiple law enforcement witnesses. In support, Al-Amin alleged that there were material inconsistencies in the evidence, including inconsistencies among the deputies' personal statements and inconsistencies between the deputies' statements and the physical evidence. *See, e.g.,* (Doc. 29-4 at 40-57 & 61-135; Doc. 29-6 at 144 (lay witness saw a Cadillac rather than a Mercedes drive away); Doc. 29-6 at 160 (lay witness testified that pistol fire preceded assault rifle fire); Doc. 31-6 at 117-19; Doc. 32-2 at 172-75 (same)).

22

Al-Amin also suggested that investigators had prevented him from obtaining helpful evidence, including, for example, by having the deputies' patrol car repaired, by failing to follow-up fully on leads generated before the investigation focused tightly on him, and by failing to test the guns found in White Hall for fingerprints or to examine the clothing that he had been wearing for bullet holes or gunshot residue. *See, e.g.,* (Doc. 29-6 at 132-33; Doc. 30-2 at 116-17 & 123; Doc. 30-3 at 53, 70-71 & 122; Doc. 31-2 at 78-88; Doc. 31-3 at 127-28; Doc. 31-6 at 84-94; Doc. 32-3 at 144)

Al-Amin's attorneys alluded vaguely to other people who might have shot the deputies and implied through examination that there might have been multiple shooters and multiple getaway vehicles. *See, e.g.,* (Doc. 29-4 at 119-20; Doc. 29-6 at 144; Doc. 31-3 at 48; Doc. 32-2 at 115-16 (reference to "Mustafa" as possibly possessing a "weapon"); Doc. 32-3 at 19-22 (testimony that a club van, driven by a man under 6'0", was seen by neighbors fleeing the crime scene with its lights out) & 36-39 (same) & 129 (testimony regarding security camera footage shot at 3:00 am at a retirement home one and one-half miles away from the crime scene of an apparently injured man)); Def. Tr. Exs. 92-99, 100 (911 tape subject to limiting

23

instruction relating to a report of a wounded man in the neighborhood), and 106-120.

Al-Amin offered witnesses from White Hall, Alabama who stated that the U.S. Marshals or FBI agents were the only ones who fired shots near the woodline. *See, e.g.,* (Doc. 32-1 at 93-96, 138-40 & 164). And Al-Amin suggested that the FBI, and particularly Agent Ron Campbell who fell behind the dog tracking team, might have planted incriminating evidence in Alabama in order to frame him for the shooting of Deputies Kinchen and English. *See, e.g.,* (Doc. 30-8 at 35-46 & 57-60; Doc. 31-1 at 163-64; Doc. 31-5 at 43-45). *See also* (Doc. 31-1 at 68-70 (eliciting testimony that the tracking team did not see most of the items recovered later that night or the next day in the course of their pursuit); Doc. 31-5 at 64 (implying the FBI "want[ed] to maintain control" over Agent Campbell); Doc 32-5 at 105 (closing argument that the evidence was "too staged, too convenient, too perfect").[2]

---

[2]In closing argument, Al-Amin went so far as to suggest that had the FBI captured him in Alabama rather than local law enforcement officers: "We might not have a trial today because . . . a Ron Campbell with a high-powered rifle would finish him off . . . ." (Doc. 32-5 at 105); *see also* (*id.* at 114) ("It was shoot first, ask questions later. . . . If Big John hadn't been there we wouldn't be having a trial today.").

24

Al-Amin elected not to take the stand to testify in his own defense. This reflected his four trial lawyers' advice that he ought not do so. *See, e.g.,* (Doc. 32-3 at 157); *see also* (Doc. 32-5 at 70 (closing argument)).[3]

As noted above, during closing argument the prosecutor violated Al-Amin's constitutional rights by commenting impermissibly on Al-Amin's decision not to testify. The prosecutor did this by posing and "answering" rhetorical "Questions for the Defendant" that he displayed with a visual aid for the jury to read. The questions were as follows:

> QUESTIONS FOR THE DEFENDANT
> – Who is Mustafa?
> – Why would the FBI care enough to frame you?
> – How did the murder weapons end up in Whitehall?
> – How did your Mercedes get to Whitehall?
> – How did your Mercedes get shot up?
> – Why did you flee (without your family)?

---

[3] By avoiding testifying himself or seeking to introduce character evidence, Al-Amin was able during the guilt/innocence phase of trial to limit the stipulation with respect to his criminal history to a statement that he had been convicted of a felony, *see* (Doc. 31-7 at 140), without having to reveal that his prior criminal history included multiple felony convictions after a 1970s shootout with police in New York in which an officer was shot and disabled with an assault rifle, *see generally* (Doc. 29-6 at 25-27 & 116-120 (side-bar exchange regarding the introduction of character evidence); Doc. 33-1 at 7-44 (side-bar discussion of New York convictions during penalty phase and trial court's exclusion of any discussion of the underlying facts); Doc. 33-3 at 106-07 (argument regarding New York indictment and convictions)); St. Tr. Ex. 398.

AO 72A
(Rev.8/82)

– Where were you at 10PM on March 16, 2000?

(Doc. 15-7 at 62).

When Al-Amin's attorneys objected and moved for a mistrial, the trial judge directed the prosecutor to alter his line of argument so that he was not commenting on Al-Amin's failure to testify. *See* (Doc. 32-5 at 29). At Al-Amin's lawyers' suggestion that it "might be okay to say Questions for the Defense," the prosecutor re-labeled his visual aid accordingly. *See* (Doc. 32-5 at 27 & 31). Al-Amin's lawyers expressly declined the trial judge's offer to give a curative instruction. *See* (Doc. 32-5 at 29 & 31).

The prosecutor persisted, however, and Al-Amin's lawyers renewed their motion for a mistrial. *See* (Doc. 32-5 at 33). Asked by the trial judge do "you wish the Court to do anything," Al-Amin's lawyers responded "not at this time, your Honor." (Doc. 32-5 at 33.).

When the prosecutor continued to pose his rhetorical questions, Al-Amin's lead trial attorney said: "Your Honor, changing my mind. I do believe we need an instruction. With this type of chart we believe it's improper. We would request instruction to the jury about the impropriety of it." (Doc. 32-5 at 34). The specific request was that:

26

The court give an instruction to the jury that – two things.  That first the Defendant has no burden to present any evidence whatsoever in any case.  The burden is always on the State to prove its case.  And the Defendant has no obligation to testify or explain, and no adverse – no inference should be drawn against the Defendant for his failure to testify.

(Doc. 32-5 at 34-35).

The Court then gave a curative instruction making all those points, saying,

*inter alia*:

This is closing argument.  Closing argument is not evidence.  Attorneys may draw inferences and urge you to draw inferences from the evidence.  It is proper for the attorneys to argue a failure to present certain evidence.  However, you must keep in mind that a defendant in a criminal case is under no duty to present any evidence to prove innocence and is not required to take the stand and testify in the case.

If a defendant elects not to testify, no inference hurtful, harmful or adverse to him shall be drawn by you, and no such fact shall be held against him.

However, it is proper for one side or the other to comment on failure to present certain evidence, but not to comment on the failure of the Defendant to testify.

And I'm clarifying this, that, as you know, the burden of proof always remains on the State to prove the guilt of a defendant as to any charge beyond a reasonable doubt.

(Doc. 32-5 at 35-36).

27

Al-Amin expressed dissatisfaction with the instruction at trial, (Doc. 32-5 at 36), and he does so again in his Fourth Amended Petition, *see* (Doc. 129 at 57-64).  He now also argues that he is entitled to federal habeas relief.

While of constitutional dimension, the acknowledged violation that occurred when the prosecutor impermissibly commented on Al-Amin's decision not to testify at trial is insufficient to entitle Al-Amin to have his convictions overturned.  Applying the *Brecht*-standard, and considering the totality of the evidence presented at trial, including that presented by Al-Amin, I am not in "grave doubt" as to whether the prosecutor's improper comments during closing argument had a "substantial and injurious" effect on the outcome of the case.  The prosecutor's constitutional violation was addressed immediately and comprehensively, and the evidence of Al-Amin's guilt was overwhelming.[4]  In sum, under the *Brecht*-standard, it is clear that Al-Amin did not suffer "actual prejudice."[5]

---

[4]I note that after hearing evidence over the course of three weeks during the guilt/innocence phase, the jury returned its verdict the day after receiving final instructions from the trial court.

[5]I am aware that Al-Amin offered in state habeas proceedings an affidavit from one juror asserting his belief that members of the jury would liked to have heard Al-Amin testify.  But the state habeas court concluded that under Georgia law it had no

28

Al-Amin is not entitled to federal habeas relief based on his Claim I.

B.

Al-Amin states his Claim II as follows: "The State court violated Mr. Al-Amin's Sixth and Fourteenth Amendment rights by precluding him from cross-examining FBI Agent Campbell regarding Campbell's 1995 shooting of Glenn Thomas in Philadelphia." Fourth Am. Pet. at 103; *id.* at iv (same).

Al-Amin and his lawyers contend that in 1995 Agent Campbell executed an unarmed Muslim man by shooting him in the back of the head and then planting a gun at the scene. Al-Amin's habeas lawyers now assert that Al-Amin's trial lawyers wanted to offer evidence of this "similar transaction" not "to tarnish the witness's character (*i.e.*, for pure impeachment), but to show [that] the witness acted in a certain manner previously and, therefore, the jury [could] infer that he

---

authority to revisit the Georgia Supreme Court's decision on issues relating to closing argument because those issues had been resolved on direct appeal. Although Al-Amin's four habeas lawyers may well believe they identified a "better" argument and "better" evidence that the prosecutor's comments during closing argument were harmful under the *Chapman*-standard than Al-Amin's four trial and three appellate lawyers made and offered on his behalf at trial, in the motion for new trial, and on direct appeal, the time for making that argument and offering the affidavit were long-past by the time of the state habeas proceeding. Al-Amin's habeas lawyers offered nothing to demonstrate that the affidavit from the juror could not have been obtained and offered sooner, so that it might have been considered before the Georgia Supreme Court had had its final say on the issue.

acted in a similar manner in this case." (Doc. 129 at 71). It is Al-Amin's contention that the trial court improperly precluded him from pursuing this line of examination of Agent Campbell. *Id. See also* (Doc. 30-6 at 58-59). And it is Al-Amin's further contention that Georgia Supreme Court repeated this error when it concluded that Al-Amin's true aim was to impeach the character or veracity of Agent Campbell with evidence of a specific instance of prior misconduct. *See, e.g., Al-Amin*, 597 S.E.2d at 345-46 & (Doc. 30-6 at 58-59). But even assuming for the sake of discussion that both state courts missed the thrust of Al-Amin's argument, he has not demonstrated that it resulted in an error warranting the grant of federal habeas corpus relief.

Although Al-Amin's habeas lawyers now seek, repeatedly, to characterize Agent Campbell as a "key" or "critical" or "essential" prosecution witness, *see, e.g.,* (Doc. 129 at 122-25), he was none of those things. Al-Amin's trial lawyers acknowledged as much in their closing arguments when they stated that "[t]his case is not all about Ron Campbell," (Doc. 32-5 at 103), and observed that Deputy English was the "key witness" (Doc. 32-5 at 96).

Moreover, Al-Amin's trial lawyers' assessment is borne out by the trial record. The prosecution offered 45 witnesses whose testimony spanned roughly

3000 pages at trial.  Agent Campbell's direct and redirect testimony constituted about 53 pages of that total.  He testified to none of the material facts summarized above, other than that he accompanied the dog tracking team that pursued Al-Amin into the woods, and that he had engaged in egregious professional misconduct at the arrest site by calling Al-Amin a cop killer, kicking him, and spitting.  He also testified that he had been investigated and was subject to discipline for that misconduct.

None of this testimony was "key," "critical," or "essential" to the prosecution's case; it established no element of any of the crimes for which Al-Amin was prosecuted.  On this basis alone, the trial court's decision to preclude "cross-examination" of Agent Campbell on Al-Amin's allegation that he had shot a Muslim African-American man in Philadelphia in 1995 is readily distinguishable from *Davis v. Alaska*, 415 U.S. 308 (1974), and *United States v. Cohen*, 888 F.2d 770 (11th Cir. 1989), the decisions relied upon by Al-Amin's habeas lawyers.  The first of those cases  involved "a crucial witness for the prosecution" whose testimony went to the heart of the charges against the defendant.  *Davis v. Alaska*, 415 U.S. at 310.  The second involved a cooperating co-defendant who "was the government's primary witness" to his non-cooperating co-defendants'

31

participation in the fraudulent scheme for which they were being prosecuted. *Cohen*, 888 F.2d at 776.

Moreover, Al-Amin's trial lawyers never offered, and his habeas lawyers have not offered, any admissible evidence that the criminal conduct they accuse FBI Agent Campbell of having committed in Philadelphia in 1995 actually occurred. Al-Amin's trial lawyers could say only "we have strong reason to believe that Mr. Campbell back in June the 1st of 1995 shot a young African-American who was also a Muslim in the head, the back of the head." (Doc. 29-2 at 25). And, Al-Amin's habeas lawyers can now point only to "multiple contemporaneous press accounts." (Doc. 121 at 166). But newspaper articles do not establish the "truth" of the statements included therein. *See, e.g., United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, (11th Cir. 2015) ("Courts may take judicial notice of documents such as the newspaper articles at issue here for the limited purpose of determining which statements the documents contain (*but not for determining the truth of those statements*).") (emphasis added). On the other hand, there is a reported Pennsylvania decision affirming the *dismissal* of a private criminal complaint filed by a community member against Agent

32

Campbell for the alleged shooting. *See Commonwealth v. Campbell*, 686 A.2d 1318 (Pa. Super. Ct. 1996).

Al-Amin's habeas lawyers also argue that "[t]he FBI generally and FBI Agent Campbell in particular were a critical focus of the defense team's conspiracy theory." (Doc. 129 at 124). Central to this defense theory are the propositions that the FBI somehow (A) collected the murder weapons and many of Al-Amin's belongings from the crime scene in Atlanta before any local law enforcement officers could respond to Deputy English's radio report that he and Deputy Kinchen were under fire, (B) transported it all to Alabama, and (C) then had Agent Campbell walk through the woods distributing this evidence surreptitiously for other law enforcement officers to find. Al-Amin had no evidence to offer at trial that any of this occurred, and he still has no evidence. Rather, he wanted to imply that it might have occurred, given Agent Campbell's acknowledged misconduct at the arrest site in White Hall and alleged misconduct at an arrest site in Philadelphia five years earlier.

Although "the Confrontation Clause guarantees an opportunity for effective cross-examination," it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v.*

33

*Fensterer*, 474 U.S. 15, 20 (1985).  There was no effective cross-examination to be had on this issue where all Al-Amin could do was cast unsubstantiated accusations.

Thus, looking at Al-Amin's claim pursuant to the *Brecht*-standard in light of the whole record, I readily conclude that Al-Amin did not suffer "actual prejudice."  *See, e.g., Grossman v. McDonough*, 466 F.3d 1325, 1339 (11th Cir. 2007) (applying the *Brecht*-standard to the harmless error analysis of an alleged Confrontation Clause violation on habeas review).[6]

Al-Amin is not entitled to federal habeas corpus relief on his Claim II.

### C.

Al-Amin states his Claim III as follows: "The Defense Lawyers violated Mr. Al-Amin's Sixth and Fourteenth Amendment rights to effective assistance of

---

[6]Even under the less-onerous *Chapman*-harmless error standard that the Georgia Supreme Court would have applied had it concluded that Al-Amin's Confrontation Clause rights were violated, there is no good argument that reversible error occurred.  None of the factors a reviewing court must weigh on direct review – "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the strength of the prosecution's case," *Delaware v. Van Arsdall*, 475 U.S. 673, 686-87 (1986)–weighed in Al-Amin's favor.

34

counsel by failing to investigate the confession of Otis Jackson adequately."
Fourth Am. Pet. at 111; *id.* at iv-v (same).

As noted above, this was a high profile case, both because of the nature of
the crimes and the identity of the defendant.  In the aftermath of the crime, a
number of people "confessed" to having committed it, among them, Otis Jackson.

In the state habeas proceeding, Al-Amin's habeas lawyers claimed that his
trial lawyers failed adequately to investigate Jackson's confession.  In support,
they offered testimony given by Jackson in a deposition after the Georgia Supreme
Court had issued its decision on direct appeal summarizing the trial evidence, that
they allege "tracks key trial evidence."  (Doc. 129 at 113).

The state habeas court was required to judge Al-Amin's claim under the
two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).
"The performance prong of *Strickland* requires a defendant to show 'that counsel's
representation fell below an objective standard of reasonableness.'"  *Lafler v.
Cooper*, 132 S. Ct. 1376, 1384 (2012) (quoting *Strickland*, 466 U.S. at 688)).  The
prejudice prong of *Strickland* requires the defendant to "show that there is a
reasonable probability that, but for counsel's unprofessional errors, the result of

35

the proceeding would have been different." *Strickland*, 466 U.S. at 694.  And it is

plain from the record that the state habeas court, in fact, applied that standard.

It is noteworthy that *Strickland* itself involved an inadequate investigation

claim and said this:

> These standards require no special amplification in order to
> define counsel's duty to investigate, the duty at issue in this case.  As
> the Court of Appeals concluded, strategic choices made after
> thorough investigation of law and facts relevant to plausible options
> are virtually unchallengeable; and strategic choices made after less
> than complete investigation are reasonable precisely to the extent that
> reasonable professional judgments support the limitations on
> investigation.  In other words, counsel has a duty to make reasonable
> investigations or to make a reasonable decision that makes particular
> investigations unnecessary.  In any ineffectiveness case, a particular
> decision not to investigate must be directly assessed for
> reasonableness in all the circumstances, applying a heavy measure of
> deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.  And *Strickland* emphasized that "a court deciding

an actual ineffectiveness claim must judge the reasonableness of counsel's

challenged conduct on the facts of the particular case, viewed as of the time of

counsel's conduct" and that "the court should recognize that counsel is strongly

presumed to have rendered adequate assistance and made all significant decision

in the exercise of reasonable professional judgment." *Id.* at 690.

36

Furthermore, on federal habeas review:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105 (internal quotations marks and citations omitted).

Although Al-Amin argues that § 2254(d) should not apply in this case, I conclude that he is mistaken. The state habeas court cited *Strickland*, applied it in a manner that was not unreasonable, and summarized the evidence it found most relevant to its analysis, also in a manner that was not unreasonable.

Specifically, the state habeas court found and concluded as follows:

> Mr. Martin testified at [Al-Amin's] evidentiary hearing that [the defense lawyers] had charged their experienced investigator, Mr. Watanni Tyehimba, with locating and interviewing Mr. Jackson. [T]he defense team strategically decided not to use the information about Otis Jackson for three reasons: 1) Mr. Jackson was being monitored by an ankle bracelet at the time of the shooting and the ankle monitor documents showed Mr. Jackson was at his home and could not have been present on the night of the shooting; 2) Mr. Jackson had retracted and repeated his confession numerous times;

37

and 3) the defense team's experienced investigator had interviewed Mr. Jackson and doubted the reliability of his testimony.  Mr. Martin further stated the defense team ultimately chose not to utilize Mr. Jackson or his confession because he was afraid the tactic would "backfire" on the Petitioner and make him look "desperate."  Based on the foregoing and because deciding on which defense witnesses to call is a matter of trial strategy and tactics that does not constitute ineffective assistance of counsel, the Court rejects the Petitioner['s] argument that he was denied effective assistance of counsel as to this claim.

(Doc. 1-2 at 11).

The complete failure to investigate cases that Al-Amin now cites are

inapposite.  Al-Amin's trial attorneys did investigate Jackson's confession,

through their experienced investigator.  There was no obligation for the attorneys

personally to have interviewed Jackson.  It is axiomatic that "[a]n attorney can

avoid activities that appear distractive from more important duties [and counsel]

was entitled to formulate a strategy that was reasonable at the time and to balance

limited resources in accord with effective trial tactics and strategy." *Richter*, 562

U.S. at 107 (internal quotation marks and citations omitted).  A reasonable jurist

could conclude that is the decision the defense team made here.

Moreover, "[a]n attorney need not pursue an investigation that would be

fruitless, much less one that might be harmful to the defense." *Id.* at 108.  It is

38

evident from Martin's testimony that is precisely what the defense team feared.  It was not unreasonable for the state habeas court to conclude that Al-Amin's trial lawyers decided that further investigation would be fruitless and might well be harmful to Al-Amin.

Al-Amin's habeas lawyers now ask that this Court revisit that strategic pre-trial decision and judge it against information they developed years *after* the trial was concluded.  But "[r]eliance on the harsh light of hindsight to cast doubt on a trial that took place now more than 15[7] years ago is precisely what *Strickland* and AEDPA seek to prevent."  *Id.* at 107.  Under the doubly deferential review that the state habeas court's decision is entitled to receive, I readily find and conclude that there is a "reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.* at 788.

Al-Amin is not entitled to federal habeas relief on his Claim III.

I note that in connection with Claim III Al-Amin's habeas lawyers seek to add new material to the record.  This new evidence includes an affidavit from Martin to supplement the testimony he gave at the state habeas hearing.  Al-

---

[7] In *Richter*, the trial had occurred 15 years earlier.  Here, Al-Amin's trial occurred 14 years ago.

39

Amin's habeas lawyers, however, give no reason for the failure to have asked Martin during state habeas proceedings questions that would have elicited the information they now offer in the affidavit.

Not only would Al-Amin have a very tenuous argument as a general matter for adding to the record now information that was available to him *before* the state habeas evidentiary hearing, but in light of AEDPA's restrictions his "fail[ure] to develop the factual basis of a claim in State court proceedings" clearly precludes him from doing so now. 28 U.S.C. § 2254(e)(2); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

Accordingly, Al-Amin cannot expand the record in support of his Claim III.

### D.

Al-Amin has withdrawn the Claim IV that he included in his Fourth Amended Petition, *see* (Doc. 135), and it requires no substantive discussion.

To the extent that Al-Amin's is still asking to expand the record to introduce new material related to his *Brady* claim, those requests must be denied as moot.

40

E.

As I noted earlier, *see* p. 9 *supra*, Al-Amin also contended in passing that

his Claims collectively warrant federal habeas relief, even if none of those Claims

individually warrant relief.  Al-Amin's entire argument on this point was that:

> Taken individually, any of the constitutional errors infecting
> Mr. Al-Amin's trial support[s] habeas relief.  All four errors,
> however, relate to and support each other.  Allowing the cross-
> examination of FBI Agent Campbell regarding the Philadelphia
> incident would have developed evidence answering several of the
> Prosecution's mock cross-examination questions (such as "Why
> would the FBI care enough to frame you? and "Mr. Defendant, how
> did those murder weapons get there to White Hall?").  Similarly, the
> confession of Otis Jackson and any exculpatory evidence from the
> FBI's investigation of Mr. Al-Amin at the time of the crime would
> answer the question of who actually shot Deputy Sheriffs Kinchen
> and English on March 16, 2000.  Taken together, these errors compel
> habeas relief.
>
> Accordingly, Mr. Al-Amin respectfully requests that his
> petition for habeas corpus be granted.

Fourth Am. Pet. at 15-16.  Al-Amin, who has four attorneys representing him in

this federal habeas proceeding, cited no cases in support of this argument and

developed it no further in his 150-page Fourth Amended Petition.

To his credit, Commissioner Bryson addressed this argument on the merits

and at length.  *See* (Doc. 131 at 48-50).  Commissioner Bryson's response

41

informed Al-Amin's habeas attorneys that they were making a "cumulative error" argument and cited relevant cases.  Thus, in their Reply in Support of Fourth Amended Petition, Al-Amin's habeas lawyers developed a more complete argument on this point.  *See* (Doc. 133 at 41-43).

As a threshold matter, I conclude that Al-Amin's "fail[ure] to provide any citation to authority or arguments in support" of his 'catch-all' claim in the Fourth Amended Petition waived it.  It is a well-established that "[a] party abandons all issues on appeal that he or she does not 'plainly and prominently' raise in his or her initial brief."  *United States v. Krasnow*, 484 F. App'x 427, 429 (11th Cir. 2012) (quoting *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003)).  Similarly, a failure to provide any citation to authority or arguments in support waives an issue.  *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) ("We will not address this perfunctory and underdeveloped argument"); *see also Flanigan's Enters. Inc. v. Fulton Cty, Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument).  Nor may "[p]arties . . . raise new issues in reply briefs."  *Krasnow*, 484 F. App'x at 429

42

(citing *Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008)).  The same principles apply at the district court level.

Moreover, even if I were to conclude that Al-Amin had "plainly and prominently" raised the issue of "cumulative error" and even if he had provided citations to authority, I would still conclude that federal habeas relief is not warranted on this basis.  First, there is no merit to any of Al-Amin's three numbered claims individually, and in these circumstances it is unnecessary to decide whether the "cumulative error" doctrine applies.  *See, e.g., Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 n.3 (11th Cir. 2012).  Second, Al-Amin does not appear to have raised a "cumulative error" argument in the state courts, and he thus failed to fully-exhaust this claim.  *See generally* 28 U.S.C. § 2254(b)(1).

Federal habeas relief is not warranted on this "catch-all" basis, and it provides no basis for expanding the record, either.

### F.

Finally, I note that Al-Amin included in his Fourth Amended Petition a footnote declaring:  "Mr. Al-Amin incorporates and does not waive any of the claims asserted in his direct appeal, his initial state habeas petition, or his amended state habeas petition."  Fourth Am. Pet. at 19 n.6.  This footnote purports to

AO 72A
(Rev.8/82)

incorporate by reference the 16 issues that he raised on direct appeal and the 17 grounds for relief that he raised in state habeas proceedings. *See id.* at nn. 4&5. For the reasons just discussed above in the text–namely that none of these claims was "plainly and prominently" raised or supported by citations to authority in the Fourth Amended Petition–I conclude that all of these claims were waived.

### IV.

For the foregoing reasons, I **RECOMMEND** that Al-Amin's Fourth Amended Petition (Doc. 129), as further amended to withdraw Claim IV (Doc. 135), be **DENIED**.

I further **RECOMMEND** that Al-Amin be **DENIED** a Certificate of Appealability because he has not demonstrated that he meets the requisite standards. *See Slack v. McDaniel*, 529 U.S. 473, 478 (2000). *See also* 28 U.S.C. § 2253(c)(2); 28 U.S.C. foll. § 2254, Rule 11(a).

And I **DENY** Al-Amin's Motion to Expand the Record (Doc. 101), Second Motion to Expand the Record (Doc. 116), and Supplement to Second Motion to Expand the Record (Doc. 117)

44

I **DIRECT** the Clerk to terminate the referral of this case to me.

**IT IS SO RECOMMENDED, ORDERED, AND DIRECTED**, this 24th day of March, 2016.

*Gerrilyn G. Brill*

GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A