IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAMIL ABDULLAH AL-AMIN,    :
                          :
        Petitioner,       :        HABEAS CORPUS
                          :        28 U.S.C. § 2254
v.                        :
                          :
JOHN "J.T." SHARTLE, Warden, et  :    CIVIL ACTION NO.
al.,                      :        1:12-CV-1688-AT-GGB
                          :
        Respondents.      :

# ORDER

This matter is before the Court on Petitioner Jamil Abdullah Al-Amin's ("Mr. Al-Amin") Objections to the Magistrate Judge's Report and Recommendation ("R&R") that Mr. Al-Amin's Fourth Amended Habeas Petition be denied. For the following reason, the Court **OVERRULES** Mr. Al-Amin's Objections and **DENIES** his habeas petition. The Court **GRANTS** Mr. Al-Amin a Certificate of Appeal as to all claims discussed in this Order (and not already abandoned by him).

## I.  Standard of Review for a Report and Recommendation

Under 28 U.S.C. § 636(b)(1), the Court reviews the Magistrate Judge's Report and Recommendation for clear error if no objections are filed to the report. 28 U.S.C. § 636(b)(1). If a party files objections, however, the district court must determine de novo any part of the Magistrate Judge's disposition that

is the subject of a proper objection.  Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b).
Petitioner has objected to the entirety of the R&R. The Court therefore reviews
the Petition and record on an independent de novo basis.

## II.  Procedural Background

Petitioner Al-Amin[1] is a former civil rights activist who served as a
community leader for over two decades in Atlanta's West End neighborhood.  He
was the fifth Chairman of the Student Nonviolent Coordinating Committee and
one of a "handful of civil rights leaders . . . specifically identified in the [1967] FBI
memorandum outlining the counterintelligence program known as
'COINTELPRO,' the purpose of which was to 'expose, disrupt . . . or otherwise
neutralize' civil rights leaders and organizations."  (Fourth Am. Pet. at 23.)

On March 9, 2002 Mr. Al-Amin was convicted of malice murder and other
offenses related to the March 16, 2000 shooting of Fulton County, Georgia
Deputy Sheriffs Ricky Kinchen and Aldranon English.  He filed a motion for a
new trial, which was denied on July 2, 2003.  Mr. Al-Amin then filed a notice of
appeal with the Supreme Court of Georgia.  In his appeal, Mr. Al-Amin argued
that his constitutional rights were violated when the prosecutor engaged in a
mock cross-examination of Mr. Al-Amin even though he had invoked his right to
remain silent.  The Supreme Court of Georgia agreed that Mr. Al-Amin's rights
were violated but found that the error was harmless.  *Al-Amin v. Georgia*, 597
S.E.2d 332, 346 (Ga. 2004).  The court reached its decision by viewing the

---

[1] Mr. Al-Amin was formerly known as H. Rap Brown.

evidence against Mr. Al-Amin in the "light most favorable to the verdict," looking only to "determine if the evidence was sufficient for a rational trier of fact to find" Mr. Al-Amin guilty of the charged offenses. *Id.* at 339 (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). The United States Supreme Court declined to grant certiorari. *Al-Amin v. Georgia*, 543 U.S. 992 (2004).

Mr. Al-Amin filed his state habeas petition in 2005. The state court held an evidentiary hearing on February 27, 2007, and denied relief on July 28, 2011. The Supreme Court of Georgia denied a certificate of probable cause to appeal on May 7, 2012. (Doc. 1-11.) Mr. Al-Amin next filed his federal habeas petition in Colorado. It was transferred to this district shortly thereafter. He amended his petition several times, finally filing his Fourth Amended Petition on November 24, 2015. His Fourth Amended Petition raises four claims:

(1) the State violated Al-Amin's Fifth and Fourteenth Amendment rights when the prosecution engaged in a mock cross-examination of him after he invoked his right not to testify;

(2) the State violated Al-Amin's Sixth and Fourteenth Amendment rights by precluding him from cross-examining FBI Agent Ron Campbell about Campbell's involvement in a 1995 shooting of a black Muslim man;

(3) Al-Amin was deprived of effective assistance of counsel; and

(4) the State violated *Brady v. Maryland* by failing to provide exculpatory evidence.

Mr. Al-Amin voluntarily withdrew his *Brady* claim (claim four in the Petition) on December 23, 2015.  (Doc. 135.)  On March 24, 2016, the Magistrate Judge issued the instant R&R.

The Magistrate Judge first recommended that the Court find that Mr. Al-Amin's Fifth Amendment rights were violated when the prosecution made repeated references to Al-Amin's silence.   The Magistrate Judge further recommended finding that the Supreme Court of Georgia unreasonably erred in calling this violation harmless because that court (incorrectly) looked only at the evidence most favorable to the verdict, not the whole record.   (R&R at 11.) However, the Magistrate Judge found that any error at Mr. Al-Amin's trial did not have a "substantial and injurious effect" on the jury because the remainder of the evidence against him was so overwhelming and because the trial court "immediately and comprehensively" addressed the prosecutor's unconstitutional closing remarks.  (R&R at 28); *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993). For these reasons, the Magistrate Judge recommended that all remaining claims in Mr. Al-Amin's Petition be denied.

Mr. Al-Amin argues that the R&R was incorrect for several primary reasons.

- First, he says that the R&R failed to give proper weight to the fact that the violations were repeated and core to the prosecution's closing argument.  (Objections, Doc. 143 at 17.)

- Second, he argues that that the trial court's instructions were at best ineffectual and at worst actively harmful.  (*Id.* at 15-17.)

- Third, he claims that the prosecution did not put on overwhelming evidence of guilt in light of the "significant evidence supporting acquittal."  (*Id.* at 25.)

- Fourth, he contends that the two reasons offered by the Magistrate Judge to reject Al-Amin's confrontation clause claim – that FBI Agent Ron Campbell was not a key witness and that Al-Amin failed to offer "admissible" evidence to support asking Campbell about a 1995 shooting –  are irrelevant.

- Fifth, he argues that the Magistrate Judge failed to appreciate that the state habeas court made an unreasonable fact determination in rejecting Mr. Al-Amin's ineffective assistance of counsel claim.

- Sixth, he argues that the Magistrate Judge erred in rejecting his cumulative error argument.

## III.  Legal Standards

This case primarily requires the Court to assess if the constitutional errors in Mr. Al-Amin's trial were harmless, or instead so impacted the jury's verdict that the Court must grant habeas relief.  The procedural posture of this case has a significant impact on both the evidence the Court must consider in deciding that question and on the Court's ultimate answer.

In Mr. Al-Amin's direct appeal, the Supreme Court of Georgia reviewed whether (1) the State violated Mr. Al-Amin's constitutional rights at trial and (2) if so, if those violations were "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 23-24 (1967).   The Supreme Court of Georgia was required to examine "the whole record" to determine if the error was harmless. *Delaware v. Van Ardsall*, 475 U.S. 673, 681 (1986).   The Supreme Court of Georgia agreed that Mr. Al-Amin's Fifth and Fourteenth Amendment right to not testify was violated but then held such error was harmless after (incorrectly) viewing the evidence in the "light most favorable to the verdict."   *Al-Amin*, 597 S.E.2d at 346.   The Supreme Court of Georgia thus erred when it failed to review the whole record when judging the impact of the violations.

But this habeas case is a collateral proceeding, not a direct appeal. Therefore, the Court must impose the twin requirements of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and the Supreme Court's harmless error test laid out in *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993) – not the harmless error test established by *Chapman*.   The Court thus looks at this case through a different prism than that used by the Supreme Court of Georgia on direct appeal.

Under AEDPA:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

> (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceedings.

AEDPA also requires this Court to presume that a state court's factual findings are correct.  28 U.S.C. § 2254(e)(1).  However, because the Supreme Court of Georgia failed to consider "the whole record" when deciding if the trial errors were harmless, the Court must now consider the whole record.  *Libby v. Duval*, 19 F.3d 733, 741 (1st Cir. 1994) (noting that both *Chapman* and *Brecht* require "whole-record" review).  For this reason, the Court discusses evidence in the record not outlined in the Supreme Court of Georgia's decision rejecting Mr. Al-Amin's direct appeal.

If the Court determines that the state court "unreasonably" applied *Chapman*, then it must also determine that the trial error resulted in "actual prejudice" before it can grant habeas relief under *Brecht*.  507 U.S. at 629.  "Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict."  *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) (cleaned up).  "There must be more than a 'reasonable possibility' that the error was harmful."  *Id.* (quoting *Brecht*, 507 U.S. at 637).

*Brecht's* "actual prejudice" test is more onerous to habeas petitioners than *Chapman's* "harmless beyond a reasonable doubt" test. *Brecht* "subsumes the limitations imposed by AEDPA," *Ayala*, 135 S. Ct. at 2199, and imposes its own requirements above and beyond AEDPA. *See id.* ("Ayala must show that he was actually prejudiced [by the error], a standard that he necessarily cannot satisfy if a fair-minded jurist" could agree that the state court's harmlessness determination was reasonable.) Thus, satisfying AEDPA is necessary but not sufficient to satisfy *Brecht's* requirements for habeas relief in a federal court's review of a state court criminal judgment. *See Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307–08 (11th Cir. 2012) (emphasis supplied) ("The *Brecht* standard is more favorable to and less onerous on the state, and thus less favorable to the defendant, than the *Chapman* harmless beyond a reasonable doubt standard.")

Ultimately, "for a federal court to grant habeas relief, it must be true *both* that the state court's application of the *Chapman* harmless beyond a reasonable doubt standard was objectively unreasonable *and* that the error had a substantial and injurious effect or influence on the verdict." *Mansfield*, 679 F.3d at 1307–08.

With these standards in mind, the Court turns to the facts of the case.

## IV.  Factual Background[2]

Deputy Kinchen and Deputy English arrived in Mr. Al-Amin's West End Neighborhood at around 10:00 pm to serve Mr. Al-Amin with a Cobb County

---

[2] The Court draws from the Record, the Petition, the R&R, and Petitioner's Objections to the R&R in presenting this factual background.

bench warrant relating to a May 31, 1999 traffic stop.[3]  They were uniformed and driving a marked police car.  After finding that Mr. Al-Amin was not at home, the deputies began to drive away.  But they stopped and turned around when they noticed a black 1979 Mercedes-Benz sedan park in front of Mr. Al-Amin's residence and witnessed an individual they believed matched Mr. Al-Amin's physical description get out.  The deputies pulled up nose-to-nose with the Mercedes and then exited their vehicle.  Deputy English asked the individual to show him his right hand.  The man responded by frowning, saying "yeah," raising an assault rifle, and opening fire.  (Doc. 29-3 at 66-70, 78.)  The deputies returned fire.  (Doc. 29-3 at 77-81.)  Deputy English ran to an adjacent field and radioed for assistance.  Deputy Kinchen remained by the patrol car.

Both deputies were shot.  Deputy English was shot four times, and a pepper spray canister on his utility belt was ruptured by a bullet, temporarily blinding him.  (Doc. 29-3 at 13, 81-82, 98.)  Deputy Kinchen was also hit several times, and seriously wounded by a gunshot to his abdomen just under his bulletproof vest.  (Doc. 31-3 at 144, 157-58.)  While in the field adjacent to his parked squad car, Deputy English radioed in a report that the shooter had fled north in a black Mercedes-Benz.  (Doc. 29-6 at 84.)

When responding officers arrived on the scene, Deputy Kinchen identified the shooter as a 6'4" tall black male in trench coat-like attire.  (Doc. 29-6 at 7.) Both injured officers were loaded into ambulances and transported to a hospital

---

[3] The trial court later ruled that the traffic stop leading to this warrant was unconstitutional and suppressed the resulting indictment (but not the warrant itself).  (Doc. 15-6 at 45-47.)

for surgery.   Deputy Kinchen died of his wounds the day after the shooting. Deputy English, hospitalized and under the influence of morphine[4] (Doc. 31-5 at 152-156), identified Mr. Al-Amin from a photo array of six pictures.   Deputy English was told before picking Mr. Al-Amin out of the photo array that the suspect may or may not have been in the array.   (Doc. 29-3 at 108.)   But when Deputy English identified the shooter, he insisted the shooter had grey eyes.   (*See* Doc. 29-4 at 121.)   Mr. Al-Amin's eyes are in fact brown, but were (mistakenly) listed as grey on the Cobb County traffic warrant.   Deputy English also later identified Mr. Al-Amin in the courtroom during trial.   (Doc. 29-3 at 63.)   Mr. Al-Amin attacked Deputy English's identifications by raising the "inherent concerns presented where officers eager to secure an identification to support an arrest warrant present a single photo line-up with only six pictures."   Mr. Al-Amin also "raised numerous questions regarding the reliability of Deputy English's eyewitness identification," including the fact that he was blinded during much of the gunfight by pepper spray, inaccurately described the color of Mr. Al-Amin's eyes, and was under the influence of powerful pain medication.   (Fourth Am. Pet. at 48; Doc. 31-5 at 152-156.)

Both deputies were confident that they had wounded the shooter.   Deputy English testified that he fired three rounds, "[t]wo to the chest, one to the head." (Doc. 29-3 at 80.)   Deputy Kinchen informed officers who arrived on the scene that "I shot him, I think I shot him."   (Doc. 29-6 at 77.)   On this basis, the police

---

[4] Deputy English was also prescribed Phenergan, but his surgeon testified that the Phenergan dosage was not high enough to have a sedative effect.  (Doc. 31-5 at 156.)

secured a search warrant for blood, bloody clothing, and evidence of medical intervention.  (*E.g.*, Doc. 30-1 at 74.)  Ultimately, none of this blood evidence matched Mr. Al-Amin.

Mr. Al-Amin acknowledges that he was in the West End area during the shooting but denies any involvement in it.[5]  At the state habeas hearing, he testified that he fled because he thought the shooting might be a retaliatory attack directed towards him by third parties.  Earlier on the day of the shooting, Mr. Al-Amin had engaged in a heated discussion with four young men he thought were selling drugs in the neighborhood.  He feared that they were the ones doing the shooting, and that it was aimed at him.  (Doc. 1-3 at 141.)  Mr. Al-Amin drove away from the scene in a Mercedes.  (Doc. 1-3 at 125.)  He acknowledged that the car may have been hit by gunfire: as he was driving away, "the back window, you know, collapsed and fell out of the car."  (Doc. 1-3 at 152.)[6]  He testified that this too caused him to believe the shooting "was directed at [him]."  (Doc. 1-3 at 152.)  After the shooting, Mr. Al-Amin drove to White Hall, Alabama, a small town where he had helped develop a Muslim community.  (Doc. 1-3 at 128.)

The FBI tracked Mr. Al-Amin to White Hall and began conducting surveillance in an attempt to locate him.  Four days after the shooting, United States Marshals spotted Mr. Al-Amin in White Hall and reported that he fled into

---

[5] The evidence in this paragraph is drawn from the state habeas hearing.
[6] (*See also id.* at 125 ("I didn't know in terms that the car had been hit until I pulled down the street and the back window fell out.").)

the woods.[7]  United States Marshall Jerry Lowery testified that Mr. Al-Amin took three shots at him and other law enforcement officers just before retreating into the woods.  (Doc. 30-5 at 37-39.)  Mr. Al-Amin presented civilian witnesses at trial who testified that they observed this portion of the manhunt for Mr. Al-Amin and that only law enforcement officials fired their weapons.  (*E.g.*, Doc. 32-1 at 93-97.)

FBI agents (including an agent named Ron Campbell) and a dog tracking team followed Mr. Al-Amin into the woods.  Three hours later, Mr. Al-Amin was apprehended walking along a road near the woods, wearing torn jeans and a bulletproof vest.  He was carrying the keys to the black Mercedes and driver's licenses in his name from three states.  (Doc. 30-3 at 115-116; Doc. 30-7 at 65; 103; Doc. 31-2 at 22-24.)  While Mr. Al-Amin was handcuffed and on the ground, Ron Campbell called Mr. Al-Amin a cop killer, spit on him, and kicked him.  Mr. Al-Amin showed no signs of having been shot, and no gun residue was found on him that might indicate he had fired a weapon recently.  (*See* Doc. 31-2 at 107. 139-40.)

After Mr. Al-Amin was apprehended, local and federal officers combed Mr. Al-Amin's path through the woods.  They discovered a piece of fabric from his jeans on a barbed wire fence, a 9mm handgun and ammunition, an assault rifle and ammunition, a nylon bag, documents indicating Mr. Al-Amin owned the

---

[7] There is conflicting testimony in the record about whether, in the area near the woods, Mr. Al-Amin fired at law enforcement officials, whether law enforcement officials fired at Mr. Al-Amin, or whether both sides exchanged fire.

Mercedes-Benz, Mr. Al-Amin's day planner, a bank statement, a cell phone, and a jacket with Mr. Al-Amin's passport.

The 9mm pistol and assault rifle found in the White Hall woods were the same used to shoot Deputies Kinchen and English.  However, they had no fingerprints on them, and Mr. Al-Amin consistently contended that they were planted by Ron Campbell.  Several days later, investigators found the license plate for the Mercedes-Benz.  About a week after that they found the car itself, riddled with bullet holes fired from the deputies' service weapons.  The car was in the White Hall area on property owned by a friend of Mr. Al-Amin.  (Doc. 31-3 at 2.)

Mr. Al-Amin maintained his innocence throughout the investigation and trial.  At trial, he offered nearly twenty (20) witnesses, including Imhotep Shaka, an individual who had known Mr. Al-Amin for several years.  Shaka testified that he witnessed the West End shooting and saw the shooter, and was positive that it was not Al-Amin because the shooter did not have Mr. Al-Amin's distinctive tall and skinny frame.  (Doc. 32-3 at 88-90.)  Another eyewitness similarly testified that the shooter did not match Mr. Al-Amin's physical description.  Mr. Al-Amin also highlighted inconsistencies in the testimony and evidence, several of which are listed on pages 22 and 23 of the R&R.[8]   In particular, Mr. Al-Amin focused on these evidentiary problems:

---

[8] The Court considered all of these inconsistencies when viewing the record as a whole.

1.  The Deputies both stated that each was positive or nearly positive that they had shot their assailant, but Mr. Al-Amin did not have any gunshot wounds when he was arrested.

2.  There is evidence in the record that there was a trail of blood from the scene of the crime to an empty house a few blocks away, and a 911 operator received at least one phone call stating that a man involved in the shooting was bleeding and begging for a ride.  (Doc. 128 at 49-50.)  But because Mr. Al-Amin was not shot, this blood trail cannot be his and it is plain he was not the wounded individual supposedly asking for a ride.

3.  Deputy English reported and repeatedly testified that the shooter had grey eyes, when Mr. Al-Amin has brown eyes.

4.  There is no fingerprint or gunshot residue evidence connecting Mr. Al-Amin to the firearms used in the murder,[9] and no other evidence linking him to the weapons other than the fact that they were found in his vicinity in White Hall, Alabama.  Mr. Al-Amin argued that Ron Campbell planted the two guns found in the White Hall woods.

Finally, Mr. Al-Amin offered the witnesses from White Hall who claimed that United States Marshalls or FBI agents fired at Mr. Al-Amin.

Mr. Al-Amin elected not to take the stand to testify at his trial, on his attorneys' advice.  During closing arguments, the prosecution repeatedly referenced Mr. Al-Amin's decision to remain silent.  The prosecutor first did so by

---

[9] The Court notes that investigators did not test Al-Amin for gunshot residue.  (Doc. 31-2 at 107, 119, 139-40.)

displaying a visual aid for the jury titled, "QUESTIONS FOR THE DEFENDANT." This visual aid posed several mock cross-examination questions, including:

> Who is Mustafa?
> Why would the FBI care enough to frame you?
> How did the murder weapons end up in White Hall?
> How did your Mercedes get to White Hall?
> How did your Mercedes get shot up?
> Why did you flee (without your family?)
> Where were you at 10 PM on March 16, 2000?

The prosecutor then stated that he wanted to leave the jury "with a few questions you should have for the defendant." He then rattled off a series of queries aimed at Mr. Al-Amin which mirrored the visual aid:

> "The First Question. Who is Mustafa?"

> "Question two. Why would the FBI care enough to frame you?"

> "Third question. How did the murder weapons end up in White Hall? . . . Mr. Defendant, how did those murder weapons get there to White Hall?"

> "Next question. How did your Mercedes get to White Hall? . . . More important, how did your Mercedes get shot up?"

(Doc. 32-5 at 23 – 26.)

Mr. Al-Amin's attorneys objected and moved for a mistrial. The trial court denied the motion outside the presence of the jury but offered a curative instruction. The defense declined the trial court's offer, fearing it would make the matter worse.

The prosecutor re-labeled his visual aid to "Questions for the Defense." But after the jury returned, the prosecutor persisted in his unconstitutional line of questioning, and again referred to Mr. Al-Amin's failure to take the stand. He

began to ask, "the question is either *your* car was there at the scene parked in front of *your* store," before the defense interjected and objected and again moved for a mistrial. The trial court refused the request a second time, this time in front of the jury. (Doc. 32-5 at 33.) In response, Mr. Al-Amin's attorneys requested a curative instruction because of the "impropriety" of the prosecution's comments and chart. The trial court corrected the defense attorneys in front of the jury, characterizing the defense's objections as "what you believe is an impropriety." (Doc. 32-5 at 34.)

> The trial court then gave this instruction:
>
> There has been an objection to some of Mr. McBurney's closing which the Court has overruled. However, in order to clarify, I'm going to make very clear what I believe is appropriate.
>
> This is closing argument. Closing argument is not evidence. Attorneys may draw inferences and urge you to draw inferences from the evidence. It is proper for the attorneys to argue a failure to present certain evidence. However, you must keep in mind that a defendant in a criminal case is under no duty to present any evidence to prove innocence and is not required to take the stand and testify in the case.
>
> If a defendant elects not to testify, no inference hurtful, harmful or adverse to him shall be drawn by you, and no such fact shall be held against him.
>
> However, it is proper for one side or the other to comment on failure to present certain evidence, but not to comment on the failure of the Defendant to testify. And I'm clarifying this, that, as you know, the burden of proof always remains on the State to prove the guilt of a defendant as to any charge beyond a reasonable doubt.
>
> The defense renewed its motion for a mistrial, which the trial court again

denied. *After* the instruction, the prosecution asked, "Why run if *you* didn't do

it?  If *you're* innocent, just turn yourself in."  (Doc. 32-5 at 38.)  The defense again renewed its motion for a mistrial, which was again overruled.  (Doc. 32-5 at 39.)

The prosecutor also stated near the end of closing arguments: "Don't stand for him." Here, the prosecution was blatantly referencing Mr. Al-Amin's religiously-based (and court-approved) decision to not stand when the jury or judge entered the courtroom.  The prosecutor made his "Don't stand for him" comment not once, but twice.  (Doc. 32-6 at 13-14.)  Mr. Al-Amin was convicted and then sentenced to life without parole.

## V. Discussion

The Court now turns to the twin lenses of AEDPA and *Brecht*.  AEDPA governs a federal court's review of a state court's determination that a constitutional error in a criminal trial was harmless.  *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015).  Mr. Al-Amin must therefore satisfy this standard to obtain habeas relief.    But as discussed above, AEDPA is "subsumed" into the requirements of *Brecht*.  For this reason, the Court focuses its gaze on whether or not Al-Amin has met *Brecht's* test.

Under *Brecht*, Mr. Al-Amin must show that the underlying trial error resulted in actual prejudice.  *Brecht*, 507 U.S. at 637.  *Brecht's* test is satisfied only if the federal court has "grave doubt" about whether a trial error had a "substantial and injurious effect or influence" on the jury's verdict.  *Ayala*, 135 S. Ct. at 2198.  In making this inquiry, the court must not focus on whether or not it

believes the petitioner is guilty, but instead on whether or not the error had an impact on the minds of the jurors in the case in light of the rest of the trial. *Trepal v. Sec'y, Florida Dep't of Corr.*, 684 F.3d 1088, 1114 (11th Cir. 2012).

The *Brecht* analysis is intensely fact-specific.  Courts may consider whether the references to the defendant's silence were repeated or intentional; whether the trial court promptly addressed the violation with a curative instruction; and whether the evidence was otherwise "weighty" or "overwhelming."  *Hill v. Turpin*, 135 F.3d 1411, 1417 (11th Cir. 1998); *Gongora v. Thaler*, 710 F.3d 267, 278 (5th Cir. 2013) (violation not harmless when there were repeated references to defendant's silence, the jury instruction to ignore the references were half-hearted, and the evidence in case "was not overwhelming, and there was substantial evidence supporting acquittal.")  At its core, the *Brecht* test is concerned with "what effect the error had . . . upon the jury's" actual decision. *Duest v. Singletary*, 997 F.2d 1336, 1338-39 (11th Cir. 1993) (*quoting Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946)).

Finally, when there is "weighty" evidence in favor of guilt, *Brecht* is likely not met, even if other factors weigh in favor of habeas relief.  *E.g.*, *Prevatte v. French*, 547 F.3d 1300, 1306 (11th Cir. 2008); *see also Trepal*, 684 F.3d at 1114 ("the erroneous admission of evidence is likely to be harmless under the *Brecht* standard where there is significant corroborating evidence, or where other evidence of guilt is overwhelming.")

The Court first agrees with Mr. Al-Amin and the R&R that the Supreme Court of Georgia's application of the incorrect standard of review was contrary to the clearly established law found in *Chapman*.[10]  However, this finding does not end the Court's analysis of Claim 1.  Under *Brecht*, Mr. Al-Amin must show "actual prejudice" and a substantial and injurious effect or influence resulting from the State's violation of Mr. Al-Amin's Fifth and Fourteenth Amendment rights.

The Court next finds that the prosecution's comments were repeated, blatant, central to the prosecutor's closing argument, intentional, and were arguably returned to in the prosecution's rebuttal.  (*See* Doc. 32-6 at 13-14.)  But under *Brecht*, these facts are not enough on their own.  In fact, *Brecht* itself confronted that situation.  There, the prosecutor made three references to the defendant's pretrial silence during closing arguments.  507 U.S. at 625 n.2.  But the Supreme Court still held that this was not a "deliberate and especially egregious" trial error or a "pattern of prosecutorial misconduct" worthy of granting habeas relief in the face of weighty or overwhelming evidence of guilt.  *See id.* at 638 n.9; *see also United States v. Wiley*, 29 F.3d 345, 349 (8th Cir. 1994) (three references to defendant's post-*Miranda* silence not enough to warrant habeas relief in face of overwhelming evidence).

The Court also finds that the trial court's curative instruction did not actually "cure" any harm because it was not strongly worded, failed to admonish

---

[10] The State did not concede this point at oral argument.  (Doc. 153 at 55-56.)

the prosecution for the blatant nature of the violation, and was undermined by the trial court's contemporaneous but confusing instruction that the jury was permitted to draw inferences from Mr. Al-Amin's failure to present evidence, but not his failure to testify.

*Gongora v. Thaler* illustrates the problems with the trial court's instructions. 710 F.3d 267, 280 (5th Cir. 2013). There, a defendant was on trial for his alleged role in a conspiracy to rob and shoot an individual. The defendant's alleged co-conspirators testified against him. However, the co-conspirators had major credibility problems, including the fact that one of them had initially identified other individuals as the shooters. *Id.* at 271. Thus, "[a] principal focus of the prosecutor's closing argument, and central to the State's case, was the credibility of co-conspirators' statements that [the defendant] was the shooter." 710 F.3d at 279.

In closing arguments, the prosecutor made at least five comments about the defendant's failure to testify. The district court characterized the remarks as "numerous and blatant." *Id.* Among the comments, the prosecutor asked, "[w]ho else would you want to hear from, though? The shooter? We're not going to talk to that person." *Id.* In doing so, the prosecutor "attempted to bolster the credibility" of the co-conspirators' statements by pointing to the fact that they had taken the stand and the defendant had not.

The trial court issued general instructions about the defendant's right to not testify at voir dire and before closing arguments. However, the prosecutor's

improper comments followed those closing arguments.  Two of the prosecutor's comments were objected to.  The trial court sustained those objections and told the jury to disregard the comments, but in a manner that the Fifth Circuit characterized as "perfunctory and devoid of specificity." *Id. at* 280.  And the trial court did not sustain all of the defense's objections to the prosecution's remarks. The Fifth Circuit thus found that the curative instruction was, "diminished by the lack of a strong admonishment . . . the court's overruling of [defendant's] objection . . . and the mixed message resulting from allowing the jury to consider the comments in some respects." *Id*.  The Fifth Circuit granted habeas relief because the remarks were blatant, the curative instructions ineffective, and because there was "substantial evidence supporting acquittal." *Id*. at 281.  The instruction here was lengthier than those given in *Gongora*, but similarly ineffective.  As in *Gongora*, the trial court here overruled some of the defense's objections.  And like *Gongora*, some of the unconstitutional comments came after the curative instruction was given.  Moreover, here the trial court undermined its instruction by characterizing the prosecution's comments as something that "[Mr. Al-Amin] believe[s] is an impropriety," and by stating to the jury in the middle of its instruction that "it is proper for one side or the other to comment on failure to present certain evidence" – likely mitigating the instruction's impact.  Thus it is plain that the instruction was ineffective, as it was in *Gongora*.  This too weighs in favor of relief.

The Court nonetheless must deny Mr. Al-Amin relief because there is "weighty" evidence supporting his conviction. *Brecht*, 507 U.S. at 639.

Mr. Al-Amin's best evidence is the mishmash of inconsistencies from the scene of the shooting. Eyewitnesses testified that Mr. Al-Amin was not responsible for the shooting. (Doc. 32-3 at 88-90.) The deputies and the shooter exchanged fire at close range. Both deputies were convinced that each had shot Mr. Al-Amin, and the police obtained a warrant based on blood evidence at the scene. But that blood evidence did not match Al-Amin, and he was not wounded when he was apprehended. Deputy English swore that the shooter had grey eyes, when Mr. Al-Amin has brown eyes. And both deputies were severely wounded and under duress at the time they identified Mr. Al-Amin. Deputy English had been shot and pepper sprayed and was under the influence of morphine when he picked Mr. Al-Amin out of a photo array. And the shooter had fatally wounded Deputy Kinchen. In addition, a 911 operator received a call that a man "involved in the shooting of the deputies" was bleeding in the West End area and begging for a ride – a fact inconsistent with the reality that Mr. Al-Amin was not shot. (Doc. 31-8 at 48-49; Doc. 32-3 at 43.) If this were the only evidence in the record, the Court might harbor "grave doubt about whether [the] trial error[s] of federal law had a substantial and injurious effect . . . in determining the jury's verdict." *Ayala*, 135 S. Ct. at 2198 (punctuation and citation omitted).

But the evidence from White Hall is "if not overwhelming, certainly weighty." *Brecht*, 507 U.S. at 639. Investigators found the license plate for Mr.

22

Al-Amin's black Mercedes-Benz in a shed near where Mr. Al-Amin was first spotted in White Hall.  The car itself was found several days after Mr. Al-Amin was apprehended, mixed in with other abandoned cars on a property owned by one of Mr. Al-Amin's friends.  (Doc. 31-3 at 2.)  Mr. Al-Amin concedes that this car was at the crime scene, that he drove it away, and that it was hit by at least one bullet (though he disputes the surrounding circumstances of all of the above).

The car had several bullet holes containing bullets fired from the deputies' handguns.  Other of Mr. Al-Amin's effects were found in the woods near White Hall near where Mr. Al-Amin was apprehended and along the path between where he was initially spotted and the place of his arrest.  The murder weapons were also found along the path.   Mr. Al-Amin simply has no reasonable explanation for how this evidence got to White Hall.  His claim that the weapons were planted by a rogue FBI agent is not credible given the lack of supporting evidence for that assertion.  To believe this argument the Court would have to assume that the FBI somehow acquired the weapons from the real perpetrator, the scene of the crime, or elsewhere, without disclosing that fact to Atlanta police, and then transported the weapons across state lines to drop them in the Alabama woods.

Mr. Al-Amin offers no real evidence to support this purported conspiracy.  Mostly he claims he was prevented from doing so because he was prevented from cross-examining FBI Agent Campbell about a 1995 incident in Philadelphia where Campbell allegedly planted a fingerprint-less gun on a Muslim man whom

23

he shot in the context of a law enforcement stop.   But as discussed below in connection with Claim 2, it was not error for the state trial court to preclude this cross examination.

Mr. Al-Amin's evidence is also not as powerful as that in other cases where courts granted habeas relief.   For example, in *Gongora*, a robbery and murder case, one of the prosecution's witnesses was under the influence of heroin, pot, and alcohol at the time of the shooting *and* had participated in the robbery and feared a capital murder charge himself.   710 F.3d at 272.   Another key witness had also participated in the crime but had identified two individuals *other than* the defendant as likely shooters, before changing his story.   *Id.* at 271.   Most importantly, "the physical evidence and the statement of the only non-biased eyewitness did not support the" idea that the defendant was the shooter.   *Id.* at 283.   And another individual had bragged to a non-party that he was the shooter, not the defendant.   *Id.*

*Jensen v. Clements* also provides a contrast.   800 F.3d 892 (7th Cir. 2015). There, a husband was convicted of killing his wife.   The investigation and prosecution of the crime dragged on, and the husband was not convicted until nearly nine years after his wife died.   At trial, the prosecution submitted into evidence a handwritten letter from the husband's late wife that said, in a nutshell, if anything bad happened to her then it should be assumed her husband killed her.   *Id.* at 895.   The case "was no slam dunk" and the "evidence was all circumstantial."   *Id.* at 908.   There was significant evidence in favor of the theory

that the wife had taken her own life.  She had called her neighbor the day of her death to tell her not to worry if she did not see her outside that day.  She saw her doctor two days before her death, and he described her as "depressed and distraught."  One of the prosecution's witnesses was a jailhouse informant whom the trial judge referred to as the "top liar I've ever had in court."  *Id.* at 907.  The informant's testimony was the only basis for later testimony from a medical professional that the victim had suffocated.  A defense witness doctor testified that the wife was a "significant suicide risk."  The court ultimately held that the jury "improperly heard [the wife's] voice from the grave" and so there was a serious risk of error warranting habeas relief under *Brecht*.

By contrast, here the evidence at the actual crime scene might be a mixed bag, but the White Hall evidence strongly ties Mr. Al-Amin to the crime.  He was found after fleeing, and the evidence strongly suggests he possessed and dumped the murder weapons and secluded his car amongst other abandoned cars.[11]  It was punctured with bullet holes containing projectiles fired by the two deputies.

Mr. Al-Amin attempts to undercut this significant evidence by introducing the testimony of a juror who avers that his verdict was influenced by Mr. Al-Amin's failure to testify.  But under both federal and Georgia law applicable at the time of Mr. Al-Amin's conviction, evidence of jury testimony to impeach a verdict

---

[11] The Court recognizes, though, that Mr. Al-Amin's theory is that the car had bullet holes in it only because it was parked near the scene of the shooting – not because he was involved in the crime.

is not permitted.  There are only a few exceptions, almost all of which concern the problem of outside influences on a jury's decision-making.

For example, in *Turpin v. Todd*, relied upon by Petitioner, a bailiff remarked to the jury that a homicide defendant who received a life sentence would likely only be in prison for "about seven years."  493 S.E. 2d 900, 903-04 (Ga. 1997).  The jury then sentenced the defendant to die.  Importantly, this "extra-judicial evidence was offered outside the presence of Todd and his counsel," and therefore not subject to the adversarial process and not rectifiable by the trial court.  *Id.*  The Supreme Court of Georgia held that the habeas court should consider whether jurors could testify about the impact of the bailiff's statements because the "general rule against impeaching verdicts must succumb to the defendant's right to a fair trial."  *Id.*

But this does not mean that Georgia applied this exception willy-nilly at the time.  Instead, it was confined to cases like *Todd* "where extrajudicial and prejudicial information has been brought to the jury's attention improperly, or where non-jurors have interfered with the jury's deliberations."  *Gardiner v. State*, 444 S.E.2d 300, 303 (Ga. 1994).[12]  And at the time, Georgia law was that, "[t]he affidavits of jurors may be taken to sustain but not impeach their verdict."

---

[12] *Ward v. Hall*, 592 F.3d 1144, 1177-78 (11th Cir. 2010) also involved a bailiff's comment to juror's about a defendant's eligibility for parole.  *Lawson v. Borg*, 60 F.3d 608 (9th Cir. 1995) similarly concerned extrajudicial information.  There, a juror said in the jury room that he knew people who knew the defendant and that the defendant had a propensity for violence.  *Id.*

OCGA § 17-9-41.[13]   Fed. R. Evid. 606 contains the same exceptions as those outlined in *Gardiner*, and is focused on the same concern: the influence of extrajudicial evidence or communications on the jury.

Recently, in *Pena-Rodriguez v. Colorado*, --- S. Ct. ---- (2017), the Supreme Court recognized an exception to this bar, and permitted a habeas court to consider juror testimony about racial bias infecting jury deliberations.  But in doing so, the Supreme Court relied on the uniquely pernicious nature of racial bias.  It explained that it had rejected such an exception even in cases where jury members were drinking during the trial, falling asleep, or ingesting cocaine. *Tanner*, 483 U.S. 109-11.  *Pena-Rodriguez* is a narrow exception to the otherwise fairly straightforward rule that jurors may not impeach their own verdicts except in cases where they offer evidence of outside influence or information infiltrating the jury's deliberations.

Mr. Al-Amin's other cited cases also fall within the exception for extrajudicial information.  In *Scott v. Calderon* the Ninth Circuit upheld a trial court's refusal to admit jury testimony to show that a juror had brought into the jury room and shared with the jury a newspaper article ridiculing diminished capacity defenses in a case involving just that defense.  39 F.3d 188 (9th Cir. 1994) (Table).  This is because no juror purported to testify that they were actually influenced by the article.  Setting aside the fact that the trial court's refusal to consider juror testimony was affirmed, the case still dealt with

---

[13] This statute was repealed in 2012 as part of Georgia's overhaul of its evidence code, but was in effect at the time *Todd* and *Gardiner* were decided, as is reflected in both opinions.

extrajudicial information. In *Perez v. Marshall*, a California federal district court discussed competing juror affidavits about the jury's discussion of the defendant's refusal to testify. 946 F. Supp. 1521, 1537-38 (S.D. Cal. 1996). The court did not reach the issue of whether or not it was appropriate to consider the juror affidavits because it instead held that even if it had considered them, the jury's consideration of the defendant's failure to testify halted when the jury foremen informed them they could not do so and so the constitutional error did not actually prejudice the defendant. *Id.* The court also concluded that the jury would have convicted regardless of whether or not the defendant testified. *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) is inapposite because Mr. Al-Amin relies on that case's dissent. (Pet.'s Supp. Br., Doc. 156 at 17.)

Although Mr. Al-Amin argues that the juror's affidavit concerns "an improper external influence on the jury" in the form of "the unconstitutional mock cross-examination," (Pet.'s Supp. Br., Doc. 156 at 18 n.12) most all of the cases discussed above involve information not presented in court. In other words, they involve information or influences "external" to the trial, not improper conduct that occurred *within* the trial. Moreover, the juror's affidavit at issue does not explicitly point to the prosecutor's comments as the impetus for the jury's consideration of Mr. Al-Amin's failure to testify. For these reasons, the Court declines to consider the juror's affidavit.

**Claim 2**

Mr. Al-Amin's second claim alleges that his Sixth and Fourteenth Amendment rights were violated when he was prevented from cross-examining Robert Campbell about Campbell's 1995 shooting of an unarmed Muslim man in Philadelphia.  Campbell allegedly planted a fingerprint-less gun next to the Philadelphia victim's body to cover up the shooting.  Mr. Al-Amin contends that he should have been permitted to examine Campbell to establish that Campbell had acted in a "certain manner previously and, therefore, the jury [should] infer that he acted in a similar manner" here.  (Fourth Am. Pet., Doc. 129 at 71.)  He claims there is evidence that Campbell fell behind the dog tracking team while it was in pursuit of Al-Amin and White Hall and took the opportunity to plant some of the evidence found there just like he allegedly did in Philadelphia in 1995.

Mr. Al-Amin submitted to the state trial court (and attached to his Objections to the R&R) a handful of news articles and other documents about the shooting.  (*See* Doc. 143-3.)  Mr. Al-Amin contends these materials were offered to show his "good faith basis" for asking Campbell about the 1995 incident on cross examination.  *Coquina Investments v. TD Bank, N.A.*, 760 F.3d 1300, 1313 (11th Cir. 2014) (*citing United States v. Beck*, 625 F.3d 410, 418 (7th Cir. 2010)). The trial court excluded this evidence on the basis that "Campbell had not been prosecuted for the alleged misconduct, and [] any probative value was far outweighed by the danger of unfair prejudice."  *Al-Amin*, 597 S.E. 2d at 345-46.

The collection of documents offered by Mr. Al-Amin does not suggest that the state court(s) erred.  First, Campbell was investigated by the Philadelphia district attorney's office, the FBI, and the Department of Justice in connection with the shooting and was cleared of wrongdoing.  (Doc. 143-3 at 12.)  Mr. Al-Amin's documents say as much.  And none of the articles convincingly tie Campbell to the alleged planting of the gun on the Philadelphia shooting victim; instead, at least some of them simply suggest the gun was "planted by law enforcement officers."  (Doc. 143-3 at 30.)  The Court understands that Mr. Al-Amin firmly believes that had he been permitted to cross-examine Campbell about the 1995 shooting, the resulting testimony would have been core to his theory that he was framed.  But the trial court had broad discretion to limit the scope of cross-examination based on concerns regarding the significant danger of unfair prejudice given the specific circumstances before the Court, even if Al-Amin had a good faith basis for his questions.  And the materials relied upon by Al-Amin were not nearly so strong as to suggest that the trial court abused its discretion in precluding questioning Campbell about the 1995 shootings.

The Court therefore cannot say it was an unreasonable application of clearly established law to bar questions about the 1995 shooting or to reject Mr. Al-Amin's confrontation clause argument.  28 U.S.C. § 2254(d).  The Court therefore agrees with the Magistrate Judge that Mr. Al-Amin is not entitled to habeas relief under Claim 2, even if the Court's reasoning differs from that in the R&R.  (R&R at 34.)

**Claim 3**

Mr. Al-Amin also argues that his trial attorneys failed to adequately investigate the confession of Otis Jackson, an individual who recanted and then re-confessed to the crime several times.  The Court also agrees with the R&R that Mr. Al-Amin's ineffective assistance of counsel claim fails.  Habeas petitioners who seek to prevail on a claim for ineffective assistance of counsel must meet the standard laid out in *Strickland v. Washington*, 466 U.S. 668 (1984), which asks whether an attorney's representation amounted to incompetence under prevailing professional norms.  *Harrington v. Richter*, 562 U.S. 86, 105 (2011).  A petitioner seeking to establish that a state court's application of *Strickland* was unreasonable must *also* overcome § 2254(d)'s deferential standard of review.  *Id.* Thus, Mr. Al-Amin must overcome two highly deferential standards of review to prevail on his ineffective assistance of counsel claim.

Mr. Al-Amin simply cannot do so.  His trial counsel reasonably decided not to pursue more information about Otis Jackson's confession or interview him personally after Jackson recanted that confession.  Trial counsel was (perhaps wrongfully) under the impression that ankle monitoring data or documents showed that Jackson was not in the area of the crime on the night of the shooting, and trial counsel's investigator described Jackson as "a little kooky."  (Objections at 37.)  Although Mr. Al-Amin's attorneys have since developed information that might have caused an attorney to more carefully examine Mr. Jackson as a potential alternative shooter, much of that information was not available at trial.

31

As the R&R observes, relying on hindsight bias is what "*Strickland* and AEDPA seek to prevent." (R&R at 39 (citation omitted).)

### Cumulative Error Claim

The R&R properly rejected Mr. Al-Amin's cumulative error claims for the reasons stated therein. If a cumulative error claim exists, it requires more than one error. *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 n.3 (11th Cir. 2012). Because the Court is rejecting Mr. Al-Amin's second and third claims, there are not multiple errors to accumulate. And even if the Court considered the impact of the prosecution's "Don't stand for him" comments in conjunction with Mr. Al-Amin's first claim, the Court cannot find that there was sufficient cumulative error to warrant granting the Petition based on governing legal standards. *Id.*

## VI. Conclusion

For the foregoing reasons, the Court **ADOPTS IN PART** and **DECLINES TO ADOPT IN PART** the Report and Recommendation as described herein. [Doc. 136]. The Court **DENIES** Mr. Al-Amin's habeas petition. The constitutional violations at Mr. Al-Amin's trial as described in Claim One were serious and repeated. But under the onerous standards set forth by AEDPA and the Supreme Court's case law, the Court is constrained to reject his request for relief.

Under *Slack v. McDaniel*, 529 U.S. 473 (2000) the Court may issue a certificate of appeal if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." The Court finds

that Mr. Al-Amin meets the standards set forth by *Slack* for a Certificate of Appeal and grants it as to all claims discussed in this Order (and not already abandoned by Mr. Al-Amin). It does so because (1) reasonable jurists could disagree about this Court's "actual prejudice" holding under *Brecht* and (2) Mr. Al-Amin's other claims should be considered alongside the Court's *Brecht* holding because they are intertwined with and inform it. The Court therefore **GRANTS** Mr. Al-Amin a Certificate of Appeal as described herein.

The Clerk is **DIRECTED** to close this case.

**IT IS SO ORDERED** this 29th day of September, 2017.

_____
**Amy Totenberg**
**United States District Judge**